O'MELVENY & MYERS LLP
Dale M. Cendali (DC 2676)
Johanna Schmitt (JS 2125)
Melanie Bradley (MB 0823)
Times Square Tower
7 Times Square
New York, New York 10036
(212) 326-2000

**07 CIV 9667**



*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WARNER BROS. ENTERTAINMENT INC. and
J.K. ROWLING,

           Plaintiffs,

        -against-

RDR BOOKS and DOES 1-10,

           Defendants.

Case No.

**COMPLAINT**

---

       Plaintiffs Warner Bros. Entertainment Inc. ("Warner Bros.") and J. K. Rowling, by their undersigned counsel, for their Complaint, hereby allege, on knowledge as to their own conduct and otherwise on information and belief as follows:

### NATURE OF THE ACTION AND RELIEF SOUGHT

       1. This action arises out of Defendant RDR Books' willful and blatant violation of Plaintiffs' respective intellectual property rights in the highly-acclaimed *Harry Potter* series of children's books (the "*Harry Potter* Books") and films (the "*Harry Potter* Films") (collectively the "*Harry Potter* Works") in violation of the Copyright Act, the Lanham Act, and New York state law. Defendant, being fully aware of Plaintiffs' rights in and to the *Harry Potter* Works, seeks to misappropriate those rights by publishing a 400-page book entitled the "*Harry Potter*

*Lexicon*" (the "Infringing Book") which, upon information and belief, is comprised of widespread misappropriation of Ms. Rowling's fictional characters and universe, including list after list of spells and potions, imaginary places, fantastic creatures and invented games. In addition, the Infringing Book is misleading to consumers and will be marketed in a way that implies endorsement by Plaintiffs and will likely cause confusion. The Infringing Book currently is scheduled to be released in the United States on November 28, 2007.

2. The Infringing Book is particularly troubling as it is in direct contravention to Ms. Rowling's repeatedly stated intention to publish her own companion books to the series and donate proceeds of such books to charity, as she already has done in the past with respect to the first two companion guides she authored, *Quidditch Through the Ages* and *Fantastic Beasts and Where to Find Them* (the "Companion Books"). Ms. Rowling has only authorized limited derivative works of her series and has never authorized a companion guide to engage in such wholesale misappropriation of her work.

3. Plaintiffs did everything they could prior to filing this lawsuit to engage in a substantive dialogue with Defendant only to be rebuffed and treated rudely. For example, while claiming not to have the ability or time to respond to Plaintiffs' multiple "cease and desist" letters because of a family tragedy, Defendant instead was hawking foreign publishing rights to the Infringing Book in Germany. Moreover, Defendant had the audacity to accuse Warner Bros. of violating the purported copyrights of the Infringing Book's author in a timeline based on the *Harry Potter* Books -- a complete fabrication apparently intended to deflect Plaintiffs' complaints -- but which merely serves to highlight the hypocritical nature of Defendant's conduct.

2

4. Defendant's main excuse for its blatant conduct is to argue that the Infringing Book is merely a print version of the free-of-charge *Harry Potter* fan website located at www.hp-lexicon.com (the "*Lexicon* Website"). Even assuming this were the case -- which Plaintiffs have been thus far unable to verify as Defendant has refused repeated requests for a copy of the manuscript -- there is a big difference between the innumerable Harry Potter fan sites' latitude to discuss the *Harry Potter* Works in the context of free, ephemeral websites and unilaterally repackaging those sites for sale in an effort to cash in monetarily on Ms. Rowling's creative works in contravention of her wishes and rights.

5. Thus, Plaintiffs have no choice but to file this lawsuit seeking injunctive relief and damages that they have suffered as a result of Defendant's activities. Plaintiffs intend to donate any monetary award that may result from Defendant's activities prior to an injunction being entered to charity. Specifically, Plaintiffs' claims against Defendant include copyright infringement under the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq., federal trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1), false designation of origin and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), deceptive trade practices under § 349 of the General Business Law of New York and unfair competition under the common law of New York. Moreover, Warner Bros. seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 (a) that its "Hogwarts Time Line" does not infringe any purported rights Defendant or anyone else claims to have in a *Harry Potter*-related time line from either the Infringing Book or the *Lexicon* Website.

## PARTIES

6. Ms. Rowling is an individual residing in Edinburgh, Scotland. Ms. Rowling is a highly respected, world-famous author. She is and, at all times material herein, was engaged in

3

the business of, among other things, creating literary works, including the *Harry Potter* Books, and licensing the right to create derivative works based on her literary works, including the copyrighted elements of those works, to others for exploitation.

7. Warner Bros. is a Delaware corporation with its principal place of business at 4000 Warner Boulevard, Burbank, California 91522. Warner Bros. has offices at 1325 Avenue of the Americas, New York, New York 10019. Warner Bros. is engaged in the business of, among other things, creating, producing, distributing and marketing motion pictures and goods related to the *Harry Potter* Books, including merchandise relating to these properties. Warner Bros. owns rights in the trademarks associated with the *Harry Potter* Films, pursuant to contractual agreement with Ms. Rowling.

