UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X

WARNER BROS. ENTERTAINMENT INC. and
J.K. ROWLING,

         Plaintiffs,

    -against-

RDR BOOKS and DOES 1-10,

         Defendants.

---------------------------------------- X

Case No. 07-CV-9667 (RPP)

## DECLARATION OF SUZANNE MURPHY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Suzanne Murphy, declare and state as follows:

1. I am the Vice President, Publisher, Trade Publishing and Marketing at Scholastic Inc. ("Scholastic"), the publisher of the *Harry Potter* books in the United States. Except for the facts stated on information and belief, all of the facts set forth herein are known to me personally, and if called as a witness, I could and would testify competently thereto.

2. I have worked in children's book marketing for over 20 years. At Scholastic, where I have worked for the past two and a half years, I am responsible for marketing all titles in the trade channel (i.e., sales of books to book stores and other retail outlets), including the *Harry Potter* books. Prior to Scholastic, I worked for approximately eight years at Simon & Schuster, Inc. and previously held jobs in marketing and public relations at Random House, Inc. and Bantam Doubleday Dell Publishing Group.

## IMPACT OF PUBLICATION OF THE INFRINGING BOOK

3. In my view, were RDR Books to publish *The Harry Potter Lexicon* (the "Infringing Book"), it would damage the market for future companion books by Ms. Rowling in a way that cannot easily be measured or remedied by money.

4. First, from a marketing point of view, being first in time to publish is very important to the success of a book. There is inherent value to publishing first because readers are eager to purchase the first book of its kind that becomes available. Second, publishing a unique book on a popular subject provides important marketing advantages.

5. Here, RDR Books is attempting to rush out a *Harry Potter* encyclopedia fast on the heels of the publication of the seventh and final book in the *Harry Potter* series. This 450-page "lexicon" would therefore come out first in time and would preempt Ms. Rowling's own plans for a companion guide. While one would assume that Ms. Rowling will add her own flair to a companion guide, to the extent that someone else has already come out with a similar book, it would make Ms. Rowling's version less distinctive. Moreover, RDR Books would have the unwarranted and undeserved advantage of being the first to publish. In essence, RDR Books is appropriating Ms. Rowling's work and her right, as an author, to control the timing of publication of her copyrighted material, in an effort to make money off of the *Harry Potter* books and to use Ms. Rowling's own creative works to compete against her.

6. I am also concerned that if RDR Books is not stopped it will lead others to rush to publish similar works and further flood the market in a manner detrimental to Ms. Rowling.

7. Moreover, because Defendant was rushing the Infringing Book to market, based on my review of the manuscript, the book appears to be of poor quality. It does not include any

significant analytical thought, the "fictional facts" are not presented in an entertaining way, and the visual layout is boring and pedantic, all of which could have two impacts: (1) it could turn people off to the idea of enjoying this kind of companion guide; and (2) it could lead people to think that Ms. Rowling is associated with and has endorsed something of poor quality because, as discussed below, the title, design and misleading quotation of Ms. Rowling on the back cover of the Infringing Book will falsely lead people to believe that Ms. Rowling approved it.

8.   It should be noted that Ms. Rowling and Scholastic have worked very hard to ensure that the *Harry Potter* books are of the very highest quality. For example, we maintain consistency in the typeface used, incorporate high quality cover art and illustrations, employ editors dedicated to ensuring continuity through the series, and print the volumes on excellent quality and recycled paper. All of this effort is intended to create the best possible impression on readers. The Infringing Book, based on my review, appears to be at the opposite end of the spectrum.

SIGNIFICANCE OF THE WEBSITE

9.   I understand that RDR Books has taken the position in the press that Ms. Rowling will not be harmed by the Infringing Book because it is simply a "printed version" of the *Lexicon* Website. Having reviewed a copy of the manuscript, it is apparent that the Infringing Book contains only a small portion of the material that appears on the website. The material that does appear in the Infringing Book is, as discussed above, devoid of quality, entertainment value or analysis. I also want to note that from a marketing perspective, there is a fundamental difference between material presented on a website as opposed to a book.

10.     The audience for a website is different from that of a physical book. While the *Lexicon* Website might be visited by and known to "hard core" Harry Potter fans, I do not believe it is generally known to the overall broad audience of people who enjoy the *Harry Potter* books and purchase them in bookstores. In essence, the distribution channel for the Infringing Book is significantly wider because it includes bookstores and online retailers and would be supported by advertising and marketing campaigns in various media to drive sales.

11.     Furthermore, the printed book is no mere substitution for the website "version" of the *Harry Potter Lexicon*. I have visited the *Harry Potter Lexicon* Website; it cannot be downloaded easily at the punch of a button. The entire experience of the website is different from picking up a book that has all of the materials organized in one linear package. For example, the use of multiple layers of web pages, cross-references within the same site, and hyperlinks to other relevant websites creates a different kind of product -- visiting an ephemeral website is simply not the same thing as buying a book and putting it on your shelf forever, even if the contents were the same, which they are not in this case. Thus, the fact that some material may have already appeared on a free website that is difficult to print out, in no way diminishes my view that were the Infringing Book to be published, it would undermine Ms. Rowling's plans to publish her own high quality companion guide.

### THE PROPOSED BOOK AND COVER DESIGN

12.     I have reviewed a copy of the original cover of the Infringing Book as well as the revised proposed cover and some related materials. The revised cover does not obviate the impression that Ms. Rowling has endorsed this book, when in fact, she does not.

13. On the back cover is a "quote" from Ms. Rowling about the *Harry Potter Lexicon* Website, stating "[t]his is such a great site that I have been known to sneak into an Internet café while out writing and check a fact.... A website for the dangerously obsessive; my natural home." The prominent use of this quotation gives the false impression that Ms. Rowling approved of or endorsed the Infringing Book when, as this lawsuit attests, Ms. Rowling objects vehemently to the book. In my view, the disclaimers do not ameliorate the impression that Ms. Rowling endorses the book because of the appearance of the quote. The use of this quotation is also misleading in that Ms. Rowling's compliment was, I understand, directed to the *Harry Potter Lexicon* Website nearly four years ago and implies that the Infringing Book is the same as the website when it is not. The *Harry Potter Lexicon* Website has a different graphic style and, in addition to the A-Z dictionary-like entries, also includes essays, discussion forums and hyperlinks to other sources, all of which are presented in a different format and layout. By putting the quote on the back cover of the Infringing Book, RDR Books is encouraging fans to buy the book thinking it has been endorsed by Ms. Rowling.

14. In addition to this quote is the phrase in prominent letters "Winner of J.K. Rowling's Fan Site Award" which also gives the appearance that the book has won an award from Ms. Rowling when I understand it in fact has not, and moreover exacerbates the impression that Ms. Rowling has endorsed the book.

15. I was also shown a page about the Infringing Book from RDR Books' catalogue as well as a flyer used to market the book that RDR Books produced pursuant to the Court's Order. Like the back cover of the book, these marketing materials use the quote from Ms. Rowling about the *Lexicon* Website and once again give the impression that Ms. Rowling has endorsed the publication of the Infringing Book. Attached hereto as **Exhibit A** is a true and

correct copy of page one of RDR Books' catalogue and the flyer produced by Defendant on November 6, 2007.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 14, 2008, at New York, New York.

Respectfully submitted,

By: _____
Suzanne Murphy