**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------ X

WARNER BROS. ENTERTAINMENT INC. and J.K. ROWLING,

Plaintiffs,

-against-

RDR BOOKS and DOES 1-10,

Defendants.

------------------------------------ X

**Case No. 07-CV-9667 (RPP)**

**DECLARATION OF WILLIAM M. LANDES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, William M. Landes, declare and state as follows:

## I. INTRODUCTION AND OVERVIEW

### A. QUALIFICATIONS

1. I, William M. Landes, am the Clifton R. Musser Professor of Law and Economics at the University of Chicago Law School. I received a Ph.D. in Economics from Columbia University in 1966. Since that time, I have taught economics on the faculties of Stanford University, Columbia University, the Graduate Center of the City University of New York, and the University of Chicago, where I have been a professor at the Law School for the past 32 years.

2. I am an economist that specializes in the economic analysis of law, industrial organization and intellectual property. At the University of Chicago Law School, I teach courses on economic analysis of law, intellectual property and art law. I have taught and published extensively on antitrust and intellectual property matters, and I recently co-authored a book with Richard A. Posner entitled *The Economic Structure of Intellectual Property Law*.

3. From 1991 to 2000, I served as Editor of *The Journal of Legal Studies* and from 1975 to 1991, I served as an Editor of *The Journal of Law and Economics*, both of which are leading academic journals in the field of law and economics. I currently serve on the Editorial Board of the *Journal of Cultural Economics*. I served as President of the American Association of Law and Economics in 1992-93.

4. In addition to my academic experience, I am Chairman Emeritus of Lexecon, an economics consulting firm which I co-founded in 1977 with Richard A. Posner and Andrew M. Rosenfield. A copy of my curriculum vitae that lists my publications and identifies cases in which I have testified in the past four years is attached as Exhibit A to this report. I am being compensated for my time at the rate of $900 per hour. My compensation does not depend on the outcome of this case.

**B. OVERVIEW**

5. I have been asked to evaluate from an economic perspective RDR Books' unauthorized use of copyrighted materials from J.K. Rowling's series of *Harry Potter* books in a roughly 400-page dictionary of terms entitled the *Harry Potter Lexicon (HP Lexicon).* Ms. Rowling and Warner Bros. Entertainment claim that the *HP Lexicon* is a derivative work of the *Harry Potter* series and cannot be published without the consent of the copyright holder. RDR claims that its unauthorized use is a "fair use," which allows one to use certain copyrighted materials in limited circumstances without permission of the copyright owner.

6. This statement reviews the economic basis for granting copyright holders property rights in derivative works as well as the economic basis for the fair use doctrine. My views do not reflect legal conclusions — although I teach intellectual property courses at the University of Chicago Law School it is important to stress that I am not a lawyer. Instead, this statement summarizes my views about the economic rationale for copyright law and some of its legal

doctrines. My major conclusions, which are discussed in more detail later in this affidavit, are as follows:

- Granting the original copyright holder rights in derivative works promotes economic efficiency both by reducing transactions costs and by bolstering the incentives to create new works. As a corollary, the rights to derivative works should be extended both to authors of highly successful original works, such as Ms. Rowling, as well as the authors of less successful works.
- Under limited circumstances, the "fair use" of material without the copyright holder's consent will promote economic efficiency. These circumstances are considered below. However, the *HP Lexicon* does not appear to meet the conditions under which the unauthorized use of copyrighted materials promotes economic efficiency.

## II. ECONOMIC EFFICIENCY REQUIRES THAT COPYRIGHT OWNERS RETAIN EXCLUSIVE RIGHTS TO AUTHORIZE DERIVATIVE WORKS.

7. RDR Book's *HP Lexicon* is a dictionary/encyclopedia drawn from J.K. Rowling's *Harry Potter* series. With limited exceptions (discussed shortly), the publication of works such as the *HP Lexicon* that contain extensive copyrighted material requires permission of the copyright owner. In order to evaluate whether the unauthorized publication of the *HP* enhances economic efficiency, I first set out the economic basis for the legal rule that gives the copyright owner exclusive rights to make and authorize others to make derivative works.

