UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X

WARNER BROS. ENTERTAINMENT INC. and
J.K. ROWLING,

        Plaintiffs,

-against-

RDR BOOKS and DOES 1-10,

        Defendants.

------------------------------------- X

Case No. 07-CV-9667 (RPP)

### DECLARATION OF NEIL BLAIR IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Neil Blair, declare and state as follows:

1. I am an attorney and junior partner at Christopher Little Literary Agency ("CLLA"), J.K. Rowling's literary agency in this action. Except for the facts stated on information and belief, all of the facts set forth herein are known to me personally, and if called as a witness, I could and would testify competently thereto.

**Ms. Rowling's Intellectual Property**

2. J.K. Rowling is the author of the world-famous *Harry Potter* series of books (the "*Harry Potter* Books") including *Harry Potter and the Sorcerer's Stone*, released in the United States in 1998; *Harry Potter and the Chamber of Secrets* (1999), *Harry Potter and the Prisoner of Azkaban* (1999), *Harry Potter and the Goblet of Fire* (2000), *Harry Potter and the Order of the Phoenix* (2003), *Harry Potter and the Half-Blood Prince* (2005), and, finally, *Harry Potter and the Deathly Hallows* (2007).

3. In addition to the *Harry Potter* Books, Ms. Rowling also has authored and published two companion books to the *Harry Potter* Books so far – *Quidditch Through the Ages* and *Fantastic Beasts and Where to Find Them* (the "Companion Books") and has donated all of her royalties to charity. To date, these books have collectively raised approximately $30 million for the United Kingdom-based charity Comic Relief. Ms. Rowling has also recently auctioned a hand-written copy of a *Harry Potter*-related book entitled "The Tales of Beedle the Bard," one of only seven in existence, which generated approximately $4 million which was donated to The Children's Voice Campaign.

4. The seven *Harry Potter* Books and two Companion Books published to date have been registered with the United States Copyright Office. Attached hereto as **Exhibit A** are the copyright registrations for those works, namely, *Harry Potter and the Sorcerer's Stone*, Serial No. TX 4-465-397; *Harry Potter and the Chamber of Secrets*, Serial No. TX 4-465-398; *Harry Potter and the Prisoner of Azkaban*, Serial No. TX 4-465-399; *Harry Potter and the Goblet of Fire*, Serial No. TX 5-122-771; *Harry Potter and the Order of the Phoenix*, Serial No. TX-5-705-321; *Harry Potter and the Half-Blood Prince*, Serial No. TX-6-179-388; *Harry Potter and the Deathly Hallows*, Serial No. TX-6-578-062; *Quidditch through the Ages*, TX-5-374-649; and *Fantastic Beasts and Where to Find Them*, TX-5-374-653. Ms. Rowling also owns a trademark in her name, "J.K. Rowling," registered with the United States Patent and Trademark Office under registration number 2757849.

**Ms. Rowling's Intellectual Property Protection Strategy**

5. Ms. Rowling has developed a long-term strategy to preserve the integrity of the *Harry Potter* Books and protect the copyrights that she holds in those works including monitoring the marketplace to determine if unauthorized use of her works occurs, and taking

varying courses of action to enforce her rights against unauthorized users. These activities range from engaging in informal discussions, to writing more formal letters, to instituting litigation, with litigation always being the last resort.

6.      In addition, Ms. Rowling limits the number of licenses that are granted and the number of products that are made based on the *Harry Potter* Books. Ms. Rowling has been careful not to license certain types of "tie-in" books, including so-called "companion" books based on the series, especially those which merely repackage her creative expression without adding valuable analysis or scholarly commentary.

7.      In keeping with Ms. Rowling's strategy, CLLA, along with the help of outside counsel, has taken the necessary steps to protect Ms. Rowling's intellectual property rights in the *Harry Potter* Books and defend against those individuals who seek to diminish the value of the works, unfairly free-ride on their success, or impinge on the integrity of Ms. Rowling's original fictional creation.

8.      Upon obtaining information of a book or website, for example, that may potentially violate Ms. Rowling's intellectual property rights, it is our policy to instruct outside counsel to thoroughly review the work and assess whether or not the work violates any of Ms. Rowling's rights. If counsel has a good faith belief that the work is in fact infringing, efforts are made to communicate with the individual responsible for the work. Oftentimes, counsel asks that the individual cease and desist from the infringing conduct. If necessary, as a last resort, we will pursue legal action.

9.      For example, in 1999, we filed a lawsuit in this Court concerning an unauthorized *Harry Potter* magazine. We subsequently filed another complaint in this Court involving unauthorized *Harry Potter* Halloween costumes, obtaining a TRO and a recall order halting

distribution of such costumes. We have dealt with numerous proposed books, making sure that they are marketed in a non-misleading manner and preventing them from being published if they infringe Ms. Rowling's work without adding sufficient scholarly analysis or commentary. For example, in 2006 a publisher began offering for sale an "encyclopedia" that, similar to The *Harry Potter* Lexicon (the "Infringing Book"), contained lists detailing hundreds of elements and "facts" from the *Harry Potter* books and companion books. Counsel immediately requested the publisher to cease and desist. Consequently, the publisher halted publication and sale of the work without the need for litigation. We also have contacted a number of websites that sold unauthorized Harry Potter materials to get them to cease and desist.

