UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WARNER BROS. ENTERTAINMENT, INC. and
J.K. ROWLING,

> Plaintiffs,

-against-

RDR BOOKS and DOES 1-10,

> Defendants.

Case No.: 07-CV-9667 (RPP)

---

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF PLAINTIFFS WARNER BROS. ENTERTAINMENT, INC. AND J.K. ROWLING FOR PRELIMINARY INJUNCTION

Dale M. Cendali (DC 2676)
Melanie Bradley (MB 0823)
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY - 10036
Telephone:     (212) 326-2000
Facsimile:     (212) 326-2061

Attorneys for Plaintiffs Warner Bros.
Entertainment, Inc. and J.K. Rowling

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT .......................................................................... 1

FACTUAL BACKGROUND ............................................................................. 3

    The World of Harry Potter .......................................................................... 3

    Plaintiffs' Licensing and Enforcement Strategy ........................................ 4

    RDR's and Vander Ark's Infringing Activities ......................................... 5

ARGUMENT ....................................................................................................... 8

I.     PLAINTIFFS HAVE MET THE STANDARD FOR INJUNCTIVE RELIEF ................. 8

II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................... 9

    A.    The Book Infringes Plaintiffs' Copyrights ........................................... 9

        1.    RDR Has Copied Plaintiffs' Copyrighted Works ...................... 9

        2.    Defendant's Use Is Not "Fair" ................................................... 10

            a.    The Book Is Not Transformative ................................. 11

            b.    Plaintiffs' Creative Works Deserve Strong Protection ................ 14

            c.    The Book Misappropriates Ms. Rowling's Creative Expression ........................................................................... 14

            d.    The Market for Ms. Rowling's Work Will Be Harmed .............. 15

            e.    RDR's Bad Faith Precludes a Finding of Fair Use ..................... 17

    B.    RDR Has Engaged in False Endorsement and False Advertising ...................... 18

        1.    Use Of Ms. Rowling's Name Is An Actionable False Endorsement ....... 18

        2.    RDR's Conduct Constitutes False Advertising ........................ 21

III.   PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ABSENT RELIEF ............. 22

IV.   THE BALANCE OF HARDSHIPS FAVORS PLAINTIFFS, AND THERE ARE FAIR GROUNDS FOR LITIGATION ......................................................... 23

CONCLUSION .................................................................................................. 25

## TABLE OF AUTHORITIES

**Page**

### CASES

*ABKCO Music v. Stellar Records,*
　96 F.3d 60 (2d Cir. 1996)..........................................................................9, 22, 23

*Allen v. Nat'l Video, Inc.,*
　610 F. Supp. 612 (S.D.N.Y. 1985) ......................................................................18, 20

*American Brands, Inc. v. R.J. Reynolds Tobacco Co.,*
　413 F. Supp. 1352 (S.D.N.Y. 1976)......................................................................21

*Apple Computer Inc. v. Franklin Computer Corp.,*
　714 F.2d 1240 (3d Cir. 1983), *cert. dismissed,* 464 U.S. 1033 (1984) ................................24

*Burroughs v. Metro-Goldwyn-Mayer, Inc.,*
　519 F. Supp. 388 (S.D.N.Y. 1981) ......................................................................9

*Campbell v. Acuff-Rose Music, Inc.,*
　510 U.S. 569 (1994)..........................................................................11, 14, 15

*Castle Rock Ent., Inc. v. Carol Publ'g Group, Inc.,*
　150 F.3d 132 (2d Cir. 1998)....................................................................passim

*Castle Rock Ent., Inc. v. Carol Publ'g Group, Inc.,*
　955 F. Supp. 260 (S.D.N.Y. 1997) ......................................................................10

*Clinique Labs., Inc. v. Dep Corp.,*
　945 F. Supp. 547 (S.D.N.Y. 1996)......................................................................20

*Coca-Cola Co. v. Tropicana Products, Inc.,*
　690 F.2d 312 (2d Cir. 1982)......................................................................21

*Concrete Mach. Co. v. Classic Lawn Ornaments,*
　843 F.2d 600 (1st Cir. 1988)......................................................................24

*Construction Tech., Inc. v. Lockformer Co., Inc.,*
　704 F. Supp. 1212 (S.D.N.Y. 1989)......................................................................18

*Consumers Union of the U.S., Inc. v. The New Regina Corp.,*
　664 F. Supp. 753 (S.D.N.Y. 1987) ......................................................................19

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,*
　604 F.2d 200 (2d Cir. 1979)......................................................................18

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,*
　111 F.3d 993 (2d Cir. 1997)......................................................................19

*Hasbro Inc. v. Lanard Toys, Ltd.,*
　858 F.2d 70 (2d Cir. 1988)......................................................................22

*Home Box Office, Inc. v. Showtime/Movie Channel, Inc.,*
　832 F.2d 1311 (2d Cir. 1987)......................................................................20

*Johnson & Johnson v. Carter-Wallace, Inc.,*
　631 F.2d 186 (2d Cir. 1980)......................................................................22

*Miramax Films Corp. v. Columbia Pictures Entm't, Inc.,*
　996 F. Supp. 294 (S.D.N.Y. 1998) ......................................................................20

*Mylan Pharms., Inc. v. Procter & Gamble Co.,*
　443 F. Supp. 2d 453 (S.D.N.Y. 2006)......................................................................21

## TABLE OF AUTHORITIES
### (continued)

**Page**

*McNeil-PPC, Inc. v. Pfizer, Inc.,*
    351 F. Supp. 2d 226 (S.D.N.Y. 2005)............................................................ 20

*My-T Fine Corp. v. Samuels,*
    69 F.2d 76 (2d Cir. 1934)............................................................................ 24

*New Line Cinema Corp. v. Bertlesman Music Group, Inc.,*
    693 F. Supp. 1517 (S.D.N.Y. 1988)......................................................... 9, 24, 25

*Novelty Textile Mills v. Joan Fabrics Corp.,*
    558 F.2d 1090 (2d Cir. 1977)....................................................................... 9

*Paramount Pictures Corp. v. Carol Publ'g Group,*
    11 F. Supp. 2d 329 (S.D.N.Y. 1998)....................................................... passim

*RJR Foods, Inc. v. White Rock Corp.,*
    603 F.2d 1058 (2d Cir. 1979)...................................................................... 19

*Roy Export Co. Establishment v. Columbia Broadcasting Sys. Inc.,*
    503 F. Supp. 1137 (S.D.N.Y. 1980)............................................................ 15

*Tin Pan Apple, Inc. v. Miller Brewing Co.,*
    737 F. Supp. 826 (S.D.N.Y. 1990) .......................................................... 19, 21

*Toho Co., Ltd. v. William Morrow and Co., Inc.,*
    33 F. Supp. 2d 1206 (C.D. Cal. 1998) ...................................................... 13, 15

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.,*
    996 F.2d 1366 (2d Cir. 1993)................................................................. passim

*Ty, Inc. v. Publ'ns Int'l Ltd.,*
    292 F.3d 512 (7th Cir. 2002) ....................................................................... 13

*Ty, Inc. v. Publ'ns Int'l Ltd.,*
    333 F. Supp. 2d 705 (N.D. Ill. 2004) .......................................................... 13

*Vidal Sassoon Inc. v. Bristol-Myers Co.,*
    661 F.2d 272 (2d Cir. 1981)........................................................................ 21

