UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

:

WARNER BROS. ENTERNTAINMENT INC. and          :
J.K. ROWLING,                                                           :   Case No. 07 Civ. 9667 (RPP)

:

                              Plaintiffs,          :

:

           -   against -                              :

:

RDR BOOKS and DOES 1-10                                   :

:

                        Defendants          :

:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

### DEFENDANT RDR BOOKS' MEMORANDUM OF LAW
### IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL BACKGROUND....................................................................................1

ARGUMENT .........................................................................................................4

I.      Plaintiffs Cannot Show Likelihood Of Success On Their
Copyright Claim...................................................................................4

      A.      Plaintiffs Fail To Show A Prima Facie Case Of
Infringement............................................................................4

      B.      The Lexicon Is Protected By Fair Use ....................................5

            1.      Purpose And Character Of The Use............................7

            2.      Nature Of The Copyrighted Work ...........................13

            3.      Amount And Substantiality Of The Portion Used ....14

            4.      Market Effect ...........................................................15

            5.      No Bad Faith .............................................................20

II.     Plaintiffs' Lanham Act Claims Are Moot And They Could
Not Show Likelihood Of Success In Any Event ...............................20

III.    Plaintiffs Cannot Show Irreparable Harm........................................23

CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allen v. National Video, Inc.*, 610 F. Supp. 612 (S.D.N.Y. 1985) .................................................22

*Allora, LLC v. Brownstone, Inc.*, 2007 WL 1246448 (W.D.N.C. April 27, 2007) ........................24

*American Express Travel Related Services Co. v. MasterCard*, 776 F. Supp. 787 (S.D.N.Y. 1991) ............................................................................................................................21

*Amoco Production Co. v. Gambell*, 480 U.S. 531 (1987) ............................................................24

*Arica Institute, Inc. v. Palmer*, 970 F.2d 1067 (2d Cir. 1992) .........................................................6

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) ................. *passim*

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) ..................................................................... *passim*

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) .................................................. *passim*

*Canon Inc. v. GCC International, Ltd.*, 450 F. Supp. 2d 243 (S.D.N.Y. 2006), *aff'd*, 2008 WL 213883 (2d Cir. Jan. 25, 2008) ...............................................................................24

*Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132 (2d Cir. 1998) ....................................................................................................................... *passim*

*Chamberlain Group, Inc. v. Lear Corp.*, 2007 WL 1017751 (N.D. Ill. March 30, 2007) .............25

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ....................................................21

*Charles of the Ritz v. Quality King Distributors*, 832 F.2d 1317 (2d Cir. 1987) ..........................23

*Christopher Phelps & Associates, L.L.C. v. Galloway*, 492 F.3d 532 (4th Cir. 2007) ................................................................................................................................24

*Clinique Labs, Inc. v. Dep Corp.*, 945 F. Supp. 547 (S.D.N.Y. 1996) .........................................23

*Consumers Union of U.S., Inc. v. General Signal Corp.*, 724 F.2d 1044 (2d Cir. 1983) .............................................................................................................................21, 23

*Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema*, 604 F.2d 200 (2d Cir. 1979) ................22

*eBay, Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837 (2007) .................................................23, 24

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) .........................................................................................6

*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) ..............................25

*Harris Research v. Lydon,*, 505 F. Supp. 2d 1161 (D. Utah 2007) ..............................................24

*Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311
(2d Cir. 1987)...........................................................................................................................23

*Johnson & Johnson Merck Consumer Phar. Co. v. Smithkline Beecham Corp.*,
960 F.2d 294 (2d Cir. 1992)....................................................................................................23

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) .........................................................14

*MCA, Inc. v. Wilson*, 677 F.2d 180 (2d Cir. 1981) ....................................................................15

*Metropolitan-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197
(C.D. Cal. 2007)........................................................................................................................24

*MyGym LLC v. Engle*, 2006 WL 3524474 (D. Utah Dec. 6, 2006)............................................24

*MyWebGrocer, L.L.C. v. Hometown Information, Inc.*, 375 F.3d 190 (2d Cir. 2004) ...................4

*NVIXM Corp. v. Ross Institute*, 364 F.3d 471 (2d Cir. 2004)......................................................23

*New Kids on the Block v. News America Publishing*, 971 F.2d 302 (9th Cir. 1992)....................21

*New York Times Co. v. Roxbury Data Interface, Inc.*, 434 F. Supp. 217 (D. N.J. 1977) ...........7, 8

*Nunez v. Caribbean International News Corp.*, 235 F.3d 18 (1st Cir. 2000)................................14

*Paramount Pictures Corp. v. Carol Publishing Group*, 11 F. Supp. 2d 329
(S.D.N.Y. 1998) .......................................................................................................................12

*Perfect 10, Inc, v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ...................................7, 8, 14

*Playboy Enterprises, Inc. v. Wells*, 279 F.3d 796 (9th Cir. 2002) .................................................22

*Repp v. Weber*, 132 F.3d 882 (2d Cir. 1997) ................................................................................5

*Siemens Medical Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*,
2008 WL 114361 (D. Del. Jan. 8, 2008)....................................................................................24

*Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir. 2001)......................................6

*Tin Pan Apple, Inc. v. Miller Brewing Co., Inc.*, 737 F. Supp. 826 (S.D.N.Y. 1990) ..................22

*Toho Co. Ltd. v. William Morrow & Co. Ltd.*, 33 F. Supp. 2d 1206 (C.D. Cal. 1998) ...........12, 17

*Torspo Hockey International, Inc. v. Kor Hockey Ltd.*, 491 F. Supp. 2d 871
(D. Minn. 2007) ....................................................................................................................................25

*Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 277 F.3d 253
(2d Cir. 2002).........................................................................................................................................4

*Twin Peaks Productions, Inc. v. Publications International, Ltd.*, 996 F.2d 1366
(2d Cir. 1993).........................................................................................................................4, 12, 17, 18

*Ty, Inc. v. Publications International Ltd.*, 292 F.3d 512 (7th Cir. 2002)............................ *passim*

*Wright v. Warner Books, Inc.*, 953 F.2d 731 (2d Cir. 1991)........................................................15

## FEDERAL STATUTES

17 U.S.C. § 101 ......................................................................................................................................4

17 U.S.C. § 106.............................................................................................................................4, 5, 6, 17

17 U.S.C. § 107 ........................................................................................................................... *passim*

U.S. Const. art. I, § 8, cl. 8.................................................................................................................5

## MISCELLANEOUS

Benjamin Kaplan, *An Unhurried View of Copyright* at 100, n. 61 (1967) ......................................4

Mark A. Lemley and Eugene Volokh, *Freedom of Speech and Injunctions in Copyright
Cases,* 48 Duke L.J. 147 (1998)............................................................................................................5

Pierre N. Leval, *Toward a Fair Use Standard,* 103 Harv. L. Rev. 1105, 1107, 1110
(1990)......................................................................................................................................................5

Defendant RDR Books submits this memorandum of law in opposition to the motion by Plaintiffs Warner Bros. Entertainment Inc. ("Warner") and J.K. Rowling for a preliminary injunction.

