# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

WARNER BROS. ENTERTAINMENT INC. and
J.K. ROWLING,

        Plaintiffs,

    -against-

RDR BOOKS and DOES 1-10,

        Defendants.

------------------------------------ X

Case No. 07-CV-9667 (RPP)

## SUPPLEMENTAL DECLARATION OF EMILY BLUMSACK IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Emily Blumsack, declare and state as follows:

1.     I am an associate in the law firm of O'Melveny & Myers LLP, counsel for Warner Bros. Entertainment Inc. ("Warner Bros.") and J.K. Rowling in this action. Except for the facts stated on information and belief, all of the facts set forth herein are known to me personally, and if called as a witness, I could and would testify competently thereto.

### OVERVIEW OF DECLARATION

2.     This declaration will address two things. The first part will rebut RDR's contentions with respect to other Harry Potter companion books. The second section will discuss various inconsistent statements made by RDR and Mr. Vander Ark, as well as certain admissions with respect to Ms. Rowling's exclusive right to create her own encyclopedia.

## A. OTHER *HARRY POTTER* BOOKS AND POTENTIAL MARKET HARM

3. In its papers, RDR argues that Ms. Rowling would not be harmed by the publication of the Lexicon book because, to the extent there is a benefit to being the first to publish on a topic, other books on the market have already done that damage. This is not correct. As previously explained, Plaintiffs have developed a long-term policing strategy to protect their copyrights in the *Harry Potter* works, including "so-called 'companion' books based on the series, especially those which merely repackage her creative expression without adding valuable analysis or scholarly commentary." *See* Decl. of N. Blair at ¶¶ 5-9 ("Blair"); Decl. of J. Williams at ¶¶ 17-18. Moreover, I have reviewed all of the books cited in the declarations of David Harris and Steven Vander Ark and have also reviewed the Lexicon manuscript. Of the books cited by RDR, three are not similar to the Lexicon book but rather add analysis and commentary; another is currently the subject of Plaintiffs' policing efforts; and the remaining three merely attempted to repackage Ms. Rowling's copyrighted expression and/or use Warner Bros.' trademarks without permission and, as a result in part of Plaintiffs' policing efforts, are currently out of print (two of which had negligible sales and one of which had, at best, modest sales). I will discuss each of these books in turn.

4. As noted above, with respect to three of the books mentioned, the books are different from the Lexicon, in that they are not encyclopedias but rather are books of essays, commentary and analysis. For example:

   a. ***The End of Harry Potter?: An Unauthorized Guide to the Mysteries that Remain***
   by David Langford

   Published prior to the release of the seventh and final book, *Harry Potter and the Deathly Hallows*, this book is organized into 18 chapters that discuss the first six *Harry*

2

*Potter* books and attempt to predict the outcome of various story arcs in the final installment of the series. The book makes reference to characters and plot lines, but does so in a limited way to contextualize and explain the themes and patterns that inform its predictions. For example, the book includes a list of characters with accompanying entries that explain the implication of naming patterns throughout the series. These entries are followed by observations about the importance of new characters that might be introduced in the final book, *Harry Potter and the Deathly Hallows*. Direct quotation is minimal, and the limited paraphrasing of the Harry Potter books is used to describe particular elements relevant to a discussion and prediction. As the book notes in its introduction, "direct quotations from the *Harry Potter* novels have been kept to an absolute minimum—well within the limits of fair use in criticism." *See* Decl. of D. Harris ("Harris") at ¶ 9, Ex. 6.

b.  *Fact, Fiction, and Folklore in Harry Potter's World: An Unofficial Guide* by George Beahm

Published in 2005, this book covers only the first five books of the seven-book *Harry Potter* series and is broken into four sections containing entries for various people, places and things. These entries focus on connecting the role of a given element in the *Harry Potter* books to the relevant "real world" myths, legends, literature and history to which they relate. Discussion of the story elements in *Harry Potter* is generally brief and although the book describes the *Harry Potter* context, this is done to provide context to the broader mythological tradition discussed in the remainder of the entry. The book also contains "sidebars" which connect interesting real world facts to the story elements of *Harry Potter*. *See* Harris ¶ 8, Ex. 5.

