UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------

WARNER BROS. ENTERTAINMENT INC. and
J.K. ROWLING,

        Plaintiffs,

        -against-

RDR BOOKS and DOES 1-10,

        Defendants.

------------------------------------

Case No. 07-CV-9667 (RPP)

## SUPPLEMENTAL DECLARATION OF WILLIAM M. LANDES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, William M. Landes, declare and state as follows:

### I. INTRODUCTION

1.    I, William M. Landes, am the Clifton R. Musser Professor of Law and Economics at the University of Chicago Law School.

2.    I previously submitted a declaration in this matter, dated January 15, 2008, at the request of counsel for J.K. Rowling and Warner Bros. Entertainment.[1] That declaration evaluated from an economic perspective RDR Books' claim that its use of material from J.K. Rowling's series of Harry Potter books in a 400-page dictionary of terms now entitled *The Lexicon* (formerly the *Harry Potter Lexicon,* hereafter *"Lexicon"*) is a "fair use," which enables

---

1.    My January 15, 2008 Declaration also summarizes my qualifications.

publication of certain copyrighted materials without permission of the copyright owner. I also addressed the sources of potential harm to J.K. Rowling resulting from the publication of the *Lexicon*.

3. This declaration responds to several points raised by the Defendant in its brief opposing preliminary injunction against publication of the *Lexicon*.[2] I focus on Defendant's claim that publication of the *Lexicon* would not result in harm to Ms. Rowling.

## II. OVERVIEW OF PRIOR DECLARATION

4. My prior declaration evaluated the economic basis for granting copyright holders property rights in derivative works as well as the economic basis of the "fair use" doctrine.[3] I showed that granting the original copyright holder rights in derivative works promotes economic efficiency by bolstering incentives to create new works, reducing transactions costs and preserving authors' incentives for timely publication of new works.

5. I also showed that, under certain limited circumstances, the "fair use" of material without the copyright holder's consent will promote economic efficiency. More specifically, I showed that:

- Fair use can be economically efficient when there are high transaction costs between copyright holders and potential licensees, and use of the copyrighted material causes little or no harm to the copyright holder. An example of this efficiency rationale for fair use is the direct quotation of brief passages from a book.

---

2. Defendant RDR Books' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction, February 8, 2007 (hereafter, Defendant's Memorandum).
3. As I emphasized in my declaration, these views do not reflect legal conclusions and instead describe an economic framework for evaluating copyright law and some of its legal doctrines.

- 2 -

- Fair use also can be economically efficient when use of copyrighted material creates "negative harm" (e.g., an economic benefit to copyright holders). Examples of "negative harm" include the unlicensed use of copyrighted materials in a book or movie review – activities which, in the aggregate, benefit copyright holders by providing valuable information to potential consumers of their works. In such circumstances, we can view copyright holders as giving implied consent for such uses of copyrighted material.

- Fair use also can be economically efficient when the use of copyrighted material creates substantial benefits to others that more than offset any small harm to the copyright holder. Examples of this efficiency rationale for "fair use" include the development of compatible computer software, which may require unauthorized copying of the original software in the process.

6. Based on the characterizations of the content of *Lexicon* provided by other witnesses, my prior declaration showed that the *Lexicon* does not appear to meet any of the conditions in which fair use enhances economic efficiency.[4]

7. Defendant RDR Books has not directly challenged the economic analysis of any of these issues presented in my prior declaration. More specifically, the defendant does not dispute the fact that providing copyright protection to derivative works promotes incentives for their creation, or that reserving rights to derivative works for original copyright holders promotes incentives for the creation and timely distribution of new works. Nor does the defendant dispute the fact that allowing others to copyright unauthorized derivative works would increase

---

4. I would like to note that, in contrast to the suggestion in footnote 1 of Defendant's Memorandum, I had in fact reviewed the *Lexicon* for purposes of my analysis prior to writing my January 15, 2008 Declaration.

- 3 -

transactions costs, requiring producers of new derivative works to obtain licenses from others that have published derivative works, including the original copyright holder.[5] Instead of challenging my analysis, defendant RDR Books challenges the views expressed by other experts that the *Lexicon* does not contain a significant amount of original content.

