UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                              :
WARNER BROS. ENTERTAINMENT INC. and                           :
J.K. ROWLING,                                                 :   Case No. 07 Civ. 9667 (RPP)
                                                              :
                              Plaintiffs,                     :
                                                              :
               -    against -                                 :
                                                              :
RDR BOOKS and DOES 1-10                                       :
                                                              :
                              Defendants                      :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## DEFENDANT RDR BOOKS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

Dockets.Justia.com

Defendant RDR Books ("RDR") respectfully submits these proposed findings of fact and conclusions of law following the non-jury trial on the merits that was held on April 14, 15, and 16, 2008, following consolidation of the trial of this matter with the hearing on Plaintiffs' motion for preliminary injunction pursuant to Federal Rule of Civil Procedure 65.

## PROPOSED FINDINGS OF FACT

### Copyrighted Works At Issue

#### A.    Harry Potter Novels

1.    Plaintiff J.K. Rowling ("Ms. Rowling") wrote and owns the copyright in seven Harry Potter novels: *Harry Potter and the Sorcerer's Stone* (1998) (Serial No. TX 4-465-397); *Harry Potter and the Chamber of Secrets* (1999) (Serial No. TX 4-465-398); *Harry Potter and the Prisoner of Azkaban* (1999) (Serial No. TX 4-465-399); *Harry Potter and the Goblet of Fire* (2000) (Serial No. TX 5-122-771); *Harry Potter and the Order of the Phoenix* (2003) (Serial No. TX-5-705-321); *Harry Potter and the Half-Blood Prince* (2005) (Serial No. TX-6-179-388); *Harry Potter and the Deathly Hallows* (2007) (Serial No. TX-6-578-062) (Tr. 43:8-9; EX 12-A).

2.    Plaintiff Warner Bros. Entertainment ("Warner Bros.") owns the exclusive film rights and copyrights to the Harry Potter series (EX 26 (Williams Decl. ¶ 3)) and is the exclusive distributor for worldwide distribution of these films (EX 26 (Williams Decl. ¶ 4)).

3.    Warner Bros. released full-length feature films of the first five Harry Potter novels: *Harry Potter and the Sorcerer's Stone* (2001) (Serial No. PA0001063646); *Harry Potter and the Chamber of Secrets* (2002) (Serial No. PA0001105748); *Harry*

*Potter and the Prisoner of Azkaban* (2003) (Serial No. PA0001222542); *Harry Potter and the Goblet of Fire* (2005) (Serial No. PA 0001279121); *Harry Potter and the Order of the Phoenix* (2007) (Serial No. PA 0001355547) (EX 26 (Williams Decl ¶ 3)). In addition, a sixth film, *Harry Potter and the Half-Blood Prince*, is scheduled for a worldwide release in November 2008. Production of the seventh, *Harry Potter and the Deathly Hallows*, has been announced but a release date has not yet been set (EX 26 (Williams Decl. ¶ 4)).

4.      Plaintiffs have not offered into evidence the copyright registrations for the Harry Potter films, nor have they offered copies of the Harry Potter films themselves.

5.      The Harry Potter novels have achieved tremendous success and phenomenal sales  (Tr. 47:14-18; 433:1-3). Together the Harry Potter novels have sold more than 300 million copies worldwide. The final book in the series *Harry Potter and the Deathly Hallows* alone has sold over 13 million copies since July 2007, earning its American publisher, Scholastic, over $250 million (Tr. 443:15-20). The books have won many children's literary awards and the British Book Award (Tr. 47:17-20).

**B.      Fantastic Beasts And Quidditch Through The Ages**

6.      Ms. Rowling wrote and owns the copyright in two Harry Potter companion books, which are not novels, *Quidditch Through the Ages* (Serial No. TX-5-374-649) and *Fantastic Beasts and Where to Find Them* (Serial No. TX-5-374-653) (Tr. 49:10-16; EX 12-A).

7.      *Quidditch Through the Ages* and *Fantastic Beasts and Where to Find Them* have both sold more than one million copies (Tr. 445:21-446:2) and generated over $30 million in royalties to Ms. Rowling, which she has donated to charity (Tr. 49:25-

50:10).

### C. The Daily Prophet

8.      Ms. Rowling wrote three newsletters, a fictional newspaper for fans, called the Daily Prophet, which were sent to fans without charge (Tr. 73:19-25).  Ms. Rowling asserts that she owns the copyright in the Daily Prophet Newspapers (Tr. 74:6-8), but she has offered no copyright registrations or documentary proof of copyright ownership.  In addition, Plaintiffs have not offered into evidence copies of the Daily Prophet Newsletters themselves.

### D. Wizard Cards

9.      Ms. Rowling wrote the text of "wizard cards" for use in an Electronic Arts video game (Tr. 76:8-14).  Plaintiffs admit that the copyrights in the video games in which the wizard cards appear are registered solely to Electronic Arts and the registrations from the United States Copyright Office confirm this.  (Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of registration certificates from the United State Copyright Office, all of which identify Electronic Arts Inc. as the sole owner of copyrights bearing the following serial numbers: PA0001062155, PA00160374, PA0001067206, P0001069813, PA 0001217438, PA 0001218122, PA 0001221429, PA0001154042, PA00011255093, PA0001122439, PA0001117142, PA0001117207.)

10.      Warner Bros. submitted no evidence that it owns these copyrights, not in testimony or in the declaration of Jeremy Williams or any other Warner Bros. representative.  While Ms. Rowling testified that she "believe[s]" Warner Bros. and Electronic Arts own the copyright to the wizard cards (Tr. 76:15-17) that hearsay testimony is contradicted by the copyright registrations for these works.

**The Lexicon**

     **A.**    **Origins Of The Lexicon Website**

11.    Steven Jan Vander Ark is a former teacher and librarian from Michigan who owns and is the principal author of the content on the Harry Potter Lexicon website (Tr. 334:4-17). Mr. Vander Ark became an ardent Harry Potter fan after reading the first novel, and while reading the second novel in 1999, he started taking notes to keep track of facts in the books (Tr. 335:1-15). He expanded these notes to include short descriptive lists of spells and character names, which he shared on internet discussion groups for fans (Tr. 336:4-11; EX 502 (Vander Ark Decl. ¶ 5)).

12.    Mr. Vander Ark began work on his own website, the Harry Potter Lexicon, in 1999, and opened the site in August 2000 (Tr. 336:20-337:10). The HTTP address for the Lexicon website is [http://www.hp-lexicon.org](http://www.hp-lexicon.org). Mr. Vander Ark testified that his purpose in establishing the website was to create a comprehensive encyclopedia, a reference tool that organized information from the Harry Potter books and collected numerous facts in one central source for fans to use to find definitions of all the characters, places, spells, creatures and physical objects in the world of Harry Potter. (Tr 338:6-21; EX 502 (Vander Ark Decl. ¶ 13)).

13.    For the first three years after he established the Lexicon website, Mr. Vander Ark worked on it alone. He did so as a hobby, spending his nights and weekends updating it with new information while he worked as a teacher and librarian during the day (Tr. 339:15-17). With the publication in 2003 of the fifth book in the series, *Harry Potter and the Order of the Phoenix*, the amount of work became too great for Mr. Vander Ark to handle by himself because the book contained a large number of new

characters, spells and details, as well as new information and facts relating to events and characters that appeared in previous books. Fans were clamoring for Mr. Vander Ark to add this new material to the website, and existing encyclopedia entries needed to be updated and the new information catalogued. Because of these demands, Mr. Vander Ark recruited others to help him edit the website (Tr. 339:18 - 340:8). The Lexicon website currently has an editorial staff of seven or eight people (Tr. 340:12-16).

14.     In addition to Mr. Vander Ark, two other website editors are librarians, whose training and skills have helped them to develop the Lexicon website as a reference tool that collects information for quick and easy access (Tr. 341:2-342:5). Mr. Vander Ark and the editors organize the website so that people who want to locate and identify specific information about the Harry Potter works can use the website's collection of facts as a centralized, quick reference rather than spending considerable time paging through the seven Harry Potter novels and other works to find the information they need (Tr. 342:2-343:1). Other website editors add additional specialized skills, including a teacher of Latin and Greek, who consults on languages (Tr. 341:2-3; 344:2-6).

15.     The material on Mr. Vander Ark's website is drawn from the Harry Potter books, and contains background information drawn from many outside resources to help illuminate what Mr. Vander Ark calls, "the incredibly rich world and hidden meanings" of the Harry Potter texts (Tr. 345:21-346:6). The outside resources Mr. Vander Ark relies on include etymological dictionaries, encyclopedias, historical reference books, and mythological reference books to explicate the facts of the Harry Potter novels (Tr. 346:12-347:19). The reference works Mr. Vander Ark has used include Bullfinch's Mythology, Field Guide to Little People, New Shorter Oxford English Dictionary, and

online encyclopedias such as Encyclopedia Mythica and Haunted Britain (Tr. 347:11-348:19; EX 502 (Vander Ark Decl. ¶ 14)).

16.     In addition to the seven Harry Potter novels, Mr. Vander Ark's encyclopedia entries also draw on material from the *Fantastic Beasts* and *Quidditch Through the Ages* companion books, the Daily Prophet newsletters, the magic wizard cards, and interviews of Ms. Rowling (Tr. 348:7-13; EX 502 (Vander Ark Decl. ¶ 14)).

17.     The Lexicon website is extremely popular with fans of Harry Potter.  It attracts hundreds of thousands of visitors every month from all over the world (Tr. 352:5-25; EX 502 (Vander Ark Decl. ¶ 17)).  Access to the Lexicon website has always been free and available to everyone; there never has been a fee and/or password needed for entry (Tr. 351:25-4; EX 502 (Vander Ark Decl. ¶ 16)).

18.     Since Mr. Vander Ark created the Lexicon website in 2000, it has been a volunteer effort that earned little money.  For the seven year period between August 2000 and October 2007, the website generated approximately $6,500 to $7,000 in total revenue, an average of approximately $1,000 per year (Tr. 350:1-10).  The costs associated with running the website were nearly the same or slightly less than the revenue it generated (Tr. 350:20).  Since October 2007, when Mr. Vander Ark added additional advertisements to the website to cover anticipated increases in expenses, the site has generated approximately $400 per month in revenue (Tr. 351:6-18).

19.     The usefulness of Mr. Vander Ark's website as a reference source has been acknowledged by the words and actions of numerous fans, Ms. Rowling, representatives of Warner Bros. and Scholastic, Inc., and the makers of the Harry Potter video games at Electronic Arts.

20.     Ms. Rowling praised the Lexicon website as a "great site" and in 2004 gave it her "fan site award," one of eight such awards she has given.  (Tr. 92:1-17). About the Lexicon website Ms. Rowling wrote, "This is such a great site that I have been known to sneak into an internet café while out writing and check a fact rather than go into a bookshop and buy a copy of Harry Potter (which is embarrassing). A website for the dangerously obsessive; my natural home."  (Tr. 118:2-119:2).

21.     In September of 2006, Warner Bros. flew Mr. Vander Ark to the set of the film *The Order of the Phoenix* where he met David Heyman, the producer of all of the Harry Potter movies.  Mr. Heyman told Mr. Vander Ark that Warner Bros. used the Lexicon website almost everyday (Tr. 386:8-20; EX 502 (Vander Ark Decl. ¶ 39)).

