UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WARNER BROS. ENTERTAINMENT, INC. and
J.K. ROWLING,

               Plaintiffs,

       -against-

RDR BOOKS and DOES 1-10,

            Defendants.

Case No.: 07-CV-9667 (RPP)

---

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Dale M. Cendali (DC 2676)
Claudia Ray (CR 4132)
Melanie Bradley (MB 0823)
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY - 10036
Telephone:     (212) 326-2000
Facsimile:     (212) 326-2061

Attorneys for Plaintiffs Warner Bros.
Entertainment, Inc. and J.K. Rowling

Dockets.Justia.com

This case having come on for trial before the Court on April 14, 2008, and the Court having heard the evidence, considered the arguments of counsel, and observed the demeanor of the witnesses, does hereby make, pursuant to Fed. R. Civ. P. 52, the following Findings of Fact and Conclusions of Law:

## I. FINDINGS OF FACT

### A. The Parties

1. Plaintiff J.K. Rowling is the author of the highly-acclaimed *Harry Potter* series of books. (4/14/08 Tr. (Rowling) at 43:6-7; 47:17-20; Pl. Ex. No. 25 (Rowling Decl.) at ¶1).

2. Plaintiff Warner Bros. Entertainment Inc. is engaged in the business of, among other things, creating, producing, distributing and marketing motion pictures and goods related to the *Harry Potter* series, including merchandise relating to these properties. (Pl. Ex. No. 26 (Williams Decl.) at ¶¶ 4, 8).

3. Defendant RDR Books is a Michigan-based publishing company that is seeking to publish a book entitled "The Lexicon" (4/14/08 Tr. (Rapoport) at 150:19-151:2), which it describes as an "encyclopedia" of Ms. Rowling's *Harry Potter* works. (4/15/08 Tr. (Vander Ark) at 254:19-22).

### B. Creation of the *Harry Potter* Books

4. Plaintiff J.K. Rowling is one of the most popular and beloved authors of the 21st century, having written the critically-acclaimed *Harry Potter* series of children's books. (4/14/08 Tr. (Rowling) at 43:6-7; 47:17-20; Pl. Ex. No. 25 (Rowling Decl.) at ¶ 1)

5. The manner in which the *Harry Potter* series came into being and the circumstances under which Ms. Rowling created the series have been well publicized. Ms.

1

Rowling was only 25 years old and on a train to London when the idea for the series first came to her. (4/14/08 Tr. (Rowling) at 45:5-9; Pl. Ex. No. 25 (Rowling Decl.) at ¶ 2). Ms. Rowling spent the next seven years drafting the first *Harry Potter* book and mapping out her plan for the remainder of the series. (4/14/08 Tr. (Rowling) at 45:11-12).

6.     This seven-year period was extremely difficult for Ms. Rowling. After her first marriage had fallen apart, Ms. Rowling became the sole caregiver to her infant daughter. (Id. at 45:18-24). Living in Edinburgh on public assistance, Ms. Rowling drafted the first *Harry Potter* manuscript while caring for her infant daughter single-handedly and attempting to resume her teaching career. (4/14/08 Tr. at (Rowling) 45:19-20; Pl. Ex. No. 25 (Rowling Decl.) at ¶ 3).

7.     After some initial difficulty obtaining both a literary agent and a publisher, Ms. Rowling's first book, *Harry Potter and the Philosopher's Stone* was published in the United Kingdom in 1997. (4/14/08 Tr. (Rowling) at 46:12-16; 4/15/08 Tr. (Vander Ark) at 363:19-20). In 1998, the book was published in the United States as *Harry Potter and the Sorcerer's Stone*. (Pl. Ex. No. 25 (Rowling Decl.) at ¶ 2.)

8.     Over the next ten years, Ms. Rowling wrote and published the remaining six books in the *Harry Potter* series (Pl. Ex. No. 25 (Rowling Decl.) at ¶ 2), namely, *Harry Potter and the Chamber of Secrets* (1998), *Harry Potter and the Prisoner of Azkaban* (1999), *Harry Potter and the Goblet of Fire* (2000), *Harry Potter and the Order of the Phoenix* (2003), and *Harry Potter and the Half-Blood Prince* (2005). (Pl. Ex. Nos. 5-9). The seventh and final book, *Harry Potter and the Deathly Hallows* was released last year, on July 21, 2007. (Pl. Ex. No.10). Ms. Rowling owns a United States copyright registration in each of the *Harry Potter* books. (Pl. Ex. No. 12 (Blair Decl.) at ¶ 4; Pl. Ex. No. 12-A)

9. In all, Ms. Rowling has spent 17 years of her life working on the *Harry Potter* series. When asked what *Harry Potter* meant to her, Ms. Rowling testified at trial, "It [*Harry Potter*] means, setting aside my children, *everything*." (4/14/08 Tr. (Rowling) at 48:6-8) (emphasis added).

10. The books have achieved enormous success and popularity, becoming a true publishing phenomenon. (4/15/08 Tr. (Murphy) at 432:20-433:3). Enjoyed by both children and adults alike, the *Harry Potter* series has won numerous awards and has been credited with encouraging literacy in children. (4/14/08 Tr. (Rowling) at 47:17-20; 103:8-22).

## C. Companion Guides and Other *Harry Potter*-related Properties

11. One of the many reasons why the series appeals to such a wide audience is Ms. Rowling's "nominative genius" in creating a detailed fictional world parallel to ours that is filled with magical spells, imaginary beings, "fantastic beasts," and imaginative places. (4/15/08 Tr. at (Vander Ark) 346:1-6; 371:1-22; 4/16/08 Tr. (Sorensen) at 513:6-14). All of the parties agree that these fictional facts have an entertainment value all of their own, outside of their place in the narrative of the *Harry Potter* novels. (4/15/08 Tr. (Vander Ark) at 273:23-274:7; 371:1-22; 4/16/08 Tr. (Sorensen) at 538:4-8, (Johnson) at 619:6-12, (Rowling) at 648:1-12). Mr. Vander Ark admits that one of the big appeals of the *Harry Potter* books is the universe of creative fictional things and places that Ms. Rowling created. (4/15/08 Tr. (Vander Ark) at 274:1-7).

12. Public interest in the fictional facts that Ms. Rowling created prompted her to write, in the United Kingdom, a series of newsletters entitled "The Daily Prophet," which were initially distributed to fans in the United Kingdom. (4/14/08 Tr. (Rowling) at 73:17-74:1).

Ms. Rowling holds valid registered copyrights in and to "The Daily Prophet" newsletters. (Exhibit A attached hereto).

13.     In addition, when asked to write a short story for charity, Ms. Rowling instead wrote two companion guides to the *Harry Potter* series and donated all proceeds from these books to charity. (4/14/08 Tr. (Rowling) at 49:12-50: 10). The first, *Quidditch through the Ages* (2001), details the history and development of the game "Quidditch" -- an invention of Ms. Rowling's featured in the *Harry Potter* books -- which involves teams of wizards on flying broomsticks. (Pl. Ex. No. 2). The second, *Fantastic Beasts and Where to Find Them* (2001), is an A to Z encyclopedia of the imaginary beasts and beings from *Harry Potter*'s fictional world. (Pl. Ex. No. 3) (collectively, the "Companion Books"). Neither of the Companion Books was written in narrative form, but instead they chronicle and expand on the fictional facts Ms. Rowling created for her *Harry Potter* series, as Mr. Vander Ark admits. (4/15/08 Tr. (Vander Ark) at 396:21-25; Pl. Ex. Nos. 2-3).

14.     The market for the Companion Books is not nearly as large as the market for the *Harry Potter* novels, meaning sales of the Companion Books have been much smaller than sales of the *Harry Potter* novels. Nevertheless, Ms. Rowling's Companion Books have raised over $30 million for the children's charity Comic Relief to date. (4/14/08 Tr. (Rowling) at 49:25-50:10; Pl. Ex. No. 25 (Rowling Decl.) at ¶ 6; Pl. Ex. No. 12 (Blair Decl.) at ¶ 3). The Companion Books are both registered with the United States Copyright Office. (Pl. Ex. No. 12 (Blair Decl.) at ¶ 4).

15.     In addition to these two Companion Books, Ms. Rowling has repeatedly stated, since at least 1998, that she plans to publish a *Harry Potter* encyclopedia once the series was finished and similarly donate the proceeds to charity. (4/14/08 Tr. (Rowling) at 50:25-51:

4

15, 55: 1-5; Pl. Ex. No. 25 (Rowling Decl.) at ¶ 6; Pl. Ex. No. 12 (Blair Decl.) at ¶ 17; Pl. Ex. No. 14 (Bradley Decl.) at ¶ 13).

16.     Ms. Rowling has similarly used another of her copyrighted works to benefit charity. Just last year, Ms. Rowling donated a hand-written novel entitled "Tales of Beetle the Bard"-- another book within *Harry Potter* -- to be auctioned for charity. (4/14/08 Tr. (Rowling) at 50:11-20).