8. Upon information and belief, defendant RDR Books is a publishing company with its principal place of business at 1487 Glen Avenue, Muskegon, Michigan 49441. RDR Books' books are available for sale to customers located in this judicial district through its website (located at www.rdrbooks.com), online vendors and retail stores located within this judicial district.

9. Plaintiffs are ignorant of the true names and capacities of the defendants used herein under the fictitious names DOES 1 through 10 inclusive. Plaintiffs will seek leave of court to amend this complaint to allege such names and capacities when they are ascertained. Plaintiffs are informed and believe, and based thereon allege, that each of the fictitiously named DOE defendants is responsible in some manner for the wrongful conduct alleged herein, specifically distribution and sale of the Infringing Book in the United States and abroad. Plaintiffs further allege that each defendant acted in concert with, as agent or representative for,

or at the request or on the behalf of Defendant. Each charging allegation contained herein is, therefore, also hereby alleged against each fictitiously named DOE defendant.

## JURISDICTION AND VENUE

10. This action asserts claims arising under the Copyright Act of 1976, as amended, 17 U.S.C. § 101 et seq., the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a) and the Declaratory Judgment Act, 28 U.S.C. § 2201 (a). This Court has federal question jurisdiction over these claims pursuant to 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1338(a) and 1338(b). This Court also has subject matter jurisdiction over Plaintiffs' state law claims pursuant to the principles of pendant jurisdiction.

11. This Court has personal jurisdiction over RDR Books pursuant to C.P.L.R. §§ 302(a)(2) and 302(a)(3) because RDR Books has committed a tortious act both within and without the State of New York through the sale of the Infringing Book, which will be available nationally and within the State of New York through traditional and online retailers, causing injury to Plaintiffs within the State of New York, and RDR Books has regularly conducted or solicited business within the State of New York.

12. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1400(a).

## PLAINTIFFS' VALUABLE INTELLECTUAL PROPERTY

### The *Harry Potter* Books

13. The *Harry Potter* Books are a modern day publishing phenomenon and success story. As has been widely publicized, author Ms. Rowling, who graduated from Exeter University, was divorced and living on public assistance in Edinburgh when she started writing the *Harry Potter* Books in the local coffee shop, drafting the manuscript in longhand while her

5

infant daughter slept. In these unlikely circumstances, Ms. Rowling created a highly detailed imaginary world, one that has come to be loved by millions of children and adults around the world.

14. The *Harry Potter* Books tell the story of an orphaned boy named Harry Potter. Harry lives a normal enough life, sleeping in a tiny room under the stairs in the home of his hated Aunt Petunia, Uncle Vernon, and cousin Dudley, all of whom are "Muggles" (humans without any magical abilities), until his eleventh birthday, when he begins to receive letters from the Hogwarts School of Witchcraft and Wizardry, which he is invited to attend. Harry learns that his parents did not die in a car crash, but in fact were wizards who were killed by Voldemort, the Lord of Darkness, and that he himself is famous in the world of wizardry. Together with his magical snowy owl, Hedwig, Harry leaves his home and begins a new life at Hogwarts School of Witchcraft and Wizardry.

15. Each of the seven books cover one of Harry's seven years at Hogwarts School of Witchcraft and Wizardry ("Hogwarts"). Over the course of these seven books, Harry learns many new things, makes new friends, travels, and has many adventures. He learns to hone his wizarding skills, cast spells, make potions and play new games, including "Quidditch" (a game Ms. Rowling invented in which two teams flying on broomsticks try to score points by getting balls through goals that are suspended in mid-air), which he plays as part of the Gryffindor House Quidditch team at Hogwarts. He learns of the Sorcerer's Stone and the three-headed dog that guards it, and battles Lord Voldemort. He travels in a magic flying car, meets Cornelius Fudge, the Minister of Magic, and visits the Leaky Cauldron pub. He attends the International Quidditch Cup and competes in the Triwizard Tournament. He organizes Defense Against the Dark Arts classes when the students are forbidden from practicing magic, attempts to rescue his

godfather Sirius Black from danger and, along with his friends, battles supporters of Lord Voldemort. All of these adventures culminate in a final, climactic battle with the evil Lord Voldemort. Along the way, Harry faces the transition into adulthood, falls in love, and experiences personal tragedy with the loss of people close to him.

16. The first book in the series, *Harry Potter and the Philosopher's Stone*, was published in the United Kingdom in June 1997 with a substantially identical version of the book published in the United States in September 1998 under the title *Harry Potter and the Sorcerer's Stone* (the title of the United States version is used herein to refer to both the original United Kingdom version and the United States version). The six succeeding books in the series are titled: *Harry Potter and the Chamber of Secrets* (1999), *Harry Potter and the Prisoner of Azkaban* (1999), *Harry Potter and the Goblet of Fire* (2000), *Harry Potter and the Order of the Phoenix* (2003), *Harry Potter and the Half-Blood Prince* (2005), and, finally, *Harry Potter and the Deathly Hallows* (2007).