### A. RESERVING EXCLUSIVE RIGHTS IN DERIVATIVE WORKS TO COPYRIGHT OWNERS PRESERVES INCENTIVES FOR WRITERS TO INVEST TIME AND EFFORT IN CREATING NEW WORKS.

8. The traditional rationale for the legal protection of copyrighted works and other types of intellectual property is to provide incentives for individuals to invest in creating, developing and distributing such works. In the absence of copyright protection, for example, one

could freely duplicate or abridge a book or manuscript, which would make it difficult for or even prevent the original author and publisher from covering their costs and realizing the full benefit of their efforts. In short, copyright protection increases social welfare by preserving the incentives to create and distribute new works.[1]

9. Extending copyright protection to derivative works or adaptations based on the original work serves this same economic objective. Without such protection, the incentive to invest in creating new works would be compromised without the (probabilistic) expectation of revenues from derivative works.[2] Indeed, for some copyrighted works, derivative products (such as a movie based on a novel or short story) might be the principal source of the expected financial returns for the original author. Without the ability to extend copyright protection to the more lucrative derivative work, the original author and his publisher would be less likely to create and develop the original work in the first place.

10. The incentive-preserving rationale for reserving rights in derivative works to original copyright holders applies both to copyright holders, such as Ms. Rowling, who have achieved great success as well as to those who are less successful. Economic efficiency requires that *ex ante* rules provide incentives for authors and publishers to create and develop new works since their decisions are based on *ex ante* expectations of future income.

11. Failing to protect the intellectual property of copyright holders such as Ms. Rowling who have already achieved great success weakens the economic incentives to create new copyrighted works in the future by limiting the potential financial "upside" from works that achieve great success. Moreover, since successful works are most likely to generate significant

---

1. See Landes and Posner, *The Economic Structure of Intellectual Property Law* (2003) (hereinafter "Landes and Posner"), p. 3, p. 40.
2. See Landes and Posner, p. 111.

numbers of derivative works, failing to adequately protect the original author's rights would greatly undermine the legal protection for derivative works in general.

**B. RESERVING EXCLUSIVE RIGHTS FOR DERIVATIVE WORKS TO COPYRIGHT OWNERS ENHANCES ECONOMIC EFFICIENCY BY REDUCING TRANSACTION COSTS.**

12. An equally important economic reason for giving the original author rights over derivative works is to minimize transaction costs faced by other producers of derivative works. Imagine a legal rule that allowed an unauthorized creator of a derivative work to copyright his work. This means that other persons who wish to create derivative works without risking liability for copyright infringement would have to negotiate rights not only from the original copyright holder but also from the myriad of persons who had created unauthorized derivative works and might claim that their copyrights had been infringed. As more unauthorized derivative works are created, transaction costs for new licensees would increase, which in turn would discourage the use of the material in new licensed works.[3] The prospect of the original copyright holders and other parties claiming copyright protection in their unauthorized works would also increase the costs and information burden of copyright litigation by adding more parties to an infringement claim and requiring courts to decide whether the defendant had copied from one or more copyright holders all of whom have appropriated copyrighted expression from the original author.

13. For example, consider a publisher of an unauthorized abridgment of a novel who claims copyright in the abridgment. A magazine that wanted to publish chapters from the novel would have to negotiate potentially with two copyright holders and thus would face higher licensing or transaction costs than if the original copyright holder retained rights in both the original work and the abridgment. When books, such as the *Harry Potter* series, generate a very

---

3. See Landes and Posner, pp. 110-111.

large number of derivative works, people who want to use any part of the original *Harry Potter* series would potentially have to assemble a large set of licenses to avoid the risk of legal entanglements. The confusion and uncertainty faced by potential licensees under such a system would raise the cost of licensing and tend to discourage the creation of authorized derivative works.