7. In addition to aiding Ms. Rowling's protection of her intellectual property rights, CLLA is responsible for helping to promote Ms. Rowling and her works of authorship. As such, I have worked with Ms. Rowling to encourage fan-based web sites ("fan sites") to actively foster a robust *Harry Potter* fan community that includes fan participation in discussion groups, fan fiction, and other creative endeavors. In order to balance Ms. Rowling's dual interests in protecting her creative works and supporting fans of the *Harry Potter* books, I have reached out to developers of these fan sites to create an atmosphere of good faith relating to what material does and does not violate Ms. Rowling's rights. When necessary, I have worked with these fan sites to remove material that crosses the line and infringes Ms. Rowling's work, without disturbing non-infringing material.

8. Mr. Vander Ark, as the operator of the *Harry Potter Lexicon* website, hp-lexicon.org (the "*Lexicon* Website") has long been aware of Ms. Rowling's efforts to balance the interests of fan sites and those of Ms. Rowling. In the past, CLLA contacted Mr. Vander Ark on behalf of Ms. Rowling and asked him to remove certain infringing content from the *Lexicon*

Website. In that instance, Mr. Vander Ark posted content obtained by decompiling files from Ms. Rowling's copyrighted website without permission and reengineering them for display. My colleague at CLLA and I exchanged a series of emails with Mr. Vander Ark to ensure that this infringing material was removed. Attached hereto as **Exhibit B** is a true and correct copy of an email exchange between Mr. Vander Ark, myself and my colleague at CLLA relating to the removal of infringing material from the *Lexicon* Website.

**The Infringing Book**

10. I have been familiar with Steven Vander Ark, the author of the Infringing Book, because of his activities as the owner of the *Lexicon* Website.

11. We have always considered our relationship with Mr. Vander Ark to be one of mutual respect and cordiality. In addition to the dialogue concerning Mr. Vander Ark's use of decompiled files on the *Lexicon* Website, Mr. Vander Ark would contact us from time to time about things relating to Ms. Rowling or the *Harry Potter* series.

12. In July, 2007, Mr. Vander Ark contacted this agency via email concerning Ms. Rowling's publicly-stated plans to publish a reference guide to the *Harry Potter* Books. In his email, Mr. Vander Ark inquired about the possibility of employment, stating, "if [Ms. Rowling] is thinking of working on an encyclopedia or other references to the series, I would be a good candidate to work as an editor, given my work on the Lexicon." The Christopher Little Agency turned down Mr. Vander Ark. In response to his inquiry, we stated that, "should Jo decide to work on an encyclopedia or other HP companion book, she will definitely not be looking to collaborate with anyone." Attached as **Exhibit C** is a true and accurate copy of the email string between Mr. Vander Ark and the Christopher Little Literary Agency.

14. Just a few months later, while visiting the site www.PublishersMarketplace.com, I

saw an advertisement announcing that RDR Books would be publishing a book entitled "The Harry Potter Lexicon," authored by Steve Vander Ark -- the owner of the *Lexicon* Website" -- and purportedly scheduled for release in late October 2007. Attached as **Exhibit D** is a true and accurate copy of the advertisement from the website www.PublishersMarketplace.com.

15. Based on the description in the PublishersMarketplace.com advertisement and being familiar with the content of the *Lexicon* Website, Ms. Rowling and I became concerned about the nature of the book. As such, on September 12, 2007, I wrote a friendly email to Mr. Vander Ark and RDR Books and appealed to them as fans of Ms. Rowling's work to forego publication of *The Harry Potter Lexicon*. After six days, on September 18, 2007, the only reply I received was an email from Mr. Vander Ark advising that he "[had] been asked to leave all correspondence on this matter to others."

16. Having been rebuffed by my informal efforts to resolve this matter, I then contacted Ms. Rowling's outside counsel, Dale Cendali of O'Melveny & Myers LLP. She and her firm made repeated efforts, as described in the accompanying Declaration of Dale Cendali, to have RDR Books and Mr. Vander Ark halt publication of *The Harry Potter Lexicon*, or to at least give us a copy of the book so that we could review it. All of these efforts were rebuffed.

17. As Ms. Rowling never gave RDR Books, or anyone else, permission to publish a Harry Potter encyclopedia, but rather wishes to write such a book herself and donate the proceeds to charity, we were left with no choice but to file this lawsuit.

18. Having now seen the proposed manuscript of *The Harry Potter Lexicon*, I am more distressed than ever at the infringing nature of the material to be included therein. The manuscript does not contain any of the fan fiction, art, essays or analysis that appears on the *Lexicon* Website. Instead, the manuscript is comprised solely of an alphabetical list of the

people, places and things from the *Harry Potter* Books. The manuscript contains no analysis, no criticism and no commentary -- just a mere re-telling of the fictional facts related to each entry. This is exactly the type of work which CLLA generally opposes on Ms. Rowling's behalf as violating her copyrights.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 6, 2008, at London, England.

Respectfully submitted,

By: _____
Neil Blair