*Virgin Enters. Ltd. v. Nawab,*
    335 F.3d 141 (2d Cir. 2003).......................................................................... 19

*Yurman Design Inc. v. Diamonds and Time, Halton's Jeweler's, Inc.,*
    169 F. Supp. 2d 181 (S.D.N.Y. 2001)......................................................... 20

## STATUTES

15 U.S.C. § 1125(a)(1)(A) ................................................................................. 18

15 U.S.C. § 1125(a)(1)(B) ................................................................................. 18

17 U.S.C. § 410(c) ............................................................................................. 9

17 U.S.C. § 106 ................................................................................................. 11

17 U.S.C. § 107 ................................................................................................. 11

## TABLE OF AUTHORITIES
### (continued)

## OTHER AUTHORITIES

*Manual for Complex Litigation*, 116 (5th ed. 1981) ................................................................. 19

N.Y. Civ. Rights L. §§ 50-51 ....................................................................................................18

N.Y. Gen. Bus. L. § 349 ............................................................................................................18

J.K. Rowling and Warner Bros. Inc. ("WB") (collectively, "Plaintiffs") respectfully submit this Memorandum of Law in support of their motion to preliminarily enjoin RDR Books ("RDR") from marketing or selling its planned book "The Harry Potter Lexicon" (the "Book").

## PRELIMINARY STATEMENT

The *Harry Potter* series of books (the "Series") is a unique cultural phenomenon that has cast a worldwide spell. Although Ms. Rowling has allowed fans and scholars wide latitude to comment on, critique, and even create "fan fiction" and art based on her stories, the Book clearly crosses the line. Seeking to cash in and free ride on the Series' success, the Book copies from it wholesale, presenting snippets in alphabetical order while adding no creativity or inventiveness and contributing nothing original to the reader's understanding of the Series. RDR's use of Plaintiffs' works for its own commercial benefit stands in direct conflict with Ms. Rowling's long-stated plans to create her own comprehensive guide for the Series and donate the proceeds to charity, as she has done with the more than $30 million generated by the two more narrowly focused companion books that she has published (collectively, the "Companion Books").

RDR's attempt to justify its infringement as "scholarship" is a sham. It is not a reference book or scholarly critique, merely a mass-market work that lifts whole chunks of Ms. Rowling's text and orders them alphabetically, in effect "rearranging the furniture" that Ms. Rowling created while lacking any originality or invention. As discussed below, the Second Circuit has expressly stated that such works are copyright infringements warranting injunctive relief and not fair use. *See, e.g.*, *Castle Rock Ent., Inc. v. Carol Publ'g,Group, Inc.*, 150 F.3d 132, 138-39 (2d Cir. 1998). The availability of the Book's content on "The Harry Potter Lexicon*"* website at <hp-lexicon.org> (the "Website") does not change the result; there is a world of difference between permitting a free fan site to operate and allowing RDR to commercialize those efforts in derogation of Plaintiffs' rights. Moreover, unlike the Book, an intangible website that takes

several days to print is not a market substitute for Ms. Rowling's planned book.  A contrary rule

would also harm the fan community by necessitating more monitoring and restriction of fan

activity by copyright owners afraid of compromising their rights against infringers.

Injunctive relief is particularly appropriate here given the striking evidence of RDR's bad

faith in proceeding with the Book despite knowing that its conduct was unlawful.  Steven Vander

Ark, owner of the Website and the Book's "author," has long been aware of Ms. Rowling's plan

to write a comprehensive companion book.  He even stated in a "smoking gun" e-mail that it

would be "illegal" to sell such a work without Ms. Rowling's permission and that she had

reserved her rights in the Series.  Yet, after unsuccessfully seeking employment as a co-author of

Ms. Rowling's planned encyclopedia, Vander Ark contracted with RDR, obtaining an express

indemnity against any claims by Ms. Rowling based on the Book.  RDR has also demonstrated

its understanding that the Book is unlawful, instructing foreign publishing agents "shopping" the

book to avoid foreign publishers of the Series and stalling Ms. Rowling's representatives who

were attempting to discuss the Book with RDR, while continuing to hawk the Book overseas.

Adding insult to injury, RDR has falsely advertised the Book, brazenly quoting Ms. Rowling

prominently on the Book's back cover and in marketing materials so as to suggest she has

endorsed the Book when she in fact vehemently opposes it.

Allowing RDR to proceed with the Book would irreparably injure Plaintiffs.  In addition

to the presumption of irreparable harm resulting from RDR's violation of Plaintiffs' intellectual

property rights, Ms. Rowling would effectively be "scooped" by her own work and deprived of

the exclusive right to be the first to create a definitive encyclopedia of the Series, as well as the

right to exercise quality control over derivative works based on the Series.  Moreover, when Ms.

Rowling publishes her own guide she might find herself in the absurd position of defending a

claim that she infringed RDR's copyright in its unauthorized derivative work based on *her* creation. Nor is this possibility remote: RDR has *already* written to WB claiming infringement of a timeline based on the Series and posted on the Website. There would also be a societal cost as permitting sale of the Book would open the door to similar unauthorized works, increasing transaction costs by making it unclear to prospective licensees who could grant all of the rights needed, confusing consumers as to what goods are authorized, and diluting the goodwill Plaintiffs have built up in the Series through their policing and quality control. For all of these reasons, this Court should bar RDR from publishing the Book in the United States and abroad.

## FACTUAL BACKGROUND

### The World of Harry Potter

The *Harry Potter* phenomenon began nearly 18 years ago when Ms. Rowling first put pen to paper during a train ride to London. Facing financial difficulties, the demands of single parenthood and the stress of preparing to resume a teaching career, she created a fictional world that has captured the imaginations of millions around the world. (Decl. of J.K. Rowling dated January 15, 2008 ("Rowling Decl.") ¶ 2). After publishing the first *Harry Potter* book in the United Kingdom in 1997 (1998 in the United States), Ms. Rowling chronicled the lives of Harry Potter and his friends in six subsequent books over the past 10 years. (*Id.*).

Ms. Rowling has been able to harness the Series' popularity for social good, including authoring the short Companion Books and donating all her royalties, now totaling over $30 million, to charity. (*Id.*, ¶ 6; Decl. of N. Blair dated January 6, 2008 ("Blair Decl.") ¶ 3). Ms. Rowling has also repeatedly stated, since at least 2001, that she plans to publish a *Harry Potter* encyclopedia once the Series was finished and similarly donate the proceeds to charity. (Rowling Decl. ¶ 5; Blair Decl. ¶ 17; Decl. of M. Bradley dated January 15, 2008 ("Bradley Decl.") ¶ 13). Ms. Rowling has created notes for that work and is also free to draw on the

detailed alphabetical indices and other materials already prepared by her publishers in the United States and United Kingdom, which are similar in content to the Book. (Rowling Decl. ¶ 7; Decl. of S. Odedina dated January 9, 2008 ("Odedina Decl.") ¶¶ 2-3; Decl. of C. Klein dated January 14, 2008 ("Klein Decl.") ¶¶ 2-3). The final *Harry Potter* book was released in July 2007; Ms. Rowling toured in support of it until December 2007. (Rowling Decl. ¶ 8). Ms. Rowling owns valid U.S. copyright registrations to the Series and the Companion Books. (Blair Decl. ¶ 4).