## PRELIMINARY STATEMENT

In this action, a distinguished and tremendously successful novelist demands the suppression of a reference guide to her works. J.K. Rowling, author of the Harry Potter books, asserts that this reference guide infringes both her copyright in the seven Potter novels and her right to publish, at some unidentified point in the future, a reference guide of her own. In support of her position she appears to claim a monopoly on the right to publish literary reference guides, and other non-academic research, relating to her own fiction.

This is a right no court has ever recognized. It has little to recommend it. If accepted, it would dramatically extend the reach of copyright protection, and eliminate an entire genre of literary supplements:  third party reference guides to fiction, which for centuries have helped readers better access, understand and enjoy literary works. By extension, it would threaten not just reference guides, but encyclopedias, glossaries, indexes, and other tools that provide useful information about copyrighted works. Ms. Rowling's intellectual property rights simply do not extend so far and, even if they did, she has not shown that the publication of *this* reference guide poses a sufficient threat of irreparable harm to justify an injunction. Her preliminary injunction motion should be denied.

## FACTUAL BACKGROUND

The reference guide that Ms. Rowling seeks to suppress is the Lexicon. Its author, Steven Vander Ark, is a former grade school teacher who has spent much of the last eight years' running a web site devoted to the Harry Potter novels (variously, the "Lexicon Website," the

"website and the "site"). The website, which has a volunteer staff of ten, has developed an enormous volume of material on the Potter books, material that analyzes and describes all the characters, places, spells, creatures and physical objects found in the seven novels. Vander Ark has organized this material in "A to Z" fashion, with concise entries presented in alphabetical order; he has called this material a "lexicon" and, since its first appearance on his website, this lexicon has been a favorite research tool of Harry Potter fans. In fact, it has long been a favorite of Ms. Rowling, who has called the materials on the website "great," given the site her "J.K. Rowling Fan Site Award" and recommended it to all Potter fans.

Last summer, shortly after the seventh and final Potter novel was released, the founder of Defendant RDR Books, Roger Rapoport, suggested to Vander Ark that RDR publish the A to Z listing in book form. Vander Ark agreed, and provided RDR with a manuscript, containing a condensed version of the website lexicon. Like the Lexicon Website, the Lexicon book was designed to provide a single source in which readers could find description, definitions, analyses and information about the world described in the Potter books.

Shortly after RDR Books announced its intention to publish the Lexicon, Plaintiffs commenced this action, alleging among other things that the Lexicon infringes Ms. Rowling's copyrights, and the Lexicon's cover and marketing plan are likely to confuse consumers and infringe plaintiff Warner's trademarks. Plaintiffs ask this Court to preliminarily enjoin publication and distribution of the Lexicon in order to protect Ms. Rowling's right to be the "first to publish" a companion book to the Potter series. *See* Rowling Dec. at ¶ 9; Murphy Dec. at ¶ 5.

It is far too late, however, for Ms. Rowling to publish the first Potter companion book, or even the first Harry Potter lexicon. Nearly 200 Harry Potter companion guides already have been published, many of which incorporate A to Z listings in a manner that closely resembles the

Lexicon's. *See* Harris Dec. at ¶¶ 3 - 9; Malhotra Dec. at ¶ 7. Defendant RDR provides with its supporting papers six Harry Potter companion books that incorporate extensive lexicons; each was published since 2004, and is available in New York City. *See* Harris Dec., Exhibits 1- 6. No injunction can undo that.

       Unique or not, the Lexicon is a serious book – a reference guide that is the product of eight years work by Vander Ark and his staff. As Professor Janet Sorensen explains in her declaration, lexicons like this one have an important and distinguished place in the literary world. *See* Sorensen Dec. at ¶ 2-3. Indeed, the value and importance of this lexicon is evident from its contents. It organizes a tremendous amount of information into a concise and readable form with citations to the scores of original sources it draws upon. *See id.* ¶ 14; pp. 8-9, below. At the same time, it provides a significant amount of original analysis and commentary concerning everything from insights into the personality of key characters, relationships among them, the meaning of various historical and literary allusions, as well as internal inconsistencies and mistakes in the novels. *See id.* ¶¶ 27 - 31; pp. 9-10, below. Finally, the Lexicon collects a wide array of additional information gleaned from painstaking collection and analysis of Ms. Rowling's interviews and public statements, which reveal additional details about not only the Harry Potter Works, but the creative inspirations behind them. *See id.* ¶¶ 19 - 26; p. 11, below. In sum, the Lexicon "help[s] readers to construct the universe of the Potter books in their minds, to understand its rich connections to the wide world in which we live, and to encourage the impulse to imagine a universe beyond the one depicted in the books." Sorensen Dec. at ¶ 32. It is the type of highly "transformative" work that has always been held to constitute fair use of copyrighted materials. It presents neither a Copyright nor Lanham Act violation, and Plaintiffs' motion for a preliminary injunction should be denied.

**ARGUMENT**

A preliminary injunction is an "extraordinary remedy." *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 277 F.3d 253, 258 (2d Cir. 2002). A party seeking one must demonstrate (1) irreparable harm in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in the movant's favor. *See MyWebGrocer, L.L.C. v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir. 2004). Plaintiffs have not made that showing. They fail to show likely success on any of their claims, or any irreparable harm in the absence of an injunction.

**I.      Plaintiffs Cannot Show Likelihood Of Success On Their Copyright Claim**

**A.      Plaintiffs Fail To Show A Prima Facie Case Of Infringement**

While the Copyright Act reserves certain exclusive rights to Ms. Rowling, it does not give her complete control over all things Harry Potter. In order to show a *prima facie* case of infringement, Ms. Rowling must first show that RDR exercised one of the exclusive rights reserved to her by the Copyright Act. *See* 17 U.S.C. § 106. But the Lexicon does not "reproduce" the Harry Potter Works (or any one of them) in any meaningful sense of the word. *See* 17 U.S.C § 106(1). Nor is it a derivative work. *See* 17 U.S.C. § 106(2). Examples of derivative works include "a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101; *see also Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366 (2d Cir. 1993) (derivative work transforms original from one medium to another). A reference guide to copyrighted works is not among the examples listed, and does not recast, transform or adapt copyrighted works in comparable ways. *See Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 520-21 (7th Cir. 2002) (Posner, J.) (collector's

guide to Beanie Babies not a derivative work). If anything, the Lexicon is a "supplementary" work the purpose of which is "explaining . . . commenting upon [and] assisting in the use of" the Harry Potter Works. *See* Benjamin Kaplan, *An Unhurried View of Copyright* at 100, n.61 (1967). Congress has specifically considered and rejected the suggestion that "supplementary works" be added to the exclusive rights secured by section 106. *See id.* That decision should not be undone here.