3

c.  *The Magical Worlds of Harry Potter: A Treasury of Myths, Legends, and Fascinating Facts*
by David Colbert

This book consists of 60 short essays that explore mythical and magical references in the first five books of the seven-book *Harry Potter* series. These essays discuss "the playful references to history, legend and literature that [J.K. Rowling] hides in her books." Each essay gives some descriptions of events or elements in the *Harry Potter* books, but this done in broad strokes designed to provide context to the remainder of the essay. This structure of alluding to the *Harry Potter* books and drawing comparisons to mythology, folklore and history is consistent throughout the book. For example, in the essay, "What Makes Harry a Universal Hero?" the author discusses Harry's story arc in light of scholar Joseph Campbell's articulation of the "hero's journey," including the sequence of "departure," "initiation," and "return."

The longest chapter of this book entitled "What's in a Name?" consists of approximately 20 pages of discussion about the importance of names in *Harry Potter*. Although it is organized as entries arranged by the sources Ms. Rowling used to create each name—such as Geography, Foreign Words, Literature, History, and Flowers and Plants—the author explains the relevance of foreign words, puns, anagrams, history and myth, maps, war memorials and natural phenomena. It should be noted that many of these entries do not reference the use of the name in the *Harry Potter* novels, or do so only obliquely, as in the entry for "Potter, Lily: The lily is a symbol of purity, which makes it almost too perfect for the name of Harry's mother." True and correct copies of the front and back covers and illustrative pages from *The Magical Worlds of Harry Potter: A Treasury of Myths, Legends, and Fascinating Facts* are attached hereto as **Exhibit A.**

5. One of the books mentioned that is more closely analogous to the Lexicon is a recently published book that Plaintiffs have recently reviewed for possible infringement.

a. ***Field Guide to Harry Potter***
   by Colin Duriez

This book was published in 2007 and covers all seven *Harry Potter* books. Thus far, only 201 copies have been sold. *See* Supp. Decl. of W. Landes at ¶ 23. Plaintiffs have sent a cease and desist letter to the publisher of this book and are presently in negotiations over what changes should be made to the book to avoid further infringement.

This book is organized into two parts, the first of which includes discussion of themes in *Harry Potter* such as the role of Good and Evil in the novels, as well as the place of *Harry Potter* in the broader tradition of children's literature. The second part consists of an alphabetical list of detailed entries describing elements of *Harry Potter*. With few exceptions, the entries are devoid of commentary and analysis. Longer entries, particularly those that relate to key characters, creatures and locations, incorporate detailed plot summaries. Among the appendices are comprehensive synopses of each of the seven *Harry Potter* books. *See* Harris ¶ 5, Ex. 2.

6. Three of the other books mentioned are more akin to the Lexicon book and, as a result, Warner Bros. and Ms. Rowling took action with regard to these books, which are no longer in print and did not even cover all seven of the *Harry Potter* books (as the Lexicon would). Notably, nowhere in its original papers does RDR make reference to the fact that these books are no longer available, although as discussed below, RDR has since retreated from this position, acknowledging our successful and consistent policing in this regard. *See infra* ¶ 7. Nor

has RDR noted that two of the books had only negligible sales and the third had, at best, modest sales, such that they could not have already preempted Ms. Rowling's own encyclopedia. For example:

a. ***The J.K. Rowling Encyclopedia***
by Connie Ann Kirk

This book, published by Greenwood Press, a division of Houghton Mifflin Harcourt, covers only the first six *Harry Potter* novels and is currently out of print. Plaintiffs wrote a cease and desist letter, after which the parties entered into a confidential settlement agreement. Only 194 copies of this book were sold.

The book contains approximately 2000 alphabetical listings. Each entry ranges in length and provides detailed descriptions of elements in the Harry Potter books. In addition to entries for characters, items and other story elements, the book contains listings for each of the individual *Harry Potter* novels themselves. These entries consist of fully detailed plot summaries including significant "spoilers." There are a limited number of entries that focus on the world outside of the *Harry Potter* novels, such as the cultural phenomenon surrounding the books and biographical information relating to Ms. Rowling. *See* Harris ¶ 6, Ex. 3.

b. ***Harry Potter A-Z: The Unofficial Harry Potter Encyclopedia***
by Kristina Benson

This book contains 163 pages of sparse alphabetical entries using large type to describe the wizards, witches and muggle characters from the first six *Harry Potter* novels. There are no creatures or locations listed. Plaintiffs wrote a cease and desist letter to the publisher, who agreed to withdraw the Benson Book from the market. Only

6

213 copies were ever sold.[1]