8. I further concluded in my earlier Declaration that, as a result of publication of the *Lexicon*, Ms. Rowling "… could lose income from the sale of her proposed companion encyclopedia."[6] Additionally, I concluded that "… the harm to Ms. Rowling from publication of the *HP Lexicon* is likely to be substantially greater than the harm from the website."[7] The harm to Ms. Rowling results from the fact that the *Lexicon* is a substitute for the companion encyclopedia that Ms. Rowling has proposed. The harm would be compounded by the loss to Ms. Rowling of the advantage to being the first to publish a comprehensive encyclopedia to the Harry Potter series, which includes the right to decide what is the appropriate time to release such a publication.[8]

9. Defendant claims that "Plaintiffs' assertions of market harm […] are in the end unsupported."[9] Defendant also claims that publication of the *Lexicon* would not result in the loss of the "first mover" advantage which they claim no longer exists due to the publication of several other Harry Potter encyclopedia-like volumes.[10] Defendant also claims that the availability of a version of the contents of the *Lexicon* on the website for free also indicates that that there is no harm from its publication in book form.[11]

---

5. As discussed in my prior Declaration, RDR's assertion of copyright over a timeline of events in the Harry Potter series shows that this concern is not merely hypothetical.
6. Landes Declaration, ¶ 29.
7. Ibid., ¶ 30.
8. Ibid., ¶ 38.
9. Defendant's Memorandum, p. 17.
10. Ibid., p. 18-19.
11. Ibid., p. 19.

10.     The remainder of this declaration demonstrates how Defendant's claims that J.K. Rowling would not suffer harm from publication of the *Lexicon* are based on erroneous economic reasoning and are not supported by available data.

## III. PUBLICATION OF THE *LEXICON* WOULD RESULT IN HARM TO MS. ROWLING.

11.     The *Lexicon* is being marketed as the "definitive guide to all things Potter" as stated on the current version of the cover.[12] In an attempt to generate interest in the *Lexicon* and distinguish it from other works that are already on the market, Defendant has promoted it to retailers and foreign publishers emphasizing the fact that it is the first Harry Potter related work to deal with all seven Harry Potter books.[13]

12.     Publication of the *Lexicon* would likely harm Ms. Rowling by reducing sales of her own planned encyclopedia of the Harry Potter series, reducing her revenue and in turn reducing revenue to the charities to which Ms. Rowling donates all proceeds from her Harry Potter companion volumes. In addition, publication of the *Lexicon* would raise transactions costs for authors of derivative works based on the Harry Potter series, resulting in additional future losses in licensing income. This section reviews each of these sources of harm.

### A.     POTENTIAL FOR HARM DUE TO LOST SALES OF J.K. ROWLING'S PROPOSED ENCLYCLOPEDIA

13.     There is no economic basis for defendant's claims that the *Lexicon* would not adversely affect demand for Ms. Rowling's proposed volume. Harry Potter fans do not have unlimited demand and resources to purchase comprehensive guides to the series. And, for some consumers, the *Lexicon* would be substitutable for J.K. Rowling's own planned guide. For

---

12.     Declaration of Roger Rapoport in Opposition to Plaintiff's Motion for a Preliminary Injunction, Exhibit 1.
13.     Declaration of Melanie Bradley, Exhibits M, N.

example, consumers who purchase the *Lexicon* as a gift would be less likely to purchase Ms. Rowling's volume as they are unlikely to give someone a second Harry Potter encyclopedia.

14. While Defendant argues that Ms. Rowling would not be damaged because the information in the *Lexicon* is available on Mr. Vander Ark's website, this form of the information clearly is not a good substitute for many consumers, including those who wish to give a gift to a Harry Potter fan. Of course if the Lexicon website were a perfect substitute for the *Lexicon*, there would be no reason to incur the extra costs of publishing the book. Even if it is an imperfect substitute for the volume that Ms. Rowling expects to produce, the *Lexicon* would adversely affect demand for Ms. Rowling's book. Moreover, the greater the potential success of the *Lexicon* book, the greater the harm to Ms. Rowling. As I show below, there are a variety of reasons to expect that the *Lexicon* is likely to achieve commercial success and thus result in harm to Ms. Rowling.

1. **Vander Ark has a prominent role in the Harry Potter fan community.**

15. The likelihood of success of the *Lexicon* is increased by Steven Vander Ark's prominent role in the Harry Potter fan community as well as the popularity of the *HP-Lexicon* Website. Vander Ark is widely recognized as a Harry Potter authority among Harry Potter fans. According to a July 2007 news article, "[i]n the Harry Potter fandom world, Vander Ark is a celebrity. People line up for his autograph and take his pictures."[14] An interview of Vander Ark for TheUrbanWire.com notes that Vander Ark "... is renowned throughout the Harry Potter Fandom online for creating The Harry Potter Lexicon – the first, and only complete online encyclopedic companion to the Harry Potter books." In addition, Vander Ark has been a keynote

---

14. "Even J.K. Rowling turns to Michigan Potter fan with questions," by Terri Finch Hamilton, the Grand Rapids Press, July 21, 2007. The same article notes that Vander Ark was interviewed as a Harry Potter authority by the BBC.