22.     In July 2007, Mr. Vander Ark visited the Electronic Arts studios, where he saw the walls of the studio covered with printouts from the Lexicon website (Tr. 387:3-13; EX 502 (Vander Ark Decl. ¶ 39)).

23.     In addition, Cheryl Klein, a Senior Editor at Scholastic Inc., wrote Mr. Vander Ark to thank him and his staff for the help the Lexicon website gave Scholastic publishers during the editing process (EX 502 (Vander Ark Decl. ¶ 39); Ex. 502a)).

24.     Fans of the Lexicon website often suggested that Mr. Vander Ark create a print version of the Lexicon.  Beginning around 2003, Mr. Vander Ark considered creating a book from the material on his website (Tr. 355:13-18).  At that time, Mr. Vander Ark had two reasons for not creating such a book: (1) the Harry Potter series was not finished yet, so an encyclopedia would not be complete; (2) he believed that publishing such a book would not be allowed under copyright law (Tr. 355:20-356:4).

25.     Mr. Vander Ark, who is not a lawyer, is unsure why he formed the belief

that publishing the Lexicon as a book would be prohibited by copyright law; at the time he had never spoken to an attorney regarding what copyright law would allow (Tr. 356:10) and he did not know then if his belief was accurate or not. (Tr. 356:10-25).

**B.     Decision To Publish The Lexicon Book**

26.     Roger Rapoport is the president of Defendant RDR Books, a book publisher based in Michigan. RDR Books seeks to publish the "Harry Potter Lexicon" by Steve Vander Ark (Tr. 150:19-151:2).

27.     Mr. Rapoport learned of Mr. Vander Ark and the Lexicon website in August of 2007, when he read an article in his local paper, The Muskegon Chronicle about Mr. Vander Ark and the Lexicon website (Tr. 153:2-13; EX. 77). Upon reading the article, Mr. Rapoport recognized an opportunity to publish a Harry Potter encyclopedia based on Mr. Vander Ark's website (Tr. 154:7-15).

28.     In August 2007, Mr. Rapoport contacted Mr. Vander Ark about publishing a Harry Potter encyclopedia based on some of the materials from the Lexicon website (Tr. 357:10-19).

29.     During their initial meetings and conversations in August, Mr. Vander Ark raised his concerns regarding the legalities of publishing the Lexicon. Mr. Rapoport assured Mr. Vander Ark that he would look into the legal issue. Mr. Rapoport later informed Mr. Vander Ark that he had determined that publication of content from the Lexicon website in book form would be legal (Tr. 358:25-359:5).

30.     Mr. Vander Ark asked Mr. Rapoport to "stand behind" this opinion, by agreeing that RDR would defend and indemnify him in the event of any lawsuits, and Mr. Rapoport agreed (Tr. 178:8-15; 360:8-21; EX 502 (Vander Ark Decl. ¶ 28)). On August

23, 2007 RDR Books and Mr. Vander Ark signed a contract – which included an indemnification clause protecting Mr. Vander Ark – for the publication of a book entitled "The Harry Potter Lexicon"  (Tr. 359:6-10; Tr. 360:8-21; EX 502 (Vander Ark Decl. ¶ 28); EX 14-J).

31.     Mr. Vander Ark and Mr. Rapoport orally agreed that the book would be limited to the encyclopedia sections of the Lexicon website, that is the sections of the website that gave descriptions and commentary on individual names, places, spells, creatures, and things from the Harry Potter stories (Tr. 359:14-21; EX 502 (Vander Ark Decl. ¶ 28)).

32.     The two men decided on an encyclopedia, organized in the A to Z format used on the Lexicon website, which they felt would be an easily accessible resource for readers to use rather than sifting through 200 chapters of the original books to track down diffuse facts (Tr. 361:20-362:6; 366:25-367:24).  Because the Harry Potter books do not contain footnotes, an index, or glossary of any kind, Mr. Rapoport and Mr. Vander Ark believed an A to Z guide would fill the demand of fans wanting easy access to the facts of Harry Potter, all organized in one central location (Tr. 362:12-17).

33.     Mr. Vander Ark and his editors created the manuscript of the book by using the material from the Lexicon website – all of the entries in the book version come from the website (Tr. 365:1-5; EX 502 (Vander Ark Decl. ¶ 30)).  But because the book was intended to be a complete but easy-to-use reference guide, there were space limitations for the printed work and about half of the material from the website was not included in the book. (Tr. 365:1-11; 366:9-18; 369:3-14; EX 502 (Vander Ark Decl. ¶¶ 30, 31, 33)).

34.     All of the material in the Lexicon book is currently on the Lexicon website (Tr. 365:1-5; EX 502 (Vander Ark Decl. ¶ 30)).  Moreover, nearly all of the material was available on the Lexicon website in August 2007, and had been for years, before Mr. Vander Ark began composing the Lexicon book.  The only material in the book that did not previously appear on the website was information about the seventh and final Potter novel, *Harry Potter and the Deathly Hallows*, which was released in 2007.  Mr. Vander Ark wrote the material involving the *Deathly Hallows* book simultaneously for the Lexicon book and the Lexicon website because it had just been released when Mr. Vander Ark began composing the Lexicon book (EX 502 (Vander Ark Decl. ¶ 32)).

**C.      Content Of The Lexicon Book**

35.     The Lexicon book is an A to Z guide to the facts of the Harry Potter world, referencing in one place the thousands of things – creatures, characters, spells, events, places – that exist or are referenced in the Harry Potter works.  It contains thousands of citations to the original sources of the information it organizes, referring the reader back to the original works from which the information is drawn.

36.     Mr. Vander Ark explained he created the Lexicon to be a "quick reference, the kind of thing that somebody who's reading would need to look up a fact or, for example, a fan who is writing a story and needs to know some fact about a character for their story.  That's the kind of reference this is.  So we tried to make a concise, easy-to-use reference, but also one that was as complete as possible."  (Tr. 369:19-25).

37.     Mr. Vander Ark did not intend the Lexicon book to be a substitute or a replacement for the Harry Potter works, but rather he wrote the Lexicon for fans and readers who are familiar with the names, characters, spells, events, places and storylines

in the Harry Potter works (Tr. 287:17-19; 307:2-4); EX 502 (Vander Ark Decl. ¶ 41)).

38.     Janet Sorensen is a tenured associate professor in the English Department at the University of California at Berkeley, who has taught and researched at the university faculty level for fourteen years.  She received her PhD in English in 1994 from State University of New York at Buffalo (EX 503a).  Dr. Sorensen teaches British and American Literature from the seventeenth through twentieth centuries and her field of specialization is eighteenth-century British literary studies, with a particular interest in language, lexicons, and dictionaries (EX 503 (Sorensen Decl. ¶ 1)).  Her expert testimony established the long history of lexicons, encyclopedias and other reference guides in English literature, as well as the Lexicon's placement in that context and its value as a reference guide and aid to readers of the Harry Potter works.

39.     Dr. Sorensen defined a reference guide to literature as "something that would help readers understand, access, in some cases illuminate layers of meaning in a particular text."  (Tr. 499:14-18).  Reference guides have existed for centuries, emerging in the late seventeenth and early eighteenth centuries at the time of a simultaneous expansion in the amount of published, printed material, and literacy rates (Tr. 500:9-20).

40.     Dr. Sorensen explained that fantasy literature, literature that "invents very elaborate universes, creates places, imaginary beings, imaginary flora and fauna, often of a sort of layered and extensive variety," is especially given to generating a large number of reference guides (Tr. 504:4-11). These types of fantasy books, such as those by C.S. Lewis and J.R.R. Tolkien, lend themselves to reference guides because they involve a large number of invented characters, creatures and places introduced over a number of volumes, that readers read over time.  Thus, a reference guide is useful because it reminds

readers of the many characters and their relationships, as well as offer insights into the significance of invented items (Tr. 507:8-18). Works of fantasy literature therefore may generate a large number of companion guides, and Dr. Sorensen found 19 or 20 companion guides to Tolkien's novels, and about 15 guides to Lewis's works (Tr. 507:1-5).

41.     In Dr. Sorensen's opinion, the Harry Potter novels fall within that genre of fantasy literature because "they create a rich universe of invented beings, places [and] things." (Tr. 504:12-15). Like Lewis and Tolkien's works, the Harry Potter novels may lead a reader to want to use a reference guide because the novels contain an elaborate world, described in thousands of pages of texts, and involving characters, creatures, spells that appear in one book and maybe again hundreds of pages later, or in another book. Having a reference guide that acts as a memory guide to these novels can often be helpful (Tr. 504:16-23).

42.     Dr. Sorensen explained that authors often write their own reference guides to their own literature, at times in response to guides written by third parties with which they disagree (Tr. 502:19-25). One value of having other third-party guides in addition to the author's guide, is that the author may not be the best judge of what in her text needs illumination (Tr. 503:18-504:1). Another value of having multiple guides to a text is that there usually is not a single authoritative way to understand a book (Tr. 508:12-20).

### (1)     The Lexicon Synthesizes And Distills Facts Of The Harry Potter Universe

43.     The seven novels in the Harry Potter series were published over a period of ten years and released periodically, often with two years elapsing between releases. The series totals several thousands of pages in length and contains hundreds of thousands

of words (Tr. 653:19-654:5).  Together, the novels refer to hundreds of characters, creatures (both real and fanciful), places (both real and fanciful), spells, objects and devices (some of them magical).  Not every character or creature appears in every novel. A character may appear in the first book, and then disappear until the fifth or sixth book (Tr. 372:6-13; Tr. 504:18-23; 505:10-22; EX 502 (Vander Ark Decl. ¶ 34)).  Additional information about the characters, creatures, places, spells, objects and devices that appear in the Harry Potter novels is scattered across scores of other sources, including dozens of interviews Ms. Rowling has given over the years, and her short companion books, *Quidditch Through the Ages* and *Fantastic Beasts and Where to Find Them* (Tr. 373:23-374:7).

44.     The testimony of Dr. Sorensen and Mr. Vander Ark establish the utility of the Lexicon as a reference guide to the elaborate world of the Harry Potter works (Tr. 372:14-373:15; Tr. 604:21-23).  Mr. Vander Ark testified that a fundamental purpose of the Lexicon is to gather and synthesize information from the thousands of pages and hundreds of chapters of the Harry Potter works, plus hundreds of other sources of information given by Ms. Rowling (Tr. 373:23-374:14; EX 502 (Vander Ark Decl. ¶ 45)).  Dr. Sorensen's expert opinion supports Mr. Vander Ark's testimony.  Dr. Sorensen explained, "the chief use and value of this text is the way in which it is synthesizing and distilling information for quick reference material for a reader."  (Tr. 578:19-21; *see also* Tr. 509:23-510:3).

45.     The facts gathered in the Lexicon are accompanied by thousands of citations that indicate where they were found within the corpus of the Harry Potter works. These citations are found in parentheses, with a chapter number where applicable (EX

502 (Vander Ark Decl. ¶ 45); EX 1). Mr. Vander Ark explained that page numbers are excluded from the citations because the various editions of the Harry Potter books have different pagination, but the chapter numbers remain consistent (Tr. 277:19-278:1).