### D.     Ms. Rowling's Planned Encyclopedia

17.     Ms. Rowling intends for her encyclopedia to contain alphabetical entries for the various people, places and things from the *Harry Potter* novels. (4/14/08 Tr. (Rowling) at 53:11-13). While she intends to add new material, her encyclopedia will contain "all information in the published [*Harry Potter*] books." (4/15/08 Tr. (Vander Ark) at 387:20-388:16; Pl. Ex. Nos. 25 (Rowling Decl.) at ¶ 7, 32 (Suppl. Rowling Decl.) at ¶ 5).

18.     Ms. Rowling already has commenced work on this encyclopedia, compiling her notes and obtaining from her U.K. publisher its "bible" of *Harry Potter* materials. (4/14/08 Tr. (Rowling) at 52:1-53:10). This "bible" is an alphabetical listing of the people, places and things from the *Harry Potter* books. Ms. Rowling's U.S. publisher has a similar collection of materials which Ms. Rowling has requested and intends to draw on in creating her encyclopedia. (4/14/08 Tr. (Rowling) at 51: 24 - 53: 18; Pl. Ex. No. 25 (Rowling Decl.) at ¶ 7; Pl. Ex. No. 23 (Odedina Decl.) at ¶¶ 2-3; Pl. Ex. No. 18 (Klein Decl.) at ¶¶ 2-3).

### E.     The *Harry Potter* Films and Related Merchandising

19.     As a result of the popularity of the *Harry Potter* books, Plaintiff Warner Bros. obtained the film rights from Ms. Rowling to the entire seven-book series. (Pl. Ex. No. 26 (Williams Decl.) at ¶ 3). To date, Warner Bros. has released five *Harry Potter* films including

*Harry Potter and the Sorcerer's Stone* (2001), *Harry Potter and the Chamber of Secrets* (2002), *Harry Potter and the Prisoner of Azkaban* (2003), *Harry Potter and the Goblet of Fire* (2005), and *Harry Potter and the Order of the Phoenix* (2007). (*Id.*) The sixth film, *Harry Potter and the Half-Blood Prince* is scheduled for a worldwide release in November, 2008; production of the seventh film, *Harry Potter and the Deathly Hallows* is confirmed, but a release date has not yet been set. (*Id.* at ¶ 4). Each of the *Harry Potter* films is the subject of a copyright registration. (*Id.* at ¶ 3).

20.    Pursuant to Warner Bros.' agreement with Ms. Rowling, Warner Bros. also owns trademark rights in *Harry Potter* and *Harry Potter*-related designations in connection with its film rights and ancillary merchandising projects. (Pl. Ex. No. 26 (Williams Decl.) at ¶ 5)

21.    Warner Bros. licensed certain rights to Electronic Arts to create video games based on the *Harry Potter* books and films which included a series of "Famous Wizard Cards" that Ms. Rowling created and which are the subject of United States Copyright Registration Nos. PA 1-391-853 and PA 1-391-854 jointly owned by Warner Bros. and Electronic Arts (4/14/08 Tr. (Rowling) at 76:15-17 and Exhibit B attached hereto). The Famous Wizard Cards feature fictional historical information about famous wizards from the *Harry Potter* universe. (4/14/08 Tr. (Rowling) at 76:20-77:1). Many of the wizards mentioned in the Famous Wizard Cards are not actually referenced in the *Harry Potter* novels. (See Pl. Ex. Nos. 4-10, Pl. Ex. No. 45).

F.    **Plaintiffs' Intellectual Property Protection Strategy**

22.    Ms. Rowling has, in conjunction with Warner Bros., taken precautions to protect the integrity of her intellectual property rights and that of her *Harry Potter* works. To

that end, Ms. Rowling and Warner Bros. are careful in granting licenses to third parties and issue style guides and otherwise put in place stringent quality control procedures in order to ensure that licensed products are of the highest possible quality. (4/14/08 Tr. (Rowling) at 48:16 - 49:9; Pl. Ex. No. 12 (Blair Decl.) at ¶¶ 5-7; Pl. Ex. No. 26 (Williams Decl.) at ¶¶ 8-10).

23.    While Plaintiffs receive numerous requests to license *Harry Potter*, they do not grant a license to everyone who requests one and, in fact, they deny many such requests. (Pl. Ex. No. 26 (Williams Decl.) at ¶¶ 8-10).

24.    In connection with Plaintiffs' protection of *Harry Potter* intellectual property, they examine companion guides that have been or will be released. (Pl. Ex. No.12 (Blair Decl.) at ¶¶ 5-7; Pl. Ex. No. 26 (Williams Decl.) at ¶ 17). Plaintiffs review each such book to ensure that it is not labeled in a misleading way to give the impression that either Ms. Rowling or Warner Bros. endorses the book and also to ensure that the book does not infringe Ms. Rowling's copyrights. (4/14/08 Tr. (Rowling) at 80:23-81:18; Pl. Ex. Nos. 12 (Blair Decl.) at ¶ 6, 26 (Williams Decl.) at ¶ 17). When a book does raise concerns, Plaintiffs attempt to work with the publisher and author to find a non-infringing resolution. (Pl. Ex. No. 12 (Blair Decl.) at ¶5; Pl. Ex. Nos. 81, 84, 85).

25.    Plaintiffs engage in a number of standard enforcement practices including, registering their copyrights, monitoring the marketplace for unauthorized use of their works, and, when necessary, sending cease and desist letters to potential infringers. (Pl. Ex. Nos. 12 (Blair Decl.) at ¶ 5; 26 (Williams Decl.) at ¶¶ 11, 14, 17; 15-A; and 82).

**G.    Interest in *Harry Potter* Spawns Numerous Books and Websites**

26.    The *Harry Potter* series has spawned more than 90 books published in the United States alone about *Harry Potter*. Plaintiffs' Exhibit No. 50 is a chart detailing the titles,

authors and publishers of many of these books. These books discuss such topics as *Harry Potter* and religion, *Harry Potter* and business, *Harry Potter* and science, *Harry Potter* and kids, and *Harry Potter* and philosophy. There also are books that parody *Harry Potter*. Representative titles include *A Charmed Life: The Spirituality of Potterworld*, *If Harry Potter Ran General Electric*, *The Science of Harry Potter: How Magic Really Works*, *Kids Letters to Harry Potter from Around the World*, *Harry Potter and Philosophy: If Aristotle Ran Hogwarts*, and *Harry Potty and the Pet Rock*. (Pl. Ex. No. 50). Plaintiffs have not moved to enjoin any of these 90+ books (4/14/08 Tr. (Rowling) at 81:10-18).

27. In addition, there are a number of *Harry Potter* companion guides on the market, including *The Complete Idiot's Guide to the World of Harry Potter* (Pl. Ex. No. 73), *The Sorcerer's Companion: A Guide to the Magical World of Harry Potter* (Pl. Ex. No. 192), *Fact Fiction & Folklore in Harry Potter's World: An Unofficial Guide* (Pl. Ex. No. 74), and *The Magical Worlds of Harry Potter* (Pl. Ex. No. 75). In his declaration, Mr. Vander Ark refers to the latter two companion guides as "encyclopedias," and claims that *Fact Fiction & Folklore in Harry Potter's World* "closely resembles" his own book. (Def. Ex. No. 502 (Vander Ark Decl.) at ¶ ¶ 29, 44 (a) (1); Pl. Ex. No. 74).

28. Unlike the Lexicon, these *Harry Potter* companion guides analyze and interpret the Harry Potter books and describe the real-world underpinnings for many of Ms. Rowling's creations. (4/14/08 Tr. (Rowling) at 83:10-25; 85:9-15; 87:2-12; 88:4-6; Pl. Ex. Nos. 1, 73-75, 192). Rather than regurgitating Ms. Rowling's text in vast quantity, these books only use brief portions of text as jumping off points for commentary or analysis related thereto. (Pl. Ex. Nos. 73-75, 192). Plaintiffs did not sue or move to enjoin any of these books. (4/14/08 Tr. (Rowling) at 82:18-83:1; 84:9-19; 85:16-86:4; 87:13-88:2).

29.     The Harry Potter series has also generated widespread interest on the Internet. Ms. Rowling herself operates her own Harry Potter website. (Pl. Ex. No. 12 (Blair Decl.) at ¶ 8).

30.     In addition, there are numerous "fan sites" dedicated to Harry Potter on the Internet. (4/15/08 Tr. (Vander Ark) at 345:15-18). Plaintiffs allow these fan sites wide latitude in operating provided that these sites are free-to-fans and do not attempt to merchandise Harry Potter or interfere with Plaintiffs' licensing program. (Pl. Ex. No. 25 (Rowling Decl.) at ¶ 5; Pl. Ex. No. 26 (Williams Decl.) at ¶¶ 14-16.).

31.     Ms. Rowling is "keen to maintain an almost entirely hands-off approach to the online fandom where Harry Potter [is] concerned" with the exception of "obvious boundaries of decency that occasionally one would not like to see overstepped." (4/14/08 Tr. (Rowling at 107:5-8).

32.     Ms. Rowling sees "massive positives in this amount of fan activity" (*Id.* at 107:10). As Ms. Rowling testified, "I saw it as a great global book club with a lot of enthusiasm. I met people who had made real life friendships through posting on Harry Potter message boards, which I thought was a wonderful thing. The fan sites, the fan created fan message boards and the essays and so on, they were all fun. I have never read online fan fiction. It is uncomfortable to see your world restated in that way. But, I never censored it or wanted to censor it." (*Id.* at 107:10-18).