17. Since the release of the first book in the United Kingdom in 1997, the *Harry Potter* Books have been a tremendous popular and critical success. It has been reported that, collectively, the *Harry Potter* Books, which have been translated into more than 65 languages, have sold well over 325 million copies worldwide and have taken their place among the best loved children's classics, including *Winnie the Pooh*, *The Wizard of Oz*, *Little House on the Prairie* and *The Hobbit*. The *Harry Potter* books have won numerous prizes and awards and received critical praise from such prestigious reviewers as *The New York Times*, *The Chicago Sun-Times*, and *The Wall Street Journal*.

18. In addition to the many prizes and accolades, the *Harry Potter* Books have spent many weeks on *The New York Times* bestseller list and other prestigious bestseller lists, demonstrating their enduring popular and critical acclaim. Adults and children have eagerly awaited each new book in the series and bookstores around the country have stayed open late to accommodate the eager customers who rush to buy the latest *Harry Potter* book at the stroke of midnight. The final book, *Harry Potter and the Deathly Hallows* sold 8.3 million copies in the first 24 hours of its release.

19. In addition to the *Harry Potter* Books themselves, Ms. Rowling has authored and published the two Companion Books so far – *Quidditch Through the Ages* and *Fantastic Beasts and Where to Find Them.* Ms. Rowling generously donates royalties from the Companion Books to the charitable organization Comic Relief. In creating the two Companion Books, Ms. Rowling succeeded in transforming a typically pedestrian book genre into highly imaginative and entertaining works. Ms. Rowling's present intention is to create additional companion books and to donate royalties to charitable organizations.

## The Harry Potter Films

20. As a result of the popularity of the *Harry Potter* Books, Warner Bros. sought, and obtained the film rights from Ms. Rowling to the series. To date, Warner Bros. has released five of the seven films including *Harry Potter and the Sorcerer's Stone* (2001), *Harry Potter and the Chamber of Secrets* (2002), *Harry Potter and the Prisoner of Azkaban* (2003), *Harry Potter and the Goblet of Fire* (2005), and *Harry Potter and the Order of the Phoenix* (2007). The sixth film, *Harry Potter and the Half-Blood Prince* is scheduled for a worldwide release in November, 2008 and production of the seventh, *Harry Potter and the Deathly Hallows* is confirmed, but a

8

release date has not yet been set. The five *Harry Potter* Films released to date represent the highest grossing film series of all time with over $4 billion in worldwide receipts.

## Ms. Rowling's Intellectual Property Rights

21. The people, places, terms, and images in the *Harry Potter* Books and the Companion Books are Ms. Rowling's original creative work. The seven *Harry Potter* Books and two Companion Books published to date have been registered with the United States Copyright Office. The registration for *Harry Potter and the Sorcerer's Stone* is Serial No. TX 4-465-397. The registration for *Harry Potter and the Chamber of Secrets* is Serial No. TX 4-465-398. The registration for *Harry Potter and the Prisoner of Azkaban* is Serial No. TX 4-465-399. The registration for *Harry Potter and the Goblet of Fire* is Serial No. TX 5-122-771. The registration for *Harry Potter and the Order of the Phoenix* is Serial No. TX-5-705-321. The registration for *Harry Potter and the Half-Blood Prince* is Serial No. TX-6-179-388. The registration for *Harry Potter and the Deathly Hallows* is Serial No. TX-6-578-062. The registration for *Quidditch through the Ages* is TX-5-374-649, and the registration for *Fantastic Beasts and Where to Find Them* is TX-5-374-653.

## Warner Bros.' Intellectual Property Rights

22. Pursuant to its agreement with Ms. Rowling, Warner Bros. owns trademark rights in *Harry Potter* and *Harry Potter*-related designations in connection with its film rights and ancillary merchandising projects (collectively, the "*Harry Potter* Marks"). Warner Bros. has received registrations for numerous *Harry Potter* Marks around the world, including in the United States. For example, Warner Bros. has over 15 federal trademark registrations for HARRY POTTER, including, but not limited to, Registration Nos. 2,457,302, 2,685,932, 2,506,166 and 2,506,165.

9

23.    In addition to these trademark registrations, each of the *Harry Potter* Films has been registered with the United States Copyright Office including, *Harry Potter and the Sorcerer's Stone*, Serial No. PA0001063646; *Harry Potter and the Chamber of Secrets*, Serial No. PA0001105748; *Harry Potter and the Prisoner of Azkaban*, Serial No. PA0001222542; *Harry Potter and the Goblet of Fire*, Serial No. PA0001279121; and The *Harry Potter and the Order of the Phoenix*, Serial No. PA0001355547.