14. The above discussion does not appear to be merely hypothetical. The *HP Lexicon* website warns in strong terms against the copying of any materials appearing on the website.[4] Moreoever, recent events involving RDR books and owners of the *Harry Potter* copyrights highlight transaction costs problems that might arise if the original copyright holder does not retain copyrights over derivative works. I understand that RDR has asserted a copyright in a timeline of events from the *Harry Potter* series (despite the fact that it does not own the fictional "facts" that are the basis of the timeline). Warner Bros., Ms. Rowling's licensee, has created a distinct timeline with Ms. Rowling's permission and RDR alleges that the Warner Bros. timeline infringes its own.[5]

15. If Warner Bros. needed to negotiate a license from RDR in addition to its existing license from Mr. Rowling in order to create a timeline based on events in the *Harry Potter* series, the additional transaction costs and legal uncertainty involved could discourage Warner and other future licensees from creating derivative works and could lead to additional litigation as numerous parties claim to own copyrights in various unauthorized derivative works. In short, this example illustrates the increased costs and confusion that can result when third parties assert copyright over derivative works and how these costs can discourage the creation of new derivative works.

---

4. See, for example, http://www.hp-lexicon.org/index-2.html.
5. E-mail from Roger Rapoport to Neil Blair, October 12, 2007.

16. In addition, I understand that Ms. Rowling intends to create her own encyclopedia to the world of Harry Potter and that her publishers have compiled materials that she may use in that work.[6] Not surprisingly, I also understand that these materials are similar to those in the *HP Lexicon*. Were the *HP Lexicon*, which lists the various characters and elements of the books in alphabetical order, allowed to proceed to publication, and Ms. Rowling did in fact produce a similar encyclopedia, then RDR could assert a claim for copyright infringement, this time against the author herself.

### C. GRANTING EXCLUSIVE RIGHTS FOR DERIVATIVE WORKS TO ORIGINAL AUTHORS PRESERVES THE INCENTIVES FOR TIMELY PUBLICATION OF NEW WORKS.

17. Reserving exclusive rights for derivative works also promotes economic efficiency by preserving incentives for authors of new works to publish them in a timely manner. If other persons can create derivative works without the copyright holder's consent, then authors of original works have an incentive to delay publication of the original work in order to get a head-start on creating derivative works of their own. This delay is economically inefficient because it reduces the consumer benefits generated by the new work and serves no productive purpose.[7]

## III. THE *HP LEXICON* DOES NOT MEET THE CONDITIONS UNDER WHICH "FAIR USE" USE OF COPYRIGHTED MATERIALS PROMOTES ECONOMIC EFFICIENCY.

18. Some unauthorized uses of copyrighted materials are protected by the Copyright Act as "fair use." From an economic standpoint, fair use can promote economic efficiency under certain limited conditions. However, in the absence of these conditions, "fair use" of copyrighted material is likely to harm economic efficiency. This section first reviews the

---

6. Samples of these materials are attached to the declarations of Sarah Odedina and Cheryl Klein.
7. See Landes and Posner, p. 110.

conditions in which fair use can promote economic efficiency and then shows that these conditions do not appear to be met by the *HP Lexicon.*

## A. CONDITIONS WHEN FAIR USE OF COPYRIGHTED MATERIAL CAN PROMOTE ECONOMIC EFFICIENCY.

19. My prior work (co-authored with Judge Richard Posner) identifies three broad circumstances in which fair use can promote economic efficiency. As noted earlier, these are economic arguments, not legal principles, and while I believe courts consider economic efficiency arguments in making legal rulings, I do not purport to describe the state of the law or to offer a legal opinion.

### 1. High Transaction Costs / No Harm to Copyright Holder [8]

20. Fair use can be economically efficient when the transaction costs of negotiating a license are high relative to the potential benefits from the derivative work, and the harm to the copyright holder is negligible. The direct quotation of brief passages from a book provides an example of this efficiency rationale for fair use. The high cost of obtaining a license for a brief quotation is likely to dominate the benefit from quoting the passage. The presence of transaction costs, therefore, would reduce the use of such quotes. While reduced use of quoted material would adversely affect consumers, it yields no significant benefit for the copyright holder because the presence of transaction costs means that he would not have received any revenues from his right to prevent the brief quotation. Another example of negligible harm is unauthorized photocopies of current newspaper stories by teachers. Here there is no time to negotiate with the copyright holder and the educational benefits from the unauthorized copies

---

8. See Landes and Posner, pp. 115-117.

may be large relative to the negligible harm to the newspaper.[9] In these circumstances, economic efficiency is enhanced if copyrighted material can be used without such permission.