**Plaintiffs' Licensing and Enforcement Strategy**

Ms. Rowling has carefully selected the licensees with whom to work on projects based on the Series, including working with WB on the planned seven-film series based on the Series (the "Films"). Each film made to date is the subject of a copyright registration. (Decl. of J. N. Williams dated January 14, 2008 ("Williams Decl.") ¶¶ 3-4). Pursuant to its agreement with Ms. Rowling, WB also owns trademark rights in *Harry Potter*-related designations in connection with its film rights and ancillary merchandising projects (collectively, the "Marks"). (*Id.*, ¶¶ 5-6). To maintain the quality and integrity of the Series and Films (Collectively, the "*Harry Potter Works*") Ms. Rowling and WB carefully consider licensing requests. (Rowling Decl. ¶ 4; Williams Decl. ¶ 8). They deny many, making every effort to ensure that licensed materials are of the highest quality (Rowling Decl. ¶ 4; Williams Decl. ¶ 9), and use licensee style guides and quality controls to ensure that their high standards are upheld. (Williams Decl. ¶¶ 9-10).

Plaintiffs also carefully guard against individuals who seek to diminish the value of the Series and Films or free-ride on their success to the detriment of Plaintiffs' licensing programs. (Blair Decl. ¶¶ 5-7). They have numerous cease and desist letters and filed several actions to protect their intellectual property rights. (*Id.*, ¶¶ 7-9). WB has spent hundreds of thousands of dollars in the past year alone protecting its rights and working with outside counsel, law enforcement agencies and customs officials to enforce its trademarks and copyrights around the

world. (Williams Decl. ¶¶ 12-13). As a result, Plaintiffs have safeguarded the goodwill and integrity associated with the Series, Films and Marks. (Williams Decl. ¶ 10; Blair Decl. ¶ 3). Plaintiff's efforts have involved policing their rights against infringement by unauthorized *Harry Potter*-related books, including unauthorized "companion" type books. (Williams Decl. ¶¶ 11-12; Blair Decl. ¶ 9). Plaintiffs do not object to books that analyze or comment on the series— even if they may not agree with the points made. They *do* object to books that simply repackage the world of *Harry Potter* in an unoriginal way to turn a profit, and to books that are marketed to falsely suggest that Plaintiffs have endorsed or approved them. (Williams Decl. ¶ 17).

Ms. Rowling deeply appreciates the Series' fans and the enthusiasm and energy they bring to the *Harry Potter* fan community. (Rowling Decl. ¶ 5). Plaintiffs give fans wide latitude to comment on the *Harry Potter* Works, reference them on fan sites and create and post derivative works such as fan fiction/art. (*Id.*, ¶ 7; Williams Decl. ¶ 14; Blair Decl. ¶ 7). Ms. Rowling has even recognized the fans' hard work and dedication on her own website by giving "Fan Site Awards." (Rowling Decl. ¶ 5). However, these activities cross the line when they are offered for sale instead of fun. At that point they undermine the latitude given to true non-commercial fan activities and interfere with Plaintiffs' carefully monitored licensing program.[1] (Williams Decl. ¶ 15).

## RDR's and Vander Ark's Infringing Activities

In July 2007, during the rush to release the final *Harry Potter* book, Vander Ark, the Website's owner and well-aware of Ms. Rowling's plans for a *Harry Potter* encyclopedia, emailed her agent seeking employment as co-author of that book. (Blair Decl. ¶ 12). His request was declined. (Blair Decl. ¶ 12). Less than two months later, RDR announced it would be

---

[1] While some fan sites feature ads, the sites are free to fans and the ads primarily consist of minimal Google-style automated ads that Plaintiffs permit to help the sites defray their operating costs. (Williams Decl. ¶¶ 14-15.)

publishing the Book. (*Id.* ¶ 14). Ms. Rowling was concerned that the Book was designed to trade off the success of the Series and Films in violation of her rights and goals for the Series and Companion Books. (*Id.* ¶ 15). For over six weeks, Ms. Rowling's agent and Plaintiffs' counsel tried to reach RDR, asking it to drop or at least postpone its plans for the Book and provide Plaintiffs with a copy so that they could assess it and potentially resolve any issues. (*Id.* ¶ 16; Decl. of D. Cendali dated January 15, 2008 ("Cendali Decl.") ¶¶ 3-13.) These efforts were utterly rebuffed. (Blair Decl. ¶ 16; Cendali Decl. ¶¶ 3-13). Instead, RDR apparently sought to string Plaintiffs along while continuing surreptitiously to market the book. (Cendali Decl. ¶¶ 9-11). Plaintiffs filed this suit on October 31, 2007, after futilely offering RDR a last chance to cease publication, or at least provide a copy of the manuscript. (*Id.* ¶ 13).

On November 6, 2007, after this Court granted Plaintiffs limited expedited discovery, RDR finally provided Plaintiffs a copy of the manuscript and proposed cover, which confirmed that the Book merely repackages the fictional facts created by Ms. Rowling in an unoriginal fashion. (Decl. of E. Blumsack dated January 15, 2008 ("Blumsack Decl.") ¶ 3). Despite indicating previously that the Book was a "print version" of the Website, the manuscript showed otherwise.[2] (*Id.*). Unlike other *Harry Potter*-related books that contain analysis, commentary, criticism or other original material, the Book simply lists, in alphabetical order, all of the characters, creatures, spells and other fictional elements from the Series and defines them as Ms. Rowling does in her works—even going so far as to repeatedly quote verbatim and closely paraphrase significant passages from the Series. (Decl. of D. Birchall dated January 14, 2008

---

[2]  The Website contains more than 700+ web pages of material, including critical essays, fan fiction/art, discussion forums, an interesting, graphical format and cross-referenced hyperlinks, additional features that were central to Ms. Rowling's recognizing it with a 2004 Fan Site Award, which did not and does not constitute Ms. Rowling's permission or endorsement of the Book. Rowling Decl. ¶ 5. Also, the material on the Website is presented in a wholly different graphic design than the Book (Bradley Decl. ¶¶ 2-7) and is not easily or readily downloaded. (Decl. of D. Perry dated December 21, 2007 ("Perry Decl.") ¶¶ 2-4.) It appears to be designed to prevent pages from being printed. (Bradley Decl. ¶¶ 10-12.)

("Birchall Decl.") ¶¶ 3-10; Blumsack Decl. ¶¶ 6-8). Short entries typically have direct

quotations or paraphrases; large entries retell Ms. Rowling's story in an abridged fashion.

(Birchall Decl. ¶¶ 3-10). As Professor Johnson of Oxford explains, the Book is not scholarly—it

merely "rearranges the furniture" of Ms. Rowling's masterpiece by chopping it into pieces.

(Decl. of J. Johnson dated January 10, 2008 ("Johnson Decl.") ¶¶ 9-10).

     Beyond its infringing content, RDR deliberately markets the Book so as to mislead

consumers into believing that it has been endorsed by Plaintiffs. (Decl. of S. Murphy dated

January 14, 2008 ("Murphy Decl.") ¶ 12). On the back cover, prominent, bold type reads

"Winner of J.K. Rowling's Fan Site Award," with a misleading quotation from Ms. Rowling

taken out of context from comments she made regarding the free Website in 2004. (Rowling

Decl. ¶ 10; Murphy Decl. ¶ 13-14; Blumsack Decl. ¶¶ 4-5). RDR's use of this quote falsely

suggests to consumers that Ms. Rowling has given the Book an award and endorsement.