Even if the Lexicon were a "reproduction" or a "derivative work," Ms. Rowling would still have to show substantial similarity between the Lexicon and the Harry Potter Works. *See e.g.*, *Repp v. Weber*, 132 F.3d 882, 889 (2d Cir. 1997) (upon showing actual copying, plaintiff must still show substantial similarity between the works at issue). Ms. Rowling cannot do that under the traditional "ordinary observer" or "total concept and feel" tests, or under the quantitative / qualitative test applied in *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132, 138-41 (2d Cir. 1998). On the contrary, *Castle Rock* itself acknowledged that a secondary work may cease to be substantially similar if it transforms the original sufficiently. *See id.* at 143 n.9. As explained below, that is precisely the case here.

## B.     The Lexicon Is Protected By Fair Use

The fair use doctrine protects the right to use copyrighted material for new and transformative purposes. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994). Here, it protects RDR's right to publish the Lexicon, a valuable reference tool that helps readers to better access, understand and enjoy the Harry Potter works.

Anticipating RDR's fair use rights, Plaintiffs assert that fair use is a "narrow exception" that should be "cautiously applied" only where it enhances "economic efficiency." Pl. Memo at 11. But Plaintiffs have it backwards. Far from a "narrow exception," fair use is an integral part of

the Copyright Act designed to further its most basic purposes by balancing the need to both protect copyrighted material and "to allow others to build upon it." *Campbell*, 510 U.S. at 575 (fair use is "necessary to fulfill copyright's purpose"); *see also* Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1107, 1110 (1990); 17 U.S.C. §§ 106, 107. The purpose fair use serves is not simply economic. It is a critical "First Amendment safeguard[]" designed to prevent copyright law from unduly burdening free speech. *Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003); *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1263-65 (11th Cir. 2001). Insofar as any "caution" is appropriate here (Pl. Memo at 11) it should be exercised *against* injunctive relief in light of the free speech and First Amendment interests that fair use protects. *See Campbell*, 510 U.S. at 578, n.10 (urging caution against injunctive relief over "reasonable contentions of fair use") (internal citations omitted); *Suntrust*, 268 F.3d at 1265 (reversing preliminary injunction; courts must be cautious in granting injunctions over a "colorable fair-use defense"); Mark A. Lemley and Eugene Volokh, *Freedom of Speech and Injunctions in Copyright Cases*, 48 Duke L. J. 147 (1998) (preliminary injunctions in copyright and trademark cases should be subject to traditional First Amendment analysis as prior restraints on speech).

In assessing fair use, the Court is guided by four statutory factors. *See Campbell*, 510 U.S. at 577; 17 U.S.C § 107. They are non-exclusive and must be weighed together in light of the underlying purposes of copyright. *See Campbell*, 510 U.S. at 577-78. While they inform the fair use analysis, "the ultimate test of fair use" is whether copyright's goal of "'promot[ing] the Progress of Science and useful Arts' . . . would be better served by allowing the use than by preventing it." *Castle Rock*, 150 F.3d at 132 (quoting U.S. Const. art. I, § 8, cl. 8; *Arica Institute, Inc. v. Palmer*, 970 F.2d 1067, 1077 (2d Cir. 1992)). Here, there is no doubt RDR meets that test.

### 1.      Purpose And Character Of The Use

The "heart of the fair use inquiry" lies in the first factor – the purpose and character of the use. *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006); *see also* 17 U.S.C. § 107(1). The focus of this analysis is the "transformative" nature of the accused work. *See Campbell*, 510 U.S. at 579; *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006). A work is transformative when it does not "merely supersede[] the objects of the original creation," but rather "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579. This may involve combining copyrighted expression with original expression to produce a new creative work. *See, e.g.*, *Blanch*, 467 F.3d at 251-52. Or it may involve incorporating copyrighted expression into a reference tool that organizes information and renders it more accessible. *See, e.g.*, *Perfect 10, Inc, v. Amazon.com, Inc*., 508 F.3d 1146, 1165 (9th Cir. 2007) (reversing preliminary injunction; search engine is "highly transformative" because it incorporates original work into reference tool); *Castle Rock*, 150 F.3d at 143 ("secondary work need not necessarily transform the original work's expression to have a transformative purpose"); *New York Times Co. v. Roxbury Data Interface, Inc.*, 434 F.Supp. 217, 221 (D. N.J. 1977) (denying preliminary injunction; index of names appearing in *New York Times* served public interest because it enable users to locate information more quickly).

Plaintiffs contend the Lexicon is not transformative because it merely "repackages" the Harry Potter Works and contains no original analysis. *See* Pl. Memo at 12; Birchall Dec. ¶ 3; Blumsack Dec ¶ 2. But a thoughtful review of the Lexicon reveals significant, transformative functions that add extensive value, understanding and insights to the original works. *See*

Sorensen Dec. ¶¶ 14-32.[1]

**Organizational Value.** The Harry Potter universe is spread over seven novels totaling over a million words, five feature films, and other media, including video games and trading cards. *See* Vander Ark Dec. at ¶¶ 14-15, and Ex. 2 (list of numerous Harry Potter Works cited in the Lexicon). Thousands of characters, places and things populate these works. Still more information about them is available from other sources, such as scores of interviews that J.K. Rowling has given over the years, and newsletters she prepared for fan club members. *See id.* The Lexicon organizes, synthesizes and discusses this mass of information in the form of a reference volume that makes it easier for readers to locate, access, and understand the information that is spread across so many disparate sources. Sorensen Dec. ¶ 14. With its extensive citations to original sources, the Lexicon also permits readers to locate information in the original sources, much like an index would. This organizational function, and the utility that follows from it, is alone sufficient to show the Lexicon is transformative. *See Perfect 10*, 508 F.3d at 1165; *Roxbury Data*, 434 F.Supp. at 221.

The value of reference tools like the Lexicon is especially well-established in regard to literary works. Reference guides like the Lexicon that index the characters, spaces, and times of literary works "have been part and parcel of the literary culture for at least as long as such works

---

[1] Several of Plaintiffs' declarants leave it unclear whether they have even read the Lexicon. William Landes does not state that he has read the Lexicon, or even seen it, and all of his assumptions about its contents are based on statements contained in the declaration of Emily Blumsack. *See* Landes Dec. ¶ 26. But Blumsack does not state she has read the Lexicon, either, and nearly everything she says about its contents is stated on "information and belief." Blumsack Dec. ¶ 2, 4-5. Diana Birchall states she has "reviewed [the Lexicon] in its entirety" (Birchall Dec. ¶ 2) but apparently not with an eye toward detail. While Birchall declares the Lexicon "does not cite to any third party sources" (Birchall Dec. ¶ 3) the first few pages of the Lexicon identify *scores* of sources other than the Harry Potter Works from which the Lexicon draws information. *See* Vander Ark Dec., Ex. 2 (list of abbreviations of all the sources cited in the Lexicon). Birchall also asserts that "few citations are provided" by the Lexicon (Birchall Dec. ¶ 7) when in fact the Lexicon entries contain literally *thousands* of citations to the sources of information it provides. *See* Vander Ark Dec., Exs 2 -5 (the Lexicon manuscripts).

have been circulated commercially." *See* Sorensen Dec. ¶ 3. They help readers analyze,

approach, and make sense of printed texts, and often spur further research and discussion. *Id.*

They are particularly valuable in regard to literary works that contain large and complex

universes of characters and places, including not only Ms. Rowling's work, but also that of other

authors like Charles Dickens, Thomas Hardy, Thomas Pynchon, J.R.R. Tolkien and C.S. Lewis.