The entries appear to be based exclusively on material from the series and do not incorporate material from other sources. Each entry is composed of short sentences and dry language that does not provide significant detail about the character it describes and does not add commentary. Entries for important characters, while longer and more detailed than the others, are generally no more than a few short paragraphs. Even one of the lengthiest entries, "Sirius Black," does not exceed 800 words. Like the Lexicon, this book recapitulates Ms. Rowling's own descriptions and plot points relating to each character, simply reordering the story in an alphabetical glossary. *See* Harris ¶ 4, Ex. 1.

c.  *An Unofficial Muggle's Guide to the Wizarding World: Exploring the Harry Potter Universe*
    by Fionna Boyle

This book only covers the first five books of the seven-book series and is currently out of print. Plaintiffs wrote a cease and desist letter and, after protracted negotiations, the publisher decided to withdraw the book from the marketplace. According to BookScan data,[2] fewer than 19,000 copies were ever sold.

Organized by topic, each entry generally describes the features of the location, element or character. Certain entries, such as the section on the "Triwizard Tournament" retell significant plot points that might be considered "spoilers" to those who have not read the novels. The book also includes "call outs" which list and catalogue miscellaneous story points, such as the various birthday presents that Harry receives each

---

[1] A true and correct copy of the Nielsen BookScan United States Consumer Market ("BookScan") panel data for *Harry Potter A-Z*, by Kristina Benson is attached hereto as **Exhibit B**.

[2] A true and correct copy of the BookScan panel data as of Feb. 22, 2008 for *An Unofficial Muggle's Guide to the Wizarding World*, by Fionna Boyle is attached hereto as **Exhibit C**.

year. The book also contains, for example, an alphabetized glossary of various characters organized by family or other grouping. Other lists describe fictional "facts" from the *Potter* books relating to places ("Hogwarts"), groups ("Quidditch") and other elements (spells and magical items). *See* Harris ¶ 7, Ex. 4.

### RDR's Corrective Letter to the Court

7. I also note that RDR was forced to admit that its brief gave a false impression regarding these books. On Monday, February 25, 2008—more than two weeks after submitting its papers and only two days before Plaintiffs' papers were due. RDR sent a letter to the Court explaining that, upon contacting publishers of the books referenced in Mr. Harris' Declaration, RDR had learned that three of the books it cites—*The J.K. Rowling Encyclopedia, Harry Potter A-Z, An Unofficial Muggle's Guide to the Wizarding World*—are no longer available and are out of print. The letter does not make clear, however, that these books had very limited sales prior to being pulled from publication, as described above. A true and correct copy of the letter sent by Mr. Hammer to the Court on February 25, 2008 is attached hereto as **Exhibit D**.

### Claim of Selective Book Choice

8. My previous declaration was criticized by RDR for allegedly selectively choosing certain books, suggesting that I analyzed various books just because they were different from the Lexicon. My point in my original declaration, however, was to give a sample overview of Harry Potter books in the marketplace to show that there are many non-infringing books containing significant criticism, commentary and analysis that are not like the Lexicon or like the book Ms. Rowling intends to write. RDR's papers admit that almost 200 *Harry Potter* books have been published that contain commentary and analysis that distinguish them from the Lexicon. Decl.

8

of S. Malhotra at ¶ 7. Moreover, the very reason that I analyzed two books in particular—*Mugglenet.com's What Will Happen in Harry Potter 7* by Ben Schoen, et al. and *The Complete Idiot's Guide to the World of Harry Potter* by Tere Stouffer—was because RDR specifically mentioned these two books in its early statements to the press after the lawsuit was filed, using them to argue that, because allegedly similar books had already been published, they could proceed with publishing the Lexicon book. Decl. of E. Blumsack at ¶ 8. RDR now seems to be retreating from that argument, after my previous declaration showed that the books they mentioned were different from the proposed Lexicon.

### Admission That The Lexicon Is Not Like Previous Books

9. I also note that RDR asserts there would be no harm to Ms. Rowling from being "scooped" by the Lexicon book because other books have already been printed similar to the Lexicon that would have already had this effect. This argument is belied, however, by RDR's own words in marketing its materials for the Lexicon book which attempt to emphasize its unique nature. For example, in trying to market the book to books stores and foreign publishers, RDR repeatedly asserts:

> [T]he Harry Potter Lexicon is the only reference work that covers all seven books including the brand new Harry Potter and the Deathly Hallows.

Decl. of M. Bradley ("Bradley") at ¶ 17, Ex. M. Similarly, in an email to Joao Paulo Riff of the Agencia Riff, RDR said that other previously published books were not as good as the Lexicon book, and explained that:

> Since there is no index to [these] books and every other book on the subject is now out of date, our title will be the only complete up to date reference book on the series through Book 7, Harry Potter and the Deathly Hallows.