- 6 -

speaker at major Harry Potter conferences, including Nimbus 2003, Convention Alley 2004, Accio 2005, Lumos 2006, Patronus 2006, Sectus 2007, and Prophecy 2007.[15]

16. The mainstream media also recognize Vander Ark as an authority on the series. Vander Ark was one of three experts interviewed for an A&E television special on the Harry Potter series entitled "Harry Potter: The Hidden Secrets," which was later included on the DVD version of Harry Potter and the Order of the Phoenix as "The Hidden Secrets of Harry Potter." Additionally, Vander Ark has been interviewed by the New York Times and USA Today and has appeared on The Today Show.[16]

## 2. Harry Potter fan websites provide an effective means of reaching potential consumers.

17. Vander Ark's website, www.hp-lexicon.org, which contains an Internet version of his *Lexicon*, is one of the most popular Harry Potter fan websites. According to Internet traffic data, www.hp-lexicon.org currently receives over 92,000 unique visitors per month, second only to www.mugglenet.com among Harry Potter fan sites. The Internet traffic generated by www.hp-lexicon.com is substantial even in comparison to that of the two official Harry Potter websites (www.jkrowling.com and http://harrypotter.warnerbros.com), which each receive about

---

15. *http://www.accio.org.uk/05/speakers.shtml, http://www.snitchseeker.com/harry-potter-news/convention-alley-programming-schedule-announced-15568/, http://lumos2006.org/programming/shtml http://www.hp2003.org/nimbuspgmtrack.html, http://www.wizardnews.com/story.200605081.html, http://hp2007.org/indexx.html?page=programming/specialguests, http://www.associatedcontent.com/article/53809/sectus_2007_a_harry_potter_fan_confe rence.html*

16. "HP Webmasters Interview," by Mary-Ann Russon, Urbanwire, at http://www.theurbanwire.com/jun04/stevevanderark.html

- 7 -

260,000 unique visitors per month.[17] A 2007 news story about the popularity of Harry Potter fan sites mentions the *Lexicon* as one of four such sites.[18]

18. RDR Books' marketing of the *Lexicon* would benefit from Vander Ark's ability to use Harry Potter fan websites to target its efforts. Vander Ark's website is a member of "Floo Network," a network linking three complementary Harry Potter fan sites. The other two members of the network, www.accio-quote.org and www.the-leaky-cauldron.org are also popular sites, and the "Floo Network" linkage provides Vander Ark a wider platform to market his book to its audience of Harry Potter fans.

### 3. Independently published books by other Harry Potter authorities have gained commercial success.

19. The success of an independently published book by another recognized Harry Potter authority indicates that the *Lexicon* would be likely to generate substantial sales. In 2006, the creators of www.mugglenet.com, which as mentioned above is the leading Harry Potter fan website, wrote a book offering predictions about the resolutions of story lines in the final yet-to-be installment of the Harry Potter series. Despite being a first book for the authors, and despite being made obsolete by the publication the final Harry Potter volume (*Harry Potter and the Deathly Hallows*) eight months after its publication, *Mugglenet.com's What Will Happen in Harry Potter 7?* has been quite successful. According to a July 2007 article, there were 335,000 copies in print, and the book had made the New York Time Children's Paperback Best-sellers list for 20 consecutive weeks.[19]

---

17. Quantcast.com, accessed Feb. 22, 2008 for data on the Warner Brothers website, and Feb. 20, 2008 for data on the other websites.
18. "Wizards of the WEB – Out in cyberspace, Harry Potter fan sites experienced their own meteoric rise," The Commercial Appeal, April 17, 2007.
19. "Potter spin-off a hit for tiny Berkeley publisher / prediction book capitalizes on Pottermania," The San Francisco Chronicle, July 7, 2007. Defendant witness Shawn Malhotra reports that the book has sold over 300,000. (Declaration of Shawn Malhotra

20. The Mugglenet book was published by Ulysses Press, which, like defendant RDR Books, is an independent publisher with a history of publishing titles that generate more limited circulation. Ulysses Press' previous "successes" had sold about 50,000 copies each.[20] This suggests that RDR's previous lack of titles that generate significant sales does not preclude it from publishing a very successful *Lexicon*.

21. Thus, RDR Books' *Lexicon* has the potential to be quite successful. Since the *Lexicon* would compete directly with Ms. Rowling's own encyclopedia, it is likely that publication of the *Lexicon* would reduce royalties earned by Ms. Rowling from her own encyclopedia.

### 4. Other Harry Potter volumes cited by defendants cannot be considered "first movers."

22. If not enjoined, the *Lexicon* would usurp the advantage of being the first published comprehensive guide to the Harry Potter series. The loss of this first-mover advantage (including the potential loss from losing the right to decide when is the best and most profitable time to release the guide) would harm potential sales of J.K. Rowling's planned volume. There is no basis for defendants' claim that the publication of other companion books has already eliminated any first-mover advantage that J.K. Rowling's proposed encyclopedia would enjoy.