46.     The synthesizing function of the Lexicon is evident in any number of examples that illustrate how the book collects and synthesizes information from the various Harry Potter novels and other sources, and cites to the sources for the facts collected. Such examples include "Rubeus Hagrid" (citing to more than seven different sources); "McKinnon, Marlene" (citing to four different Harry Potter novels in a one-sentence entry); "Chudley Cannons" (citing to various Harry Potter novels, *Quidditch Through the Ages* and the Daily Prophet newsletters); "Medical Magic" (a category created by Mr. Vander Ark to collect facts related to the magic and spells in the book that replace real-world medicine; citing nearly every novel and the Daily Prophet newsletters) (Tr. 375:7-24; Tr. 376:9-23; EX 1; EX 502 (Vander Ark Dec. ¶ 45)). Other examples include the entries for "Moaning Myrtle" and "Polyjuice Potion" each of which collects information gathered from a variety of sources, and synthesizes it into a concise entry (EX 1).

47.     In addition to synthesizing information, the Lexicon is also valuable simply as a memory aid. A reader may, for example, wonder on reading *Harry Potter and the Order of the Phoenix* (published in 2003) where he or she previously encountered character Dedalus Diggle, a name last mentioned in "*Harry Potter and the Philosopher's Stone* (published in 1997). The Lexicon provides the answer to this question (Vander Ark Decl. ¶ 34; EX 1) (EX 502 (Vander Ark Decl. ¶ 34); EX 1).

48.     Mr. Vander Ark testified that the value of the Lexicon as a ready source

for such information goes beyond that of a memory aid. As Mr. Vander Ark explained, he created the Lexicon so that readers and fans can easily find information for a number of purposes, such as to research a paper on women in literature, write fan fiction, create art work, write wizard rock songs, or the like based on the Harry Potter works (Tr. 336:12-19; 338:6-11; 342:2-343:1; 351:19-24; 361:25-362:6; 369:10-25; 375:18-25). The Lexicon thus also functions as a resource to support the creative efforts of many Harry Potter fans.

49.     Mr. Vander Ark acknowledged that there is substantial linguistic overlap between many Lexicon entries and the sources from which information is drawn, including the Harry Potter works. But he explained that such overlaps were necessary to accurately report the facts of the novels. Mr. Vander Ark testified that when he identified specific characters, places or spells, he used language similar to the novels simply to make clear what was being described (Tr. 276:1-9; 280:12-19; EX 502 (Vander Ark Decl. ¶ 36)). The alternative would have been to employ very artificial devices, such as nicknames, substitute names, or vague and generic descriptions of the things described. Mr. Vander Ark testified that doing so, however, would have interfered with the purpose and goal of the Lexicon to accurately organize and report information found in the Harry Potter works in an easily accessible format (Tr. 383:11-384:3; EX 502 (Vander Ark Decl. ¶ 36)).

50.     While it would be possible to shorten certain Lexicon entries and use fewer of the words from the original text, doing so would detract from the value of the Lexicon as a comprehensive guide of factual information (Tr. 281:1-23; 286:14-17). Dr. Sorensen testified that other Lexicons and reference guides frequently quote and

paraphrase liberally from the underlying works (Tr. 510:10 - 511:21). Dr. Sorensen likewise acknowledged that while it may be possible to write shorter entries to remind readers who certain characters are, the longer, more descriptive entries in the Lexicon serve the purpose of illuminating the importance of certain characters and figures (Tr. 545:8-547:4). Dr. Sorensen testified that another reference guide with a different focus might find it appropriate to describe things differently in entries of different length (Tr. 551:2-12).

51.     Mr. Vander Ark admitted that certain entries in the present manuscript for the Lexicon book quote songs and poems verbatim, but he testified that these songs and poems will be deleted from the Lexicon before it is published (Tr. 382:22-383:10). Similarly, after the lawsuit was filed, Mr. Vander Ark revised the Lexicon entries regarding the *Fantastic Beast* materials to remove a significant amount of overlapping language (Tr. 382:6-382:21; EX 79).

52.     Plaintiffs offered several demonstrative exhibits comparing the Lexicon text to the text of the Harry Potter works. Plaintiffs contend these charts show the extent to which the Lexicon copies Ms. Rowling's words. The reliability of these charts is undermined by the fact that the entries on Plaintiffs' charts often report the text of the Lexicon incorrectly. For example, a comparison of the Lexicon's text in Exhibit 1 to Plaintiffs' Exhibit 48 reveals that Plaintiffs' exhibit misquotes the Lexicon's entries for Aguamenti; apparition; astrology; Binns, Professor Cuthbert; and Decoy Detonators (EX 1; EX 48). Similarly, Plaintiffs' Exhibit 47 inaccurately describes the Lexicon entry for "Hog's Head," and quotes a phrase that is nowhere to be found in the Lexicon entry (EX 1; EX 47).

53.     The utility and credibility of Plaintiffs' charts are further damaged by the fact that these charts omit the full text of the Lexicon entries, to make it appear that the entire Lexicon entry is copied from the Harry Potter works, and the charts exclude information contained in the Lexicon entries that comes from sources outside the Harry Potter works.  The charts also exclude the Lexicon's numerous citations to source materials and do not include phrases from the Lexicon, such as "According to Ron" or "Dumbledore said," which indicate that the Lexicon is quoting characters' dialogue (Tr. 278:16-279:15; Tr. 381:17-382:3; EX 1; EXs 165-171; EXs 43-38).

54.     Plaintiffs also contend that the Lexicon is not valuable as a reference guide because it provides few citations.  This assertion is contradicted by the text of the Lexicon itself, which contains citations to the title and chapter of the relevant Potter books for each entry in the Lexicon (EX 1; Tr. 276:20-277:1; 279:6-20; EX 502 (Vander Ark Decl. ¶ 44 c. (1))).  In response to Plaintiffs' complaint that the Lexicon lacks quotation marks, Mr. Vander Ark admitted quotation marks were not always used but he explained that Lexicon entries nevertheless indicate where they are quoting statements of characters; moreover, these indirect quotes are followed by a citation to the source material (Tr. 278:16-279:15).

55.     Plaintiffs further contend that the Lexicon reveals a tremendous amount of the plot lines of the Harry Potter novels, and therefore may discourage children from actually reading the books. (Tr. 103:8-22; Tr. 307:14-17; Tr. 410-411; Tr. 418-419). This contention is not credible. As Ms. Rowling herself admitted, the Lexicon would not be read for entertainment value (Tr. 650:24-651:1).  People, particularly children, interested in finding a short-cut substitute for reading the seven novels, could easily watch the

Harry Potter movies (Tr. 427:11-16). Plaintiffs' objections to the Lexicon on this basis are not persuasive.

56.     In sum, the witness testimony and documentary evidence offered confirms that the Lexicon provides a comprehensive, centralized source where the myriad Harry Potter facts are distilled, explained and organized for ease of reference.

### (2)     The Lexicon Draws On Outside Resources And Adds Insights To The Harry Potter Works

57.     In addition to synthesizing and distilling large amounts of information into an A to Z reference guide, the Lexicon offers a significant amount of original insight into the Harry Potter texts.

58.     The Lexicon provides etymologies for approximately 200 terms (EX 1). The Harry Potter works themselves do not contain these etymologies (Tr. 512:12-20; EX 587).

59.     The Lexicon's etymologies clue readers into the history, sources and allusions that underlie invented terms in the texts. As Professor Janet Sorensen explained, the Lexicon's etymologies show Ms. Rowling's thoughtfulness in naming her characters, reveal layers of linguistic information, historical information and depth of the characters, as well as provide information about motifs running throughout the novels (Tr. 515:21-516:24; EX 587). The etymologies uncover and illuminate Ms. Rowling's references to a wide range of languages, vernaculars, and "cultural repositories," and in Dr. Sorensen's opinion, ultimately contribute to readers' appreciation of Ms. Rowling's achievement (Tr. 515:16-516:2; Tr. 517:17-23).

60.     Plaintiffs' witnesses, Ms. Rowling and Jeri Johnson, criticize the Lexicon's etymological explanations as wrong, misinformed and sloppy, while also

complaining that the Lexicon offers too few of them (Tr. 56; 67-73; Tr. 597:12-17).

61.     Etymologies, however, are often subject to debate.  As Dr. Sorensen persuasively explained, this is a "rich and interesting terrain that is often fought over." (Tr. 522:10-14).  One thing that makes competing etymologies interesting and helpful is that "they point to the very complex history of language which is not usually something that can be established with absolute accuracy."  (Tr. 580:16-20).

62.     Dr. Sorensen further explained that different authors often find varied significance and offer diverse meanings of the original works they analyze, and that this is one of the values of having multiple guidebooks published by a variety of authors (Tr. 581:1-7).  By adding his non-academic voice to the debate, Mr. Vander Ark offers competing interpretations, which even if subject to debate, contain useful information (Tr. 520:2-20; Tr. 523:1-7).

63.     As for the number of etymologies the Lexicon includes, the Lexicon would not be expected to offer an etymology for every entry, because many entries do not require an etymology.  The etymologies that are offered in the Lexicon explain invented terms that are interesting composites of different words or different roots of other languages (Tr. 579:10-16).  Again, this is why multiple guidebooks are valuable; different authors offer other interpretations and can add information regarding terms they find significant (Tr. 579:20-580:6).

64.     Another way the Lexicon adds material that enhances readers' understanding of the Harry Potter texts is by including referential material that offers insight into the Ms. Rowling's allusions to literature, mythology, and other cultural sources (Tr. 345:22-346:6; Tr. 347:4-10; Tr. 512:21-514:10; EX 502 (Vander Ark Decl.

¶ 44 c. (3)); EX 503 (Sorensen Decl. ¶ 18)). Such examples in the Lexicon include information regarding the allusions to Shakespeare's Macbeth and Norse mythology underlying the name of a rock band in the novels, the "Weird Sisters," (Tr. 523:14-524:11; EX 1; EX 587), and to Judaic tradition alluded to in the term "Avada Kadavra" (Tr. 526:23-527:24; EX 1; EX 587).

65.     In addition, the Lexicon includes descriptions and discussions of real-world geographic places that appear in the Harry Potter novels. These entries educate readers about many places in this fictional world that also exist in the real world. Additional entries educate readers regarding the real-world historical significance of the places referenced in the Harry Potter world (Tr. 513:4-14; Tr. 527:25-17; Tr. 529:4-24; EX 587; EX 503 (Sorensen Decl. ¶¶ 15, 20)).

66.     The Lexicon also includes entries that illuminate cross-cultural translations, which translate British vernacular and slang for American readers, and entries that provide descriptions of British cultural references and places. According to Dr. Sorensen, such entries are another way the Lexicon enhances the quality of reading by providing additional information not contained in the Harry Potter novels (Tr. 533:1-2; EX 587; EX 503 (Sorensen Decl. ¶ 21)).