33.     As a result, Plaintiffs generally do not seek to prevent activities such as fan fiction, fan art and *Harry Potter* rock bands (known as "wizard rock"), but instead allow them to flourish with minimal or no intervention. (Pl. Ex. No. 12 (Blair Decl.) at ¶ 7; Pl. Ex. No. 25 (Rowling Decl.) at ¶ 5; Pl. Ex. No. 26 (Williams Decl.) at ¶ 14). Ms. Rowling has even

recognized the various fan sites by giving "Fan Site Awards." (4/14/08 Tr. (Rowling) at 92:4-9; Pl. Ex. No. 25 at ¶ 5).

### H.     The *Harry Potter* Lexicon Website

34.      One of these fan sites is the *Harry Potter* Lexicon website at www.hp-lexicon.org (the "Lexicon Website") (4/14/08 Tr. (Rowling) at 93:1-93:9).

35.      The Lexicon Website is owned and operated by Steven Vander Ark, formerly of Muskegon, Michigan, and now living in the United Kingdom. (4/15/08 Tr. (Vander Ark) at 248:3-24; 252:2-4). Prior to moving to the United Kingdom, Mr. Vander Ark was a library media specialist at a middle school in Michigan. (4/15/08 Tr. (Vander Ark) at 248:4-6; 248:14-16). Mr. Vander Ark has a Bachelor of Arts, but does not hold any advanced degrees. (Id. at 248:11-13).

36.      Mr. Vander Ark is known within the *Harry Potter* fan community because of his work on the Lexicon Website. (*Id.* at 385:21-386:7). He has worked to increase his prominence in the fan community by speaking at *Potter*-related conventions, online podcasts, and other similar speaking engagements. (Pl. Ex. No. 27 (Blumsack Corrected Supp. Decl.) at ¶¶ 14-15). Although currently unemployed, Mr. Vander Ark continues to operate the Lexicon Website and testified that he is trying to make a living in the United Kingdom writing books about *Harry Potter*. (*Id.* at 330:6-8; 330:23-331:4).

37.      The Lexicon Website contains a variety of material including fan art, commentary, essays and various interactive data. (Pl. Ex. Nos. 14 at ¶ 3; 14-A and 14-C). In addition to these materials, the Lexicon Website also contains alphabetical topical listings of the people, places and things from *Harry Potter* in categories such as "Encyclopedia of Spells," "The Bestiary," and "Which Wizard: Who's Who in the Wizarding World." (*Id.*)

38.     The Lexicon Website is free to fans. (4/15/08 Tr. (Vander Ark) at 293:8-12). Mr. Vander Ark maintains the site with the assistance of other volunteers and visitors often send in corrections and updates as well. (4/15/08 Tr. (Vander Ark) at 345:2-9). The site has minimal advertising, which Mr. Vander Ark testified he uses to offset the costs of operating the site. (4/15/08 Tr. (Vander Ark) at 349:24-350:10).

39.     In 2004, Ms. Rowling conferred on the Lexicon Website, along with three other fan sites, her "Fan Site Award." (4/14/08 Tr. (Rowling) at 91:24-92:6). In connection with this award, Ms. Rowling stated, "this is such a great site that I have been know to sneak into an Internet café while out writing and check a fact rather than go into a bookshop and buy a copy of *Harry Potter* (which is embarrassing). A website for the dangerously obsessive; my natural home." Ms. Rowling testified that the award was meant "as a kind of A for effort." (4/14/06 Tr. (Rowling at 92:10-17). Ms. Rowling "never intended for this award to be taken by anyone as an authorization for them to create and sell an infringing *Harry Potter* book for profit..." (Pl. Ex. No. 32 (Rowling Suppl. Decl.) at ¶ 13).

**I.     Mr. Vander Ark's Awareness of Ms. Rowling's Plans**

40.     Mr. Vander Ark admitted that he has read all of Ms. Rowling's public statements including those in which Ms. Rowling repeatedly stated her intention to do an encyclopedia upon completion of the seventh *Harry Potter* book. (4/15/08 Tr. (Vander Ark) at 247:10-12, 250:21-251:13; Def. Ex. No. 502 at ¶ 37).

41.     Mr. Vander Ark also admitted that until he was approached by RDR about the Lexicon book, he believed that use of Ms. Rowling's work to create an encyclopedia constituted copyright infringement. (4/15/08 Tr. (Vander Ark) at 251:20-22). In an email he

sent to two fans who approached him about just such an encyclopedia in May, 2005, Mr. Vander

Ark stated:

> Basically, it is illegal to sell a book like that. Jo has reserved all
> publishing rights to her intellectual property, which means that
> she's the only one who may publish any book that is a guide to her
> world . . . So while it's a smashing idea, it isn't something that's
> allowed at the moment. (Pl. Ex. No. 20 (Lares Decl.) at ¶ 3, Pl.
> Ex. No. 21 (Lawliss Decl.) at ¶ 3).

42.   Moreover, prior to his dealings with RDR, Mr. Vander Ark maintained

that he would not publish the Lexicon as a book without Ms. Rowling's permission, and

admitted that the market for the Lexicon Website is different from the market for the Lexicon

book. In December 2000, Mr. Vander Ark stated on a public internet newsgroup that:

> [W]ithout her permission, I won't publish [the Lexicon] in any
> form except online. [Ms. Rowling is] entitled to that market, not
> me and not [a third party] author. (Pl. Ex. No. 27 (Blumsack
> Corrected Supp. Decl.) at ¶ 12, and Pl. Ex. No. 27-G).

43.   In fact, Mr. Vander Ark viewed his website as a means of deterring third

parties from publishing an encyclopedia that competed with the one Ms. Rowling planned to

write. In an email to Cheryl Klein of Scholastic, Inc., Ms. Rowling's U.S. publisher, Mr. Vander

Ark stated:

> It might interest you to know that George Beahm [author of "Fact
> Fiction & Folklore in *Harry Potter's* World: An Unofficial
> Guide"] commented that he had originally intended to write an
> encyclopedia of *Harry Potter* (which Jo has specifically reserved
> for herself, I understand), but seeing the Lexicon convinced him
> not to bother. I want you to know that one of the express purposes
> of the Lexicon is to dissuade people from that sort of thing, so I
> was particularly happy to hear him say that. The fact that he
> copies a lot of the material for his books directly from the Lexicon,
> however, still rankles. (Pl. Ex. No. 29 at ¶ 4).

44.   While Mr. Vander Ark tried in the course of this litigation to back away

from these earlier statements by claiming his view of copyright was just his layman's

impression, Mr. Vander Ark also admitted that as a librarian he had training and experience with copyright issues and boasted that he had read "ridiculously large numbers of related books, articles, etc., and even [went] to the occasional conference on the subject of copyright." (4/15/08 Tr. (Vander Ark) at 258:3-8; 258:25-259:3; Pl. Ex. No. 193).

### J. Mr. Vander Ark Seeks A Meeting with Ms. Rowling's Literary Agent

45.     By July of 2007, Mr. Vander Ark was seeking to move to the United Kingdom and thus emailed Ms. Rowling's representatives at Christopher Little Literary Agency ("CLLA") to request a meeting to throw out some "questions." (4/15/08 Tr. (Vander Ark) at 249:13-250:4; Pl. Ex. No. (Blair Decl.) 12 at ¶ 12).

46.     CLLA advised Mr. Vander Ark that the timing of his proposed meeting -- a mere four days before the release of the final *Harry Potter* book -- was not ideal, but that they would be happy to answer his questions via email. (Pl. Ex. No. 12-C).   Mr. Vander Ark responded, indicating that he wanted to move to London and was looking for a job.  (*Id.*).  Mr. Vander Ark stated, "if she [Ms. Rowling] is thinking of working on an encyclopedia or other references to the series, I would be a good candidate for work as an editor, given my work on the Lexicon." (*Id.*).  Ms. Rowling's representatives advised him that Ms. Rowling intended to work alone and did not require a collaborator.  (4/15/08 Tr. (Vander Ark) at 250:14-20; Pl. Ex. No. 12 (Blair Decl.) at ¶ 12; Pl. Ex. No. 12-C).

### K. Development of the Lexicon Book

47.     Roger Rapoport of RDR Books learned of Mr. Vander Ark after reading a July 23, 2007 article in the Muskegon Chronicle tied to the release of the final *Harry Potter* book. (4/14/08 Tr. (Rapoport) at 153:8-154:15).  The article portrayed Mr. Vander Ark as well-

known within the *Harry Potter* fan community and the proprietor of the Lexicon Website. (4/14/08 Tr. (Rapoport) at 152:2-154:15).