## Ms. Rowling's Licensing Strategy and Plans for the Series

24.    The tremendous success of the *Harry Potter* Books and Movies has led to tremendous interest in *Harry Potter*-related merchandise and books. Ms. Rowling has been selective in granting licenses in order to protect the integrity of the *Harry Potter* Books. Limiting the number of licenses that are granted, the number of products that are made, and exercising stringent quality control are central to Ms. Rowling's licensing strategy.

25. In particular, Ms. Rowling has been careful not to license certain types of "tie-in" or "companion" books based on the *Harry Potter* Books, which merely regurgitate her creative expression without adding valuable analysis or scholarly commentary. Ms. Rowling has refused to license such books, in part, because as discussed above, she has authored and published her own Companion Books and intends to create additional companion books. As a result, Ms. Rowling has sought to reserve her exclusive right to do so by refraining from granting or licensing these rights to third-parties.

10

## DEFENDANT'S INFRINGEMENT OF
## PLAINTIFFS' INTELLECTUAL PROPERTY RIGHTS

### RDR Books' Infringing Book Will be Published Soon

26. RDR Books is about to publish and distribute the Infringing Book,

purportedly on or about November 5, 2007 in the United Kingdom and, upon information and

belief, on or about November 28, 2007 in the United States. According to RDR Books' own

statements in an advertisement it posted on the website www.PublishersMarketplace.com, it

already has sold the rights to the Infringing Book in England, France, Canada and Australia and

is actively selling the rights in other countries. Publication of the Infringing Book in these

countries is likely to begin soon.

### Plaintiffs Learn that RDR Books Intend to Publish the Infringing Book

27. Ms. Rowling's literary agent first learned of the Infringing Book when he saw

the advertisement on www.PublishersMarketplace.com announcing that RDR Books would be

publishing the *Harry Potter Lexicon*, purportedly scheduled, at that time, for release in late

October 2007. The ad listed the author as Steve Vander Ark, the editor of the free *Lexicon*

Website, and made clear that the book was intended to be the definitive *Harry Potter*

encyclopedia totaling approximately 400 pages long. The advertisement also stated that RDR

Books already had sold the rights to the Infringing Book in England, France, Canada and

Australia and that it was offering for sale the worldwide rights to the Infringing Book with the

exception of those countries.

28. Based on the description in the PublishersMarketplace.com advertisement and

being familiar with the content of the *Lexicon* Website, Ms. Rowling and her agent became

11

concerned that the Infringing Book was designed to unilaterally misappropriate Ms. Rowling's intellectual property rights for Defendant's own financial gain. In addition, Ms. Rowling and her representative were concerned that the title of the Infringing Book, devoid of any disclaimer, gave the misleading and false impression that Ms. Rowling or Warner Bros. had sponsored, licensed or were otherwise associated with the Infringing Book.

29. As a result, on September 12, 2007, Ms. Rowling's agent emailed the book's author, Mr. Vander Ark, with a copy to RDR Books, reminding them that Ms. Rowling has publicly stated that she intended to write her own companion guides to the *Harry Potter* Books in the future and donate proceeds to charity. Ms. Rowling's agent also stated that Ms. Rowling did not wish to grant rights to any third party to publish a companion book to the *Harry Potter* series. Appealing to Mr. Vander Ark as a friend and supporter of Ms. Rowling and the *Harry Potter* Books, Ms. Rowling's agent asked Mr. Vander Ark to forgo publication of the Infringing Book. Neither Mr. Vander Ark nor Defendant RDR Books responded to this email for six days.

30. Not having heard a response, on September 18, 2007, counsel for Ms. Rowling and Warner Bros. forwarded a letter to RDR Books and Mr. Vander Ark by email, notifying them that the Infringing Book would infringe Ms. Rowling's copyrights and mislead consumers to believe that it had been authorized by Ms. Rowling and Warner Bros. The letter cited two cases in this Circuit on point: (1) a Second Circuit decision, affirming judgment that a book which contained detailed plot summaries of *Twin Peaks* episodes constituted copyright infringement, *Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366 (2d Cir. 1993) and (2) a decision from the Southern District of New York, holding that a book containing trivia questions about the *Seinfeld* television series constituted copyright infringement, *Castle Rock Entertainment v. Carol Publishing Group,* 955 F. Supp. 260 (S.D.N.Y. 1997). Counsel

12

requested that Defendant (a) cease its efforts to publish the Infringing Book; (b) forward the letter to parties that have purchased rights to the Infringing Book in England, France, Canada and Australia; and (c) identify these parties so that counsel for Ms. Rowling and Warner Bros. could contact them directly.