**2. Negative Harm to Copyright Holder / Implied Consent [10]**

21. Fair use of copyrighted material can also promote economic efficiency when the unauthorized use generates "negative harm" (e.g., an economic benefit) to the copyright holder. If negative harm to the copyright holders can be established, copyright holders normally would consent to these uses because they tend to increase the demand for the underlying copyrighted works. Consider the unlicensed use of copyrighted materials in a book or movie review. There is no real dispute that the unauthorized use of small amounts of copyrighted material and the review itself provide useful information to consumers in helping them to decide whether to buy the book of go to the movie. Overall, this information generates benefits to consumers and copyright holders of books and movies (although some authors receiving negative reviews would be harmed) and enhances economic efficiency.

22. There is a related reason for allowing fair use for reviews. If reviewers were required to obtain licenses in order to quote copyrighted material in a review, it is likely that the consumers would suspect that the credibility of the review because it is unlikely that a copyright holder would be willing to grant permission to a reviewer if he had some concern that the review might be negative. Consumers might reasonably believe the copyright holders would only grant permission to reviewers if they were first given the right to approve the review prior to publication. Ultimately, fewer copyrighted works would be reviewed and consumers would be

---

9. I note that the outcome should be different in the case where the teacher assembles a packet of copyrighted stories and articles as part of the course materials for the class. In that case, there is usually sufficient time to obtain the consent of the copyright holders and often the party making the many copies will help the teacher obtain permission from the copyright holders.

10. See Landes and Posner, pp. 117-122.

less willing to accept a review as unbiased. Since the availability of unbiased reviews provides valuable information to consumers and creates interest in books and other copyrighted works, fair use benefits both consumers and copyright holders (provided the review does not take so much that it substitutes for the original work).

### 3. Harm to Copyright Holders / Productive Use [11]

23. There is also a very limited number of situations in which fair use of copyrighted material can enhance economic efficiency even when it results in some small harm to the copyright holder that is more than offset by substantial benefits to others. An example of this occurs in the computer software context, where manufacturing compatible software often requires that an infringing copy of the copyrighted software be made in the process.[12] Here there are substantial benefits to consumers from the additional compatible software products on the market which are not substitutes for the original copied product. A key factor in identifying a fair use is that the unauthorized software not substitute for the original work or for works of authorized licensees but instead uses the original work in a productive and transformative way that creates substantial benefits to consumers.

## B. ECONOMIC EFFICIENCY REQUIRES THAT THE FAIR USE DOCTRINE BE NARROWLY APPLIED.

24. Before evaluating whether the *HP Lexicon* meets any of the conditions under which unauthorized use of copyrighted material enhances economic efficiency, it is important to stress that economic efficiency requires that courts narrowly apply the fair use doctrine.

25. Broad application of the fair use doctrine undermines the basic rationale for copyright and thereby adversely affects the incentive to create new copyrightable work. A further consideration is that widespread application of fair use can inhibit the creation of market

---

11. See Landes and Posner, p. 122.
12. See *Sega Enter. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (1992).

mechanisms that facilitate licensing of copyrighted materials and thereby reduce transaction costs. For example, institutions such as ASCAP and BMI are efficiency-enhancing joint ventures of music composers and publishers that license performance rights to copyrighted musical compositions, collect licensing fees from users and distribute royalties to composers and publishers. Similarly, the Copyright Clearance Center facilitates the licensing of academic journal articles by offering blanket licenses to firms and other institutions who may desire to photocopy articles from these journals. These institutions were created to overcome the high transactions costs that arise in licensing small amounts of copyrighted material to a large numbers of users and the development of these market mechanisms would have been inhibited by broad application of the fair use doctrine that permitted without liability unauthorized performances of copyrighted materials and widespread reproductions of copyrighted articles.