(Murphy Decl. ¶ 13-14). RDR also has deliberately misused this quotation in its marketing

materials and in direct solicitations to foreign publishers and domestic retailers to capitalize on

Ms. Rowling's reputation and boost its own sales. (Bradley Decl. ¶ 17). The revised cover that

RDR subsequently prepared included disclaimers, but they are not as prominent as is standard

publishing practice or clear enough to dispel the confusion caused by the misleading use of Ms.

Rowling's name and quotation—which tellingly remain on the revised cover despite RDR's

knowledge that Ms. Rowling vehemently opposes the Book. (Murphy Decl. ¶¶ 13-14.) Only a

very careful reader would notice the disclaimers tucked away on the back cover. (*Id.* ¶ 13). As

detailed below, Plaintiffs' survey shows *at least* 38%, and possibly as high as 55%, of

respondents think Ms. Rowling has endorsed the book as a result of that calculatedly misleading

cover. (Decl. of M. Helfgott dated January 14, 2008 ("Helfgott Decl.") ¶ 2).

Even as RDR and Vander Ark infringe Ms. Rowling's work claiming fair use, Vander Ark aggressively protects what he believes to be his own copyrights by prohibiting any copying of his Website. (Bradley Decl. ¶ 12.) This double standard is emblematic of Vander Ark's disingenuous claims to be a fan and RDR's position in this case. (Bradley Decl. ¶7.)

Vander Ark and RDR have proceeded with the Book despite knowing that it infringes Plaintiffs' rights. For example, in May 2005, two fans contacted Vander Ark to discuss the possibility of collaborating on a "Fan-Made Harry Potter Encyclopedia." (Decl. of J. Lares dated January 8, 2008 ("Lares Decl.") ¶ 2; Decl. of M. Lawlis dated January 5, 2008 ("Lawlis Decl.") ¶ 2). In his reply, Vander Ark admitted that such a work would be unlawful: "Basically, it is illegal to sell a book like that. Jo has reserved all publishing rights to her intellectual property, which means that she's the only one who may publish any book that is a guide or encyclopedia to her world." (Lares Decl. ¶ 3, Lawlis Decl. ¶ 3).

RDR and Vander Ark's contract supports this conclusion. Although normally an author warrants that a book does not infringe any third party rights and indemnifies the publisher, here *RDR indemnified Vander Ark* against any copyright infringement claims by *Ms. Rowling* (but not by others). (Bradley Decl. ¶ 14). It also tried to hide its infringement by insisting that foreign publishing agents not show or discuss the Book with publishers of the Series. (Bradley Decl. ¶ 15). Not even repeated letters from Plaintiffs' representatives could convince RDR to cease or even temporarily suspend its efforts to publish.

## ARGUMENT

**I.   PLAINTIFFS HAVE MET THE STANDARD FOR INJUNCTIVE RELIEF**

Injunctive relief is warranted when a plaintiff shows (1) irreparable harm; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly

in Plaintiffs' favor.  *See ABKCO Music v. Stellar Records*, 96 F.3d 60, 64 (2d Cir. 1996).

Plaintiffs easily meet this test as to their copyright and misleading marketing claims.

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    The Book Infringes Plaintiffs' Copyrights

Plaintiffs can easily establish *prima facie* copyright infringement based on (1) ownership

of a valid, existing copyright; and (2) RDR's unauthorized copying of their copyrighted material.

*See Novelty Textile Mills v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 (2d Cir. 1977).

### 1.    RDR Has Copied Plaintiffs' Copyrighted Works

Plaintiffs own United States copyright registrations for the Series, the two Companion

Books and the Films.  (Blair Decl. ¶ 4; Williams Decl. ¶ 3).  These registrations are *prima facie*

evidence of the copyrightability of the *Harry Potter* Works and the validity of Plaintiffs'

copyrights.  *See* 17 U.S.C. § 410(c); *see also Novelty Textile Mills*, 558 F.2d at 1092 n.1.

Ms. Rowling also owns copyrights in the fictional characters, events, places, and things

that she has created and developed.  *See Castle Rock*, 150 F.3d at 139 (fictional characters and

facts created by *Seinfeld* writers were protectable expression); *Paramount Pictures Corp. v.*

*Carol Publ'g Group*, 11 F. Supp. 2d 329 (S.D.N.Y. 1998); *see also New Line Cinema Corp. v.*

*Bertlesman Music Group, Inc.*, 693 F. Supp. 1517, 1521 n.5 (S.D.N.Y. 1988); *Burroughs v.*

*Metro-Goldwyn-Mayer, Inc.*, 519 F. Supp. 388, 391 (S.D.N.Y. 1981).  There can be no doubt

that Plaintiffs own valid, existing copyrights.

Copying can be proven by direct evidence of copying or by showing access to the

underlying work and similarities between the works that are probative of actionable copying.

*Castle Rock*, 150 F.3d at 137; *Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.*, 996 F.2d

1366, 1372 (2d Cir. 1993); *Paramount*, 11 F. Supp. 2d at 332-33; *Castle Rock Entm't v. Carol*

*Publ'g Group*, 955 F. Supp. 260, 264 (S.D.N.Y. 1997), *aff'd* 150 F.3d 132 (2d Cir. 1998).  Here,

the Book indisputably copies the *Harry Potter* Works; Vander Ark freely admits that the

Website's encyclopedia section is based on his detailed notes on the Series.  (Bradley Decl. ¶ 7).

*See Paramount*, 11 F. Supp. 2d at 332 (copying inquiry unnecessary where book took quotations

from *Star Trek* television series and told its fictional "history"); *Castle Rock*, 955 F. Supp. at 264

(trivia book copied material from *Seinfeld* television series).  Because the Book admittedly

copies the Harry Potter Works, the only inquiry is whether such copying is actionable.  *Castle

Rock*, 150 F.3d at 138; *Paramount*, 11 F. Supp. 2d at 333.

In *Castle Rock*, which is directly analogous, the Second Circuit said that "substantial

similarity depends on whether the copying is quantitatively and qualitatively sufficient to support

a finding of actionable copying."  *Castle Rock*, 150 F.3d at 138.  Because the Book, in the

aggregate, has appropriated 400 pages of material directly from the Series, just like the *Seinfeld*

*Aptitude Test* in *Castle Rock* it clearly "has crossed the *de minimis* threshold."  *Castle Rock*, 150

F.3d at 138 (copying 643 fragments from an 84-episode tv series was actionable); *see also Twin*

*Peaks*, 996 F.2d at 1372 (2d Cir. 1993) (taking 89 lines of dialogue for companion book was

actionable).  As for the qualitative prong, the entire Book is based on Ms. Rowling's fictional

facts and world.  (Birchall Decl. ¶¶ 3-4, 10; Bradley Decl. ¶ 7; Johnson Decl. ¶¶ 5-6).  Even

those few entries identifying real places or things are defined solely as Ms. Rowling defined

them in the Series.  (Johnson Decl. ¶ 7).  Such wholesale copying of protected expression is

clearly qualitatively significant.  *Castle Rock*, 150 F.3d at 138; *see also Twin Peaks*, 996 F.2d at

1372-73; *Paramount*, 11 F. Supp. 2d at 332-33.  RDR's extensive copying, both quantitatively

and qualitatively, plainly violates Plaintiffs' copyrights in the *Harry Potter* Works.