*Id*. Rather than serving as a substitute for reading the original novels, these reference works help

readers better understand, appreciate and enjoy the original literature.

      **Original Commentary and Analysis.** The Lexicon also contains a significant amount of

original commentary and analysis. It contains insightful discussions of key characters that go far

beyond simply "tak[ing] elements from the Harry Potter Works" while "summarizing" and

rearranging them. *See* Pl. Memo at 12. The entry for Neville Longbottom, for example, contains

extensive observations about the nature of his bravery and leadership. *See* Sorensen Dec. ¶ 28.

The entry for Luna Lovegood likewise includes analytical observations about her nature, each

supported by references to actions and events from the Harry Potter Works. *See id*. at ¶ 29.

Similarly, the entry for Draco Malfoy offers hypotheses about his motivations and his nature, and

again supports these hypotheses with textual references. *See id.* at ¶ 30. In other entries, such as

the one for Wingardium Leviosa, the Lexicon authors theorize and interpret nuanced meaning of

events in the books. *See id.* at ¶ 27. These entries, and many others like them, do not simply

"repackage" material found in the Harry Potter Works, they offer critical interpretations of the

characters as a book review or essay might. *See id.* at ¶¶ 27, 30.

      Still other entries analyze the relationship among characters, noting where shared names

have no familial significance, or hypothesize on relationships and family trees. *See* Sorensen

Dec. ¶ 22 (discussing the relationships analyzed in the Lexicon's entries for Lily Evans, Miss S.

Fawcett). The Lexicon also offers observations regarding factual events, and the connections among events and the logical consequences of certain truths. *See id.* (discussing the Lexicon's theories regarding why Arabella Figg's cats understand human speech and whether certain Quidditch players can wear gloves). This analysis of connections among disparate elements within the Harry Potter Works likewise enhances the reading experience by adding new insights, perceptions and judgments not found in the original works.

In addition to this analysis, the Lexicon decodes the meaning of many geographical and historical references, folklore and literary allusions, and provides etymologies of invented terms and names, as well as translates cross-cultural references used in the Harry Potter series. *See* Sorensen Dec. ¶ 18 (discussing the Lexicon's wealth of referential material that functions much like cataloged footnotes). The vast bulk of this information is drawn not from any of the Harry Potter Works, but independent sources such as "Brewer's Dictionary of Phrase and Fable," etymological dictionaries, "Bullfinch's Mythology," "The Field Guide to the Little People," and the "New Shorter Oxford English Dictionary." *See* Vander Ark Dec. ¶ 14. This original analysis adds dimensions and layers to the characters, places, objects and spells found in Harry Potter by describing the roots of the words used and mapping the fictional facts onto places, activities and events of the real world, which in turn fosters a more complex and sophisticated comprehension, interpretations and enjoyment of the original works. *See* Sorensen Dec. ¶¶ 15 -21.

Finally, the detailed research that went into the Lexicon revealed myriad errors and inconsistencies in the Harry Potter Works and subtle differences among the books published in various locations. For example, students are only supposed to attend Hogwarts for seven years, yet Ms. Rowling included Hogwarts student Marcus Flint in one too many books, making him an "eighth year" student. *See* Sorensen Dec. ¶ 24.

**Additional Research and New Information.** In addition to the above, the Lexicon incorporates additional research and new information about the characters and things that appear in them. Lexicon authors pored over scores of interviews, newsletters, webcasts and speeches in which Ms. Rowling provides clues and further information not found in the Harry Potter Works themselves. *See* Sorensen Dec. ¶ 25 (discussion of class lists, maps, and songs that do not appear in the Harry Potter series, but were discussed by Ms. Rowling in other forums). One entry, for example, discusses the significance of Platform 9 ¾ – a hidden platform in King's Cross Station in London. The Lexicon explains that the platform is purposely filled with romantic imagery because Ms. Rowling's parents met there and it became so much a part of her "childhood folklore" that she wanted to include it in Harry Potter's life. Another entry describes a character from the novel *Harry Potter and the Goblet of Fire*, Natalie McDonald, whom Ms. Rowling named in honor of a Canadian child who died after writing Ms. Rowling a fan letter. *See id.*

Any fair reading of the Lexicon reveals significant transformative value. It organizes information into a useful reference tool, adds original commentary and analysis, and includes the fruits of significant outside research concerning everything from etymology to connections between Ms. Rowling's personal life and her fictional creations. Plaintiffs' suggestion that the Lexicon does no more than "rearrange the furniture" (Pl. Memo at 1, 7) is simply mistaken.

Plaintiffs' attempts to analogize this case to *Castle Rock* are likewise misguided. *See* Pl. Memo at 10, 12. The accused work at issue in *Castle Rock* was the *Seinfeld Aptitude Test* (*SAT*), "a 132-page book containing 643 trivia questions and answers about the events and characters depicted in [the] *Seinfeld* [television series]," asking, for example, "What candy does Kramer snack on while observing a surgical procedure from an operating-room balcony?" 150 F.3d at 135. The court found the *SAT* served no transformative purpose because the *SAT* "simply poses

trivia questions," could not be "used to research *Seinfeld*" and did not "contain [any] commentary or analysis about *Seinfeld*." *Id.* at 143. The Lexicon, by contrast, is a valuable research tool, and contains significant commentary about the Harry Potter Works, as well as analysis of the nature and names of characters, places and things that appear in them, along with extensive citations to original sources. Moreover, its contents are drawn not simply from the Harry Potter Works, but scores of other sources, including other references books and many interviews with J.K. Rowling. The Lexicon, therefore, does much more than simply pose trivia questions. It is a "research tool" and does contain "commentary [and] analysis." *Castle Rock*, 150 F.3d at 143. In short, the Lexicon passes the test the *SAT* failed.

Plaintiffs' reliance on *Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366 (2d Cir. 1993), *Paramount Pictures Corp. v. Carol Publishing Group*, 11 F. Supp. 2d 329 (S.D.N.Y. 1998), and *Toho Co. Ltd. v. William Morrow & Co. Ltd.*, 33 F. Supp. 2d 1206, 1217 (C.D. Cal. 1998), is likewise misplaced. None of the works at issue in those cases served a purpose comparable to the Lexicon's; each was essentially an abridgement that retold the original story in its original sequence, albeit in shortened form. *See Twin Peaks*, 996 F.2d at 1372-73, 1375-76 (work at issue found to be an abridgement because it recounted "precisely the plot details" of television episodes "in the same sequence" as they appeared in the original series); *Paramount*, 11 F.Supp.2d at 335 (work at issue "simply retells the story of Star Trek in a condensed version"); *Toho*, 33 F.Supp.2d at 1217 (work at issue contained "extensive detailed plot summaries"). Each was therefore a plausible substitute for the original work.