*Id.* RDR has clearly recognized the value of publishing the first encyclopedia to cover all seven of the *Harry Potter* books.

**Admission that Being First to Publish Constitutes A Market Advantage**

10. Moreover, RDR's own documents demonstrate that RDR believed that the market for a comprehensive *Harry Potter* encyclopedia had not yet been exploited and sought to preserve for itself just such a market benefit. RDR specifically requested that Mr. Vander Ark refrain from posting entries about the seventh Harry Potter book to the Lexicon website as he wrote them for the Lexicon book in order to prevent Mugglenet, a potential competitor, from "scooping" Mr. Vander Ark's summaries. RDR tells Mr. Vander Ark that from a competitive standpoint, "if we can come out a month ahead, that will sure help." He later explains part of this competitive advantage to Mr. Vander Ark. His email states:

> Remember, Mugglenet would love to see your book 7 material on the web. I would appreciate it if you would not put the book 7 updates on your website until after your book has been out for awhile. Sound like a good idea?

Upon learning that the competing book was no longer slated for publication (pursuant to a cease and desist letter from Plaintiffs), Mr. Vander Ark has since started updating the Lexicon website with this material. True and correct copies of emails between Mr. Rapoport and Mr. Vander Ark dated September 9, 2007 are attached hereto as **Exhibit E**.

**Awareness of Ms. Rowling's Plans to Occupy the Market for a *Harry Potter* Encyclopedia**

10

11. I have reviewed the declaration of Mr. Malhotra as well as the exhibits attached thereto. While Mr. Malhotra seems to suggest that Ms. Rowling does not actually intend to publish her own encyclopedia, Mr. Vander Ark's own statements from as far back as July 2000 show that he—a self-professed *Harry Potter* expert—knew that Ms. Rowling intended to publish the first and only comprehensive *Harry Potter* encyclopedia. In fact, Mr. Vander Ark openly discussed Ms. Rowling's intention to publish an encyclopedia more than seven years ago on a fan chat forum called "Harry Potter for Grown Ups" that he references in his own declaration. Decl. of S. Vander Ark ("Vander Ark") at ¶ 5. On July 26, 2000, Mr. Vander Ark posted an entry to the forum replying to a suggestion from another fan that Scholastic should hire him to publish the Lexicon. He stated:

> From what I hear, JKR herself has talked about doing an encyclopedia of the HP Universe when she gets through all 7 books. If she decides not to, hey, I'm ready to go!

A true and correct copy of the posting made by Mr. Vander Ark to the public Internet forum "Harry Potter for Grown Ups," dated July 26, 2000 is attached hereto as **Exhibit F**.

## Awareness that the Online Lexicon Has a Different Market from the Book

12. Moreover, as far back as December 2000, Mr. Vander Ark himself admitted that the market for the Lexicon website is different from the market for the book. Mr. Vander Ark rejected the idea of publishing a book version of the Lexicon, not for his now-proffered reason that the series was incomplete, but rather because,

> [W]ithout her permission, I won't publish [the Lexicon] in any form except online. [Ms. Rowling is] entitled to that market, not me and not [another author].

11

A true and correct copy of Mr. Vander Ark's posting to the Yahoo Group "Harry Potter for Grown Ups" dated December 14, 2000 is attached hereto as **Exhibit G**.

### Admission that Vander Ark's Prominence in the *Harry Potter* Fan Community is Likely to Increase Sales

13. I also note despite its claim that the market for Ms. Rowling's book will not be harmed by publication of the Lexicon, Mr. Rapoport himself asserts that the Lexicon's success will be significantly increased by virtue of Mr. Vander Ark's prominence in the fan community. In an email exchange with the British publisher of the Lexicon, Mr. Rapoport states,

> Steve Vander Ark, who created the lexicon is a rock star at academic Harry Potter conferences, not to mention fan events. Rowling herself is a fan. In the Potter name his an Elvis like figure [sic]. I am sure he will continue to attract huge audiences everywhere he goes. This will be great for the book.