23. Defendant identified six companion books as having "similarities to the *Lexicon* in both format and content."[21] However, five of these books do not cover all seven of the Harry

---

submitted in Opposition to Plaintiff's Motion for a Preliminary Injunction, ¶7.) Nielsen BookScan (BookScan) reports that as of February 17, 2008, 166,277 copies have been sold in the US consumer market through the 17 major outlets it tracks.

20. "Potter spin-off a hit for tiny Berkeley publisher / prediction book capitalizes on Pottermania," The San Francisco Chronicle, July 7, 2007.

21. Declaration of David Harris Submitted in Opposition to Plaintiffs' Motion for a Preliminary Injunction, ¶3.

Potter volumes or are not organized as encyclopedias. Thus, the availability of these titles cannot eliminate the first-mover advantage for the proposed J.K. Rowling volume. Only one of the six volumes, *Field Guide to Harry Potter*, was published after the seventh and last volume of the Harry Potter series was completed.[22] However, according to Nielsen BookScan, the *Field Guide* has sold only 201 units and thus cannot be considered to have usurped any first-mover advantage.[23] Attached hereto as **Exhibit A** is a true and correct copy of the BookScan data.

24. Of the other five books identified by the defendant, one - *The End of Harry Potter* – is marketed not as an encyclopedia or guide but as a book that "delves into the many mysteries which remain unsolved" as of book 6 of the series.[24] None of the remaining four books -- *Fact, Fiction and Folklore in Harry Potter's World: An Unofficial Guide; Harry Potter A to Z: The Unofficial Harry Potter Encyclopedia; A Muggle's Guide to Exploring the Wizarding World;* and *The JK Rowling Encyclopedia* -- was published before the series was completed and none have been successful. I understand that defendant now acknowledges that the last three of these books have been withdrawn from the market, apparently at the request of plaintiffs, due to concerns about copyright violation.[25] Thus, none of these books can be credited as being a "first-mover" among Harry Potter encyclopedia.

---

22. According to Amazon.com, *Field Guide* was published in December 2007.
23. Nielsen BookScan, Feb. 22, 2008. Total sales as of week ending Feb. 17, 2008.
24. "Book Description" on Amazon.com, accessed Feb. 24, 2008. (http://www.amazon.com/End-Harry-Potter-David-Langford/dp/0765319349/ ef=pd_bbs_sr_1?ie=UTF8&s=books&qid=1203893733&sr=1-1)
25. Letter from David Hammer to Honorable Robert P. Patterson, February 25, 2008.

## B. PUBLICATION OF THE *LEXICON* WOULD HARM MS. ROWLING BY RAISING TRANSACTIONS COSTS FOR AUTHORS OF FUTURE DERIVATIVE WORKS.

25. As discussed in my prior declaration, reserving exclusive rights to derivative works for original copyright owners enhances economic efficiency by reducing transactions costs that authors of other derivative works would face if other authors of derivative works also obtained copyrights in these works. For example, publication of the *Lexicon* could increase transaction costs for those authors of future works that are derivative of the Harry Potter series by requiring future authors to obtain licenses from both Ms. Rowling and Mr. Vander Ark.

26. The increased transactions costs of obtaining licenses from multiple copyright holders or persons asserting copyrights in their derivative works, including the legal uncertainty and confusion created for future authors of derivative Harry Potter works, would tend to discourage the creation of such derivative works. Such costs would, in turn, tend to result in a reduction in licensing revenue earned by Ms. Rowling. In addition, for the authorized derivative works that do get created, it is likely that Ms. Rowling would receive reduced licensing payments due to their creators' need to make payments to multiple copyright holders or risk being sued for copyright infringement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*William M. Landes*

William M. Landes

February 27, 2008

**EXHIBIT A**

**Author:** DURIEZ COLIN  **Title:** FIELD GUIDE TO HARRY POTTER  **Publisher:** INTERVARSITY PR  **Format:** Trade Paperback

| Date | | |
|---|---|---|
| 2/17/2008 | 22 | 127 |
| 2/10/2008 | 19 | 105 |
| 2/3/2008 | 10 | 86 |
| 1/27/2008 | 16 | 76 |
| 1/20/2008 | 11 | 60 |
| 1/13/2008 | 29 | 49 |
| 1/6/2008 | 20 | 20 |
| 12/30/2007 | 11 | 74 |
| 12/23/2007 | 17 | 63 |
| 12/16/2007 | 14 | 46 |
| 12/9/2007 | 22 | 32 |
| 12/2/2007 | 10 | 10 |
| | | **201** |