67.     The Lexicon contains entries that note "flints" (mistakes or inconsistencies) made in the Harry Potter texts, entries that explain how various events are connected, and still others that provide information regarding how the Harry Potter world connects to the author's life experiences and history (Tr. 297:15-298:1; Tr. 533:3-535:9; EX 587; EX 503 (Sorensen Decl. ¶¶ 23-26)).

68.     While this referential information in the Lexicon often does not contain

literary commentary or analysis, Dr. Sorensen testified that it is nevertheless valuable because it provides information that enables readers to draw their own connections and interpretations, and develop their own commentary and analysis regarding the meaning and significance of the Harry Potter texts (Tr. 526:4-19).

69. Professor Sorensen confirmed that in her expert opinion, the additional referential information provided by the Lexicon will give readers a deeper knowledge and appreciation of what is going in the original novels and contribute to a deeper appreciation of Ms. Rowling's achievement (Tr. 524:12-23). The Court agrees.

### (3) The Lexicon Offers Critical Interpretation

70. In addition to the above, the Lexicon offers a limited amount of critical interpretation of the Harry Potter works.

71. The Lexicon's critical interpretation usually occurs in descriptions of the characters. The entry for Neville Longbottom, for example, contains extensive observations about the nature of his bravery and leadership (Tr. 535:18 - 536:9; EX 503 (Sorensen Decl. ¶ 28); EX 587; EX 1). The entry for Luna Lovegood likewise includes analytical observations about her nature, each supported by references to actions and events from the Harry Potter works (EX 503 (Sorensen Decl. ¶ 29); EX 1). Similarly, the entry for Draco Malfoy offers hypotheses about his motivations and his nature, and again supports these hypotheses with textual references (Tr. 536:10-10; EX 503 (Sorensen Decl.¶ 30); EX 587; EX 1). Such character entries and the interpretations they offer are useful because they lend interpretation and depth of understanding regarding who these characters are and what makes them tick (Tr. 535:10-15; EX 503 (Sorensen Decl. ¶ 27)).

72. While the entries for major characters are often quite long, and do discuss

what happens to the characters in the course of the stories, fictional characters are defined in large part by what happens to them (Tr. 612:2-20). Lengthy entries for major characters are necessary because the Harry Potter works, by definition, provide a large quantity of information about major characters. Thus Mr. Vander Ark explained that "[w]hen entries are longer than a paragraph, it is always because the matter being described requires longer treatment, either to unpack the richness of Ms. Rowling's writing or to provide information about how the matter in question fits into the overall story of the books." (EX 502 (Vander Ark Decl. ¶ 44 (1) c); EX 1). Indeed, Ms. Rowling and Plaintiffs' expert Jeri Johnson both testified that they would expect that the longest entries in the Lexicon would be about the most important characters in the novels (Tr. 143:11-18; Tr. 637:12-20).

73.     These lengthy entries do not serve as plot summaries, or abridgements of Ms. Rowling's work. A summary or abridgement would be organized in the same sequence the story in the Harry Potter works is organized, and would follow the events that take place in a novel in the order in which they take place in the narrative. The character entries in the Lexicon do not do this (Tr. 548:2-19). They tend to organize the information in a manner that is most helpful in learning about the character, and this almost always differs from the sequence of information as it appears in the Harry Potter Works (EX 1 (entry for "Harry Potter" begins with information contained in the seventh and final book)).

74.     The evidence demonstrates that the Lexicon book is intended to encourage fan interest in, and to serve as a reference to, the Harry Potter works. It thus offers no substitute for those works. The Lexicon also adds significant information not found in

Ms. Rowling's work, including etymologies, referential material and commentary. It synthesizes and distills the myriad facts found in the Harry Potter world and allows the user to quickly find information he or she needs, for many purposes such as a memory aid or to help fans develop their own commentary, write research papers, or fan fiction (Tr. 369:10-25; 370:4-18; Tr. 509:22 - 510:3).

## Plaintiffs' Criticisms Of RDR's Attempts To Publish The Lexicon Without Permission

### A.   Allegations of Bad Faith

75.   Plaintiffs contend that Defendant RDR Books acted in bad faith by trying to publish the Lexicon without first providing Plaintiffs' counsel with a copy of the manuscript or getting Plaintiffs' approval. While the evidence showed that Mr. Rapoport and Mr. Vander Ark were trying to finish updating and editing the Lexicon manuscript and to publish it within a matter of weeks (Tr. 165:10-21), the evidence does not support Plaintiffs' contentions that RDR was rushing the book to the market before Ms. Rowling could finish her encyclopedia. Both Mr. Rapoport and Mr. Vander Ark testified that they wanted the book to be on the market for the Christmas sales season and before other third-party companion guides were published (Tr. 165:10-21; Tr. 166:21-167:3; Tr. 255:15-25). Both also testified that they never thought the Lexicon would compete with an encyclopedia by Ms. Rowling (Tr. 231:23-25; 389:1-20). Moreover, Ms. Rowling herself conceded she announced her intention to write a companion guide as early as 1998, yet she is at least two to three years away from completing it. (Tr. 51:6-12; Tr. 53:14-18)

76.   Plaintiffs elicited additional testimony regarding Mr. Rapoport's correspondence with Plaintiffs' counsel and Warner Bros. in the weeks leading up to the

filing of this lawsuit and Mr. Rapoport's failure to voluntarily provide Plaintiffs with a copy of the manuscript (TR 181:6-18; Tr. 207:18-20; Tr. 211:21-212:3). But Plaintiffs provide no evidence that Mr. Rapoport was under any obligation to produce a pre-publication copy of the manuscript for Plaintiffs' review and approval. Thus there is no support for the suggestion that Mr. Rapoport did something wrong by choosing not to request a license or to seek Plaintiffs' approval of the Lexicon.

77.     Plaintiffs' evidence demonstrates that before Plaintiffs ever saw the manuscript, they demanded that Mr. Rapoport halt his plans to publish the book (Tr. 211:11-18). Plaintiffs' evidence suggests that because they did not have pre-publication review of the book, they could not control the quality of the work, and objected to its publication on that basis.

**B.      Plaintiffs' Objections To The Lexicon's Quality**

78.     Plaintiffs complain that the Lexicon is not a work of scholarship or research (Tr. 105:305). But the evidence by the defense demonstrated that the Lexicon is not intended to be a scholarly work (Tr. 371:23-5; Tr. 538:4-21). The Lexicon's intended audience is readers and fans of the Harry Potter novels, who are often children. Plaintiffs' expert, Jeri Johnson, admitted that a reference guide might be useful, particularly to children, even if it is not a work of academic scholarship  (Tr. 645:6-9). Thus Plaintiffs' criticisms that the Lexicon fails to follow the standards for publishing academic texts, or academic standards for use of quotations, are not relevant.

79.     The testimony of Plaintiffs' witnesses demonstrates that Plaintiffs' objections to the Lexicon concern its quality, and describe why Plaintiffs would not license the Lexicon if they had the choice. While Ms. Rowling claimed that the quality of

third-party guidebooks does not matter to the question of whether such books should be allowed (Tr. 655:9-14), her assertion is undercut by her repeated insistence that readers should be protected form "substandard" works (Tr. 54:2-12; Tr. 56:1-18; 106:4-18). Ms. Rowling stated that she demands all licensed works be of the highest quality (EX 25 (Rowling Decl. ¶ 4)); she feels "intensely protective" about the literary world she created (EX 32 (Rowling Supp. Decl. ¶ 14); she cares "very, very deeply" about how her Harry Potter characters are presented and it is her "prime concern" when deciding what works to license (Tr. 48:16-21); and she believes the Lexicon does not measure up to the standards she sets for licensed works (EX 25 (Rowling Decl. ¶ 12). When asked her view of the quality of the Lexicon, Ms. Rowling responded, "I think it's dire. I think it's atrocious." (Tr. 104:17-20). She went on to testify that she does not like the Lexicon and does not believe it is a good book (Tr. 129:9-12).

80. Ms. Murphy, Plaintiffs' expert witness from Scholastic Inc., opined that the Lexicon was rushed to publication and was of poor quality (Tr. 408:25-409:4; Tr. 411:24; 412:11; EX 22 (Murphy Decl. ¶ 7)), and that she believes the Lexicon's visual layout is boring and pedantic (EX 22 (Murphy Decl. ¶ 7)).

81. Ultimately, Plaintiffs' testimony regarding the Lexicon's quality and whether they would choose to write it differently has no bearing on whether the Lexicon serves a different purpose than the Harry Potter works.

### C. Ms. Rowling's Intentions To Create Her Own Encyclopedia

82. Ms. Rowling testified that she intends to write her own A to Z encyclopedia concerning the Harry Potter works. Although she is in the early stages of writing it and its publication is at least two to three years away, she has stopped working

on it recently (Tr. 50:25-51:5; Tr. 53:14-54:25).

83.    Ms. Rowling testified that her planned encyclopedia will contain large quantities of material available exclusively to her.  Ms. Rowling has explained that in her encyclopedia, she imagines a layout featuring "facing pages" on which the left-facing pages would have "back story" and "extra details on characters" including for example, "an entry on wands showing what every character's wand was." (EX 504 (Malhotra Decl. ¶¶ 8 – 11, Ex. 5.))  The right-facing pages, by contrast, would feature "extra information" such as "discarded plots, characters that didn't make it, [and] problems in the plot." (EX 504 (Malhotra Decl. ¶¶ 8 – 11, Ex. 5.))  The testimony of Ms. Murphy confirms this plan (Tr. 430:20 - 431:2).

84.    Ms. Rowling's encyclopedia will be drawn from her personal notes, which she will "turn[] . . . into the definitive encyclopedic Harry Potter companion guide" and augment with additional material of her creation (EX 506; 506a (Hammer Decl. and Plaintiffs' Interrogatory Responses)).

**D.**     **Evidence Regarding The Effect Of The Lexicon On The Market For Ms. Rowling's Work**

85.     Ms. Rowling asserts that publication of the Lexicon would harm sales of the companion guide she intends to write.

86.     Suzanne Murphy, Vice President, Publisher, Trade Publishing and Marketing at Scholastic Inc. (Ms. Rowling's U.S. publisher), opined that publication of the Lexicon would harm sales of the companion guide Ms. Rowling intends to write because there is a distinct advantage in being first to market (Tr. 413:2 - 414:5).  Ms. Murphy admitted that her opinion is not supported by any studies, analysis, data, or particular references to other publications (Tr. 431:11 - 432:6).  Ms. Murphy also admitted she could not point to any instances in which an encyclopedia's first-to-market advantage was studied.  Accordingly, the Court finds Ms. Murphy's opinion to be unsupported.

87.     Plaintiffs' evidence demonstrates that there are already at least four books available on the market that contain an A to Z guide to the Harry Potter works (Tr. 82:2-87:25; EXs 72, 74, 75, 192).

88.     Bruce Harris, a former Publisher at Crown Publishers and President of Trade Sales and Marketing at Random House, testified that publication of the Lexicon is "extremely unlikely" to affect the sales of any companion guide Ms. Rowling might one day publish (Tr. 442:9-16).  Mr. Harris explained that his opinion was based on the way purchasing decisions are made in the major channels of book distribution in this country, including retail stores, wholesalers, libraries and online booksellers (Tr. 442:17-25).