48. On July 25, 2007, Ms. Rowling appeared on NBC's Today Show and stated once again that she intended to write a *Harry Potter* encyclopedia. (Def. Ex. No. 506a (Plaintiffs' Responses to Defendant's First Set of Interrogatories); 4/14/08 Tr. (Rapoport) at 155:20-156:5). This statement was carried by a variety of national news outlets reporting on Ms. Rowling's intention to do her own encyclopedia including via the Associated Press and Reuters. (Pl. Ex. No. 14-I). Despite following the news in the publishing world, Mr. Rapoport denies seeing any of these stories. (4/14/08 Tr. (Rapoport) at 156:10-158:4)

49. On August 6, 2007, after the extensive press coverage given to Ms. Rowling's statement about her planned encyclopedia and after publication of the article about Mr. Vander Ark in the Muskegon Chronicle, Mr. Rapoport emailed Mr. Vander Ark to discuss the possibility of turning some of the material on the Lexicon Website into a book. (4/14/08 Tr. (Rapoport) at 154:7-18; Pl. Ex. No. 86).

50. Even before meeting Mr. Vander Ark, Mr. Rapoport was already working to secure foreign publishers for the proposed Lexicon project and had contacted Methuen Publishing in the United Kingdom to gauge their interest in doing such a project. (4/14/08 Tr. (Rapoport) at 160:18-161:18).

51. On August 17, 2007, Mr. Rapoport met with Mr. Vander Ark to discuss the possibility of doing a book based on the A-Z portion of Mr. Vander Ark's Lexicon Website. (4/14/08 Tr. (Rapoport) at 163:22-164:6; 4/15/08 Tr. (Vander Ark) at 359:17-21; Pl. Ex. No. 92; Def. Ex. No. 502 (Vander Ark Decl.) at ¶¶ 27-28).

14

52.     During that meeting, Mr. Vander Ark expressed concerns regarding the permissibility of publishing a *Harry Potter* encyclopedia based on the fact that Ms. Rowling herself planned to publish such a book. (4/15/08 Tr. (Vander Ark) at 251:14-19). He also expressed concerns as to whether such a book would infringe Ms. Rowling's copyrights in the *Harry Potter* works. (4/15/08 Tr. (Vander Ark) at 251:20-22).

53.     Mr. Vander Ark stated that Mr. Rapoport advised him that publication of the Lexicon was permissible under copyright law. (4/15/08 Tr. (Vander Ark) at 357:16-359:5). Neither Mr. Vander Ark nor Mr. Rapoport testified as to the basis of Mr. Rapoport's alleged statement that the book was permissible. Mr. Rapoport also gave no testimony, nor did RDR present any evidence at trial showing (a) that Mr. Rapoport sought or received any advice of counsel in connection with the proposed Lexicon Book; or (b) the substance of any opinion from counsel. At no time either prior to or during trial did Mr. Rapoport assert an "advice of counsel" defense. RDR has not sought to waive the privilege with respect to any advice of counsel, if.

54.     RDR and Mr. Vander Ark clearly contemplated, however, that Plaintiffs might sue for copyright infringement. The contract that Mr. Vander Ark and RDR executed on August 23, 2008 shows that Mr. Vander Ark asked to be indemnified from any claims of copyright infringement brought by Ms. Rowling. (4/14/08 Tr. (Rapoport) at 178:16-179:5; 4/15/08 Tr. (Vander Ark) at 251:23-252:1). This type of indemnity is atypical in publishing contracts, where the norm is for authors to indemnify publishers against any potential claims of infringement. (4/14/08 Tr. (Rapoport) at 178:16-179:5; Pl. Ex. No. 141). Indeed, Mr. Rapoport told Mr. Vander Ark that, "in standard publishing contracts, the reverse is true." (Pl. Ex. No. 141).

55. Despite having periodic contact with Ms. Rowling's representatives throughout the years, at no time did Mr. Vander Ark discuss with them any plans to print any part of the Lexicon Website materials in book form. (4/15/08 Tr. (Vander Ark) at 303:3-6). Nor did Mr. Rapoport seek Ms. Rowling or her representatives' permission or even inform them of RDR's intention to publish the Lexicon. (4/14/08 Tr. (Rapoport) at 181:3-19).

L.   **Marketing the Lexicon Book**

56. RDR and Mr. Vander Ark intended to have a manuscript of the book completed within two-to-three weeks of execution of the publishing contract. (4/15/08 Tr. (Vander Ark) at 255:15-18). The plan was to rush the book to market by late-October 2007, in part, to capitalize on the interest generated by the last *Harry Potter* book. (4/14/08 Tr. (Rapoport) at 165:14-165:21). Mr. Vander Ark believed that there was a distinct advantage to being the first companion book on the market to cover all seven *Harry Potter* books. (4/15/08 Tr. (Vander Ark) at 255:7-14). In fact, RDR touted the Lexicon Book to foreign publishers as coming out "way ahead of any possible competitors." (Pl. Ex. No. 14-K).

57. RDR and Mr. Vander Ark expected the Lexicon Book to do well financially as evidenced by the fact that the contract included a provision for Mr. Vander Ark to receive a bonus for every week the Lexicon Book was on the New York Times Best Seller list. (4/15/08 Tr. (Vander Ark) at 253:23-254:1; Pl. Ex. No. 14-J at ¶ 6). Although Mr. Vander Ark testified that he "meant it as a joke," documentary evidence of his negotiation with Mr. Rapoport for the inclusion of a bonus demonstrates otherwise. (4/15/08 Tr. (Vander Ark) at 254:6-9; Pl. Ex. Nos. 96-97). Moreover, both Mr. Rapoport and Mr. Vander Ark were aware that a prior companion book published by a competing fan site owner entitled *Mugglenet.Com's What Will*

*Happen in Book 7?* achieved great success and spent several weeks on the New York Times Best Seller list. (4/14/08 Tr. (Rapoport) at 230:21-25; 4/15/08 Tr. (Vander Ark) at 253:12-16).

58.     RDR initially planned a print-run of 10,000 copies of the Lexicon Book, but admitted that it could do subsequent print-runs if the book was successful. (4/14/08 Tr. at (Rapoport) 238:22-239:20).

59.     RDR aggressively marketed the book to foreign publishers, as well as to U.S. bookstores and book sellers, as the definitive *Harry Potter* encyclopedia. (4/14/08 Tr. (Rapoport) at 160:18-161:15, 213:5-214:4; 4/15/08 Tr. (Vander Ark) at 361:9-16). RDR emailed a marketing flyer to numerous publishers and book sellers touting the book as being written by Mr. Vander Ark, "working with an exceptional team of academic and reference scholars." (Pl. Ex. No. 14-M). RDR emailed one such publisher on September 20, 2007:

> Briefly here is the background. Winner of J.K. Rowling's fan site award, the *Harry Potter* Lexicon is written by a team of professors and reference librarians. Our book is an A-Z reference complete through Book 7 which offers a complete look at the *Harry Potter* universe. The book is regularly used by the Harry Potter editors, film producers, and of course, Rowling herself. (Pl. Ex. No. 114).

60.     RDR emailed another publisher on September 25, 2007:

> It was a pleasure speaking with you today. I am attaching the *Harry Potter* Lexicon manuscript. This 160,000 word encyclopedia of the fictional *Harry Potter* world is the first and only complete reference work to all seven titles in the series including *Harry Potter and the Deathly Hallows*. (Pl. Ex. No. 117).

61.     In the course of marketing the Lexicon to one British publisher, Mr. Rapoport stated in an email that "J.K. Rowling has said again and again that the people behind this book are her absolute favorites when it comes to a *Harry Potter* reference book." (4/14/08 Tr. at (Rapoport) 172:6-173:7). Mr. Rapoport concedes that Ms. Rowling never used "those

exact words" and did not say anything about Mr. Vander Ark being her "favorite" when it comes to a "reference book." (4/14/08 Tr. at (Rapoport) 175:2-176:5; Pl. Ex. No. 89). Ms. Rowling herself confirmed in her own declaration that although she as given seven additional "Fan Site Awards" to other websites, she never has, nor would she "indicate that any one of these websites is a 'favorite.'" (Pl. Ex. No. 32 (Suppl. Rowling Decl.) at ¶13).

62.     Although Mr. Vander Ark swore in his declaration that he is the "author" of the Lexicon, he later admitted that there were three other authors of the manuscript. (Compare Def. Ex. No. 502 (Vander Ark Decl.) at ¶ 1 with 4/15/08 Tr. (Vander Ark) at 260:8-17).

63.     RDR targeted its marketing of the Lexicon Book to children's bookstores as well as to the children's book buyers at general bookstores. (4/14/08 Tr. at (Rapoport) 215:20-217:16; Pl. Ex. No. 14 (Bradley Decl). at ¶ 16; Pl. Ex. No. 14-L). RDR expected the Lexicon Book to be placed next to the *Harry Potter* books and companion guides and for this reason decided that the book should be printed in paperback form in order to compete with them. (Pl. Ex. No. 100). RDR intended for the Lexicon Book to sell for $24.95 in the United States. (Def. Ex. No. 501-A); (4/14/08 Tr. (Rowling) at 106:11-12).

64.     In marketing the Lexicon Book, Mr. Rapoport made use of the statement Ms. Rowling made in 2004 regarding the Lexicon Website, prominently displaying this quote on marketing materials and using it in communications that RDR prepared and sent to numerous foreign publishers and U.S. booksellers. (4/14/08 Tr. (Rapoport) at 171:3-6; Pl. Ex. No. 14 (Bradley Decl.) at ¶ 17; Pl. Ex. No. 22 (Murphy Decl.) at ¶ 15; Pl. Ex. No. 22-A).