31. Perhaps not coincidentally, that same day, September 18, 2007, Mr. Vander Ark informed Ms. Rowling's agent by email that he "[had] been asked to leave all correspondence on this matter to others." On September 19, 2007, RDR Books replied cursorily to Plaintiffs' counsel on behalf of the company and Mr. Vander Ark, stating "[i]t is our intention to thoroughly study the various issues you have raised and discuss them with our legal advisers."

32. On October 3, 2007, after waiting another two weeks and receiving no substantive response, counsel for Ms. Rowling and Warner Bros. wrote again to RDR Books, emphasizing their clients' concerns and the impending publication date and asking for a prompt substantive response. The president of RDR Books, Roger Rapoport, sent an email later that day, requesting more time to respond due to a death in his family. Sympathetic to Mr. Rapoport's situation, Plaintiffs' counsel replied that they understood Mr. Rapoport's circumstances and would honor his request for additional time to respond in good faith.

33. It was thus with great surprise and disappointment that Plaintiffs found that on October 11, 2007, after claiming he was not in a position to respond to Plaintiffs' letter, Mr. Rapoport sent a "cease and desist" letter of his own to Warner Bros. claiming that a timeline appearing on some of the *Harry Potter* DVDs infringed the *Lexicon* Website. Warner Bros. responded to Mr. Rapoport's letter indicating that it would look into the matter and respond more fully. In the meantime, Warner Bros. asked for a copy of the "print version" of the *Lexicon*

13

Website referred to by RDR Books in order to aid in its evaluation of the claims. RDR Books summarily dismissed Warner Bros. reasonable request, stating rudely: "If you do not know how to print that material [from the *Lexicon* Website] please ask one of your people to show you how." RDR Books' unreasonable refusal of this simple request heightened Plaintiffs' fears that RDR Books was infringing Ms. Rowling's and Warner Bros.' rights.

34. Given the fact that RDR Books was asserting claims against Warner Bros., it was apparent that Mr. Rapoport was back to work despite having not yet responded to Plaintiffs' concerns about the Infringing Book. Thus, on October 19, 2007, Plaintiffs' counsel wrote a third letter to RDR Books, asking once again for a substantive response to their clients' concerns regarding the Infringing Book. As they had before, RDR Books responded only that "[w]e are looking in to your allegations and will get back to you with our response."

35. While patiently awaiting RDR Books' response, Plaintiffs became aware of yet more events that caused them intense concern. On or around October 23, 2007, Ms. Rowling's agent learned that RDR Books had recently offered the publishing rights for the Infringing Book in Germany to Random House and in Taiwan to Crown Publishing. Plaintiffs grew increasingly concerned during the course of these events because it appeared that RDR Books was duplicitously stalling its response to Plaintiffs' concerns in order to surreptitiously promote the Infringing Book in advance of the rapidly-approaching publication date.

36. Thus the following day, on October 24, 2007, in an effort to avoid the need to litigate the matter, counsel for Plaintiffs wrote for yet a fourth time to RDR Books, expressing their grave concerns about RDR Books' recent behavior and asking for confirmation that RDR Books would not publish the Infringing Book until it attempted to resolve this matter in good

faith. In addition, Plaintiffs' counsel repeated Warner Bros.' earlier request for a copy of the Infringing Book (or the most recent draft) for review in order to facilitate the parties' discussions. Given RDR Books' previous course of conduct of delaying their response in order to get the Infringing Book closer to publication and having already refused to substantively respond to Plaintiffs' concerns for over a month, Plaintiffs' counsel set a deadline for a response of Monday, October 29, 2007.

37. RDR Books sent a brief email response on October 24, 2007, stating that Plaintiffs "unwarranted" objections were not appreciated. RDR Books also stated that the Infringing Book was a "print version" of the *Lexicon* Website, which was allegedly permitted by Ms. Rowling, and that there were allegedly other *Harry Potter* guides similar to the Infringing Book on the market. While Ms. Rowling has permitted some fan sites certain latitude to make use of the material in her books, these sites are generally free to the public and exist to enable fans to communicate, rather than to permit someone to turn a quick and easy profit based on her own creativity. Ms. Rowling never gave anyone permission to publish a 400-page *Harry Potter* "lexicon".

38. Ms. Rowling and Warner Bros. are concerned about the Infringing Book not only because of the infringing material it contains, as is discussed below, and not only because it will undermine the companion guide that Ms. Rowling herself intends to write, but also because RDR Books has confirmed -- through its refusal to be above-board about its intensions and engage in reasonable discussions about the Infringing Book -- that it cannot be trusted with one of the most beloved children's book series in history.

15

39. Not only does the Infringing Book violate Plaintiffs' copyright and trademark rights, it is also hypocritical. It should be noted that on his website, Mr. Vander Ark, the so-called "editor" of the Infringing Book states,

> "I don't give permission for people to just copy my work for their own use. Not only is that illegal, since everything in the Lexicon is copyrighted, it's also just plain wrong. Hey, I did all the work, I put in all the time, it's my skill and talent in this area which allowed the Lexicon to come into being. No one else has the right to use my·work."