### C. THE *HP LEXICON* DOES NOT APPEAR TO MEET ANY OF THE CONDITIONS IN WHICH FAIR USE ENHANCES ECONOMIC EFFICIENCY.

26. This section evaluates whether the *HP Lexicon* meets the conditions under which "fair use" promotes economic efficiency. My evaluation is based on the following assumptions that I understand that the plaintiffs will show are true:

- The *HP Lexicon* consists of encyclopedia-style listings that summarize plot lines, events, character descriptions and other elements of the *Harry* Potter series. [13]
- Most, if not all, of the material in the *HP Lexicon* appears in the *Harry Potter Lexicon* website (http://www.hp-lexicon.org), which also includes material that do not appear in the *HP Lexicon.* [14]

---

13. See Declaration of Emily Blumsack in Support of Plaintiff' Motion for Preliminary Injunction, p. 2.
14. Ibid.

- Many of the entries in the *HP Lexicon* reflect material that are direct quotations from the *Harry Potter* books or J.K. Rowlings existing companion works, and entries typically include little if any information that does not appear in the books.[15]
- The *HP Lexicon* contains no literary criticism or analytical discussion of the books or their content.[16]
- J.K. Rowling has published prior companion works[17] and has on various occasions stated that she intends to write her own reference guide to the *Harry Potter* series.[18]

**1. Economic efficiency does not require fair use for the *HP Lexicon* under the "High Transaction Costs / No Harm to Copyright Holder" criterion.**

27. As noted above, fair use may be economically efficient when the infringer faces high transactions costs and the unauthorized use of the material generates little or no harm to the copyright holder. Economic efficiency does not appear to require fair use status for the *HP Lexicon* based on this criterion.

28. I understand that the *HP Lexicon* uses an extensive amount of material from the *Harry Potter* books. It does not merely use a few brief passages. Given the absence of original content, such material represents a large share of the allegedly infringing book's content. That is, I understand that the *HP Lexicon* involves only the editor's attempt to extract various passages from the *Harry Potter* books and place them in alphabetical order, adding little or no original content or analysis. As such, the *HP Lexicon* appears to have little value apart from its

---

15. Ibid.
16. Ibid.
17. Ibid, p. 3.
18. See Declaration of Suzanne Murphy in Support of Plaintiffs' Motion for Preliminary Injunction, p. 2.

infringing content and therefore generates minimal benefits. Moreover, this is not a case of high transactions costs because the owners of the copyright have numerous agreements with other licensees and, in addition, the pressure of time does not preclude negotiation of a voluntary license (as the in the case of classroom use of newspaper articles).

29. At the same time, publication of the *HP Lexicon* would be likely to impose significant costs on Ms. Rowling. Not only would Ms. Rowling lose licensing fees from RDR books, but also from publishers of other derivative works that otherwise might attempt to license from her. Perhaps more importantly, Ms. Rowling also could lose income from the sale of her proposed companion encyclopedia.

30. I understand that the website version of the *HP Lexicon* differs significantly from the book version with respect to the costs that are imposed on Ms. Rowling. While a book version of the *HP Lexicon* would compete directly with Ms. Rowling's planned encyclopedia, the online version is a far weaker substitute. As noted in Suzanne Murphy's declaration, the audience for a website is different than that of a physical book. For example, the *HP Lexicon* and Ms. Rowling's planned volume may be close substitutes as gifts for Harry Potter fans, but the website does not serve this purpose. Thus, the harm to Ms. Rowling resulting from publication of the *HP Lexicon* is likely to be substantially greater than the harm resulting from the website.

**2. Economic efficiency does not require fair use for the *HP Lexicon* under the "Negative Harm / Implied Consent" criterion.**

31. As discussed above, fair use may be economically efficient when the copyright holder indisputably benefits by the infringement (the "negative harm" case), which in turn results in the copyright holder's implied consent use of the material. Economic efficiency does not appear to require fair use status for the *HP Lexicon* based on this criterion.