## 2.    Defendant's Use Is Not "Fair"

Although RDR will presumably argue that its wholesale copying is a "fair use," the law is

clear that repackaging "fictional facts" from another's creative work is *not* a fair use.  *Castle*

*Rock*, 150 F.3d at 142-43, 144 (*Seinfeld* trivia book containing numerous fictional facts and references not fair use); *Paramount*, 11 F. Supp. 2d at 335 (book that merely recounted television series' fictional history and characters not fair use); *Twin Peaks*, 996 F.2d at 1375, 1376-77 (companion book retelling fictional "plot details" from *Twin Peaks* was not fair use).

Authors have the exclusive right to control and authorize derivative works, 17 U.S.C. § 106, giving them an incentive to create.  (Decl. of William M. Landes dated January 15, 2008 ("Landes Decl.") ¶¶ 8-16).  The fair use doctrine is a narrow exception that permits limited unauthorized use for purposes such as criticism, comment, news, reporting, teaching, scholarship, or research of a copyrighted work.  17 U.S.C. §107.  The fair use doctrine should be cautiously applied, and is not applicable here because it would harm economic efficiency thereby contravening the policies that underlie the Copyright Act.  (Landes Decl. ¶¶ 18, 24-25).

In determining whether a use is "fair," courts analyze: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 576-77 (1994); 17 U.S.C. §107.  None of these factors favor RDR.

### a.    The Book Is Not Transformative

To determine the purpose and character of a use, courts consider (1) whether the infringing work is commercial in nature; and (2) whether it transforms the original to create new, protected expression.  *Campbell*, 510 U.S. at 578-579.  The Book, a $24.95 mass market book, undoubtedly is commercial.  (Bradley Decl. ¶ 17; Rowling Decl. ¶ 12).  Profit is its only possible purpose as nearly all of its content is already freely available on the Website.  Nor is it transformative, as it adds no value to the copyrighted work by using it as raw material "in the creation of new information, new aesthetics, new insights and understandings" and is merely

- 11 -

meant to "repackage [the original work] to entertain [the original work's] viewers." *Castle Rock*, 150 F.3d at 142 (finding trivia book non-transformative).

The Book simply takes elements from the *Harry Potter* Works, using direct quotations, close paraphrasing or detailed plot summaries, and puts them in alphabetical order. (Birchall Decl. ¶¶ 3-10.) "[C]ritically restructuring" elements of an original work into another "system of presentation" does not constitute a transformative purpose. *Castle Rock*, 150 F.3d at 142. In *Castle Rock*, for example, defendants created a quiz book based on *Seinfeld* that included "hundreds of spectacular questions of minute details from TV's greatest show about absolutely nothing." *Id.* at 136. The Second Circuit rejected defendants' argument that their book was transformative because it "decoded the…mystique that surrounds" the show and "articulate[d the sitcom's] true motive forces and its social and moral dimensions." *Id.* at 142. Here, as further evidence of the Book's lack of transformative purpose, it barely alters the original expression of the Series. *Id.* at 143. (Birchall Decl. ¶ 11). Vander Ark's diligence in listing the creative elements of Ms. Rowling's books does not make his alphabetical index a transformative fair use.

Further, where a detailed retelling of a plot merely "elaborates in detail far beyond what is required to serve any legitimate purpose," the first factor weighs in favor of the plaintiff. *Twin Peaks*, 996 F.2d at 1376. Because RDR's use of Ms. Rowling's protected expression "consists primarily of summarizing in great detail" the plots, characters and elements of the *Harry Potter* series and "goes far beyond merely identifying their basic outline for the transformative purposes of comment or criticism," the first factor favors Plaintiffs. *Id.* at 1375.

Finally, even where "the structure of the book differs from the dramatic linear format of the [underlying] Properties" RDR cannot show a transformative purpose. *Paramount*, 11 F. Supp. 2d at 332, 335 (book about *Star Trek* phenomenon consisted primarily of material taken

from the various *Star Trek* properties and was insufficiently transformative despite humorous comments interspersed within plot summaries). Courts of other circuits agree. *See, e.g., Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 520 (7th Cir. 2002) (collector's guide for Beanie Baby dolls that contained only minimal accompanying commentary did not appear to constitute fair use), *on remand*, 333 F. Supp. 2d 705, 719 (N.D. Ill. 2004) (guide book was not transformative and not fair use); *Toho Co., Ltd. v. William Morrow and Co., Inc.*, 33 F. Supp. 2d 1206 (C.D. Cal. 1998) (rejecting fair use claim for a 227-page compendium containing detailed plot summaries in addition to commentary, critique, trivia and pictures from the *Godzilla* films and finding use non-transformative). Here, although the Book does not track the chronological format of the Series, it nonetheless contains all of the elements with which to reconstruct the "heart" (not to mention the minutia) of Ms. Rowling's story. (Birchall Decl. ¶ 11).

Moreover, RDR's portrayal of the Book as "scholarship" or "research" is a ruse, as it does not present "new information, new aesthetics, new insights and understandings." *Castle Rock*, 150 F.3d at 142. Just as it is not a "transformative use," the Book cannot reasonably be classified as a work of scholarship or research as understood in the field of scholarly publishing. (Johnson Decl. ¶ 2). The requirements for a "transformative" use are closely analogous to those for "scholarship" or "research," namely, that it have "some degree of originality or invention, constitute an original investigation, or invent or generate … ideas leading to new or substantially improved insights." *Compare* (Johnson Decl. ¶ 4) *with Castle Rock*, 150 F.3d at 141. For a dictionary or "lexicon," in particular, the work must contribute in an original way to the creation, development or maintenance of the intellectual infrastructure -- that is, the language or discipline of "Harry Potter." (Johnson Decl. ¶ 4). The Book does none of these things, but as Vander Ark himself admits, merely catalogues information wholly and exclusively derived from Ms.

Rowling. (*Id.* ¶5; Bradley Decl. ¶ 7). Moreover, notwithstanding its feigned argument that the Book is for academics and scholars, RDR specifically targeted mass market children's bookstores and children's book buyers in its domestic sales strategy. (Bradley Decl. ¶ 16).

The Court need not decide whether every possible alphabetical catalogue of a work is a fair use. Given the unique facts *here*, where an author has long intended to publish an encyclopedia, her publishers have prepared material for her to use for that work, she is known for writing quickly and voluminously, she has granted fans wide latitude to create non-commercial websites and for scholars and others to do truly transformative works analyzing her books, and the content of the book at issue is available in a non-commercial way, to deprive Ms. Rowling of her right to reserve for herself the ability to create an encyclopedia for the Series is unwarranted.

### b.    Plaintiffs' Creative Works Deserve Strong Protection

The second factor, nature of the copyrighted work, recognizes that "some works are closer to the core of intended copyright protection than others," and considers whether the copyrighted work is expressive or creative and whether the work is published. *Castle Rock*, 150 F.3d at 143. Here, the *Harry Potter* Works are clearly creative fictional works entitled to the strongest protection, particularly where the secondary work is "at best minimally transformative." *Id.* at 144; *see also Twin Peaks*, 996 F.2d at 1376 (second factor "must favor a creative and fictional work, no matter how successful."); *Paramount*, 11 F. Supp. 2d at 336 (resolving the factor in a single sentence because the determination was "straight forward").