The Lexicon is no such thing. It complements the Harry Potter Works (in the economic sense) by providing an informational resource, as well as original commentary, analysis and research, along with extensive citations to primary sources. If it is comparable to anything, it is

the Beanie Baby collector's guide at issue in *Ty, Inc.* That work contained photographs of Beanie Babies, factual information about them, and occasional criticism. *See id.* at 519-20. The court concluded the collector's guide was like a book review, "which is a guide to a book." *Id.* at 520-21. Both, it explained, were "critical and evaluative as well as purely informational" and ownership of copyrights did not confer the right to control public discussion of the copyrighted works. *Id.* at 521. Ms. Rowling's copyrights do not extend to suppress a guide to her books, either.

In the end, no analogy or comparison is necessary here. The purpose of the Lexicon is unmistakable. Rather than serving as a substitute for reading the original Harry Potter Works, it helps readers better understand, appreciate and enjoy them. *See* Sorensen Dec. ¶¶ 14-32; Vander Ark Dec. ¶¶ 15-16, 18, 26. The Lexicon therefore serves a significantly different purpose than the Harry Potter Works, and is highly transformative. *See Campbell*, 510 U.S. at 579 (central focus of fair use is whether the new work supercedes the objects of the original creation).[2]

## 2.     Nature Of The Copyrighted Work

The second fair use factor focuses on "the nature of the copyrighted work." 17 U.S.C. § 107(2); *Bill Graham*, 448 F.3d at 612. While Plaintiffs suggest this factor favors them because the Harry Potter Works are creative (Pl. Memo at 14), they ignore the fact that the second factor is of "limited usefulness" where a creative work is being used for a transformative purpose. *Bill Graham*, 448 F.3d at 612; *see also Blanch*, 467 F.3d at 257. Here, the Harry Potter Works have

---

[2]     In weighing the first factor, the Court must also consider "whether [the secondary use] is of a commercial nature." 17 U.S.C. § 107(1); *Blanch*, 467 F.3d at 253-54; *Castle Rock*, 150 F.3d at 141. Yet *Campbell* observes that most fair uses are undertaken for profit. *See Campbell*, 510 U.S. at 584. Accordingly, the Court should not "not give much weight to the fact that the secondary use was for commercial gain." *Castle Rock*, 150 F.3d at 142. Where, as here, the secondary work is highly transformative, its commercial nature should receive even less weight. *See Campbell*, 510 U.S. at 569 ("[t]he more transformative the new work, the less will be the significance of other factors, like commercialism"); *Blanch*, 467 F.3d at 254 ("discount[ing]" the commercial nature of the secondary work in light of its "substantially transformative" nature).

been used to create a valuable reference tool that helps readers to better access, understand and enjoy the Harry Potter works. (pp. 8-12, above.) Accordingly, the second factor has "limited weight" in this case. *See Bill Graham*, 448 F.3d at 612 (giving second factor "limited weight" where creative work was put to transformative use); *Blanch*, 467 F.3d at 257 (same).

### 3. Amount And Substantiality Of The Portion Used

The third fair use factor requires the Court to assess "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3); *see also Blanch*, 467 F.3d at 257. While the Court must consider both the quality and quantity of the portion of the copyrighted work that was used, the central question is whether the extent of copying is reasonable in light of its purpose. *See Campbell*, 510 U.S. at 586; *Blanch*, 467 F.3d at 257; *Castle Rock*, 150 F.3d at 144. Depending on the purpose, using a substantial portion of a work – or even the whole thing – may be permissible. *See Bill Graham*, 448 F.3d at 613 (citing *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2003); *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000)). This is particularly true where the accused work is a reference tool that presents factual information about copyrighted works. *See Perfect 10*, 508 F.3d at 1167-68 (search engine may copy entire photograph to facilitate search function); *Kelly*, 336 F.3d at 821 (same); *Ty, Inc.*, 292 F.3d at 521 (collector's guide may need to depict the entire line of Beanie Babies to provide a useful and comprehensive reference volume).

Plaintiffs contend the third factor favors them because the Lexicon draws a significant amount of information from the Harry Potter Works. *See* Pl. Memo at 14-15. But Plaintiffs ignore the purpose of the Lexicon, which is to create a reference guide by collecting, organizing and presenting factual information. While this information is drawn from myriad sources (p. 8, above), creating a useful and comprehensive reference guide requires borrowing a significant

amount of information from the Harry Potter Works. *See Ty*, 292 F.3d at 521 (reference guide

"has to be comprehensive"). *Castle Rock* is inapposite because the trivia book at issue in that

case was not a reference book and did not attempt to organize information in any useful way. *See*

*Castle Rock*, 150 F.3d at 144. Its purpose was therefore distinctly different.

While the Lexicon draws a significant amount of *factual* information from the Harry

Potter Works, it does not borrow the overarching plot sequence or story arc of the Harry Potter

Works, or the pace, setting or dramatic structure of the story these works tell. That distinguishes

this case from *Twin Peaks, Paramount*, and *Toho*, *supra*, all of which concerned works that

retold the entire story of the copyrighted work in its original form and sequence. (p. 12, above.)

Nor, save for occasional short quotes, does the Lexicon borrow Ms. Rowling's actual prose.

The Lexicon takes no more than what is necessary to its purpose. It borrows the factual

information necessary to create a valuable reference tool, but does not use the narrative, plot

sequence or prose. The third factor therefore weighs distinctly in favor of RDR. *See Blanch*, 467

F.3d at 258 (third factor weighs "distinctly" in defendant's favor where artist used only the

portion of copyrighted work necessary to his purpose).

### 4.     Market Effect

The fourth factor is "the effect of the use upon the potential market for or value of the

copyrighted work." 17 U.S.C. § 107(4). This factor "requires a balancing of the benefit the

public will derive if the use is permitted" versus "the personal gain the copyright owner will

receive if the use is denied." *Bill Graham*, 448 F.3d at 613 (quoting *MCA, Inc. v. Wilson*, 677

F.2d 180, 183 (2d Cir. 1981)); *Wright v. Warner Books, Inc.*, 953 F.2d 731, 739 (2d Cir. 1991).

**Substantial Public Benefit.** There can be no dispute the Lexicon creates substantial

public value. As many previous lexicons and reference works have done for other works, the

Lexicon helps readers to better access, understand and enjoy the Harry Potter works. (pp. 8-12, above; Sorensen Dec. ¶ 32.) Its utility is confirmed not only by the website's 50,000 page views per day (*see* Vander Ark Dec. ¶ 17), but by Plaintiffs themselves. Ms. Rowling herself has used the Lexicon website to check facts, and Warner Brothers used it for the same purpose in creating the Harry Potter movies. *See id*. at ¶ 11. Plaintiffs' licensees use it too; the video game designers at Electronic Arts had print-outs of the Lexicon posted all over their walls during the development process of the Harry Potter video games. *See id*. at ¶ 39.