A true and correct copy of an email sent by Roger Rapoport to Peter Tummons dated August 21, 2007 referenced by Bates Number RDR0941-RDR0942 is attached hereto as **Exhibit H.**

14. Moreover, Mr. Vander Ark continues to work at remaining well-known in the *Harry Potter* fan community, despite this lawsuit. He has even planned to take a prominent role in these kinds of events through the upcoming year, for example, by featuring as a *Harry Potter* expert on a tour of *Potter*-related locations throughout England scheduled for this summer. A true and correct copy of a website brochure for Harry Potter Tours' summer event entitled "The Ultimate Tour with Steve Vander Ark," slated to take place from July14-23, 2008 is attached hereto as **Exhibit I**.

15. In fact, the very same day that Plaintiffs filed their Amended Complaint, Mr. Vander Ark was speaking in Manhattan at an event sponsored by the New York Public Library entitled "Meet Steve Vander Ark, Author of The Harry Potter Lexicon." Mr. Vander Ark has

gained enough notoriety that the New York Public Library refers to him as a *Harry Potter* "guru." A true and correct copy of the website advertisement for this program is attached hereto as **Exhibit J.**

### B. RDR'S INCONSISTENT STATEMENTS

16. I understand that RDR has described the Lexicon in marketing materials as the product of an "exceptional team of academic and reference scholars" that was "written by 20 academic scholars and reference experts including the world's leading Harry Potter critic, Steve Vander Ark." *See* Bradley ¶¶ 17-18; Decl. of R. Rapoport at ¶ 6, Ex. A. Mr. Rapoport has also used this claim in his communications with book retailers, such as Barnes and Noble. I note, however, that there is no mention of these alleged researchers in RDR's papers, other than Mr. Vander Ark's reference to a part-time staff of 10 volunteers. Pl. Br., p. 2; Vander Ark ¶ 10. A true and correct copy of the email between Roger Rapoport and employees of Barnes and Noble dated October 18, 2007 representing Bates numbers RDR0492-RDR0493 is attached hereto as **Exhibit K.**

### Fan Recognition of the Difference Between the Free Website Lexicon and the Book

17. I also note that, by his own admission, Mr. Vander Ark did not even write the Lexicon book himself, but rather that 40% of the book was authored by other members of the Lexicon staff, guest contributors and volunteers who submitted material to the website. Vander Ark ¶ 13. A number of fans who have contributed to the Lexicon website have reviewed the filings in this case and posted to a fan discussion forum. While these fan contributors to the Lexicon knew that they were contributing to a free fan website, they did not know that their efforts would then be turned into a for-profit book. Recognizing the distinction between the free

13

Lexicon fan website and the for-profit book, some fans who have contributed content to the Lexicon have expressed this in online fan discussion groups. One fan stated:

> No, [I had] no inkling that there was a book in the making.
>
> As a fan I happily participated in collecting solid canon facts and presenting them for corrections. I also made suggestions on improvements, things like that. Tons of posts. I never considered the 'facts' mine, because obviously the facts are JK Rowling's. I never asked to be recognized or congratulated or monetarily rewarded or any such thing. Like everyone else, I was just happy to participate and make the info contained on the [Lexicon] site that much more accurate.
>
> [...]
>
> Steve didn't write a book that listed facts and gave speculation, summary, commentary, analysis. Instead, he copy and pasted and paraphrased all things Potter from a website in which his Staff and fellow HP fans fully participated in its overall factual content---when he *expressly* stated he'd never publish a book without Jo's permission.

A true and correct copy of the forum posting from "The Leaky Cauldron" by user "dresdenfiles.fan" is attached hereto as **Exhibit L.**

18. Nor does this fan's experience appear to be unique. Another fan described noticing an error in the Lexicon, sending an email to the Lexicon editors about the error, and subsequently discovering that the entry had been corrected. Upon learning of the for-profit Lexicon book, this fan explained that she did not intend to help Mr. Vander Ark profit off of Ms. Rowling's work or the fan's own efforts. The fan explained:

> But, if I had any idea that SVA [Mr. Vander Ark] was going to try to sell the contents of the Lexicon for money, I would have done nothing [rather than send in a correction]. I thought I was doing a service for the HP Fandom when I made my suggestion, not making corrections to Steve's book.