89.     Mr. Harris testified that 40 to 50 percent of books are sold at chain stores, and these stores decide how many books to order based mainly on an author's past sales

success (Tr. 444:8-22). Given Ms. Rowling's past record of success, he estimated each major chain store would order at least a million copies of the companion guide Ms. Rowling says she plans to write (Tr. 445:7-10). By contrast, he estimated that each chain would order around 1,500 copies of the Lexicon because it was written by Mr. Vander Ark, a first-time author with no track record of success (Tr. 447:9-14).

90. Similarly, Mr. Harris concluded that each major wholesaler would likely order around 300,000 copies of a companion guide published by Ms. Rowling, versus maybe 500 copies of the Lexicon (Tr. 448:25 - 489:7). Mr. Harris suggested that the disparity would be similar in regard to orders by libraries and online booksellers (Tr. 449:12 - 451:8). Mr. Harris concluded it would be "risky" for RDR to print more than 10,000 copies of the Lexicon (Tr. 452:12-14).

91. While Mr. Harris's testimony is based on initial orders, which could increase significantly in the event the Lexicon sells well, his testimony demonstrates that the sales of the Lexicon are likely to be insignificant compared to the sales of Ms. Rowling's work, especially since her testimony indicates her companion guide will have new information and new content. Moreover, there is no credible evidence that any particular consumer who would otherwise be inclined to purchase Ms. Rowling's companion guide would forego doing so upon purchasing the Lexicon some years before.

92. Accordingly, the Court concludes that publication of the Lexicon is unlikely to have any significant effect on the market for Ms. Rowling's companion guide, should she complete and publish it.

## CONCLUSIONS OF LAW

### Plaintiffs' Copyright Infringement Claims

**A. Infringement**

The Copyright Act of 1976 grants copyright owners specific exclusive rights, including the right to "reproduce the copyrighted work in copies" and "to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(1)-(2); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006); *Castle Rock Entertainment, Inc. v. Carol Publ. Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). In order to prove a claim for copyright infringement, a plaintiff must show ownership of a valid copyright, and infringement of one of the exclusive rights granted by the Copyright Act. *See id.* In order to show the element of infringement, a plaintiff must prove her work was actually copied, and then must show that this copying amounts to "an improper or unlawful appropriation" of her work. *Castle Rock*, 150 F.3d at 137 (quoting *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 139-40 (2d Cir. 1992)).

**1. Ownership**

Only the "legal or beneficial owner of an exclusive right" has standing to sue for infringement. 17 U.S.C. 501(b); *see Eden Toys, Inc. v. Florelee Undergarment Co, Inc.*, 697 F.2d 27, 32 (2d Cir. 1982) (standing to sue for copyright infringement limited to owner of a copyright, or party that has been granted exclusive license by an owner of a copyright). Beneficial ownership arises where a party that once had legal ownership of the copyright transfers it to another party in exchange for royalties or other consideration. *See Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984).

### a.     Harry Potter Novels And Companion Books

Plaintiff Rowling asserts infringement of registered copyrights in the seven Harry Potter Novels[1] and two companion books, *Quidditch Through The Ages* and *Fantastic Beasts and Where to Find Them*.[2]  Ms. Rowling has submitted evidence of ownership in the form of registrations from the United States Copyright Office (EX 12-A), and RDR Books does not dispute that Ms. Rowling is, in fact, the owner of these copyrights. Accordingly, Ms. Rowling has satisfied the element of ownership as to the copyrights in these books.

### b.     Daily Prophet Newsletters

Ms. Rowling also asserts infringement of the Daily Prophet, a series of three fictional newsletters she wrote in 1998 that were distributed by her United Kingdom publisher.  *See* Second Amended Complaint ¶ 23[3]; ¶ 8, above.  While Ms. Rowling testified she owns the copyrights in these newsletters, she provided no documentary evidence of this fact; nor have the newsletters themselves been received as evidence. Accordingly, Ms. Rowling has not established ownership of the copyrights in these newsletters.[4]

---

[1] *Harry Potter and the Sorcerer's Stone* (1998) (Serial No. TX 4-465-397); *Harry Potter and the Chamber of Secrets* (1999) (Serial No. TX 4-465-398); *Harry Potter and the Prisoner of Azkaban* (1999) (Serial No. TX 4-465-399); *Harry Potter and the Goblet of Fire* (2000) (Serial No. TX 5-122-771); *Harry Potter and the Order of the Phoenix* (2003) (Serial No. TX-5-705-321); *Harry Potter and the Half-Blood Prince* (2005) (Serial No. TX-6-179-388); *Harry Potter and the Deathly Hallows* (2007) (Serial No. TX-6-578-062).  *See* EX 12-A.

[2] *Quidditch Through the Ages* (Serial No. TX-5-374-649) and *Fantastic Beasts and Where to Find Them* (Serial No. TX-5-374-653). *See* EX 12-A.

[3] Plaintiffs have not filed their second amended complaint. A copy was nevertheless served on defendant and provided to the Court on April 11, 2008.

[4] Even if Ms. Rowling had established ownership, she cannot establish infringement of the newsletters because they are not before the Court.

### c.  Harry Potter Video Games And Famous Wizard Cards

Plaintiff Warner Brothers asserts infringement of copyrights in twelve video games, which contain "Famous Wizard Cards," the text of which was allegedly copied here.  While Warner Brothers alleges in the Second Amended Complaint that it "owns a joint interest" in these works, it submitted no evidence of such ownership.  On the contrary, Warner Brothers expressly alleges that all of these copyrights are registered solely to Electronic Arts Inc., and the registrations from the United States Copyright Office confirm this.[5]  Although Warner Brothers alleges in its Second Amended Complaint that it has a beneficial interest in these copyrights, it submitted no evidence of any legal or beneficial ownership of the copyrights it asserts.  Nor has it introduced any evidence that it is an exclusive licensee of the copyrights registered to Electronic Arts.  The only evidence proffered in regard to ownership was the oral testimony of Ms. Rowling, who asserted without explanation that Warner Brothers owns these copyrights.  This assertion, however, is contradicted by the registrations themselves.  Accordingly, Warner Brothers has failed to establish the element of ownership, and RDR is entitled to judgment in its favor on the infringement claims concerning the Famous Wizard cards.

### 2.  Actual Copying

The parties do not dispute actual copying.  Accordingly, Ms. Rowling satisfies this element in regard to the infringement claims she asserts.

### 3.  Improper Or Unlawful Appropriation

Upon showing actual copying, a plaintiff still must show that this copying

---

[5] Registration numbers for the video games are: PA0001062155, PA00160374, PA0001067206, P0001069813, PA 0001217438, PA 0001218122, PA 0001221429, PA0001154042, PA00011255093, PA0001122439, PA0001117142, PA0001117207.

amounts to "an improper or unlawful appropriation" of her work. *Castle Rock*, 150 F.3d at 137 (quoting *Laureyssens*, 964 F.2d at 139-40); *see also Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997). In order to show the element of improper or unlawful appropriation, a plaintiff must show the defendant's work bears "substantial similarity to protected expression" in the copyrighted work. *See e.g.*, *Castle Rock*, 150 F.3d at 137.

Copyright protects only an author's original expression. *See, e.g., Feist Publications, Inc. v. Rural Telephone Svcs. Co., Inc*, 499 U.S. 340, 345 (1991); *Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, 166 F.3d 65, 70 (2d Cir. 1999). It does not protect facts, ideas or other unprotectable elements of a copyrighted work. *See id.* The point of substantial similarity analysis is to determine whether the defendant's work copied an actionable amount of protectable expression, or unprotectable elements such as facts. *See, e.g., Nihon Keizai*, 166 F.3d at 70; *Castle Rock*, 150 F.3d at 138 (analyzing substantial similarity based on qualitative and quantitative nature of copying).

At least one decision in this circuit holds that so-called "fictional facts" are entitled to copyright protection when extracted from the underlying story on the grounds that character attributes, descriptions and the like are the product of an author's creativity and expression. *See Castle Rock*, 150 F.3d at 139. While fictional facts are indeed the product of an author's imagination, they have a factual dimension nonetheless. It is a fact that James Joyce wrote Ulysses; but he chose the title, so even that fact is the product of Joyce's creativity and expression. That does not, however, stop anyone from reciting this fact. It is likewise a fact that Leopold Bloom begins his walk around Dublin in the fourth chapter of Ulysses. But the copyrights in Joyce's novel cannot stop anyone from saying so, even though this fact is also the product of Joyce's creativity and expression. The

very first sentence of Ulysses describes Buck Mulligan as "[s]tately" and "plump" and the first paragraph of chapter four explains that Bloom "liked thick giblet soup" and "nutty gizzards" but "[m]ost of all he liked grilled mutton kidneys." These are also facts, which became true upon publication of Ulysses, and there is no way to accurately recite these facts without using some of Joyce's language.[6]

At the same time, a novel is a collection of made-up facts presented in a certain order to tell a particular story. If a sufficient number of these facts are identified, reported and arranged in such a way as to tell essentially the same story, we may properly conclude that the reporter of these facts has appropriated the creative expression of the author sufficient to show substantial similarity. *See Twin Peaks Prods. v. Publications Int'l*, 996 F.2d 1366 (2d Cir. 1992) (holding that summary of television series that recited "[e]very intricate plot twist and element of character development . . . in the same sequence as the teleplays" was substantially similar to copyrighted teleplays); *see also Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir. 2001) (finding substantial similarity where defendant's work used the characters, setting and plot from

---

[6]     *Castle Rock*'s conclusion that fictional facts are protectable is based on the Supreme Court's holding in *Feist Publications,* 499 U.S. 340. *See Castle Rock*, 150 F.3d at 138 (quoting *Feist*). *Feist* held that telephone numbers were facts, and the selection and arrangement of telephone numbers in an A to Z listing was not sufficiently original to provide copyright protection. *Feist*, 499 U.S. at 362. In differentiating unprotectable facts from protectable expression, *Feist* suggested that facts are discovered, while expression is created. *See Feist*, 499 U.S. at 347. Based on this distinction, *Castle Rock* concluded that fictional facts are protectable because they owe their origin to an act of authorship. *Castle Rock*, 150 F.3d at 138-39. Yet this distinction may seem problematic in respect to many facts. Again, it's a fact that Joyce wrote a novel set in Dublin and called it Ulysses. These facts also "owe their origin to an act of authorship" (*Castle Rock*, 150 F.3d at 138) yet no one suggests the Joyce Estate holds a copyright over this information. Ultimately, this distinction between "discovered" and "created" facts need not be resolved here. The question before the Court is not whether fictional facts are protectable, but the extent of protection.

*Gone With The Wind* as a "palette for [a] new story"); *Paramount Pictures Corp. v. Carol Publishing Group*, 11 F. Supp. 2d 329, 335 (S.D.N.Y. 1998) (finding substantial similarity where defendant's work "simply retells the story of Star Trek" in a condensed version). But it does not follow that every discussion or collection of fictional facts is an improper or unlawful appropriation of the author's expression. *See Castle Rock*, 150 F.3d at 143 n. 9 (recognizing that a work may not be substantially similar if it transforms the expression of the copyrighted work by using it for a sufficiently different purpose); *cf. Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 354 F.3d 112 (2d Cir. 2003) (works may not be substantially similar even where one is "based upon" the other).