65.     The use of this quote was meant to give the distinct impression that Ms. Rowling approved of or endorsed the Lexicon book. (4/14/08 Tr. (Rapoport) at 174:1-175:2).

66.     Although RDR eventually dropped its use of the quote and redesigned the cover, it did so only after Plaintiffs went to the considerable effort and expense of presenting a survey in this litigation in support of Plaintiffs' motion for preliminary injunction demonstrating that 38% of respondents believed that the appearance of the quote on the proposed book cover meant that Ms. Rowling endorsed the book. (4/14/08 Tr. (Rapoport) at 237:6-13; Pl. Ex. No. 13-C (Blumsack Decl.); Pl. Ex. No. 16 (Helfgott Decl.) at ¶ 2).

67.     As a result of RDR's various marketing efforts, Mr. Rapoport was able to secure oral contracts with foreign publishers for rights to the Lexicon Book in England, Canada, France, Australia, New Zealand, and China, and to secure an order from Borders bookstore in the United States. (4/14/08 Tr. (Rapoport) at 187:2-11; 240:15-241:4; Pl. Ex. No. 137). Although Mr. Rapoport testified that there was never a firm order from Borders, upon further questioning by this Court, Mr. Rapoport was forced to admit that RDR did have an order from Borders that only was cancelled because of the instant lawsuit. (4/14/08 Tr. (Rapoport) at 241:15-23).

**M.     Plaintiffs Learn of Defendant's Plans**

68.     Ms. Rowling's literary agent, Neil Blair of the CLLA, first learned of the Lexicon Book when he saw an advertisement on www.PublishersMarketplace.com announcing that RDR Books would be publishing the Lexicon Book, purportedly scheduled for release in late October 2007. (Pl. Ex. Nos. 12 (Blair Decl.) at ¶ 14 and 12-D). The ad listed the author of the Lexicon as Steven Vander Ark, the editor of the free Lexicon Website and an "international celebrity in the *Harry Potter* world" and made clear that the book was intended to be the "definitive" *Harry Potter* encyclopedia "totaling approximately 400 pages long." (*Id.*).

69.     The advertisement also stated that RDR Books already had sold the rights to the Book in England, France, Canada and Australia and that it was offering for sale the worldwide rights to the Infringing Book with the exception of those countries. (*Id.*).

70.     Based on the description in the PublishersMarketplace.com advertisement and in light of the content of the Lexicon Website, Ms. Rowling and Mr. Blair became concerned that the Book infringed Ms. Rowling's copyrights. (Pl. Ex. No. 12 (Blair Decl.) at ¶ 15). As a result, on September 12, 2007, Mr. Blair emailed Defendant and Mr. Vander Ark regarding the planned Lexicon Book. (4/14/08 Tr. (Rapoport) at 188:10-20) (Pl. Ex. No. 12 (Blair Decl.) at ¶ 15). The only response Mr. Blair received to his inquiry was an email from Mr. Vander Ark stating that he had been advised to leave these matters to others. (*Id.*)

71.     On September 18, 2007, counsel for Ms. Rowling and Warner Bros. forwarded a letter to Mr. Vander Ark by email, copying Mr. Rapoport, notifying them that it appeared the Book would infringe Ms. Rowling's copyrights and requesting that RDR cease publication of the book. (4/14/08 Tr. at (Rapoport) 190:7-13; Pl. Ex. No. 15 at ¶ 3).

72.     From this point on, RDR proceeded on two separate tracks. On one track, RDR stalled Plaintiffs' attorneys with promises to "study the issues" and get back to them, while on the other track, it continued to use its best efforts to surreptitiously sell the book both domestically and abroad. (4/14/08 Tr. at (Rapoport) 195:16-196:2). During the entire time that Plaintiffs were attempting to communicate with Defendant about the Lexicon, Mr. Rapoport continued to aggressively market and promote the Lexicon as if no issues existed between the parties. (4/14/08 (Rapoport) Tr. at 193:2-25; 194:4-14; 208:3-17; Pl. Ex. Nos. 110-130, 133-140).

73.     Moreover, RDR took great pains to try to prevent Plaintiffs from knowing that RDR still was marketing the Lexicon Book, including by informing foreign agents to avoid offering rights to local publishers of the Harry Potter books. (Pl. Ex. No. 120). In connection with its efforts to locate a Brazilian publisher, Mr. Rapoport wrote "I am assuming you will NOT be discussing this book with Editorial Presenca, the publisher of the Harry Potter and the Deathly Hallows. Please confirm this. They are not a candidate for this book." (*Id.*)

74.     On September 19, 2007, RDR Books replied cursorily to Plaintiffs' counsel on behalf of the company and Mr. Vander Ark, stating "[i]t is our intention to thoroughly study the various issues you have raised and discuss them with our legal advisers." (Pl. Ex. No. 15 (Cendali Decl.) at ¶ 4).

75.     On October 3, 2007, after two weeks had passed with no substantive response from RDR, counsel for Ms. Rowling and Warner Bros. wrote again to RDR Books, emphasizing their clients' concerns and the impending publication date and asking for a prompt substantive response. (Pl. Ex. No. 15 (Cendali Decl.) at ¶ 5).

76.     Mr. Rapoport sent an email later that day requesting more time to respond due to a family emergency that had "interrupted all of [his] work including [Plaintiffs'] request." (4/14/08 Tr. at 192:13-193:1 (Rapoport); Pl. Ex. No. 15 (Cendali Decl.) at ¶ 6). Sympathetic to Mr. Rapoport's situation, Plaintiffs' agreed to Mr. Rapoport's request for additional time to respond. (Pl. Ex. No. 15 (Cendali Decl.) at ¶ 7).

77.     An hour after communicating to Plaintiffs that a family emergency had prevented him from working, Mr. Rapoport sent out an email to a British publisher in an attempt to market the Lexicon book. (4/14/08 Tr. (Rapoport) at 193:2-25).

78. The very next day, Mr. Rapoport pitched the Lexicon book to an Italian publisher. (4/14/08 Tr. (Rapoport) at 194:4-13).

79. Despite knowing full well that Plaintiffs objected to publication of the Lexicon Book, Mr. Rapoport misled foreign publishers who raised copyright concerns by giving the false impression that a suit by Plaintiffs was "unlikely." (4/14/08 Tr. (Rapoport) at 198:6-19; Pl. Ex. No. 121). For example, on October 8, 2007, in response to an email from a German publisher raising such concerns, Mr. Rapoport stated "I want you to know that our company RDR Books will indemnify your company on any and all issues relating to the copyright or trademark of the *Harry Potter* works. *In the unlikely event that any questions are raised on this issue regarding your edition* you simply need to forward this information to our company." (Pl. Ex. No. 121) (emphasis added).

80. On October 11, 2007, during the same period that Mr. Rapoport said he could not respond to Plaintiffs' letters because of a family emergency, Mr. Rapoport sent the chairman of Warner Bros. a cease and desist letter in which he claimed that Warner Bros. had violated Mr. Vander Ark's rights in a timeline appearing on the Lexicon Website. (Pl. Ex. No. 14 (Bradley Decl. at ¶ 12); Pl. Ex. No. 14-H). This timeline was based entirely on Ms. Rowling's fictional facts. (4/15/08 Tr. (Vander Ark) at 326:9-16; Pl. Ex. No. 14 (Bradley Decl.) at ¶ 12; Pl. Ex. No. 14-H). In that letter, RDR stated:

> It has come to our attention that the "Hogwarts Timeline" included in the extra features of the Warner Bros. DVD versions of *Harry Potter* and the Chamber of Secrets, *Harry Potter* and The Prisoner of Azkaban, and *Harry Potter* and the Goblet of Fire was copied directly from the *Harry Potter* Lexicon website without Mr. Vander Ark's permission. We have been given to understand that the timeline will also be incorporated in the special features of the forthcoming DVD version of *Harry Potter* and the Order of the Phoenix, announced for December 2007 release . . . . No such

timeline is contained in any of J.K. Rowling's *Harry Potter* novels. Mr. Vander Ark published details that were found nowhere else. This timeline, like all the material on the 1,000-plus-page *Harry Potter* Lexicon, is the original work of Mr. Vander Ark and his elite team of academic scholars, literary critics and reference librarians. It is copyrighted 2001 through 2007 by The *Harry Potter* Lexicon. (Pl. Ex. No. 14 (Bradley Decl.) at ¶ 12).

81.     In its letter to Warner Bros., RDR also stated that it was seeking "tangible rewards" for Vander Ark for Warner Bros.' purported use of the timeline. (Pl. Ex. No. 14 (Bradley Decl.) at ¶ 12; Pl. Ex. No. 14-H). RDR and Mr. Vander Ark had worked out an agency agreement whereby RDR would be entitled to a 15% agent's commission on any money obtained from Warner Bros. as a result of the claim. (4/15/08 Tr. (Vander Ark) at 326:2-8).