Yet this is exactly what Defendant is attempting to do here in connection with Ms. Rowling's work.

40. Given RDR Books' continued unreasonable delay tactics, inexplicable refusal to postpone publication while the parties resolve these issues, and its unwillingness to even provide Plaintiffs with a review copy of the Infringing Book or a manuscript, it is apparent that RDR Books has no intention of working with Plaintiffs to resolve this matter amicably. Plaintiffs therefore have no choice but to file this lawsuit.

## Defendant's Infringing Book - *The Harry Potter Lexicon*

41. While RDR Books has summarily and unreasonably refused to provide Plaintiffs with an evaluation copy of the Infringing Book, it has represented that the book will be a "print version" of the *Lexicon* Website. Plaintiffs' evaluation based on the content of the *Lexicon* Website suggests that the "print version" will surely infringe Plaintiffs' copyrighted works.

42. The Infringing Book is a self-described, 400 page "lexicon," replete with hundreds of elements from all seven of the *Harry Potter* Books and the two Companion Books

16

authored by Ms. Rowling, as well as images from the Warner Bros.' *Harry Potter* Films. These entries, organized alphabetically and topically, include list after list of spells, potions and imaginary creatures; fictional characters such as wizards, ghosts and Muggles, as well as invented games and made-up places, such as Hogwarts School of Witchcraft and Wizardry, Diagon Alley, and the governmental Ministry of Magic, all of which regurgitate Ms. Rowling's original creative expression with minimal additional commentary. The *Lexicon* Website includes maps based entirely on Ms. Rowling's descriptions as explained by the *Lexicon* Website itself: "[the maps] are, shall we say, visual representations of the information given in the books." Also included in the *Lexicon* Website are numerous alphabetical lists of other fictional "facts" from the series, such as class schedules, lists of different flying broomsticks, potion ingredients, and wizarding history as described in the *Harry Potter* Books. The *Lexicon* Website also slavishly copies lyrics to entire songs, lifts long passages directly from the *Harry Potter* Books, and transcribes magic spells word-for-word. In addition to copying the fictional facts and language of the books, the *Lexicon* Website also contains numerous infringing photos taken from Warner Bros' copyrighted *Harry Potter* Films.

43. Moreover, many of the entries in the Infringing Book contain lengthy plot summaries and detailed descriptions of character profiles created by Ms. Rowling, recounting, for example, key features of each of the principal characters in each of the *Harry Potter* Books, such as Hermione Granger, Harry Potter, and Ron Weasley, or chronicling the events, physical space, and subjects associated with Hogwarts School of Witchcraft and Wizardry. In sum, the Infringing Book contains synopses of the major plots and story lines of the *Harry Potter* Books, descriptions of the history and personalities of the major *Harry Potter* characters, and detailed catalogues of the fictional creatures and magical elements that constitute the "heart" of the *Harry*

17

*Potter* Books. These descriptions, character details and plot points comprise stories created and owned by Ms. Rowling, who has the sole right to control their distribution and who did not give permission to the Defendant to publish a book that stands to make millions of dollars off the back of Ms. Rowling's creativity.

44. In addition to the infringing content, upon information and belief, the Infringing Book is designed and will be marketed to mislead consumers into believing that it has been authorized, approved or licensed by Ms. Rowling and Warner Bros. The cover of the book apparently will simply say the words *"Harry Potter Lexicon"* in large letters and in a font reminiscent of the one used in other *Harry Potter* Works, without any kind of disclaimer. In addition to Warner Bros.' federally-registered trademark "HARRY POTTER" being prominently featured, the front cover of the Infringing Book contains numerous other indicia from the *Harry Potter* Works, including a white owl similar to Harry's owl Hedwig, and other magical objects in a room that could easily be mistaken for a dormitory in Gryffindor Tower. The subtitle of the Infringing Book says only that it is "The most complete and amazing reference to the magical world of Harry Potter." Moreover, the Infringing Book will not, to Plaintiffs' knowledge, include a prominent disclaimer or other indication on the cover to inform consumers that the Infringing Book has not been authorized, approved or licensed by Plaintiffs, although such disclaimers may not even effectively alert the average customer to the fact that Plaintiffs have not sponsored and are not affiliated with the Infringing Book. By using the HARRY POTTER trademark in this way, the Infringing Book gives the false and misleading impression that the book is an official *Harry Potter* book and that Ms. Rowling or Warner Bros. has authorized it or is associated with it in some way.

## COUNT ONE - COPYRIGHT INFRINGEMENT
## (17 U.S.C. §§ 101 et seq.)

45. Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 44, inclusive, and incorporate them herein by this reference.

46. By its actions alleged above, Defendant has infringed and will continue to infringe Ms. Rowling's copyrights in the *Harry Potter* Books and Companion Books and Warner Bros.' copyrights in the *Harry Potter* Films, by using their original copyrighted material as a basis for the Infringing Book, without permission.