32. As a I understand it, the *HP Lexicon* is derived almost exclusively from the existing material from the *Harry Potter* series and contains little or no analytical or critical content. Thus, it is not analogous to a book review, which as discussed above provides the typical example for this efficiency rational for fair use under these circumstances. A book review uses quoted material as part of an analysis that has the effect of generating general interest in books (e.g., generating "negative harm") by providing valuable information to consumers prior to purchase. I understand, however, that the *HP Lexicon* contains no critical or evaluative content or analysis.

33. There is also little basis to believe that the publication of the *HP Lexicon* would increase interest in or demand for the *Harry Potter* books. To the extent that the *HP Lexicon* adds little or no content, analysis or insight, it would not generate added interest in the series. Instead, like its associated website, the book appears to be targeted to existing fans of the series and thus would not be expected to expand the market for the *Harry Potter* books and related items in any material way.

34. One reason for the *HP Lexicon's* failure to benefit the copyright holder — Ms. Rowling — is its lack of any external information or analysis in addition to the unauthorized copyrighted material at issue. I describe one case to highlight this economic point. In *Ty, Inc. v. Publications International Ltd,* 292 F.3d 512 (7th Cir. 2002), the court considered whether a series of collector's guide for Beanie Baby dolls that used copyrighted photographs and other material violated copyright laws.[19]

35. The court noted that one of the collector's guides at issue included, in addition to some infringing material, information taken from other sources regarding the Beanie Babies dolls' prices, dates of retirement, etc. The guide also included criticisms of Ty's products and

---

19. This case is discussed in Landes and Posner, pp. 121-122.

business practices. The court concluded that, given the additional information and analysis in the guide and the difficulty of providing this information in an economical way without the photographs, the unauthorized use of the copyrighted images was a permitted fair use of the copyrighted material. The inclusion of analytical information and criticisms suggest that the guide was, in many ways, analogous to a book review, which (as noted above) is the principal example of this efficiency rationale for fair use. Moreover, the guide promoted the development of a secondary or resale market in Beanie Babies which, in turn, would increase the demand for new Beanies produced by Ty. The Seventh Circuit thus considered the economic arguments in deciding whether the collectors guide constituted a fair use of the copyrighted material.

36. In the same opinion, however, the Seventh Circuit explained that another collector's guide at issue contained little information other than the infringing photographs and thus did not appear to constitute fair use. It therefore remanded that case to the District Court. The District Court determined that the catalog that included little additional material was not covered by the fair use doctrine.[20] The court's focus on the role of supplementary material is consistent with this efficiency rationale for the fair use doctrine. That is, the use of copyrighted material can benefit the copyright holder only when used in conjunction with supplementary material that creates significant benefits to consumers. Simply repackaging existing copyrighted information cannot be expected to generate significant new interest and should not from an economic standpoint be covered by the fair use doctrine.

### 3. Economic efficiency does not require fair use for the *HP Lexicon* under the "Productive Use / Harm to Copyright Holders" criterion.

37. As discussed above, fair use may be economically efficient even if there is some small harm to copyright holders, as long as this harm is more than offset by benefits to others.

---

20. *Ty, Inc., v. Publications Int'l, Ltd.*, No. 99 C 5565, United States District Court for the Northern District of Illinois, Eastern Division, pp. 6-8.

Economic efficiency does not appear to require fair use status for the *HP Lexicon* under this criterion.

38. The harm to Ms. Rowling's plans to create her own encyclopedia resulting from RDR's actions may be substantial since it would no longer be the first such compendium on the market, along with the real spector that in doing her own encyclopedia she would be sued by RDR or similar third parties. In addition, Ms. Rowling loses the prospect of licensing revenues from the *HP Lexicon* and possible other unauthorized derivative works and thus loses the ability to control the quality of such works in order to maintain the appeal of the works. At the same time, the *HP Lexicon* does not appear to generate substantial offsetting benefits in terms of new analysis and content. As noted above, the book's value added merely reflects reorganization of material extracted from the books. Thus, the benefit of the book to consumers would only reflects their ability to access background on the series earlier than this information (and additional content) that would be available from Ms. Rowling's promised encyclopedia.

I declare under penalty of perjury that the foregoing is true and correct.

William M. Landes
January 15, 2008