### c.    The Book Misappropriates Ms. Rowling's Creative Expression

The third factor, the amount and substantiality of the portion used, asks whether the amount copied exceeds that necessary to further the purpose and character of the new work. *Campbell*, 510 U.S. at 586; *Castle Rock*, 150 F.3d at 144 (extensive use of underlying work suggested entertainment purpose rather than commentary). Here, RDR's Book takes every

element and character from the Series and puts them in alphabetical order without a shred of analysis, commentary or reference to any other work. (Birchall Decl. ¶ 3). Entries for key characters "consist of long, detailed prose summarizing extensive portions of the plot" of the Series, far exceeding what would be necessary to comment on or analyze the *Harry Potter* Works. (*Id.* ¶ 5). Other entries extensively paraphrase and quote lengthy portions verbatim, far beyond that necessary to create a legitimately transformative work. (*Id.* ¶¶ 7-10). *See Castle Rock*, 150 F.3d at 144; *Twin Peaks Prods.*, 996 F.2d at 1376-77 (third factor favored plaintiffs where companion book "provides synopses for several episodes, lifting many parts verbatim from the script"); *see also Toho*, 33 F. Supp. 2d at 1217 (unauthorized *Godzilla* compendium not fair use; even some commentary on films did not justify pages and pages of plot summary). RDR's substantial taking from the Series weighs this factor in favor of Plaintiffs.

### d.    The Market For Ms. Rowling's Work Will Be Harmed

Under the fourth factor, courts must consider "the current and potential market" for derivative works in addition to the primary market for the original work itself, as well as whether "unrestricted and widespread conduct of the sort engaged in by the defendant...would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (citations omitted). Unlike *Twin Peaks*, where the fourth factor favored defendant because its "work filled a market niche that the plaintiff simply had no interest in occupying," Ms. Rowling has made clear that she affirmatively intends to fill the market niche for a *Harry Potter* encyclopedia. (Bradley Decl. ¶ 13; Rowling Decl. ¶¶ 6-7) *Twin* Peaks, 996 F.2d at 1377; *see also Toho*, 33 F. Supp. 2d at 1217 ("Because [defendant's] book and [plaintiff's licensee's] book are attempting to capitalize on this market, there would be an adverse effect on the potential market for [plaintiff]"); *Roy Export Co. Estab. v. Columbia Broad. Sys. Inc.*, 503 F. Supp. 1137, 1146 (S.D.N.Y. 1980) (value of author's exclusive right to make derivative work "would

- 15 -

certainly seem to be diminished by the ability of another to use the copyrighted work in order to compete at will with the derivative work"). Not only is Ms. Rowling entitled to exclusivity in her derivative works under the Act, but from a marketing perspective RDR could usurp the benefits of first publication by using Ms. Rowling's own creative works. (Murphy Decl. ¶¶ 4-6)

Moreover, RDR has deliberately timed the release of the Book to follow close on the publication of the final installment of the Series, capitalizing on the excitement surrounding its release and cornering the market before Ms. Rowling has a chance to draft her companion guide and obtaining an undeserved market advantage while lessening the distinctiveness of Ms. Rowling's subsequent book. (Murphy Decl. ¶ 5; Landes Decl. ¶ 38). In addition, the Book's publication would rob Plaintiffs of licensing opportunities and undermine their licensing program because they would be unable to guarantee exclusivity to potential derivative works licensees or to properly enforce quality control. (Landes Decl. ¶¶ 8-11, 29-30; Williams Decl. ¶ 18).

In *Twin Peaks*, the Second Circuit held that a companion book to the *Twin Peaks* program would "almost certainly interfere[ ] with legitimate markets for derivative works," in part because the copyright owner had already licensed two companion books and stated its intention to license more. *Twin Peaks*, 996 F.2d at 1377. A copyright owner's claim is stronger where, as here, the infringing book merely reports on the content of the original in extraordinary detail. *Id.* RDR seeks to occupy a market for derivative works that Ms. Rowling is exclusively entitled to exploit either herself or through the grant of exclusive licenses. This harm is not merely hypothetical: Ms. Rowling already has an extensive licensing program in place and plans to exercise certain of her exclusive rights *herself,* donating the proceeds to charity as she did with the $30 million generated by the Companion Books. (Blair Decl. ¶¶ 3, 17; Rowling Decl. ¶ 6).

Plaintiffs also carefully maintain their licensing programs to ensure the quality associated with the *Harry Potter* Works. (Blair Decl. ¶¶ 5-6; Rowling Decl. ¶ 4; Williams Decl. ¶¶ 7-10). RDR's attempt to destroy this exclusivity not only harms the market for currently licensed works by tarnishing the reputation of the *Harry Potter* Works by failing to meet Plaintiffs' exacting standards, but harms the potential market for future licenses by introducing additional transactions costs and uncertainty. (Landes Decl. ¶ 12-16). If RDR is permitted to continue its infringement, the specter of many more unauthorized infringers would chill the license market that Plaintiffs have carefully cultivated. Thus, the fourth factor also favors Plaintiffs.

> **e.    RDR's Bad Faith Precludes a Finding of Fair Use**

Finally, in addition to the four statutory factors, courts consider whether a defendant has run afoul of principles of equity, "presuppos[ing] good faith and fair dealing." *Roy*, 503 F. Supp. at 1146-47. Here, RDR and Vander Ark conducted their entire enterprise in clandestine fashion. They knew Ms. Rowling intended to write her own encyclopedia. (Blair Decl. ¶ 12; Bradley Decl. ¶ 13; Rowling Decl. ¶¶ 6, 9). Mr. Vander Ark even told other fans that writing an encyclopedia without permission would be a violation of her rights. (Lares Decl. ¶ 3; Lawlis Decl. ¶ 3). Yet he proceeded to do so anyway, after being indemnified by RDR, when he was rejected as a co-author by Ms. Rowling's agent. (Blair Decl. ¶ 12). RDR then began its plan to market the book under the radar to publishers who do not publish the *Harry Potter* books,[3] and, after Plaintiffs got wind of RDR's plans, to stall Plaintiffs while continuing to market the book and to refuse to produce a copy of the manuscript. (Bradley Decl. ¶ 15; Cendali Decl. ¶¶ 8-11).

Because RDR intentionally sought to capitalize on the fame and success of the *Harry Potter* Works through unauthorized wholesale copying of those works, Plaintiffs are likely to succeed on their claim for copyright infringement. The record clearly supports injunctive relief.

---

[3] Including by misleading marketing materials, as is discussed in Section B, below.

**B.**     **RDR Has Engaged in False Endorsement and False Advertising**

RDR's false and misleading promotion and marketing of the Book also warrant injunctive relief. Adding two artfully-placed disclaimers and the term "unofficial" to the revised cover still leaves the most pernicious element of the original, a 2004 quote by Ms. Rowling about the *Website*.[4]  (Rowling Decl. ¶¶ 10-14; Blumsack Decl. ¶¶ 4-5.)  RDR's use of this quote to suggest falsely that Ms. Rowling has endorsed the Book, which she vehemently opposes, constitutes false endorsement and false advertising under the Lanham Act. *See* 15 U.S.C. § 1125(a)(1)(A); § 1125(a)(1)(B).[5]

**1.**     **Use Of Ms. Rowling's Name Is An Actionable False Endorsement**

A false endorsement claim requires a showing that: (1) goods or services were involved; (2) interstate commerce was affected; and (3) there was a false designation of origin or false description of the goods or services. *Allen v. Nat'l Video, Inc.*, 610 F. Supp. 612, 625-26 (S.D.N.Y. 1985) (use of celebrity's picture falsely implied endorsement); *see also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204-05 (2d Cir. 1979).