**No Cognizable Market Harm.** In considering potential market harm, the Court must consider harm to the markets for both the original Harry Potter Works and derivative works, while recognizing that the "more transformative the secondary use" the less likely the secondary work is to substitute for the original. *Castle Rock*, 150 F.3d at 145 (citing *Campbell*, 510 U.S. at 591); *see Bill Graham*, 448 F.3d at 614-15.

Here, Plaintiffs cannot point to any cognizable market harm. Plaintiffs do not suggest that the Lexicon is a plausible substitute for any of the original Harry Potter Works; they do not suggest anyone would purchase the Lexicon instead of a Harry Potter novel, or instead of seeing a Harry Potter movie. Accordingly, the Lexicon does not present any potential harm to the markets for the original Harry Potter Works. *See Bill Graham*, 448 F.3d at 614; *Castle Rock*, 150 F.3d at 145; *see also Ty, Inc.*, 292 F.3d at 517-18 (secondary works that are economic complements present no cognizable market harm).

Instead, Plaintiffs complain the Lexicon "seeks to occupy a market for derivative works" that is Ms. Rowling's alone to license and exploit. *See* Pl. Memo at 16. But Plaintiffs are wrong for at least three independent reasons. First, the Lexicon is not a derivative work because it does not adapt or recast the story (pp. 4-5, above), so it does not "occupy" any derivative market.

Second, derivative markets are not Plaintiffs' alone to exploit. Derivative works are eligible for fair use protection too, so Plaintiffs cannot prevail simply by showing the Lexicon is a derivative work. *See* 17 U.S.C. §§ 106 and 107; *Campbell*, 510 U.S. at 592-93 (applying fair use analysis to parody rap derivative).

If the Lexicon were a derivative work, the question would become whether the Lexicon presents any cognizable harm. *See Bill Graham*, 448 F.3d at 614-15 (no cognizable market harm where defendant's use of concert posters falls into a "transformative market"). The more transformative the derivative work, the less likely it is to present cognizable market harm. *See Campbell*, 510 U.S. at 592-93. The derivative works at issue in *Castle Rock*, *Twin Peaks* and *Toho* were found to be non-transformative, so the Court reserved the derivative markets in those cases to the copyright owner. *See Castle Rock*, 150 F.3d at 141-43; *Twin Peaks*, 996 F.2d at 1375-76; *Toho*, 33 F. Supp. 2d at 1216-18. Subsequent Second Circuit cases, however, make it clear that where a work is transformative, *Castle Rock* compels a finding of *no* cognizable market harm. *See Bill Graham*, 448 F.3d at 615 (citing *Castle Rock*); *see also Blanch*, 467 F.3d at 258-59 (disregarding potential future licensing of photograph at issue). The Lexicon is highly transformative. (pp. 7-13, above.) That precludes cognizable harm to any derivative market Plaintiffs may wish to exploit, and Plaintiffs cannot as a matter of law claim such "transformative markets" for themselves. *See Bill Graham*, 448 F.3d at 614-615; *Castle Rock*, 150 F.3d at 146 n.11 (copyright owner cannot prevent "transformative uses" of its creative work by developing licensing market for what would otherwise be fair use).

Third, even if Plaintiffs' assertions of market harm were cognizable, they are in the end unsupported. Insofar as Ms. Rowling wants to rely on harm to supposed derivative markets, she has to show the Lexicon is a substitute for the companion guide she wishes to publish or license.

*See Campbell*, 510 U.S. at 593 ("the only harm to derivatives that need concern us is the harm of market substitution"); *Castle Rock*, 150 F.3d at 145 (fourth factor weighs against fair use because *Seinfeld* trivia book "substitutes" for derivative market reserved to copyright holder); *Twin Peaks*, 996 F.2d at 1377 (detailed abridgement was "adequate substitute" for original television series).[3] But in her declaration, Ms. Rowling does not suggest anyone would purchase the Lexicon instead of her companion guide, should she ever publish it. Nor does her publisher, Suzanne Murphy. *See* Murphy Dec. ¶¶ 3-8. Instead, Murphy worries that publication of the Lexicon might make Ms. Rowling's guide "less distinctive" and suggests that there is some advantage to publishing first. *Id.* at ¶ 5. But copyright does not protect the right to be "distinctive," and Murphy ignores the fact similar books are already on the market.[4] *See* Harris Dec. ¶¶ 3-9. Thus, while Murphy worries about the supposedly "poor quality" of the Lexicon, she does not point to any likelihood that it will diminish sales of Ms. Rowling's companion guide. *See* Murphy Dec. at ¶ 5. Neither does Ms. Rowling's expert economist, William Landes. He simply speculates that Ms. Rowling "could" lose income from the sale of her companion guide. *See* Landes Dec. ¶ 29. And even that is based on the advantage of being first (*see* Landes Dec. ¶ 38), which has long since passed.

---

[3]     Insofar as Rowling asserts she can show cognizable market effect simply by showing she has entered, or plans to enter, the market for so-called derivative market for "companion books" she is wrong. She has to show *harm* to that market, not presume it (*see* Campbell, 510 U.S. 590-91), and the only harm that matters is "market substitution." *See id.* at 593. *Castle Rock* does not suggest otherwise. It held that the market for non-transformative trivia books is reserved to the owner of the copyrights in the Seinfeld television series, and that the *SAT* would be a substitute for any trivia book the copyright owner might wish to publish. *See Castle Rock*, 150 F.3d at 145. Nor does *Twin Peaks*. It held the secondary work would be a substitute for the television series itself. *See Twin Peaks*, 996 F.2d at 1377.

[4]     Such books include *The Unofficial Harry Potter Encyclopedia: Harry Potter A-Z*, by Kristina Benson (2007); *Field Guide to Harry Potter*, by Colin Duriez (2007); *The J.K. Rowling Encyclopedia*, by Connie Ann Kirk (2006); *Fact, Fiction, and Folklore in Harry Potter's World*, by George Beahm (2005). *See* Harris Dec. ¶¶ 3-9, and Exs. 1 - 6.