A true and correct copy of the forum posting from "The Leaky Cauldron" by user "cbm" dated February 20, 2008 is attached hereto as **Exhibit M.**

14

## Admission of Double Standard In Claiming Fair Use of Material

19. I also understand that RDR claims that the Lexicon makes a fair use of Ms. Rowling's *Harry Potter* books although, as noted in Plaintiffs' original papers, this claim is inconsistent with the aggressive stance taken by the Lexicon website regarding protection of its own purported copyright. *See* Bradley ¶¶ 9-12. In addition to the copious copyright protections[3] used by Mr. Vander Ark on the Lexicon website—which RDR does not contest—as recently as three months prior to signing the contract with RDR, Mr. Vander Ark appears to have retained a copyright attorney to pursue his own claims of infringement. Mr. Vander Ark posted an entry to the "What's New" section of the website explaining that he decided to enforce his own perceived copyright in the content of the Lexicon website, despite now claiming that the material constitutes fair use of Ms. Rowling's books. He stated,

> Two days ago I did something I've never done before. I sicced my lawyer on someone.
>
> [...]
>
> This fellow is basically out to scam fans out of money as fast as he can before book seven comes out. He's written a book which he wants to sell and in order to sweeten the deal, he offers bonus material. This bonus material is all from the Lexicon, from Accio Quote, and from Jo's website. I'm sorry, but that's where I draw the line. I will not stand for someone stealing my material and using it to scam fans out of money."
>
> [...]
>
> I don't like to do things like this. But this leech is not a true fan. He's an opportunist who sees a chance to make some quick money by playing on fans' enthusiasm leading up to book seven.

This appears to be precisely what RDR, in conjunction with Mr. Vander Ark, is doing by

---

[3] We note that since plaintiff's previous filing, which pointed out that the Lexicon includes features designed to make it difficult to copy its content, the Lexicon website's "right click" copyright protection has recently either been removed or modified from numerous pages throughout the website. *See* Bradley ¶¶ 9-11.

attempting to publish an encyclopedia on the heels of the publication of *Harry Potter and the Deathly Hallows*. A true and correct copy of a screen shot showing the entry titled "Something I had to do..." from the Lexicon website posted on May 11, 2007 is attached hereto as **Exhibit N.**

20. It is also my understanding that RDR is presenting the Lexicon book as a critical reference work. I note, however, that RDR's own editor of the Lexicon book—a former attorney—rejected the contention that the book contained sufficient criticism or commentary to justify a fair use claim. Discussing the scope of RDR's proposed disclaimer which called the Lexicon a "critical reference work," Richard Harris stated,

> Just because you say it's a "critical reference work" or covered by the fair use doctrine doesn't mean it is. I think "reference work" and "reader's guide" protect as fully as possible.

RDR nevertheless appears to maintain its position that the work is a critical reference work in its legal papers, demonstrating once again that RDR will adopt whatever position is most expedient, rather than that which is most accurate. A true and correct copy of an email exchange between Mr. Rapoport and Richard Harris dated September 30, 2007 is attached hereto as **Exhibit O.**

## Vander Ark's Inconsistent Statement Regarding Seeking Permission to Publish the Lexicon

21. I have reviewed Mr. Vander Ark's declaration and understand that Mr. Vander Ark claims that he contacted the Christopher Little Literary Agency (CLLA) to request a meeting to discuss turning the Lexicon website into a print book. I note that Mr. Vander Ark provides no evidence to substantiate this claim. Vander Ark ¶ 26. Moreover, a review of his email exchange with Emma Schlesinger of the CLLA relating to this alleged request produced in Plaintiffs' papers shows that, contrary to his declaration, Mr. Vander Ark did not submit a formal proposal or even "pitch" his idea for the Lexicon, but merely asked to work on Ms. Rowling's encyclopedia in order to secure a visa to move to London. His email states,

16

> I have no idea what Rowling is planning now that the novels are finished, but if she is thinking of working on an encyclopedia or other references to the series, I would be a good candidate for work as an editor, given my work on the Lexicon. I had hoped to meet with you simply to give you a note to pass along to Rowling making the enquiry.

*See* Blair ¶ 12, Ex. C. After his request to work on Ms. Rowling's encyclopedia was declined, Mr. Vander Ark responded,

> I wasn't really thinking of collaborating, just working somewhere in the organization..."

*Id.* Nowhere in this email exchange does Mr. Vander Ark mention wanting to discuss "the possibility of using material from the Lexicon for a book," much less ask permission to do so. Vander Ark ¶ 26.

### Stanford Fair Use Project's Stated Political Agenda to Expand the Fair Use Defense

22. I have reviewed the website for RDR's intellectual property counsel, the Stanford Fair Use Project, located at <http://cyberlaw.stanford.edu/taxonomy/term/374>. I note that this organization's stated goal is to "define, and expand, the boundaries of fair use."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 27, 2008, at New York, New York.

Respectfully submitted,

By: _____
Emily Blumsack