Here, the Lexicon reports thousands of fictional facts from the Harry Potter works. It reports, for instance, that Rubeus Hagrid "lives in a hut on the Hogwarts grounds with his pet boarhound, Fang" and that he was expelled from Hogwarts at the end of his third year, while directing the reader to the specific books and chapters in which this information appears. *See* EX 1. It reports that Moaning Myrtle offered "to share her toilet with [Harry Potter] if he died" and that this happened in chapter 17 of *Harry Potter and the Chamber of Secrets*. *See id.* It explains that Polyjuice Potion is a "muddy brown potion (HBP9) described as 'complicated' (CS10)" even though "Hermione managed to brew it during her second year (CS12)" – again noting the books and chapters in which this information can be found. *See id.*[7]

These facts and many more are arranged in an A to Z listing consisting of roughly

---

[7]     Steven Vander Ark explained that the Lexicon cites to chapters because pagination varies in different editions of the book, whereas chapters remain constant. *See* ¶ 45, above. While plaintiff's expert Jeri Johnson suggested page numbers could still be used in the form of parallel citations, the fact remains that the Lexicon points the reader to specific places where information can be found.

2,400 entries.  The order in which fictional facts are presented in the Lexicon bears almost no resemblance to the order in which the fictional facts are arranged to create the story of Harry Potter and the universe he inhabits.  In other words, the fictional facts used by the Lexicon are arranged to report information and where to find it, rather than to tell the same story told by the Harry Potter works in similar fashion.  It is presumably for this reason that Ms. Rowling herself acknowledged that no one would read the Lexicon for entertainment.  *See* ¶ 55, above.

In *Castle Rock*, fictional facts were also extracted from the copyrighted works and rearranged.  They were not, however, presented in an organized manner, or in a way that helps readers locate information in the underlying works.  *See Castle Rock*, 150 F.3d at 143.  They were simply jumbled up to create a trivia game.  *See id.*  Accordingly, they were used primarily in their fictional capacity to entertain and "satisfy" the reader's "craving" for the *Seinfeld* television series.  *See id.* at 142-43.  Here, the fictional facts reported by the Lexicon are being used to report information and where to find it.  The Lexicon collects information about the characters, places and things that appear in the imaginary universe of Harry Potter, organizes it into an A to Z listing, and specifies, through thousands of citations, where specific information can be found in the published books.  Thus, unlike the trivia book at issue in *Castle Rock*, the Lexicon uses fictional facts primarily in their factual capacity.  In this respect, the qualitative similarity between the Lexicon and the Harry Potter works is significantly diminished.

While a large amount of information from the Harry Potter Works is included in the Lexicon, much is also left out, as evidenced by the length of the Lexicon (450 pages) compared to the combined length of the Harry Potter novels (thousands of pages).  By

necessity, the Lexicon not only organizes fictional facts, it distills a large volume of information into a much shorter summary form. *See Nihon Keizai*, 166 F.3d at 71 (one paragraph abstract copying approximately 20 percent of a six paragraph article is not substantially similar on a quantitative level). It is unclear from the record how much of the Lexicon is made up of direct quotes from the Harry Potter works. *See* ¶¶ 52-53, above. Even assuming a significant amount of quotation, the accurate reporting of attributes, characteristics and events will often require linguistic overlap. *See* ¶ 49, above. Accordingly, the quantitative similarity between the Lexicon and the Harry Potter Works, while significant, is likewise diminished.

The substantial similarity inquiry "must be made on a case-by-case basis, as there are no bright line rules for what constitutes substantial similarity." *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998); *Nihon Keizai*, 166 F.3d at 71 (there are no "simple, right-line rules" for substantial similarity). While the fictional universe of Harry Potter is the product of Ms. Rowling's creativity and expression, it appears in books that have been published, printed, sold and consumed by millions of readers. In these books, specific things happen to specific characters in specific chapters of the books; the fact these things occur in specific chapters are facts that are true in the world. While the Lexicon makes extensive use of the fictional facts that are the product of Ms. Rowling's creativity and expression, the use of these facts in their factual capacity – as things that do in fact appear in specific places within the copyrighted works – does not amount to "an improper or unlawful appropriation" of Ms. Rowling's work. *Castle Rock*, 150 F.3d at 137 (quoting *Laureyssens*, 964 F.2d at 139-40). Accordingly, the Lexicon is not substantially similar to Ms. Rowling's works and therefore does not infringe her

copyrights in them.

**B.      Fair Use**

Even if Ms. Rowling were to show infringement of her copyrights, the Lexicon

may nonetheless be protected by the fair use doctrine.  *See* 17 U.S.C. §§ 106-07. Fair use

is an integral part of the Copyright Act designed to further its most basic purposes by

balancing the need to both protect copyrighted material and "to allow others to build

upon it."  *Campbell*, 510 U.S. at 575 (fair use is "necessary to fulfill copyright's

purpose"); *see also* Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev.

1105, 1107, 1110 (1990); 17 U.S.C. §§ 106, 107. The purpose fair use serves is not

simply economic. It is a critical "First Amendment safeguard[]" designed to prevent

copyright law from unduly burdening free speech. *Eldred v. Ashcroft*, 537 U.S. 186, 221

(2003); *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1263-65 (11th Cir. 2001).

In assessing fair use, the Court is guided by four statutory factors.  *See Campbell*,

510 U.S. at 577; 17 U.S.C § 107.  They are non-exclusive and must be weighed together

in light of the underlying purposes of copyright. *See Campbell*, 510 U.S. at 577-78.

While they inform the fair use analysis, "the ultimate test of fair use" is whether

copyright's goal of "'promot[ing] the Progress of Science and useful Arts' . . . would be

better served by allowing the use than by preventing it." *Castle Rock*, 150 F.3d at 141

(quoting U.S. Const. art. I, § 8, cl. 8; *Arica Institute, Inc. v. Palmer*, 970 F.2d 1067, 1077

(2d Cir. 1992)).

**1.      The Purpose And Character Of The Use**

The "heart of the fair use inquiry" lies in the first factor – the purpose and

character of the use.  *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006); *see also* 17

U.S.C. § 107(1). The focus of this analysis is the "transformative" nature of the defendant's work. *See Campbell*, 510 U.S. at 579; *Bill Graham*, 448 F.3d at 608. Although this factor also considers whether the use is commercial in nature, commercial use is not a dispositive consideration, and the "more transformative the new work, the less will be the significance of other factors, like commercialism." *Blanch*, 467 F.3d at 254 (quoting *Campbell*, 510 U.S. at 579).

### a. Transformative Purpose

A work is transformative when it does not "merely supersede[] the objects of the original creation," but rather "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579. This may involve combining copyrighted expression with original expression to produce a new creative work. *See, e.g.*, *Blanch*, 467 F.3d at 251-52. Or it may involve incorporating copyrighted expression into a reference tool that organizes information and renders it more accessible. *See, e.g.*, *Perfect 10, Inc, v. Amazon.com, Inc*., 508 F.3d 1146, 1165 (9th Cir. 2007) (reversing preliminary injunction; search engine is "highly transformative" because it incorporates original work into reference tool); *Castle Rock*, 150 F.3d at 143 ("secondary work need not necessarily transform the original work's expression to have a transformative purpose"); *New York Times Co. v. Roxbury Data Interface, Inc.*, 434 F.Supp. 217, 221 (D. N.J. 1977) (index of names appearing in *New York Times* served public interest because it enabled users to locate information more quickly).

In her written and oral testimony, Professor Janet Sorensen explained that reference guides like the Lexicon have, for centuries, helped readers to better understand

and access literary works, and illuminate additional layers of meaning in the text. *See* ¶ 39, above. She likewise explained that reference guides to multi-volume works of fantasy literature, such as those by C.S. Lewis and J.R.R. Tolkien, are particularly useful because they provide the reader with a way to help remember specific characters, their relationships to other characters, and what the significance of certain things may be. *See* ¶ 40, above. In doing so, it is common for such reference guides to quote extensively from the underlying works they discuss. *See* ¶ 50, above.

In regard to the Lexicon, Professor Sorensen explained its "key value" is organizational; it provides a tool that gives readers ready access to information about the elaborate and complicated universe Ms. Rowling has created. *See* ¶ 44, above. The Lexicon synthesizes and distills information about this very complicated universe and puts it in a form that readers can access quickly as they make their way through the Harry Potter novels and try to remember things about the hundreds of characters, invented creatures and magical spells they encounter over thousands of pages. *See* ¶¶ 43-48, above. The testimony of Steven Vander Ark, the primary author of the Lexicon and founder of the Lexicon website, confirmed the main purpose of the Lexicon is to be a "ready reference" guide – one a reader could use to find information quickly. *See* ¶¶ 36, 48, above. The organizational value of the Lexicon is heightened by the fact it contains thousands of citations to the information it organizes so that the reader can locate information in the original texts. This organizational function, and the utility that follows from it, by itself suggests the Lexicon has a valuable and transformative purpose. *See Perfect 10*, 508 F.3d at 1165 (using copyrighted works to create a "reference tool" is "highly transformative" because works are used "in a new context to serve a different

purpose"); *Roxbury Data*, 434 F.Supp. at 221.[8]

In addition to organizing information, the Lexicon provides a significant amount of new information in the form of observations, commentary and analysis. Professor Sorensen testified that the Lexicon contains many etymologies, which are especially useful in a work with so many made-up terms.[9] *See* ¶ 59, above. As an example the Lexicon discusses the possible significance of Professor Albus Percival Wolfric Brian Dumbledore's full name. The Lexicon explains that Albus is not only Latin for white, but it is related to Albion, the ancient name for Britain; Percival is a knight of King Arthur's round table who was granted a glimpse of the holy grail; Dumbledore is eighteenth century British slang for bumblebee; Wulfric is not only an Anglo-Saxon term for wolf power but is also the name of a British hermit saint known for his miracles and prophecies; Brian may be a pop-culture reference to Monty Python's The Life of Brian, a popular British comedy film (Tr. 514:11-517:11). Other entries are shorter. So for example, the Lexicon also explains that Fenrir Grayback is likely named after Fenrisulf, the gigantic wolf of the god Loki in Scandinavian mythology (Tr. 518:12-23) and the spell "colloportus" (which seals a door) is presumably a combination of the Latin terms "colligio" (to bind together) and portus, which the Lexicon translates as Latin for "door." (Tr. 517:24-519:14).

Plaintiffs complain that some of the Lexicon's etymologies are either obvious or

---

[8]     In *Perfect 10*, the Court noted that using copyrighted works to create a reference tool was perhaps more transformative than even a parody because the parody often has the "same entertainment purpose as the original work." *Perfect 10*, 508 F.3d at 1165. Here, Ms. Rowling concedes readers would not read the Lexicon for its entertainment value. *See* ¶ 55, above.