82.     Although Mr. Vander Ark now claims to be a "layman" on copyright issues, Mr. Vander Ark takes an authoritative and aggressive view as to the scope of his copyright in the work appearing on the Lexicon Website. (Pl. Ex. No. 14 (Bradley Decl.) at ¶ 9-12). Mr. Vander Ark states on the Lexicon Website:

> ...I understand that you'd really love to have the kind of quality work you find in the Lexicon for your own site. However, I don't give permission for people to just copy my work for their own use. Not only is that illegal, since everything in the Lexicon is copyrighted, it's also just plain wrong. (Pl. Ex. No. 14 (Bradley Decl.) at ¶ 9).

83.     Further, Mr. Vander Ark does not allow copying of any of the material he claims as his own, nor does he allow "framing" or linking directly to the artwork or maps on the Lexicon Website. (Pl. Ex. No. 14 (Bradley Decl.) at ¶ 10). In fact, the Lexicon Website is set up in a manner to dissuade and prevent people from highlighting and copying text directly off of the site. (Pl. Ex. No. 14 (Bradley Decl.) at ¶ 11). If a user even attempts to highlight and copy any of the materials included on the Lexicon Website utilizing the "right click" function on their mouse, a copyright notice pops up. (*Id.*).

84.     Mr. Vander Ark has, on other occasions, sought to enforce rights in the material appearing on the Lexicon Website against third parties, including, as he put it, "siccing" his lawyer on someone for copying material from the Lexicon Website. (Pl. Ex. No. 27 (Suppl. Blumsack Decl.) at ¶ 19).

## N.     RDR Continues to Stall Plaintiffs

85.     On October 19, 2007, Warner Bros. responded to Mr. Rapoport's letter regarding the timeline requesting a copy of the "print version" of the Lexicon Website referred to by RDR Books in order to aid in its evaluation of any potential claims. (Pl. Ex. No. 15 (Cendali Decl.) at ¶¶ 8-9).

86.     RDR Books refused, despite having an electronic version of the Lexicon manuscript in its possession which it routinely sent to multiple foreign publishers, stating: "If you do not know how to print that material [from the Lexicon Website] please ask one of your people to show you how." (4/14/08 Tr. at 205:21-206:13 (Rapoport); Pl. Ex. No. 15 (Cendali Decl.) at ¶ 9, 108, 114-115, 117-118).

87.     Plaintiffs' subsequent efforts to "image" a copy of the Lexicon Website, which contains more than 891,851 individual data files totaling approximately 50 gigabytes of data, required "a dedicated computer working round the clock and took over 120 hours to complete." (Pl. Ex. No. 24 (Perry Decl.) at ¶ 2). To print the entire content of the Lexicon Website would take "a similar amount of time, if not more, and considerable effort." (Pl. Ex. No. 24 (Perry Decl.) at ¶ 3).

88.     On October 19, 2007, Plaintiffs' counsel sent a third letter to RDR Books, again asking for a substantive response to their clients' concerns regarding the Book. (Pl. Ex. No. 15 (Cendali Decl.) at ¶ 9).

89.    RDR Books responded only that "[w]e are looking in to your allegations and will get back to you with our response." (Pl. Ex. No. 15 (Cendali Decl.) at ¶ 10).

90.    In the meantime, on or around October 23, 2007, Mr. Blair learned that RDR Books had recently offered the publishing rights for the Lexicon Book in Germany to Random House and in Taiwan to Crown Publishing. (Pl. Ex. No. 15 (Cendali Decl.) at ¶ 11).

91.    On the following day, October 24, 2007, counsel for Plaintiffs wrote to RDR Books for a fourth time, asking for confirmation that RDR Books would not publish the Book until it attempted to resolve this matter in good faith. (Pl. Ex. No. 15 (Cendali Decl.) at ¶ 11). Plaintiffs' counsel also repeated their earlier request for a copy of the Book (or the most recent draft) for review in order to facilitate the parties' discussions. (Pl. Ex. No. 15 (Cendali Decl.) at ¶ 11).

92.    RDR Books replied in a brief email on October 24, 2007, stating that Plaintiffs' "unwarranted" objections were not appreciated and that the Book was a "print version" of the Lexicon Website. (Pl. Ex. No. 15 (Cendali Decl.) at ¶ 12).

93.    Plaintiffs called Mr. Rapoport on October 31, 2007 and offered a last chance to agree to cease publication, or at least delay publication and provide Plaintiffs with a copy of the manuscript and proposed cover in order to try to resolve the matter. (Pl. Ex. No. 15 (Cendali Decl.) at ¶ 13). RDR refused to provide a copy of the manuscript and refused to delay publication. (*Id.*)

O.    **Plaintiffs File Suit And Seek to Obtain A Copy of the Lexicon Manuscript**

94.    Having been unable to resolve the matter amicably, Plaintiffs filed suit on October 31, 2007, at which time they also moved by Order to Show Cause for a preliminary

injunction. (Pl. Ex. No. 15 (Cendali Decl.) at ¶ 13; Plaintiffs' Complaint dated October 31, 2007).

95.     Plaintiffs filed a motion on November 2, 2007, seeking limited expedited discovery and asking the Court to set an expedited briefing schedule in connection with the pending motion. (Plaintiffs' Motion for Expedited Discovery dated November 2, 2007)

96.     On November 2, 2007, the Court granted Plaintiffs' request for expedited discovery and directed RDR to provide Plaintiffs with a copy of the manuscript for the Book. (Order granting Plaintiffs' Motion for Expedited Discovery dated November 2, 2007).

### P.     The Lexicon Manuscript Copies Plaintiffs' Works Extensively

97.     The 400-page manuscript for the Book contains over two thousand entries that retell plots, recreate events, and describe the characters, spells and other magical elements from all seven of the *Harry Potter* Books and Ms. Rowling's two Companion Books as well as her "The Daily Prophet" newsletter and Warner Bros.' Famous Wizard Cards. (Pl. Ex. No. 13 (Blumsack Decl.) at ¶ 2).

98.     Ms. Rowling testified that Mr. Vander Ark took "all the highlights of [her] work, in other words characters' secret history, the jokes certainly, certain exciting narrative twists, all the things that are the highlights of [her] stories" and put them into the Lexicon for their entertainment value. (4/16/08 Tr. (Rowling) at 647:6-10). Ms. Rowling compared this taking of her work to plundering all of the "plums in [her] cake." (4/16/08 Tr. (Rowling) at 647:3-6).

99.     The entries are organized alphabetically and list each and every spell, potion, song, imaginary creature (such as Blast-Ended Skrewt, Clankers and Blood-Sucking

Bugbears), fictional character (such as *Harry Potter* and Lord Voldemort), invented game (such as Quidditch), and made-up place (such as Hogwarts School of Witchcraft and Wizardry, Diagon Alley, and the governmental Ministry of Magic), from Ms. Rowling's original creative expression. (4/14/08 Tr. at 57:6-15 (Rowling); Pl. Ex. No. 28 at ¶¶ 6-9).

100.    The Lexicon manuscript contains none of the fan artwork, essays or analysis that appears on the Lexicon website; it consists simply of an alphabetical list of fictional facts concerning people, places and things taken from the Harry Potter books without the addition of any criticism or commentary. (Pl. Ex. Nos. 12 (Blair Decl.) at ¶ 18, 14 (Bradley Decl.) at ¶¶ 3-6).

### Q.    Use of Illegal Electronic Copies of Ms. Rowling's Works

101.    Mr. Vander Ark took detailed notes on each of the *Harry Potter* books which he then turned into the material appearing on the Lexicon Website and in the Lexicon Book. (4/15/08 Tr. (Vander Ark) at 335:9-17).  Mr. Vander Ark also admits that while he was aware that Ms. Rowling did not release electronic copies of the *Harry Potter* books, he nonetheless obtained unauthorized scanned copies of all of the *Harry Potter* books and Ms. Rowling's two Companion Books for use in creating the Lexicon manuscript. (4/15/08 Tr. (Vander Ark) at 259:5-9, 16-23; Pl. Ex. Nos. 101, 105).

102.    Mr. Vander Ark was aware that making electronic copies of a book would be illegal, as he explained to an online discussion group.  When another poster argued that "[b]ooks that are copyrighted, that if we have a hard printed copy of our own, we are allowed to make copies for our own personal use," Mr. Vander Ark responded that "Actually, no, you can't legally make copies of copyrighted books just because you have the paper version…. So any copies of Tolkien books or *Harry Potter* books in NewtonBook [electronic] format are illegal."

(4/15/08 Tr. (Vander Ark) at 264:23-265:8, 265: 17-25, 266:8-17, 266:22-267:4; Pl. Ex. No. 194).

R.    **The Lexicon is Virtually Exclusively Drawn From Ms. Rowling's Works**

103.    Mr. Vander Ark admits that the only source of material in the Lexicon Book is J.K. Rowling (4/15/08 Tr. (Vander Ark) at 293:21-294:2, 294:14-17). Mr. Vander Ark and Mr. Rapoport agreed that "the book should focus on the fictional world of Harry Potter" and that other information, such as entries about real world features of the Harry Potter phenomenon, films and Ms. Rowling "will not be included in this book." (Pl. Ex. No. 27 (Blumsack Corrected Supp. Decl.) at ¶ 13, and Ex. 27-H). Also not included in the Lexicon book are the essays, fan artwork, and real-world information about Ms. Rowling's life and the films, all of which is included on the Lexicon Website. (4/15/08 Tr. (Vander Ark) at 307:21-308:14).