47. Plaintiffs are entitled to an injunction restraining Defendant, its agents and employees, and all persons acting in concert or participation with them, from engaging in any further such acts in violation of the Copyright Act.

48. Plaintiffs are further entitled to recover from Defendant the damages, including attorneys' fees, they have sustained and will sustain, and any gains, profits and advantages obtained by Defendant as a result of their acts of infringement as alleged above. At present, the amount of such damages, gains, profits and advantages cannot be fully ascertained by Plaintiffs, but will be established according to proof at trial. Plaintiffs are also entitled to recover statutory damages for Defendant's willful infringement of their intellectual property in the *Harry Potter* Books and Films.

## COUNT TWO - FEDERAL TRADEMARK INFRINGEMENT
### (15 U.S.C. § 1114(1))

49. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 48, inclusive, and incorporate them herein by reference.

50. Defendant's unauthorized and willful use of copies, variations, reproductions, simulations or colorable imitations of Warner Bros.' federally-registered trademarks in connection with the offering for sale and sale of the Infringing Book constitutes use in commerce. Such use infringes Warner Bros.' exclusive rights in its federally-registered trademarks, explicitly misleads as to the source or sponsorship of the Infringing Book, and has caused and is likely to cause confusion, mistake or deception as to the source of the Infringing Book written, published and sold by Defendant.

51. The aforesaid acts of Defendant, namely, the unauthorized and willful use of copies, variations, reproductions, simulations or colorable imitations of Warner Bros.' registered marks in connection with the sale of the Infringing Book, constitute trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

52. The aforesaid acts of Defendant has caused and, unless said acts are restrained by this Court, will continue to cause Warner Bros. to suffer irreparable injury.

20

## COUNT THREE - UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN
### (15 U.S.C. § 1125(a)(1)(A))

53. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 52, inclusive, and incorporate them herein by reference.

54. Through the use of the misleading cover and design of and marketing materials for the Infringing Book (including, *inter alia*, Warner Bros.' federally-registered trademarks and lack of an adequate disclaimer), Defendant is knowingly and intentionally misrepresenting and falsely designating to the general public the affiliation, connection, association, origin, source, sponsorship and approval of the Infringing Book, and intends to misrepresent and falsely designate to the general public the affiliation, connection, association, origin, source or sponsorship of the Infringing Book, so as to create a likelihood of confusion by the public as to the affiliation, connection, association, origin, source and sponsorship of the Infringing Book.

55. The aforesaid acts of Defendant constitute false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).

56. As a direct and proximate result of the foregoing acts of Defendant, Warner Bros. has been damaged and has suffered and will continue to suffer immediate and irreparable harm.

## COUNT FOUR - FALSE ADVERTISING
### (15 U.S.C. § 1125(a)(1)(B))

57. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 56, inclusive, and incorporate them herein by reference.

58. Through the use of the misleading cover and design of and marketing materials for the Infringing Book (including, *inter alia*, Warner Bros. federally-registered trademarks and lack of an adequate disclaimer), Defendant is knowingly and intentionally misrepresenting the nature, characteristics, and qualities of the Infringing Book, and intends to misrepresent the nature, characteristics, and qualities the Infringing Book, so as to create a likelihood of confusion by the public as to the nature, characteristics, and qualities of the Infringing Book.

59. The aforesaid acts of Defendant constitute false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

60. As a direct and proximate result of the foregoing acts of Defendant, Warner Bros. has been damaged and has suffered and will continue to suffer immediate and irreparable harm.

## COUNT FIVE – DECEPTIVE TRADE PRACTICES
### (New York General Business Law § 349)

61. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 60, inclusive, and incorporate them herein by reference.

62. The aforesaid acts of Defendant in using Warner Bros.' trademarks in connection with the Infringing Book and use of the misleading cover and design of and marketing materials for the Infringing Book (including, *inter alia*, Warner Bros. federally-registered trademarks and lack of an adequate disclaimer) have deceived, misled and confused the general public and will continue to do so, and constitute deceptive trade practices in violation of the New York Deceptive Trade Practices Act, § 349 of the General Business Law.

22

63. As a direct and proximate result of the foregoing acts, Defendant unlawfully and wrongfully has derived and will continue to derive, income, profits and ever-increasing goodwill from its activities, and Warner Bros. has been damaged and has suffered and will continue to suffer immediate and irreparable injury for which it has no adequate remedy at law.

## COUNT SEVEN — UNFAIR COMPETITION
### (New York Common Law)

64. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 63, inclusive, and incorporate them herein by reference.

65. The aforesaid acts of Defendant's unauthorized use of Warner Bros.' trademarks in connection with the Infringing Book and use of the misleading cover and design of and marketing materials for the Infringing Book (including, *inter alia*, Warner Bros.' federally-registered trademarks and lack of an adequate disclaimer) constitute unfair competition under the common law of New York in that Defendant has misappropriated, and unfairly competed with, Plaintiffs' commercial business and will continue to do so.