The Book, a product sold in interstate commerce, satisfies the first two prongs. The third turns on whether RDR's use of Ms. Rowling's name and quote falsely suggests that she endorses the Book. *See Allen*, 610 F. Supp. at 627.  In analyzing false endorsement, courts consider: (1) the strength of plaintiffs' marks and name; (2) the similarity of the marks; (3) the proximity of

---

[4]  The *Lexicon*'s back cover states in capital letters, "Winner of J.K. Rowling's Fan Site Award," and quotes Ms. Rowling in reference to the *Lexicon* Website: "This is such a great site that I have been known to sneak into an Internet cafe while out writing and check a fact . . . A website for the dangerously obsessive; my natural home."

[5]  Plaintiffs also claim relief under Section 349 of the New York General Business Law and related common-law claims for unfair competition. As such claims substantially track the federal claims, this brief will not separately discuss them. *See* N.Y. Gen. Bus. Law. § 349. *Construction Technology, Inc. v. Lockformer Co., Inc.*, 704 F. Supp. 1212, 1217-18 (S.D.N.Y. 1989). Plaintiffs can also claim relief under Sections 50-51 of the New York Civil Rights Law. N.Y. Civ. Rights L. §§ 50-51 (2007). Plaintiffs can establish this claim by showing (1) use of Ms. Rowling's name, (2) for purposes of advertising, (3) without written consent. *See Allen v. Nat'l Video, Inc.*, 610 F. Supp. 612, 620 (S.D.N.Y. 1985). Here, the Book cover and all the marketing materials include the name "J.K. Rowling." In addition, RDR uses Ms. Rowling's name to promote the Book to bookstores. And lastly, Ms. Rowling has not consented to such use.

the products; (4) evidence of actual confusion as to source or sponsorship; (5) sophistication of

defendant's audience; and (6) defendant's good or bad faith. *Tin Pan Apple, Inc. v. Miller*

*Brewing Co.*, 737 F. Supp. 826, 834 (S.D.N.Y. 1990); *Allen*, 610 F. Supp. at 627.

The first factor, strength of the mark, measures the extent to which Ms. Rowling's name

has developed a favorable association in the mind of consumers. *Allen*, 610 F. Supp. at 627. As

the author of a true literary phenomenon, Ms. Rowling's name could hardly be more famous.

(Blair Decl. ¶ 2; Williams Decl. ¶ 8). She also owns a registered trademark in her name. (Blair

at ¶ 4). Thus, that factor favors Plaintiffs, as does the second factor, similarity of the marks,

because the marks are identical -- the Book's back cover uses "J.K. Rowling" twice. *See Virgin*

*Enters. Ltd. v. Nawab*, 335 F.3d 141, 149-50 (2d Cir. 2003). The third factor, proximity of the

goods, also favors Plaintiffs because the goods are both books about the fictional world of *Harry*

*Potter. See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1003 (2d Cir. 1997).

As to the fourth factor, the Book is unreleased so there has not yet been an opportunity

for consumer confusion. Nevertheless, it is well settled in this Circuit that a properly conducted

survey is admissible to prove confusion. *Consumers Union of the U.S., Inc. v. The New Regina*

*Corp.*, 664 F. Supp. 753, 768 (S.D.N.Y. 1987). Plaintiffs' expert, Dr. Helfgott, conducted such a

survey in keeping with the guidelines set out by the *Manual for Complex Litigation.* (Helfgott

Decl. ¶ 2.) *See Manual for Complex Litigation*, 116 (5th ed. 1981).

The survey showed that 55% of respondents believed the quote indicated that Ms.

Rowling had endorsed the Book. (Helfgott Decl. ¶ 2). Even discounting individuals who

displayed other types of confusion, such as thinking that Ms. Rowling owned the Website or

wrote the Book (arguably evidence of actual confusion), the survey still identified a 38%

confusion rate (*id.*), well above the level of actionable confusion. *See RJR Foods, Inc. v. White*

*Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (15-20% rate of confusion supported finding of trademark infringement); *Miramax Films Corp. v. Columbia Pictures Entm't, Inc.*, 996 F. Supp. 294, 299-300 (S.D.N.Y. 1998); (17% and 20% confusion rates supported a § 43(a)(1)(A) claim); *McNeil-PPC, Inc. v. Pfizer Inc.*, 351 F. Supp. 2d 226, 249 (S.D.N.Y. 2005) (20 % confusion rate was considered significant).

Plaintiffs' survey produced these strong results despite RDR's recent addition of disclaimers. RDR has failed to meet its heavy burden of showing that its disclaimers are effective in reducing consumer confusion. *See Home Box Office, Inc. v. Showtime/Movie Channel, Inc.*, 832 F.2d 1311, 1315 (2d Cir. 1987); *Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547, 556 (S.D.N.Y. 1996). When evaluating the effectiveness of a disclaimer, courts consider several factors, including the font size and text of the disclaimer. *Yurman Design Inc. v. Diamonds and Time, Halton's Jeweler's, Inc.*, 169 F. Supp. 2d 181, 186 (S.D.N.Y. 2001) ("miniscule" disclaimer did not effectively eliminate the confusion created by the ad). Here, both disclaimers are tiny and difficult to see, and are plainly ineffective. (Blumsack Decl. ¶ 5).

As to the fifth factor (sophistication of defendant's audience), RDR clearly seeks to mass-market the Book, targeting the children's book section of large retail chains. (Bradley Decl. ¶ 17). Given how the quote is used, even the savviest fans would believe that Ms. Rowling has endorsed the Book. (*Id.* at ¶ 17); *Allen*, 610 F. Supp. at 628 ("at a cursory glance, many consumers, even sophisticated ones, are likely to be confused." ). Under the sixth factor, RDR unquestionably acted in bad faith by purposely included Ms. Rowling's name and quote on its proposed cover and marketing materials without her permission. (Bradley Decl. ¶¶ 16-17). Nor did RDR ever advise Ms. Rowling or her representatives of its plans to turn material from the Website into a book. (Cendali Decl. ¶¶ 2-13.) In fact, RDR instructed foreign agents not to

pitch the Book to any of Ms. Rowling's publishers. (Bradley Decl. ¶ 15.) Even now RDR

continues to use Ms. Rowling's name and quote to promote the Book by falsely suggesting she

has endorsed it. (Blumsack Decl. ¶¶ 4-5; Murphy Decl. ¶¶ 12-15; Cendali Decl. ¶¶ 3-13). *See*

*Tin Pan Apple*, 737 F. Supp. at 835 ("That is bad faith raised to a higher power."). Because each

of the factors weighs heavily in Plaintiffs' favor, this Court should find that Plaintiffs are likely

to succeed on their false endorsement claim.

### 2.    RDR's Conduct Constitutes False Advertising

RDR's use of Ms. Rowling's quote on the cover of the Book also constitutes false

advertising under the Lanham Act. Plaintiffs can establish this claim by demonstrating that RDR

(1) uses a false or misleading description of fact or representation of fact (2) in interstate

commerce in connection with goods or services in commercial advertising or promotion and (3)

it is likely that some harm will result from the misrepresentation. 15 U.S.C. § 1125(a)(1)(B); *see*

*Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 314 (2d Cir. 1982).