Even if Plaintiffs' submissions in support of their preliminary injunction motion did support their assertions of market harm, nearly everything Plaintiffs have said and done prior to suit disproves any plausible market harm. The entire contents of the Lexicon have been available to the public for free, much of it for years, on the HP Lexicon website. Neither Ms. Rowling nor Warner Brothers objected to the website, despite the fact Ms. Rowling has intended to write a companion guide for at least six years. (p. 20, below.) Ms. Rowling attempts to draw a distinction between content available on the Internet and in printed form. *See* Pl. Memo at 1; Murphy Dec. ¶ 10-11; Landes Dec. ¶ 30. But Ms. Rowling herself shows that distinction to be immaterial. Numerous other companion guides very similar to the format and content of the Lexicon have already been published. *See* Harris Dec. ¶¶ 3-9; n.4, above. Ms. Rowling has apparently lodged no objection to these, or to the dozens of other Harry Potter companion books and reference guides that have been published, either in print or on the Internet. *See id.*

This should come as no surprise. If and when Ms. Rowling decides to publish a companion guide, it will undoubtedly be unique. Ms. Rowling's own statements indicate the companion guide she intends to write will contain large quantities of material available exclusively to her. In a December 2007 interview with the Leaky Cauldron website, Ms. Rowling described her vision for her companion guide. *See* Malhotra Dec. ¶¶ 8 – 11, Ex. 5. She explained she imagined a layout featuring "facing pages" on which the left-facing pages would have "back story" and "extra details on characters" including for example, "an entry on wands showing what every character's wand was." *Id.* The right-facing pages, by contrast, would feature "extra information" only Ms. Rowling could provide, such as "discarded plots, characters that didn't make it, [and] problems in the plot." *Id.* Ms. Rowling's interrogatory responses confirm this material will be drawn from her personal notes, which she will "turn[] . . . into the

definitive encyclopedic Harry Potter companion guide" and augment with additional material of her creation. *See* Hammer Dec., Ex. 1 (Pl. Inter. Response No. 1). So while the Lexicon provides information mainly about what does appear in the Harry Potter Works, Ms. Rowling envisions a companion guide that focuses largely on what does *not* appear in the Harry Potter Works – the rest of the story no one knows but her. Whatever the content of Ms. Rowling's companion guide will be, it is a long way off. Ms. Rowling herself acknowledges she has had "plans" to write her companion guide since 2000, but acknowledges that she has not started on the manuscript and that the companion guide may be as much as ten years off. *See* Hammer Dec., Ex. 1 (Pl. Inter Response Nos. 2 & 3); Malhotra Dec. ¶ 10, Ex. 5.

     **5.**      **No Bad Faith**

Plaintiffs try to string together a story of supposed bad faith, based mainly on the so-called "smoking gun" email in which Steve Vander Ark (not a party here, or an agent of RDR) suggests it would be unlawful for him to publish a printed version of the Lexicon, and the fact that RDR refused to submit a pre-publication copy of the Lexicon to Ms. Rowling. *See* Pl. Memo at 2, 17. But Vander Ark is a layperson, not a lawyer, and his speculation as to the legal status of the Lexicon (since corrected) is beside the point. As for Ms. Rowling's demands to receive and review a copy of the manuscript prior to publication, RDR's failure to seek her blessing and permission before publishing the Lexicon simply has no bearing on the fair use issue. *See Campbell*, 510 U.S. at 585 n.18 ("If the use is otherwise fair, then no permission need be sought or granted."); *Blanch*, 467 F.3d at 256 (failure to seek permission is not bad faith).

## II.   Plaintiffs' Lanham Act Claims Are Moot And They Could Not Show Likelihood Of Success In Any Event

Plaintiffs assert Lanham Act violations based entirely on a quote that appears on the back cover of the Lexicon relating to the Fansite Award that Rowling gave to the Lexicon website in

2004. *See* Pl. Memo at 18-22.[5] Specifically, the back cover states that the Lexicon website won

J.K. Rowling's Fansite Award and quotes Rowling's praise of the website:

**J.K. Rowling on the Harry Potter Lexicon website –**

"*This is such a great site that I have been known to sneak into an Internet café while out writing and check a fact. . . . A website for the dangerously obsessive; my natural home.*"

Vander Ark Dec. ¶ 11. (emphasis in original)

Plaintiffs assert this quote constitutes both false advertising and false endorsement. *See* Pl. Memo at 18-22. But the quote has been removed from the cover and RDR has confirmed it will not be included anywhere in the printed Lexicon. *See* Rapoport Dec. at ¶ 6 and Ex. 1. Accordingly, there is nothing to enjoin and this issue is moot. *E.g.*, *Consumers Union of U.S., Inc. v. General Signal Corp.*, 724 F.2d 1044, 1052, n.11 (2d Cir. 1983) (reversing district court's grant of preliminary injunction where defendant eliminated allegedly infringing material from commercial); *Am. Express Travel Related Servs. Co. v. MasterCard*, 776 F. Supp. 787, 790-91 (S.D.N.Y. 1991) (holding injunctive relief unnecessary where defendant changed allegedly infringing commercial and assured that it would never be used in the future).

Even if the quote remained, it would present no violation on either a false endorsement or false advertising theory. Plaintiffs do not contend anything on the cover was literally false. *See* Pl. Memo at 18-22. They do not deny the Lexicon website received the Fansite award, or that Rowling, in fact, said the quoted words about the website. *See id.* Nor do Plaintiffs contend that consumers might believe the quote refers to the book instead of the website. *See id.* Instead, Plaintiffs complain the quote might mislead consumers by implying Rowling endorses the book.

---

[5] Plaintiffs do not assert that the use of the term "Harry Potter" in the title of the book would be misleading. *See* Pl. Memo at 18-22. Nor could they. The book at issue is, in fact, a lexicon about the Harry Potter Works, so calling it the *Harry Potter Lexicon* is accurate, factual and protected under the doctrine of nominative fair use. *See, e.g.*, *New Kids on the Block v. News Am. Publishing*, 971 F.2d 302, 308 (9th Cir. 1992); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 156 (2d Cir. 2002) (adopting nominative fair use standard set forth in *New Kids*).

*See id.* But all of the false endorsement cases Plaintiffs cite concern cases where defendants employed models, who looked like a celebrity, to pretend that the actual celebrity endorsed their product. *See Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema*, 604 F.2d 200 (2d Cir. 1979) (Dallas Cowboy cheerleader look-alikes); *Allen v. National Video, Inc.*, 610 F. Supp. 612 (S.D.N.Y. 1985) (Woody Allen look-alike); *Tin Pan Apple, Inc. v. Miller Brewing Co. Inc.*, 737 F. Supp. 826 (S.D.N.Y. 1990) (rap group look-alikes). No such thing happened here, and no false endorsement is implied by accurately reporting the award, or what Rowling said about the Lexicon Website. *See e.g., Playboy Enterprises, Inc. v. Wells*, 279 F.3d 796, 800 (9th Cir. 2002) (rejecting false endorsement claim premised on model's truthful identification of herself as a Playboy "Playmate of the Year").