[9]     While neither party identified exactly how many etymologies the Lexicon contains, a review of the manuscript reveals it contains approximately 200.

wrong. Yet these etymologies nonetheless provide additional insight and discussion not found in the Harry Potter Works themselves, and the fact some would disagree with the interpretations they posit does not change that fact. Plaintiffs also contend there are not enough etymologies to render the Lexicon transformative. While the inclusion of these etymologies might not be sufficient in and of itself to render the Lexicon transformative, they nonetheless add to its transformative properties by adding new insight and information. *See Campbell*, 510 U.S. at 578-79.

In addition to etymologies, the Lexicon also provides insight about mythological references, geographic terms (real and imagined), as well explanations of vernacular and slang. *See* ¶¶ 65, 66, above. The Lexicon also illuminates certain literary references, explaining the "Weird Sisters" (a band in the Harry Potter novels) is a reference to Shakespeare's Macbeth as well as Norse mythology, and Harfang Longbottom's first name is a reference to C.S. Lewis's Chronicles of Narnia (EX 1). Finally, the Lexicon provides occasional pieces of critical interpretation, offering observations for instance on the nature of Neville Longbottom's bravery, and some thoughts on why Draco Malfoy may be more complex than he appears to be. *See* ¶¶ 70-71, above; EX 1. Again, while this additional information is not the central focus of the Lexicon, its inclusion enhances its organizational value with original insight, information and commentary not found in the Harry Potter works.

Plaintiffs suggest the Lexicon is no more transformative than the trivia book at issue in *Castle Rock*, 150 F.3d 132. The book at issue in *Castle Rock* was the *Seinfeld Aptitude Test* (*SAT*), "a 132-page book containing 643 trivia questions and answers about the events and characters depicted in [the] *Seinfeld* [television series]," asking, for

example, "What candy does Kramer snack on while observing a surgical procedure from an operating-room balcony?" 150 F.3d at 135. The court found the *SAT* served no transformative purpose because the *SAT* "simply poses trivia questions," could not be "used to research *Seinfeld*" and did not "contain [any] commentary or analysis about *Seinfeld*." *Id.* at 143. The Lexicon, unlike a trivia book, is intended to be and can be used to research the Harry Potter works. The Lexicon distills, synthesizes and organizes information into a convenient A to Z format that has value as a reference guide or research tool, and the Lexicon contains significant additional insight and commentary, as well as analysis of the nature and names of characters, places and things that appear in them, along with extensive citations to original sources. Moreover, its contents are drawn not simply from the Harry Potter works, but scores of other sources, including other references books and many interviews with J.K. Rowling. The Lexicon, therefore, does much more than simply pose trivia questions.

The Lexicon is likewise different than the books at issue in *Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366 (2d Cir. 1993), *Paramount Pictures Corp. v. Carol Publishing Group*, 11 F. Supp. 2d 329 (S.D.N.Y. 1998), and *Toho Co. Ltd. v. William Morrow & Co. Ltd.*, 33 F. Supp. 2d 1206, 1217 (C.D. Cal. 1998). None of the works at issue in those cases served a purpose comparable to the Lexicon's; each was essentially an abridgement that retold the original story in its original sequence, albeit in shortened form. *See Twin Peaks*, 996 F.2d at 1372-73, 1375-76 (work at issue found to be an abridgement because it recounted "precisely the plot details" of television episodes "in the same sequence" as they appeared in the original series); *Paramount*, 11 F.Supp.2d at 335 (work at issue "simply retells the story of Star

Trek in a condensed version"); *Toho*, 33 F.Supp.2d at 1217 (work at issue contained "extensive detailed plot summaries"). Each was therefore a plausible substitute for the original work.[10]

Plaintiffs maintain that even if the Lexicon itself is not a summary or abridgement of the story told in the Harry Potter novels, the lengthy entries for main characters are. But they are not summaries or abridgements in any meaningful sense. First, they are quite short relative to the Harry Potter novels; even the longest character entry is little more than 10 pages long before being typeset whereas the Harry Potter novels go on for thousands of pages (EX 1). This sets them quite apart from the lengthy and extensive plot summaries at issue in *Twin Peaks*, *Paramount* and *Toho*. Second, the character entries, like other entries in the Lexicon, collect information and arrange it in an order far different than the sequence in which it appears in the Harry Potter novels. The entry for Harry Potter, for instance, begins with his birth date, a fact not revealed until the seventh and final novel (EX 1). It then goes on to discuss a variety of information stated in the third, fifth and seventh books, followed by more information from the last book (EX 1). It is not until the third page of the entry that we reach the point in Harry Potter's life where we first meet him in the first book (EX 1). Accordingly, the major character entries do not report events in the same order they appear in the Harry Potter novels; they arrange information into a fictional biography of sorts. This too sets them apart from the plot summaries at issue in *Twin Peaks*, *Paramount* and *Toho*, all of which followed the same order as the fictional stories they summarized.

---

[10] Plaintiffs complain the Lexicon contains "plot spoilers" that give away the ending and therefore "scoop" Ms. Rowling. But this is nothing to spoil or scoop. The Harry Potter novels have all been published, and five have been made into feature films. *See* ¶¶ 1- 2, above.

The Lexicon is simply not a plausible substitute for the Harry Potter works. It uses information from the Harry Potter books to create an A to Z reference guide that synthesizes, distills and organizes large amounts of information, and offers additional insight in the form of information and observations not found in the original Harry Potter works. Rather than serving as a substitute for reading the original Harry Potter works, it helps readers better understand, appreciate and enjoy them. The Lexicon therefore serves a significantly different purpose than the Harry Potter works, and is highly transformative. *See Campbell*, 510 U.S. at 579 (central focus of fair use is whether the new work supercedes the objects of the original creation).

### b. Commercial Use

While transformation is the heart of the fair use inquiry, the Court must nonetheless consider the fact the Lexicon is commercial in nature. *See* 17 U.S.C. 107(1); *Blanch*, 467 F.3d at 254. Yet *Campbell* explains that most fair uses are undertaken for profit. *See Campbell*, 510 U.S. at 584. Accordingly, the Court should not "give much weight to the fact that the secondary use was for commercial gain." *Castle Rock*, 150 F.3d at 142. Where, as here, the secondary work is highly transformative, its commercial nature should receive even less weight. *See Campbell*, 510 U.S. at 579 ("[t]he more transformative the new work, the less will be the significance of other factors, like commercialism"); *Blanch*, 467 F.3d at 254 ("discount[ing]" the commercial nature of the secondary work in light of its "substantially transformative" nature).

While the Court recognizes that the Lexicon is a commercial product, that fact is significantly outweighed by its transformative purpose. Accordingly, the first factor

weighs strongly in favor of the defendant here.[11]

## 2. Nature Of The Copyrighted Work

The second fair use factor focuses on "the nature of the copyrighted work." 17 U.S.C. § 107(2); *Bill Graham*, 448 F.3d at 612. Two distinctions are pertinent to this factor: (1) whether the work is expressive or creative, and (2) whether the work is published. Here, the Harry Potter works are all published, a fact which favors the defendant. While the Harry Potter works are obviously creative in nature, this fact is of "limited usefulness" where a creative work is being used for a transformative purpose. *Bill Graham*, 448 F.3d at 612; *see also Blanch*, 467 F.3d at 257. Here, the Harry Potter works have been used to create a valuable reference tool that helps readers to better access, understand and enjoy the Harry Potter works. Accordingly, the second factor has "limited weight" in this case and favors neither party. *See Bill Graham*, 448 F.3d at 612 (giving second factor "limited weight" where creative work was put to transformative use); *Blanch*, 467 F.3d at 257 (same).

## 3. Amount And Substantiality Of The Portion Used

The third fair use factor requires the Court to assess "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3); *see also Blanch*, 467 F.3d at 257. While the Court must consider both

---

[11]    Plaintiffs contend that RDR demonstrated bad faith by refusing to provide a copy of the Lexicon manuscript to Ms. Rowling's lawyers. A defendant's failure to seek permission before using a copyrighted work under the fair use doctrine does not constitute bad faith. *See Blanch*, 467 F.3d at 255-56. On the contrary, if "the use is otherwise fair, then no permission need be sought or granted." *Id at 256.* (quoting *Campbell*, 510 U.S. at 585 n.18). Nor is there any obligation to submit a work to a copyright holder so she can wield a censor's pen, or to delay publication upon a copyright holder's demand for that right. Plaintiffs simply have not shown RDR or its principals have acted in bad faith, much less did so in a way that affects the fair use analysis. *See Blanch*, 467 F.3d at 255-56 (cataloging examples of bad faith pertinent to fair use).

the quality and quantity of the portion of the copyrighted work that was used, the central question is whether the extent of copying is reasonable in light of its purpose. *See Campbell*, 510 U.S. at 586 (third factor asks whether "the quantity and value of the material used are reasonable in relation to the purpose of the use") (internal quotations omitted); *Blanch*, 467 F.3d at 257 (same; quoting *Campbell*); *Castle Rock*, 150 F.3d at 144 (quoting *American Geophysical Union v. Texaco Inc., 60 F.3d 913, 926 (2d Cir. 1994)*).[12]

Depending on the purpose, using a substantial portion of a work – or even the whole thing – may be permissible. *See Bill Graham*, 448 F.3d at 613 (finding fair use where publisher reproduced entire concert posters in reduced size) (citing *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2003); *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000)); *see generally Campbell*, 510 U.S. at 586-87 ("extent of permissible copying varies with the purpose and the character of the use"). This is particularly true where the accused work is a reference tool that presents factual information about copyrighted works. *See Perfect 10*, 508 F.3d at 1167-68 (search engine may copy entire photograph to facilitate search function); *Kelly*, 336 F.3d at 821 (same);

---

[12]     In discussing the third fair use factor, *Castle Rock* also asks whether "the extent of copying is consistent with or more than *necessary* to further the purpose and character of the use," *Castle Rock*, 150 F.3d at 144 (quoting *Campbell*, 510 U.S. at 586-87) (emphasis added), and whether the amount used of the original work was "no more than *necessary*" in light of the purpose of the use. *See id.* (quoting *Campbell*, 510 U.S. at 588-89) (emphasis added). A careful reading of *Campbell*, however, reveals that the decision uses the word "necessary" only to refer to the test the Court of Appeals applied in that case. *See Campbell*, 510 U.S. at 587 ("The Court of Appeals disagreed, stating . . . 'no more was taken than necessary . . . .'") and 590 ("as to the lyrics, we think the Court of Appeals correctly suggested that 'no more was taken than necessary'"). *Campbell* reversed the Court of Appeals decision, and held the proper test is whether "the quantity and value of the material used are *reasonable* in relation to the purpose of the use." *Id.* at 586 (emphasis added). In applying that test, the Court emphasized the question is what is "reasonable" versus "excessive," not what is strictly "necessary." *See id.* at 588-89.

*Ty, Inc. v. Publications International Ltd.,* 292 F.3d 512, 521 (7th Cir. 2002) (collector's guide may need to depict the entire line of Beanie Babies to provide a useful and comprehensive reference volume).

Here, it is clear that the Lexicon draws a large amount of information from the Harry Potter works.  Whether the extent of that copying however, is unreasonable or excessive, can only be determined in light of its purpose.  Here, the purpose of that copying is to create a reference guide by collecting, organizing and presenting factual information.  Creating a useful and comprehensive reference guide requires borrowing a significant amount of information from the Harry Potter works. *See Ty*, 292 F.3d at 521 (reference guide "has to be comprehensive"). *Castle Rock* is inapposite because the trivia book at issue in that case was not a reference book and did not attempt to organize information in any useful way. *See Castle Rock*, 150 F.3d at 144. Its purpose – to entertain – was therefore distinctly different.