104.    The Lexicon book makes very clear what materials are the subject of the book's content. As the first page of the Lexicon manuscript states:

> All the information in the Harry Potter Lexicon comes from J.K.
> Rowling, either in the novels, the 'schoolbooks,' from her
> interviews, or from material which she developed or wrote herself.
> (Pl. Ex. No. 1, p. 1).

105.    Mr. Vander Ark considers Ms. Rowling's works and words to be "canon" and therefore the only reliable source for all things *Harry Potter*. (Pl. Ex. No. 14 (Bradley Decl.) at ¶ 7 and 14-E). Mr. Vander Ark states on the Lexicon Website: "Only information which comes directly from the author is considered canon . . . . Material and information which does not come from [Ms. Rowling] is not canon, which means it's not really part of the Harry Potter universe as created by the author." (Pl. Ex. No. 14 (Bradley Decl.) at ¶ 7 and 14-D). Professor

Sorensen also admits that "most of the material" from the Lexicon has been drawn from Ms. Rowling's works. (04/16/08 Tr. (Sorensen at 544:5-12).

106.    In his declaration, Mr. Vander Ark claims the Lexicon uses reference materials beyond Ms. Rowling's works. (Def. Ex. No. 502 (Vander Ark Decl.) at ¶ 14). However, only the "NSOED" (New Shorter Oxford English Dictionary) is listed in Mr. Vander Ark's bibliography for the Lexicon. (Pl. Ex. No. 1). Moreover, in his testimony, Mr. Vander Ark did not dispute that, other than four dictionary citations, no other citations to any third-party work appear anywhere in the Lexicon manuscript. (4/15/08 Tr. (Vander Ark) at 295:13-296:13).

107.    As Professor Johnson, Senior Tutor and fellow in English at Exeter College of the University of Oxford, stated in her declaration, of the Lexicon's 2,437 entries, 2,034 simply lift information straight from the Harry Potter works. (Pl. Ex. No. 28 (Johnson Supp. Decl.) at ¶ 6) (An expert witness in the field of literature who was retained by Plaintiffs). Professor Johnson also testified that most of the remaining 403 entries are also drawn from Ms. Rowling's works with perhaps "four or five words" or a line or two of additional material that was not simply directly taken from Ms. Rowling, as described below. (4/16/08 Tr. (Johnson) at 602:19-603:10).

### S.    Types of Copying of Ms. Rowling's Works

108.    The copying in the Lexicon takes a number of forms, which will be discussed in turn, namely:

- verbatim copying of songs and poems;

- direct quoting and paraphrasing of Ms. Rowling's prose without quotation marks or proper attribution to Ms. Rowling;

- extensive copying of Ms. Rowling's "fictional facts;"

- long detailed plot summaries that recount or retell the plots of her books.

### 1. **Verbatim Copying of Songs and Poems**

109. The Lexicon contains verbatim copies of the creative songs and poems Ms. Rowling wrote for the *Harry Potter* Works including, the "Hogwarts' School Song," the Sorting Hat Song, and the poem, "His Eyes are as Green as a Fresh Pickled Toad." (Pl. Ex. No. 11 (Birchall Decl.) at ¶ 8, 11-E thru G).

110. Despite the fact that this case has been on file since October 31, 2007 and there has been extensive briefing regarding this kind of copying, it was not until Mr. Vander Ark testified at trial in April 2008 that he conceded that these entries took too much and offered to remove them from the Lexicon. (4/15/08 Tr. (Vander Ark) at 397:1-3). However, neither Defendant RDR nor counsel confirmed or commented on Mr. Vander Ark's proposal.

### 2. **Direct Quotations Without Quotation Marks and Extensive Paraphrasing**

111. Many of the Lexicon entries dealing with both the major and minor characters begin by describing that character's appearance using Ms. Rowling's words almost verbatim. (4/14/08 Tr. (Rowling) at 60:24 - 61:2). Other entries that deal with invented terms, creatures, places and things from the *Harry Potter* books simply use "again and again the specific, very colorful, idiosyncratic . . . nouns and phrases of Ms. Rowling." (4/16/08 Tr. (Johnson) at 619:7-9).

112. Plaintiffs have submitted extensive charts summarizing the vast, wholesale, comprehensive copying of Ms. Rowling's language. (See Pl. Ex. No. 43 (comparing *Quidditch Through the Ages* with the Lexicon); Pl. Ex. No. 44 (comparing *Fantastic Beasts and*

*Where to Find Them* with the Lexicon); Pl. Ex. No. 45 (comparing Famous Wizard Cards with the Lexicon); Pl. Ex. No. 46 (comparing "The Daily Prophet" newsletters with the Lexicon); Pl. Ex. No. 47 (comparing the seven *Harry Potter* novels with the Lexicon); Pl. Ex. No. 48 (comparing text from the *Harry Potter* novels with the Lexicon)).

113. One such chart was created and typed by Ms. Rowling herself with the assistance of her 14-year-old daughter. (4/14/08 Tr. (Rowling) at 57:21-58:11; Pl. Ex. No. 47 (comparing the seven *Harry Potter* novels with the Lexicon)).

114. These lengthy charts show extensive direct copying and paraphrasing of all of Ms. Rowling's works. (See Pl. Ex. No. 43 (comparing *Quidditch Through the Ages* with the Lexicon); Pl. Ex. No. 44 (comparing *Fantastic Beasts and Where to Find Them* with the Lexicon); Pl. Ex. No. 45 (comparing Famous Wizard Cards with the Lexicon); Pl. Ex. No. 46 (comparing "The Daily Prophet" newsletters with the Lexicon); Pl. Ex. No. 47 (comparing the seven *Harry Potter* novels with the Lexicon); Pl. Ex. No. 48 (comparing text from the *Harry Potter* novels with the Lexicon)).

115. Ms. Rowling's language is often copied directly, or with only slight word variations. As Professor Johnson explained, "[t]he distinctive language in these entries is the distinctive language of Ms. Rowling. It's not the author's own language, it's Ms. Rowling's language." (4/16/08 Tr. (Johnson) at 600:21-24).

116. The Lexicon rarely uses quotation marks when quoting Ms. Rowling's language, making it impossible to know which words are Ms. Rowling's and which are Mr. Vander Ark's. (4/14/08 Tr. (Rowling) at 57:6-15, 58:24-59:12, 59:19-60:2; 4/16/08 Tr. (Johnson) at 619:3-12).

117. For example, in the entry for "armor, goblin made," the Lexicon lifts Ms. Rowling's poetic language virtually verbatim without quotation marks or commentary:

| Armor, goblin made (Pl. Ex. Nos. 47-48) | |
|---|---|
| **_Harry Potter and the Deathly Hallows_** | **Lexicon Entry** |
| "Muggle-borns," he said. "Goblin-made armour does not require cleaning, simple girl. Goblins' silver repels mundane dirt, imbibing only that which strengthens it." | …goblin-made armor does not require cleaning, because goblins' silver repels mundane dirt, imbibing only that which strengthens it…. |

118. Another example, the Lexicon entry for "brain room," similarly takes Ms. Rowling's evocative words without quotation marks and adds no analysis or commentary:

| Brain room (Pl. Ex. Nos. 47-48) | |
|---|---|
| **_Harry Potter and the Order of the Phoenix_** | **Lexicon Entry** |
| What looked like ribbons of moving images flew from it, unraveling like rolls of film. | When Summoned, the brains fly out of the tank, unspooling ribbons of thought like strips of film, which wrap themselves around the Summoner. |

119. Yet another example of this copying can be seen in the entry for "Marchbanks, Madam Griselda," where the exact wording from Ms. Rowling's novel is used in the Lexicon without quotation marks:

| Marchbanks, Madam Griselda (Pl. Ex. Nos. 47-48) | |
| --- | --- |
| **_Harry Potter and the Order of the Phoenix_** | **Lexicon Entry** |
| …the tiny, stooped witch with a face so lined it looked as though it had been draped in cobwebs. | …tiny and stooped, her face so lined it appeared draped in cobwebs. |

120.     Similarly the Lexicon directly lifts Ms. Rowling's words without quotation marks in the entry for "Pince, Madam Irma," which also does not include any analysis or commentary:

| Pince, Madam Irma (Pl. Ex. Nos. 47-48) | |
| --- | --- |
| **_Harry Potter and the Chamber of Secrets; and_**<br><br>**_Harry Potter and the Order of the Phoenix_** | **Lexicon Entry** |
| …the librarian was a thin, irritable woman who looked like an underfed vulture.<br><br>…shriveled face…. | Librarian at Hogwarts who looks like an underfed vulture (CS10) with a shriveled face (OP29), and is very strict and suspicious. |