66. As a direct and proximate result of the foregoing acts, Defendant unlawfully derived and will continue to derive, income, profits and ever-increasing goodwill from its activities and Plaintiffs have been damaged and have suffered and will continue to suffer immediate and irreparable injury for which Plaintiffs have no adequate remedy at law.

## COUNT EIGHT - DECLARATORY JUDGMENT
## REGARDING COPYRIGHT INFRINGEMENT
### (17 U.S.C. §§ 101 et seq.)

67. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 66, inclusive, and incorporate them herein by reference.

23

68. Defendant contends that Warner Bros.' inclusion of the "Hogwarts Time Line" in the DVD versions of several *Harry Potter* Films infringes Defendant's rights in another time line of *Harry Potter*-related fictional events. By virtue of Defendant's contentions, Warner Bros. has a real and reasonable apprehension of litigation and has been brought into adversarial conflict with Defendants.

69. The "Hogwarts Time Line" in Warner Bros.' DVDs is original to Warner Bros. and is based on the *Harry Potter* Books. The "Hogwarts Time Line" does not infringe on any rights of Defendant or anyone else.

70. By engaging in threatening conduct, Defendant threatens to place a cloud over Warner Bros.' right to exploit the *Harry Potter* DVDs.

71. By reason of the foregoing, there now exists between the parties an actual and justiciable controversy concerning Warner Bros.' and Defendant's respective rights and obligations with respect to the use of the "Hogwarts Timeline" in the DVD versions of several *Potter* Movies, requiring declaratory relief.

72. The aforesaid declaration is necessary and appropriate at this time so that Warner Bros.' right to continue its conduct can be affirmed.

73. Warner Bros. has no adequate remedy at law.

74. Accordingly, Warner Bros. seeks, pursuant to 28 U.S.C. § 2201, a judgment from this Court that its DVD versions of the *Harry Potter* Films do not violate any of Defendant's copyrights.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, Warner Bros. Entertainment Inc. and J.K. Rowling, respectfully demand:

1. That the Court find that Defendant has infringed Plaintiffs' copyrights in the *Harry Potter* Books, the Companion Books and the *Harry Potter* Films;

2. That the Court find that Defendant has infringed Warner Bros.' trademarks;

3. That the Court find that Defendant has used Warner Bros.' trademarks, a misleading book cover and design, and misleading advertising materials to falsely designate the origin of the Infringing Book, falsely advertise the Infringing Book, and unfairly compete with Plaintiffs;

4. That the Court find that Defendant has engaged in deceptive trade practices and unfair competition;

5. That the Court find that the "Hogwarts Time Line" in the DVD versions of certain *Harry Potter* Films does not infringed Defendant's copyrights;

6. That the Court find a substantial likelihood that Defendant will continue to infringe Plaintiffs' intellectual property unless permanently enjoined from doing so;

7. A permanent injunction restraining Defendant, and its agents, servants, employees, attorneys, successors and assigns, and all persons, firms and corporations acting in concert with them, from directly or indirectly infringing Plaintiffs' copyrights and Warner Bros.' trademarks, including but not limited to continuing to manufacture, distribute, market, advertise,

promote, solicit or accept orders for, sell or offer for sale the Infringing Book or any works derived or copied from Plaintiffs' copyrighted works and from participating or assisting in any such activity whether occurring within the United States of America;

8. An order instructing Defendant, its agents, servants, employees, attorneys, successors and assigns, and all persons, firms and corporations acting in concert with them, to recall from all distributors, wholesalers, jobbers, dealers, retailers and all others known to it the Infringing Book and any other works shown to infringe any of Plaintiffs' intellectual property;

9. That the Court enter judgment for Plaintiffs and against Defendant for Plaintiffs' actual damages according to proof, and for any profits attributable to infringements of Plaintiffs' intellectual property and unfair trade practices and unfair competition, in accordance with proof;

10. That the Court enter judgment for Ms. Rowling and against Defendant for statutory damages based upon their acts of infringement pursuant to the Copyright Act of 1976, 17 U.S.C. §§ 101, et seq.;

11. An award of three times the greater of:

a. Warner Bros.' damages for the wrongful acts of Defendant in an amount the Court deems appropriate, together with appropriate interest on such damages; or

b. Defendant's profits in accordance with the accounting demanded in the preceding paragraph, pursuant to 15 U.S.C. § 1117; and

12. An award of Plaintiffs' costs and disbursements of this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505 and 15 U.S.C. § 1117; and

13. That the Court grant such other, further, and different relief as the Court deems just and proper.

Dated: October 31, 2007

Respectfully submitted:

Dale M. Cendali (DC 2676)
Johanna Schmitt (JS 2125)
Melanie Bradley (MB 0823)

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000

*Attorneys for Plaintiffs*