As to the first element, Plaintiffs' survey shows that RDR's use of Ms. Rowling's quote

tends to mislead a significant number of consumers into thinking that she endorsed the Book.[6]

(Helfgott Decl. ¶ 2). Plaintiffs must also show that the misrepresentation is material and would

influence consumers' purchasing decisions. *Vidal Sassoon Inc. v. Bristol-Myers Co.*, 661 F.2d

272, 278 (2d Cir. 1981). Clearly RDR feels that the quote is material in that it will cause fans to

buy the Book -- otherwise it would not have included it on the Book's cover and kept it there

even after this suit began. *See Mylan Pharms., Inc. v. Procter & Gamble Co.*, 443 F. Supp. 2d

453, 463 (S.D.N.Y. 2006) (ad falsely implying that products were the same was material).

Plaintiffs can also satisfy the second prong, as RDR has marketed the Book using the misleading

---

[6] To establish false advertising, Plaintiffs need only show that the quote has the tendency to mislead or confuse
consumers. *American Brands, Inc. v. R.J. Reynolds Tobacco Co.*, 413 F. Supp. 1352, 1357 (S.D.N.Y. 1976).

quote and made use of similar marketing materials in the course of its dealings with book buyers and stores across the country. (Bradley Decl. ¶ 17).

To establish the third prong, that the false advertising would give rise to harm, Plaintiffs need only show that they have a "reasonable interest" in being protected against the false advertising and a "reasonable basis" for believing that interest is likely to be damaged. *See Johnson & Johnson v. Carter-Wallace, Inc.,* 631 F.2d 186, 190 (2d Cir. 1980). Here, Plaintiffs have worked hard to maintain a licensing strategy and ensure that Ms. Rowling's name is used only in connection with high quality, authorized products. Plaintiffs also have a significant interest in protecting against misleading statements that could lead fans to mistakenly purchase the Book instead of Ms. Rowling's own future authorized encyclopedia. Thus, the Court should find that Plaintiffs are likely to succeed on their false advertising claim.

### III.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ABSENT RELIEF

Courts routinely hold that trademark or copyright infringement gives rise to a presumption of irreparable injury. *See, e.g., ABKCO Music,* 96 F.3d at 66 (a *prima facie* case of copyright infringement supports a presumption of irreparable harm); *Hasbro Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir. 1988) ("[i]n a Lanham Act case a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm…"). As Plaintiffs have clearly demonstrated a likelihood of success on the merits of their copyright and trademark infringement claims, irreparable injury may be presumed.

Even beyond the presumption of injury in intellectual property cases, however, it is clear that Plaintiffs will suffer irreparable harm absent an injunction. Were RDR permitted to proceed, Ms. Rowling—the copyright owner and creator of Harry Potter—would be "scooped" from doing a companion guide based on her own original works. (Murphy Decl. ¶ 5; Rowling Decl. ¶ 9). Ms. Rowling has clearly stated her intent to publish such a work, and has been preparing

materials to do just that, but RDR's Book would make any subsequent work by Ms. Rowling less distinctive and therefore less successful. (Murphy Decl. ¶ 5; Rowling Decl. ¶¶ 6-7; Klein Decl. ¶¶ 2-3; Bradley Decl. ¶ 13; Odedina Decl. ¶¶ 2-3). Moreover, allowing RDR to proceed would open the flood gates to other similar works, undermining Plaintiffs' long-term licensing and policing strategy—to which they have devoted tremendous time and resources—to protect and preserve ensure the high quality of their book franchise and the strength of their intellectual property rights. (Blair Decl. ¶¶ 5-6; Murphy Decl. ¶ 6; Rowling Decl. ¶ 4).

Additionally, as Prof. Landes, a noted economist focusing on intellectual property issues, has made clear, Ms. Rowling's right to control derivative works must be preserved not only to avoid the public harm, confusion and high transactions costs that would result from the myriad of individuals who could claim copyright protection in their unauthorized derivative works, but also to avoid the nonsensical result of Ms. Rowling facing liability for copyright infringement based on her encyclopedia of her own works. (Landes Decl. ¶¶12-16.) This is a real risk as RDR has already accused Warner Bros. of violating its copyright in a timeline based on the events of the Series. (Bradley Decl. ¶12.) Moreover, in a striking case of double standards, the Website is replete with various copyright warnings to prevent individuals from copying material on the site. To avoid harm to Plaintiffs and the public, this Court should enjoin RDR. To find otherwise would narrow the scope of rights available all copyright holders wishing to make use of their own creations in contravention to the constitutional grant intended to encourage creation.

## IV.    THE BALANCE OF HARDSHIPS FAVORS PLAINTIFFS, AND THERE ARE FAIR GROUNDS FOR LITIGATION

Because Plaintiffs have shown that they are likely to succeed on the merits, the Court need not consider whether the balance of hardships tips decidedly in favor of Plaintiffs and whether there are fair grounds for litigation. *See ABKCO Music*, 96 F.3d at 64. Nevertheless,

Plaintiffs can satisfy the alternate test as well.  As set forth above, the Court allows RDR to release the Book, it would cause not just harm, but irreparable injury to Plaintiffs.  *See New Line Cinema*, 693 F. Supp. at 1531 (balance of hardships favored copyright owner who offered evidence that the low-quality music video could dissuade an unspecified number of individuals from seeing its upcoming film).  Nor would every person who purchases the Book necessarily purchase a second encyclopedia, even if it is written by Ms. Rowling.

In contrast, the only harm RDR would suffer if an injunction issued would be lost sales. RDR has not yet finished setting the type on the Book, much less expended much money on printing or marketing it.  RDR's contract with Mr. Vander Ark does not even require payment of an advance.  (Bradley Decl. ¶ 14).  This Book is not the only work that RDR sells, as demonstrated by the listings on its website, but even if RDR had invested millions and the Book constituted its entire business, as Judge Hand made clear, injunctive relief would still be appropriate in light of RDR's deliberately infringing conduct.  *See My-T Fine Corp. v. Samuels*, 69 F.2d 76, 78 (2d Cir. 1934) (Hand, J.) ("advantages built upon a deliberately plagiarized makeup do not seem to us to give the borrower any standing to complain that his vested interests will be disturbed"); *see also Concrete Mach. Co. v. Classic Lawn Ornaments*, 843 F.2d 600, 612 (1st Cir. 1988) (internal quotations and citations omitted) ("[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration . . . .  Such considerations apply even to a business which is exclusively based on an infringing activity and which would be virtually destroyed by a preliminary injunction."); *Apple Computer Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983), cert. dismissed, 464 U.S. 1033 (1984) (internal citations omitted) (if defendant's reliance on infringing activity for survival barred issuance of

injunction, "a knowing infringer would be permitted to construct its business around its infringement, a result we cannot condone.").

The Court should also take into account that RDR should not be allowed to wrongfully benefit from the promotional campaigns associated with the recently released final *Harry Potter* Book and the upcoming DVD Release of the fifth *Harry Potter* Film. *See New Line Cinema*, 693 F. Supp. at 1531 (defendants were not entitled to "obtain the benefits of [plaintiff's] massive promotional campaign"). Simply put, injunctive relief is a matter of equity and equity favors Plaintiffs in this case.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the motion for preliminary injunction be granted.

Dated: January 15, 2008

Respectfully submitted:

Dale M. Cendali
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036
Tel: (212) 326-2000
Fax: (212) 326-2061

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2008, I caused a true and correct copy of the attached Plaintiff's Motion For Preliminary Injunction Against RDR Books and accompanying Declarations to be served electronically via e-mail, pursuant to the agreement of the parties, upon:

David Hammer, Esq.
Law Offices of David S. Hammer
99 Park Avenue
Suite 1600
New York, New York 10016
davyh@aol.com


_____
Melanie Bradley