Plaintiffs' false advertising claim is premised on the same false endorsement theory (*see* Pl. Memo at 21) but Plaintiffs point to no case that suggests printing a true and accurate quote constitutes false advertising, or has the potential to mislead anyone. *See id.* at 21-22. Instead, Plaintiffs rely on a survey to show supposed confusion. But the survey focuses entirely on the quote that has now been removed and therefore cannot support an injunction against the revised cover. Even if the cover had not been revised, the survey would remain fatally flawed. The original cover used in the survey contains a disclaimer immediately below the quote at issue explaining that neither Plaintiff is affiliated with the Lexicon. *See* Helfgott Dec., Ex. A, Appendix A. "Disclaimers are a favored way of alleviating consumer confusion as to source or sponsorship." *Consumers Union v. General Signal Corp.*, 724 F.2d 1044, 1052-53 (2d Cir. 1983) (preliminary injunction reversed where advertisement reported positive review in Consumers Reports magazine and disclaimed any endorsement). But Plaintiffs' survey instructed respondents to look only at the quote, inviting them to *ignore* the disclaimer, and is therefore

22

unreliable as evidence of confusion. Plaintiffs assert it should be RDR's "heavy burden" to show its disclaimer is effective under *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311 (2d Cir. 1987), and *Clinique Labs, Inc. v. Dep Corp.*, 945 F. Supp. 547 (S.D.N.Y. 1996). *See* Pl. Memo at 20. But neither case involved an implied falsehood claim. Where, as here, a false advertisement claim is premised on a statement that is literally true, it is the *plaintiff's* burden to establish confusion through survey evidence. *See Johnson & Johnson \* Merck Consumer Phar. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297-98 (2d Cir. 1992). Here, Plaintiffs' defective survey fails to do that. *See id.* ("success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey").

III.     **Plaintiffs Cannot Show Irreparable Harm**

In order to obtain a preliminary injunction on any of their claims, Plaintiffs must show irreparable harm. *See, e.g.*, *NVIXM Corp. v. Ross Inst.*, 364 F.3d 471 (2d Cir. 2004). Plaintiffs suggest irreparable harm may be presumed upon showing a likelihood of success on the merits of their Copyright or Lanham Act claims. *See* Pl. Memo at 22. But Plaintiffs have shown no such likelihood (parts I and II, above) and even if they had, they are entitled to no such presumption. In *eBay, Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837 (2007), the Supreme Court held presumptions in favor of injunctive relief are improper. *See id.* at 1838-39. Instead, courts must apply traditional principles of equity in determining whether to issue injunctive relief, which requires an actual showing of irreparable injury absent an injunction. *See id*. Following *eBay*, Plaintiffs must show, not presume, irreparable harm.

While *eBay* concerned a permanent injunction on a patent claim, its holding applies equally to copyright and trademark claims. *EBay* itself suggests that copyright and patent injunctions should be treated similarly, *see eBay*, 126 S. Ct. at 1840, and lower courts have

proceeded to apply its rule to copyright and trademark cases. *See Christopher Phelps & Assocs., L.L.C. v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1212-14 (C.D. Cal. 2007).

Nor is the *eBay* holding limited to permanent injunctions. The Court's reasoning applies with even greater force at the preliminary injunction stage, where a plaintiff has at best shown a likelihood of success, not actual success on the merits. Indeed, *eBay* rested its holding on *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542, 545 (1987), which itself involved a preliminary injunction and rejected a presumption of irreparable harm in favor of traditional equitable factors. *See eBay*, 126 S. Ct. at 1839 (citing *Amoco*, 480 U.S. at 542). The Supreme Court's *eBay* decision therefore solidified the rule set out in *Amoco* that presumptions "contrary to traditional equitable principles" are not permissible for any type of injunction. *Amoco*, 480 U.S. at 545. Accordingly, Plaintiffs face the same burden of showing irreparable harm as any other party in a civil action requesting a preliminary injunction. *See Canon Inc. v. GCC Int'l, Ltd.*, 450 F. Supp. 2d 243, 251-52 (S.D.N.Y. 2006) (applying traditional rules of equity to party's request for preliminary injunctive relief in light of *eBay*), *aff'd*, 2008 WL 213883 (2d Cir. Jan. 25, 2008).[6]

Plaintiffs attempt to show irreparable harm by repeating their contentions that Ms. Rowling would be "scooped" by publication of the Lexicon and that it would make Ms. Rowling's companion guide "less distinctive and therefore less successful." Pl. Memo at 22-23.

---

[6] *See also Allora, LLC v. Brownstone, Inc.*, 2007 WL 1246448, at *5 (W.D.N.C. April 27, 2007) (holding presumption of irreparable harm does not apply in request for preliminary injunction in a copyright case); *Harris Research v. Lydon*, 505 F. Supp. 2d 1161, 1168 (D. Utah 2007) (in light of *eBay*, refusing to presume irreparable harm in preliminary injunction motion on trademark claim); *MyGym LLC v. Engle,* 2006 WL 3524474 at *11 (D. Utah Dec. 6, 2006) (same); *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 2008 WL 114361, at *6 (D. Del. Jan. 8, 2008) (holding no presumption of irreparable harm applies at the preliminary injunction stage in light of *eBay*); *Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.*, 491 F. Supp. 2d. 871, 881 (D. Minn. 2007); *Chamberlain Group, Inc. v. Lear Corp.*, 2007 WL 1017751, at *5 (N.D. Ill. March 30, 2007)

But Plaintiffs' "first to publish" theory fails for the same reasons explained before: the opportunity to be first has long since passed, and Ms. Rowling has explained in detail how different and distinctive her companion guide will be.[7] (pp. 19-20, above) Stretching further, Plaintiffs suggest irreparable harm exists because Steve Vander Ark suggested that Warner Brothers infringed the copyrights on a timeline he made, and the HP Lexicon website has copyright notices. See Pl. Memo at 23. But neither the timeline nor the website copyright notices are part of the Lexicon, and enjoining the publication of the Lexicon would not have any effect on either issue. Plaintiffs simply present no plausible basis for a finding irreparable harm absent an injunction here.

## CONCLUSION

Plaintiffs have not sustained any of their claims. The Lexicon does not infringe Plaintiffs' copyright and in any event represents a fair use of Ms. Rowling's novels. The current cover presents no possibility of consumer confusion, and infringes no trademark belonging to either Plaintiff. Plaintiffs' motion for a preliminary injunction should be denied.

---

[7] Insofar as Rowling asserts she is being "scooped" in the same way Harper & Row was scooped in *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985), Rowling is way off-base. In *Harper & Row*, a magazine "scooped" a publisher by copying excerpts of a forthcoming book and publishing them first. Here, the material the Lexicon allegedly copies has already been published, much of it for years.

Dated:  February 8, 2008

By: _____/s/_____
David Saul Hammer (DH 9957)
Law Office of David Saul Hammer
99 Park Avenue, Suite 1600
New York, NY 10016
Telephone: (212)-941-8118
Facsimile:  (212) 557-0565

Anthony T. Falzone
Julie A. Ahrens
Lawrence Lessig
STANFORD LAW SCHOOL
CENTER FOR INTERNET AND SOCIETY
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone:(650) 736-9050
Facsimile: (650) 723-4426

Lizbeth Hasse
Creative Industry Law Group, LLP
526 Columbus Avenue, 2nd Floor
San Francisco, CA 94133
Telephone: (415) 433-4380
Facsimile:  (415) 433-6580

Robert Handelsman
77 W. Washington Street
Suite 1717
Chicago, IL 60602

Attorneys for Defendant
RDR BOOKS