While the Lexicon draws a significant amount of *factual* information from the Harry Potter works, it does not borrow the overarching plot sequence or story arc of the Harry Potter works, or the pace, setting or dramatic structure of the story these works tell. That distinguishes this case from *Twin Peaks, Paramount*, and *Toho*, *supra*, all of which concerned works that retold the entire story of the copyrighted work in its original form and sequence. While the Lexicon does quote extensively from the Harry Potter works (often without quotation marks), that is not unusual for a reference guide. *See* ¶ 50, above.  Indeed, many of the characters, spells, places and things could not be described accurately without quoting or paraphrasing the Harry Potter works because these imaginary characters are only described in them, and exist only insofar as the language of

the Harry Potter works discusses them. *See* ¶ 49-50, above.

While the third factor is admittedly a close call, the Lexicon takes no more than what is reasonable and appropriate to its purpose. It borrows the factual information needed to create a comprehensive and valuable reference tool to an author's canon, but does not copy excessively by using large amounts of the narrative, plot sequence or lengthy amounts of prose that might create an entertaining substitute for the author's works. The third factor therefore weighs in favor of defendant RDR.

### 4. Market Effect

The fourth factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor "requires a balancing of the benefit the public will derive if the use is permitted" versus "the personal gain the copyright owner will receive if the use is denied." *Bill Graham*, 448 F.3d at 613 (quoting *MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir. 1981)); *Wright v. Warner Books, Inc.*, 953 F.2d 731, 739 (2d Cir. 1991).

As discussed above, the transformative elements of the Lexicon create substantial public value because it helps readers to better access, understand and enjoy the Harry Potter works. In considering potential market harm, the Court must consider harm to the markets for both the original Harry Potter works and derivative works, while recognizing that the "more transformative the secondary use" the less likely the secondary work is to substitute for the original. *Castle Rock*, 150 F.3d at 145 (citing *Campbell*, 510 U.S. at 591); *see Bill Graham*, 448 F.3d at 614-15.

Here, there is no proof, or even a plausible suggestion, that a consumer would purchase the Lexicon instead of purchasing any one of the Harry Potter novels.

Accordingly, the Lexicon does not present any potential harm to the markets for the original Harry Potter works. *See Bill Graham*, 448 F.3d at 614; *Castle Rock*, 150 F.3d at 145; *see also Ty, Inc.*, 292 F.3d at 517-18 (secondary works that are economic complements present no cognizable market harm).

Instead, Plaintiffs focus on the derivative market, complaining the Lexicon seeks to occupy a market for derivative works that is Ms. Rowling's alone to license and exploit. But it is unclear that the Lexicon is a derivative work, as defined by the Copyright Act at all. *See* 17 U.S.C. §§ 101, 106(2). The statutory examples of derivative works include "a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101; *see also Twin Peaks*, 996 F.2d 1366, 1374 (derivative work transforms original from one medium to another). A reference guide to copyrighted works is not among the examples listed, and does not recast, transform or adapt copyrighted works in comparable ways. *See Ty, Inc*., 292 F.3d at 520-21 (Posner, J.) (collector's guide to Beanie Babies not a derivative work).

While the question of whether a reference guide is a "derivative work" under the Copyright Act is an interesting one, the Court need not answer it here. Even if the Lexicon is a derivative work, it still would not present any cognizable harm to the market for Ms. Rowling's work. The more transformative the derivative work, the less likely it is to present cognizable market harm. *See Campbell*, 510 U.S. at 592-93. The derivative works at issue in *Castle Rock*, *Twin Peaks* and *Toho* were found to be non-transformative, so the Court reserved the derivative markets in those cases to the

copyright owner. *See Castle Rock*, 150 F.3d at 141-43; *Twin Peaks*, 996 F.2d at 1375-76; *Toho*, 33 F. Supp. 2d at 1216-18. Subsequent Second Circuit cases, however, make it clear that where a work is transformative, *Castle Rock* compels a finding of *no* cognizable market harm. *See Bill Graham*, 448 F.3d at 615 (citing *Castle Rock*); *see also Blanch*, 467 F.3d at 258-59 (disregarding potential future licensing of photograph at issue). The Lexicon is highly transformative. That precludes cognizable harm to any derivative market Plaintiffs may wish to exploit, and Plaintiffs cannot as a matter of law claim such "transformative markets" for themselves. *See Bill Graham*, 448 F.3d at 614-615; *Castle Rock*, 150 F.3d at 146 n.11 (copyright owner cannot prevent "transformative uses" of its creative work by developing licensing market for what would otherwise be fair use).

Even if Plaintiffs' assertions of market harm were cognizable, it is unlikely any substantial harm would result here. Suzanne Murphy, Vice President of Publishing at Scholastic Press testified that publication of the Lexicon would harm sales of the companion guide Ms. Rowling intends to write because there is a distinct advantage in being first to market. See ¶ 86, above. Her conclusion that this first-to-market advantage was paramount was not, however, supported by any studies, analysis, data, or particular references to other publications that might support her conclusions. *See id.* In fact, she admitted she could not point to any instances in which an encyclopedia's first-to-market advantage was studied. *See id.*

Bruce Harris, a former Publisher at Crown Publishers and President of Trade Sales and Marketing at Random House, testified that publication of the Lexicon is "extremely unlikely" to affect the sales of any companion guide Ms. Rowling might one

day publish.  *See* ¶ 87, above.  His opinion was based on the way purchasing decisions are made in the major channels of book distribution in this country, including retail stores, wholesalers, libraries and online booksellers.  *See id.*  Harris testified that 40 to 50% of books are sold at chain stores, and these stores decide how many books to order based mainly on an author's past sales success.  *See* ¶ 88, above.  Given Ms. Rowling's past record of success, he estimated each of the three major chain stores would order at least a million copies of the companion guide Ms. Rowling says she plans to write.  *See id.*  By contrast, he estimated that each chain would order around 1,500 copies of the Lexicon because it was written by a first-time author with no track record of success.  *See id.*  Similarly, Harris concluded that each of the three major wholesalers would likely order around 300,000 copies of a companion guide published by Ms. Rowling, versus maybe 500 copies of the Lexicon.  *See* ¶ 89, above.  Harris suggested that the disparity would be similar with respect to orders by libraries and online booksellers. *See* ¶ 89, above.  Accordingly, while Ms. Rowling would sell millions of copies of her companion guide, Harris concluded it would be "risky" for RDR to print more than 10,000 copies of the Lexicon.  *See id.*

While Mr. Harris's testimony focused on initial order, not projected total sales, the real question is whether the Lexicon is a substitute for the companion guide she wishes to publish or license.  *See Campbell*, 510 U.S. at 593 ("the only harm to derivatives that need concern us is the harm of market substitution"); *Castle Rock*, 150 F.3d at 145 (fourth factor weighs against fair use because *Seinfeld* trivia book "substitutes" for derivative market reserved to copyright holder); *Twin Peaks*, 996 F.2d at

1377 (detailed abridgement was "adequate substitute" for original television series).[13]

Based on Ms. Rowling's description of the companion guide she plans to write, it appears it will contain large quantities of material available exclusively to her, which will make it uniquely different than the Lexicon (or any other reference book or companion guide). Ms. Rowling announced her intention to create her own encyclopedia as early as 1998 (*see* ¶ 75, above), though she is at least two to three years away from publishing it. *See* ¶¶ 75, 82, above. In previous statements about the encyclopedia she plans to write, she explained she imagined a layout featuring "facing pages" on which the left-facing pages would have "back story" and "extra details on characters" including for example, "an entry on wands showing what every character's wand was." *See* ¶ 83, above. The right-facing pages, by contrast, would feature "extra information" only Ms. Rowling could provide, such as "discarded plots, characters that didn't make it, [and] problems in the plot." *See id*. Ms. Rowling's interrogatory responses confirm this material will be drawn from her personal notes, which she will "turn[] . . . into the definitive encyclopedic Harry Potter companion guide" and augment with additional material of her creation. *See* ¶ 84, above. So while the Lexicon provides information mainly about what does appear in the Harry Potter Works, Ms. Rowling envisions a companion guide that focuses largely on what does *not* appear in the Harry Potter Works – the rest of the story no one but she knows.

---

[13]  Ms. Rowling cannot show cognizable market effect simply by showing she has entered, or plans to enter, the market for so-called derivative market for "companion books." She has to show *harm* to that market, not presume it (*see Campbell*, 510 U.S. 590-91), and the only harm that matters is "market substitution." *See id.* at 593; *Castle Rock*, 150 F.3d at 145 (finding market harm based on conclusion that trivia book at issue would be a substitute for any trivia book the copyright owner might wish to publish); *See Twin Peaks*, 996 F.2d at 1377 (finding market harm secondary work would be a substitute for the television series itself).

Given the limited sales potential of the Lexicon and the fact that Ms. Rowling herself has explained she intends to write a book quite different than the Lexicon, it seems unlikely the Lexicon would have any substantial effect on the sales of any companion guide Ms. Rowling might one day publish.  Accordingly, the fourth factor weighs in defendant's favor.

In sum, the Lexicon is highly transformative based on its utility as a comprehensive reference work and its addition of original material; uses a proportion and amount of the Harry Potter works that is reasonable in light of that purpose; and presents little, if any, effect on the market for Ms. Rowling's copyrighted works, or any companion guide she may one day publish.  No bad faith has been shown.  The Court therefore concludes that the fair use factors line up in RDR's favor, and on balance copyright's goal of "'promot[ing] the Progress of Science and useful Arts' . . . would be better served" by permitting publication of the Lexicon rather than suppressing it.  *Castle Rock*, 150 F.3d at 141.  Accordingly, the Court concludes Defendant RDR Books is therefore entitled to judgment in its favor on all of Plaintiffs' copyright claims.

## Plaintiffs' Lanham Act And State Law Claims

In addition to asserting claims for copyright infringement, Plaintiffs asserted claims arising under the Lanham Act and New York state law.  Plaintiffs withdrew those claims at the conclusion of their case.  (Tr. 486:9-488:7)  Defendant RDR Books is therefore entitled to judgment on these claims as well.

Dated: May 9, 2008

Respectfully Submitted,

By: _____/s/_____

David Saul Hammer (DH 9957)
Law Office of David Saul Hammer
99 Park Avenue, Suite 1600
New York, NY 10016
Telephone: (212)-941-8118
Facsimile: (212) 557-0565

Anthony T. Falzone
Julie A. Ahrens
Lawrence Lessig
STANFORD LAW SCHOOL
CENTER FOR INTERNET AND SOCIETY
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone:(650) 736-9050
Facsimile: (650) 723-4426

Lizbeth Hasse
Creative Industry Law Group, LLP
526 Columbus Avenue, 2nd Floor
San Francisco, CA 94133
Telephone: (415) 433-4380
Facsimile: (415) 433-6580

Attorneys for Defendant
RDR BOOKS