121.     This kind of close paraphrasing is not limited to the seven _Harry Potter_ novels, but can be found in entries drawn from Ms. Rowling's other works.  For example, the entries for "Montrose Magpies" and "Woollongong Shimmy" from Ms. Rowling's _Quidditch Through the Ages_ do not place the copied language in quotation marks, nor do they provide any analysis:

| Montrose Magpies | |
|---|---|
| (Pl. Ex. No. 43) | |
| *Quidditch Through the Ages* | **Lexicon Entry** |
| The Magpies are the most successful team in the history of the British and Irish League, which they have won thirty-two times. Twice European Champions…. The Magpies wear black and white robes with one magpie on the chest and another on the back. | The most successful Quidditch team in history, which has won the British and Irish league thirty-two times and the European Cup twice. Their robes are black and white, with one magpie on the chest and another on the back (QA7). |

| Woollongong Shimmy | |
|---|---|
| (Pl. Ex. No. 43) | |
| *Quidditch Through the Ages* | **Lexicon Entry** |
| Perfected by the Australian Woollongong Warriors, this is a high-speed zig-zagging movement intended to throw off opposing Chasers. | A high-speed zigzagging maneuver performed to throw off Chasers; perfected by the Woollongong Warriors. |

122. The same copying takes place in entries relating to Ms. Rowling's other companion book, Fanta*stic Beasts and Where to Find Them.* For example, entries for "Chinese Fireball" and "Fire Crab" contain no quotation marks and no commentary:

| Chinese Fireball | |
|---|---|
| (Pl. Ex. No. 44) | |
| *Fantastic Beasts and Where to Find Them* | **Lexicon Entry** |
| The only Oriental dragon. Scarlet and smooth-scaled, it has a fringe of golden spikes around its snub-snouted face and extremely protuberant eyes. The Fireball gained its name for the mushroom-shaped flame that bursts from its nostrils when it is angered…. Eggs are a vivid crimson speckled with gold…. | A species of dragon native to China. The Fireball is a scarlet dragon with golden spikes around its face and protruding eyes. The blast of flame from a fireball forms a distinctive mushroom shape. Eggs of a Fireball are vivid crimson, flecked with gold…. |

| Fire Crab | |
|---|---|
| (Pl. Ex. No. 44) | |
| **_Quidditch Through the Ages_** | **Lexicon Entry** |
| ...the fire crab greatly resembles a large tortoise with a heavily jeweled shell...it shoots flames from its rear end when attacked. | The fire crab looks like a tortoise with a jeweled shell which can shoot fire out of its rear end.... |

123. Similarly, entries copy Ms. Rowling's creative language from "The Daily Prophet" newsletters without the courtesy of quotation marks. For example, entries for "Madam Malkin's Robes for All Occasions" and "Dagbert Pips" copy Ms. Rowling's newsletters, without quotation marks or proper attribution:

| Madam Malkin's Robes for All Occasions | |
|---|---|
| (Pl. Ex. No. 46). | |
| **"The Daily Prophet"** | **Lexicon Entry** |
| Summer sale on now! Robes spangled, self-ironing, beautifying, slimming, fattening, lengthening, temperature-adjusting and plain. Free frog-skin belt with every purchase. | ...During one summer sale, the store sold robes which were spangled, self-ironing, beautifying, slimming, fattening, lengthening, temperature-adjusting and plain and offered a free frog-skin belt with every purchase (DP1). |

| Dagbert Pips | |
|---|---|
| (Pl. Ex. No. 46) | |
| **"The Daily Prophet"** | **Lexicon Entry** |
| Dagbert Pips, proprietor of 'Pumpkins R Us', asserted that a restriction on Hallowe'en celebrations would hit the pumpkin-growers particularly hard. | Proprietor of Pumpkins R Us, who complained to a Daily Prophet reporter that a restriction on Hallowe'en celebrations would hit pumpkin-growers particularly hard (DP). |

124.     Even entries for the Famous Wizard Cards lift verbatim text without quoting, as can be seen in entries such as "Mirabella Plunkett" and "Fulbert the Fearful":

| Mirabella Plunkett (Pl. Ex. No. 45) | |
| --- | --- |
| *EA Wizard Card* | **Lexicon Entry** |
| 1839 - unknown.<br><br>Famous for falling in love with a merman in Loch Lomond while on holiday.  When her parents forbade her to marry him, she transfigured herself into a haddock and was never seen again. | (b. 1839)<br><br>Famous for falling in love with a merman in Loch Lomond while on holiday.  When her family forbade her to marry him, she transfigured herself into a haddock and was never seen again (fw). |

| Fulbert the Fearful (Pl. Ex. No. 45) | |
| --- | --- |
| *EA Wizard Card* | **Lexicon Entry** |
| 1014 - 1097.<br><br>Famous for being so cowardly he never ventured out of his house.  Died when a Defensive Charm backfired and the roof fell in. | (1014 - 1097)<br><br>So cowardly that he never went out of his house.  He died when his roof collapsed as a result of a Defensive Charm that backfired (fw). |

125.     RDR claims that having a chapter citation referencing Ms. Rowling's books forgives the lack of quotation marks.  (4/15/08 Tr. (Vander Ark) at 276:22-277:18). However, not only does RDR not offer any support for this claim, it is contrary to accepted practices in literature.  (4/16/08 Tr. (Sorensen) at 551:23-552:2; (Johnson) at 617:12-24).  In fact, RDR's own literary expert, Professor Sorensen, admits that she uses quotation marks in her own book when she discusses Jane Austen to show which words were actually written by Ms. Austen, explaining, "That's a work of scholarship.  Of course I do."  (4/16/08 Tr. (Sorensen) at 553:13-

15). Simply having broad citations to the *Harry Potter* books would not make clear to a reader whether the language shown was directly copied from Ms. Rowling or was the creative work of Mr. Vander Ark. (4/14/08 Tr. (Rowling) at 57:9-15; 59:3-8; 59:24-60:2; 4/16/08 Tr. (Johnson) at 618:20-22)

126.    Thus, the unique descriptions and phrases which comprise the story created and owned by Ms. Rowling have been lifted from Ms. Rowling's work and inserted into the Lexicon as if they were Mr. Vander Ark's work. (4/16/08 Tr. at (Rowling) 47:3-10, 51:2-5).

127.    As Ms. Rowling testified, the proposed cover of the Lexicon claims that it is authored by Mr. Vander Ark, however, the creative work contained therein is her own. (4/14/08 Tr. at (Rowling) 57:3-10).

### 3.    The Lexicon Takes All Of Ms. Rowling's Fictional Facts

128.    In addition to quoting and paraphrasing Ms. Rowling's language, the Lexicon also copies and incorporates wholesale Ms. Rowling's invented fictional facts. Every single Lexicon entry is comprised of details of Ms. Rowling's invented world. These facts are not taken sparingly; rather, Ms. Rowling's entire detailed creative expression is repeated in the Lexicon with rarely, if any, commentary or analysis.

129.    As Ms. Rowling testified, what Mr. Vander Ark has done "constitutes wholesale theft of 17 years of [her] hard work," and that "it adds little if anything in the way of commentary, that the quality of that commentary is derisory, and that it debases what [Ms. Rowling] worked so hard to create." (4/14/08 Tr. (Rowling) at 43:24-44:7).

130.    Although the Lexicon presents Ms. Rowling's work in a bland manner, nearly all of her material has been taken straight from Ms. Rowling's work and regurgitated with

37

only minimal paraphrasing and virtually no analysis or commentary. (4/14/08 Tr. (Rowling) at 44:2-7, 66:25-67:9; 4/16/08 Tr. (Johnson) at 602:15-603:10, (Rowling) at 647:15-24).

131. Moreover, the Lexicon contains no "spoiler alerts" to warn the reader who has not yet read all of the *Harry Potter* books that they are about to learn the ultimate outcome of the series or the fate of characters. (4/14/08 Tr. (Rowling) at 103:8-22; 4/15/08 Tr. (Murphy) at 409:12-410:4). Mr. Vander Ark admits that spoilers could ruin the reading experience for a first-time reader. (4/15/08 Tr. (Vander Ark) at 305:14-306:1, 306:16-25).

132. For example, the Lexicon reveals the identity of the mysterious "R.A.B.," and reveals that ultimate fate of Harry Potter, Professor Lupin, Lord Voldemort and Severus Snape at the end of the *Harry Potter* series. (4/15/08 Tr. (Vander Ark) at 306:19-25).

133. Although RDR suggests that people may discover the outcome of a storyline by seeing one of the *Harry Potter* films, Ms. Rowling is the copyright owner of her books and is thus entitled to choose to permit film adaptations. Moreover, it is well known that books often encourage people to see a film version and films often encourage people to read the book on which they are based. In addition, while spoiler information might be available elsewhere, RDR submitted no evidence to show that it is available in book form.

a. **Use of Fictional Facts from the *Harry Potter* Novels**

134. The Lexicon entries take far more of Ms. Rowling's fictional facts than is necessary for any legitimate purpose. For example, "Blast Ended Skrewts" are a type of dangerous hybrid creature invented and raised by Rubeus Hagrid, the gamekeeper at Hogwarts, and discussed in *Harry Potter and the Goblet of Fire*. But rather than simply saying something succinct to this effect, the Lexicon's description of this creature takes nearly every detail and