closely paraphrases the text of virtually everything Ms. Rowling has written about them without

adding any analysis:

| BLAST ENDED SKREWTS |
|---|
| **(PL. EX. NO. 47)** |

| *Harry Potter and the Goblet of Fire* | Lexicon Entry |
|---|---|
| They looked like deformed, shell-less lobsters, horribly pale and slimy-looking, with legs sticking out in very odd places and no visible heads. . . . each about six inches long, crawling over each other, bumping blindly into the sides of the boxes. They were giving off a very powerful smell of rotting fish. Every now and then sparks would fly out of the end of the Skrewt and, with a small phut, it would be propelled forwards several inches. | pale, slimy, deformed, shell-less lobsters. They had no heads but had legs sticking out at odd angles. The creatures were about six inches long and smelled strongly of rotten fish. Sparks flew out from their ends every so often which propelled them forward a few inches. |
| …now over three feet long, and extremely powerful. No longer shell-less and colourless, they had developed a kind of thick, grayish shiny armor. They looked like a cross between giant scorpions and elongated crabs - but still without recognizable heads or eyes. . . . Every now and then, with an alarming bang, one of the Skrewt's ends would explode, causing it to shoot forward several yards. | After two months, the skrewts were about three feet long and extremely ill-tempered. When kept together, they attacked and killed each other. They developed gray, shiny armor and began to look like a cross between giant scorpions and elongated crabs. They still expelled fire from one end, although since they had no heads it was difficult to determine which end that was. This blast of flame shot the Skrewt in the opposite direction several yards. |

135.    Similarly, an entry for "Acromantula" could have succinctly described the

creature as:

'[A] gigantic and very terrifying spider' that is 'intelligent,'
'speaks with human speech' and who's venom is useful as a potion
ingredient…'

Dockets.Justia.com

as Mr. Vander Ark himself described the creature in his testimony. (4/15/08 Tr. (Vander Ark) at

377:24-378:5). Instead, the Lexicon copies nearly all of the unique and highly creative details

from Ms. Rowling's books, including important plot details revealed later in the *Harry Potter*

series:

> **Acromantula**
>
> A gigantic black spider (legspan may reach up to fifteen feet) with
> a poisonous bite, the Acromantula is an anomaly in the beast/being
> classification system. While capable of human speech, the
> Acromantula is classified as a beast rather than a being due to its
> violent tendencies. It is native to Borneo (FB), where it is believed
> to have been a wizard-bred species, serving as an example of why
> the Ban on Experimental Breeding was put into effect. While a
> student at Hogwarts, Hagrid raised an Acromantula named Aragog
> in the castle until he was found out, and he released it into the
> Forest (CS). An Acromantula was stationed at the center of the
> Triwizard Tournament maze, guarding the Triwizard Cup (GF31,
> OP16). Acromantulas fought on the side of the Death Eaters in the
> Battle of Hogwarts (DH32). (Pl. Ex. No. 1).

136.    Nor is this the only time that such extensive lifting takes place. It is

commonplace in the Lexicon to take far more than needed to succinctly describe an entry, such

as the entry for "Clankers." As Mr. Vander Ark himself admitted on the stand, it would be

possible "to do a shorter version" of the Lexicon's entries for a reference work. (4/15/08 Tr.

(Vander Ark) at 281:10-13). In fact, the Lexicon could have described "Clankers" as Mr.

Vander Ark did in his testimony, stating that they are:

> ...metal objects which are used to frighten a dragon. (4/15/08 Tr.
> (Vander Ark) at 281:5).

137.    The Lexicon entry, however, instead lists everything that Ms. Rowling

said about Clankers in the books, and even Mr. Vander Ark admits that the entry "uses many of

the same words" that Ms. Rowling used in her books. (4/15/08 Tr. (Vander Ark) at 280:12-16;

Pl. Ex. No. 101). A comparison of text from *Harry Potter and the Deathly Hallows* and the

Lexicon entry for "Clankers" shows the unnecessary plundering of every nugget of detail of Ms. Rowling's fictional facts:

| CLANKERS | |
|---|---|
| ***Harry Potter and the Deathly Hallows*** | **Lexicon Entry** |
| "…'It has learned to expect when the Clankers come. Give them to me.' Ron passed the bag to Griphook, and the goblin pulled out a number of small metal instruments that when shaken made a loud, ringing noise like miniature hammers on anvils…Harry could see it trembling, and as they drew nearer he saw the scars made by vicious slashes across its face, and guessed that it had been taught to fear hot swords when it heard the sound of the Clankers." (Pl. Ex. No. 47; 4/14/08 Tr. (Rowling) at 60: 14-19). | A number of small metal instruments, which when shaken make a loud, ringing noise like tiny hammers on anvil. Anyone visiting one of the high-security vaults at Gringotts must carry one of these, shaking it to make noise. The dragon guarding those vaults has been conditioned to back away at the sound, apparently by being taught to fear hot swords whenever it hears the Clankers (DH26). (Pl. Ex. No. 1). |

138.    In fact, Defendant's own expert witness, Professor Sorensen demonstrated that she could briefly describe the character "Albus Dumbledore" without using Ms. Rowling's words or providing vast details about the *Harry Potter* story.  Professor Sorensen described Albus Dumbledore as:

> [T]he master of Hogwarts in Harry's time there and for decades before that.  He's one of the main characters.  He's sort of very wise, almost a kind of father figure to Harry.  He is the leader of the sort of good force in the novel.  (4/16/08 Tr. (Sorensen) at 514:13-18.

139.    The Lexicon entry for Dumbledore, however, spans five pages and describes his career as headmaster at Hogwart's School of Witchcraft and Wizardry, puts forth details about his family life, explains his involvement in the Order of the Phoenix, provides details about his relationship with important characters such as Harry Potter, Severus Snape and

Tom Riddle, and reveals key plot points leading up to and including his murder by Professor Snape. The entry also includes lists of Dumbledore's characteristics, such as the character's "Skills and special knowledge" and "Appearance." (Pl. Ex. No. 1). It should be noted that the Lexicon does not provide citations for any of this material, other than five characteristics listed at the end of the entry.

140. Professor Sorensen admits that Lexicon entries often provide more detailed information about the element being described than would be necessary to remind a reader what an item was. (4/16/80 Tr. (Sorensen) at 544:16-20). The entry for "Bertie Bott's Every Flavor Beans," for example, could simply explain that they are:

> A favorite candy in the wizarding world, similar to jellybeans but with unexpected and sometimes disgusting flavors.

141. The entry for the Lexicon starts in similar fashion, but instead goes on at length to describe numerous instances where characters eat these sweets, as well as what flavors they got. The entry states:

### Bertie Bott's Every Flavor Beans

One of the most famous sweets in the wizarding world is Bertie Bott's Every Flavor Beans. These beans are essentially the same as Muggle jelly beans but with flavors that Muggles would never expect. Bertie Bott's Every Flavor Beans was creating by inventor Bertie Bott quite by mistake. His original purpose was to create tasty candies from food but he accidentally included a pair of dirty socks in his experiment. Bertie recognized the sales potential of a candy that presented "a risk with every mouthful!" (fw). According to Ron, there are ordinary flavors like chocolate and peppermint and marmalade, but also more adventuresome ones like spinach and liver and tripe (PS6). George said he'd had a booger-flavored one. Dumbledore said that, in his youth, he ate a vomit-flavored one and was put off Bertie Bott's Beans for quite a while. Eventually he tried what he thought might be a "nice toffee," only to discover that the flavor was actually ear wax (PS17). Bertie Bott's Every Flavor Beans are a popular sweet for kids at

Hogwarts. They buy them from the lunch trolley on the Hogwarts Express and from Honeydukes in Hogsmeade. They give them for Christmas gifts and as gifts when someone is ill and in the hospital wing. (Pl. Ex. No. 1).

b. **Use of Fictional Facts from the Companion Books**

142.     The restatement of Ms. Rowling's fictional facts is particularly egregious with regard to her Companion Books, which are short, non-narrative books that essentially already are a collection of fictional facts. (4/15/08 Tr. (Vander Ark) at 287:11-288:4) In many instances, these invented items appear nowhere in the seven *Harry Potter* books.

143.     As Ms. Rowling describes it, the Companion Books have been "plundered" by the Lexicon to such an extent that there is no reason for someone to want to buy or read them. (4/14/08 Tr. (Rowling) at 62:21-66:19)

144.     For example, the Lexicon contains over 250 entries taken from Ms. Rowling's Companion Book *Quidditch Through the Ages*, a book that is only 56 pages long. (Pl. Ex. Nos. 1, 2). Plaintiffs' Exhibit 43 is a 32-page chart comparing the text from *Quidditch Through the Ages* to the text from the Lexicon. (4/14/08 Tr. (Rowling) at 63:15-24; Pl. Ex. No. 43).

145.     For example, rather than simply describing the "Chudley Cannons" as "a Quidditch team," as Mr. Vander Ark did in his testimony, the Lexicon entry instead copies the entire description given by Ms. Rowling in *Quidditch Through the Ages*. (Pl. Ex. No. 43). At trial, when asked if the "Chudley Cannons" entry took everything that Ms. Rowling wrote about the team in *Quidditch Through the Ages*, Mr. Vander Ark conceded that it looked like the Lexicon entry "pretty much caught it all." (4/15/08 Tr. Vander Ark) at 288:20-21):

| CHUDLEY CANNONS | |
|---|---|
| (PL. EX. NO. 43) | |
| *Quidditch Through the Ages* | Lexicon Entry |
| The Cannons have won the League twenty-one times, but the last time they did so was in 1892 and their performance over the last century has been lackluster. The Chudley Cannons wear robes of bright orange emblazoned with a speeding cannon ball and a double 'C' in black. The club motto was changed in 1972 from 'We shall conquer' to 'Let's all just keep our fingers crossed and hope for the best'. | The Cannons wear orange robes with a speeding black cannon ball and a double letter C on them. They hail from Chudley. The cannons have won the league twenty-one times, but the last time was in 1892. As a result of this endless losing streak, the club motto, which used to be 'We shall conquer,' was changed in 1972 to 'Let's all just keep our fingers crossed and hope for the best (QA7).' |

146.     Similarly, the entry for "Annual Broom Race of Sweden" takes nearly the entire content of Ms. Rowling's own description for the event in *Quidditch Through the Ages*:

| ANNUAL BROOM RACE OF SWEDEN | |
|---|---|
| (PL. EX. NO. 43) | |
| *Quidditch Through the Ages* | Lexicon Entry |
| The celebrated annual broom race of Sweden dates from the tenth century. Fliers race from Kopparberg to Arjeplog, a distance of slightly over three hundred miles. The course runs straight through a dragon reservation and the fast silver trophy is shaped like a Swedish Short-Snout.... | This internationally-famous event, which started in the tenth century, takes place in Sweden. Contestants race from Kopparberg to Arjeplog, a route which takes them through a Swedish Short-Snout dragon reservation. The prize is an enormous silver trophy in the shape of a Swedish Short-Snout (QA2). |

147. Moreover, the Lexicon contains other entries relating to the Annual Broom Race of Sweden, which use even more of Ms. Rowling's fictional facts. (Pl. Ex. No. 1). For example:

**Arjeplog**

A small city in the foothills of the mountains in northern Sweden, Arjeplog has for over a millennium been the location of the finishing line for the annual broom race of Sweden (QA2). It is also less than three hundred miles away from a Swedish Short Snout dragon reservation, which is most likely in the higher parts of the mountains.

**Kopparberg**

Kopparberg, a town in central Sweden, is the starting line for the annual broom race of Sweden, which has run for over 1000 years (QA2).

148. Moreover, while *Quidditch Through the Ages* contains a table of Quidditch "fouls" wholly invented by Ms. Rowling, the Lexicon includes individual entries for all of the invented fouls contained in Ms. Rowling's chart. (Pl. Ex. No. 2, pp. 29-30). There is no scholarship relating to these entries. Rather, the Lexicon merely repackages these fictional facts about Quidditch for no purpose other than to restate them:

| QUIDDITCH FOULS (PL. EX. NOS. 1, 2) | | |
|---|---|---|
| **Foul** | ***Description Given in Quidditch Through the Ages*** | **Lexicon Entry** |
| blagging | seizing opponent's broom tail to slow or hinder | Quidditch foul: grabbing onto the broom tail of another player |
| blatching | flying with intent to collide | Quidditch foul: flying to intentionally collide with |

| | QUIDDITCH FOULS | |
|---|---|---|
| | (PL. EX. NOS. 1, 2) | |
| **Foul** | ***Description Given in Quidditch Through the Ages*** | **Lexicon Entry** |
| | | another player |
| blurting | locking broom handles with a view to steering opponent off course | Quidditch foul: locking broom handles with another player to pull him or her off course |
| bumphing | hitting Bludger towards crowd, necessitating a halt of the game as officials rush to protect bystanders… | Quidditch foul: intentionally hitting a Bludger toward the crowd in order to halt the game momentarily and thereby denying an opposing Chaser a score |
| cobbing | excessive use of elbows towards opponents | Quidditch foul: excessive use of elbows |
| flacking | sticking any portion of anatomy through goal hoop to punch Quaffle out. The Keeper is supposed to block the goal hoop from the front rather than the rear. | Quidditch Keeper foul: pushing any part of his or her body through a goal hoop to prevent a score |
| haversacking | hand still on Quaffle as it goes through goal hoop (Quaffle must be thrown) | Quidditch foul: called when the Quaffle goes through the hoop before it is released from the Chaser's hand (it must be thrown to score) |
| quaffle-pocking | tampering with Quaffle, e.g. puncturing it so that it falls more quickly or zigzags | A Quidditch foul applying to Chasers, which means a penalty for tampering with a Quaffle |
| snitchnip | any player other than Seeker touching or catching the Golden Snitch | Quidditch foul which happens when any other player than the Seeker touches the Golden Snitch |

| QUIDDITCH FOULS | | |
|:---:|:---:|:---:|
| **(PL. EX. NOS. 1, 2)** | | |
| **Foul** | ***Description Given in Quidditch Through the Ages*** | **Lexicon Entry** |
| stooging | more than one Chaser entering the scoring area<br><br>[ *"Stooging" is described in further detail elsewhere in* Quidditch Though the Ages *as:*]<br><br>'stooging' (see 'Fouls' below), a move by which two Chasers would enter the scoring area and ram the Keeper aside, leaving a goal hoop clear for the third Chaser . . ." | …It is a tactic where two Chasers ram the opposing Keeper aside so the third can score a goal |

149.     Similarly, with regard to Ms. Rowling's other Companion Book, *Fantastic Beasts and Where to Find Them*, over 200 Lexicon entries are derived from the 42-page encyclopedia-style book of creatures and beings. (4/15/08 Tr. (Vander Ark) at 287:20-22; Pl. Ex. Nos. 1, 3). Plaintiffs' Exhibit 44 is a 16-page chart comparing the text from *Fantastic Beasts and Where to Find Them* to the text from the Lexicon. (4/14/08 Tr. (Rowling) at 65:17-20; Pl. Ex. No. 44).

150.     Mr. Vander Ark admitted that by taking extensively from the Companion Books, the Lexicon could detract from their sales. (4/15/08 Tr. (Vander Ark) at 287:5-8). Shortly before trial, in a tacit admission that the Lexicon's planned entries were too long and took too much, Mr. Vander Ark and RDR revised certain of these entries to a limited extent. (4/15/08 Tr. (Vander Ark) at 382:6-383:10). However, even these revised entries take too much

of Ms. Rowling's fictional facts without adding any commentary, analysis or context. For example:

| BELBY, FLAVIUS (PL. EX. NO. 44) | |
|---|---|
| *Fantastic Beasts and Where to Find Them* | **Lexicon Entry** |
| The earliest account we have of a Lethifold was written by the wizard Flavius Belby, who was fortunate enough to survive a Lethifold attack in 1782 while holidaying in Papua New Guinea… "summoning the memory of the day I had been voted President of the local Gobstones Club…" As Belby so dramatically reveals, the Patronus is the only spell known to repel the Lethifold. | (1715 - 1791) Survived a Lethifold attack while in Papua New Guinea in 1782. He wrote about the experience, revealing for the first time the existence of this terrible creature and also the fact that a Patronus Charm will drive a Lethifold away. Belby had at one time been voted the president of the local Gobstones Club (fw, FB). |

151. In another example, the Lexicon's entry for "Pogrebin" lifts and describes all of the details that Ms. Rowling has given about her invented creature:

| POGREBIN (PL. EX. NOS. 1, 3) | |
|---|---|
| *Fantastic Beasts and Where to Find Them* | **Lexicon Entry** |
| The Pogrebin is a Russian demon, barely a foot tall, with a hairy body but a smooth, oversized gray head. When crouching, the Pogrebin resembles a shiny, round rock. Pogrebins are attracted to humans and enjoy tailing them, staying in their shadow and crouching quickly should the shadow's owner turn around. If a Pogrebin is allowed to tail a human for many hours, a sense of great futility will | These annoying little creatures are native to Russia. They love to follow people around, infusing them with a sense of hopelessness until the human collapses, at which point the pogrebin attempts to devour them. The Pogrebin resembles a grey rock with a small hairy body and it hides by crouching down and pretending to be nothing but a harmless stone (FB). |

| overcome its prey, who will eventually fall intoa state of lethargy and despair. When the victim stops walking and sinks to their knees to weep at the pointlessness of it all, the Pogrebin will leap upon them and attempt to devour them. However, it is easy to repulse the Pogrebin with simple hexes or Stupefying Charms. Kicking has also been found effective. | |
| --- | --- |

### c.   **Use of Fictional Facts from other *Harry Potter* Works**

152.   The Lexicon similarly lifts nearly all of the fictional facts in "The Daily Prophet," a fan club newsletter that Ms. Rowling created while living in the United Kingdom in 1998. (4/14/08 Tr. (Rowling) at 73:19-74:3).

153.   For example, the Lexicon entry for "Brevis Birch" restates fictional facts from a "report" found in one of "The Daily Prophet" newsletters and adds no commentary or analysis:

| BREVIS BIRCH (PL. EX. NO. 46) | |
| --- | --- |
| **"The Daily Prophet"** | **Lexicon Entry** |
| Tornados' captain Brevis Birch, meanwhile, blamed the Tornados' narrow defeat on a bout of sleeping sickness that has been affecting his Keeper, Mervyn Fenwick. | Captain of the Tutshill Tornados who blamed their loss to the Ballycastle Bats on a bout of sleeping sickness that affect the Keeper (DP2) |

154.   In another example, the Lexicon's entry for "Bodrig the Boss-Eyed" not only lifts more of Ms. Rowling's fictional facts than necessary, but does so using nearly verbatim language, and again, there is no commentary or analysis:

49

| BODRIG THE BOSS-EYED |
|---|
| **(PL. EX. NO. 46)** |

| "The Daily Prophet" | Lexicon Entry |
|---|---|
| Bodrig the Boss-Eyed, spokesgoblin for the organization, told reporters at the scene, 'B.O.G. cannot condone the use of violence to further its aims.' He was grinning broadly as he spoke, however, and waved cheerily to those goblins who were being led away in chains…. | Bodrig is the spokesgoblin of the Brotherhood of Goblins. He told the Daily Prophet that B.O.G. does not condone violence, all the while waving cheerily to those goblins being led away in chains for their violent behavior (DP3). |

### d.   Fictional Facts Taken from the Famous Wizard Cards

155.   The Lexicon also copies the text from Ms. Rowling's Famous Wizard Cards "wholesale." (4/14/08 Tr. (Rowling) at 76:12-14, 77:7-9). The Lexicon simply duplicates the fictional facts and language of the cards in their entirety without any commentary or analysis.

156.   For example, entries for "Andros the Invincible," "Thaddeus Thurkel," and "Archibald Alderton" all show this kind of copying:

| ANDROS THE INVINCIBLE |
|---|
| **(PL. EX. NO. 45)** |

| Famous Wizard Cards | Lexicon Entry |
|---|---|
| Ancient Greek. Alleged to have been the only known wizard to produce a Patronus the size of a giant. | This ancient Greek wizard is alleged to have produced a Patronus the size of a giant (fw). |

| THADDEUS THURKEL | |
|---|---|
| (PL. EX. NO. 45) | |
| **Famous Wizard Cards** | **Lexicon Entry** |
| 1632 - 1692.<br><br>Famous for producing seven Squib sons and turning them all into hedgehogs in disgust. | (1632 - 1692)<br><br>A wizard who had seven sons, all Squibs, whom he promptly turned into hedgehogs (fw). |

| ARCHIBALD ALDERTON | |
|---|---|
| (PL. EX. NO. 45) | |
| **Famous Wizard Cards** | **Lexicon Entry** |
| 1568 - 1623.<br><br>Famous for blowing up the hamlet of Little Dropping in Hampshire whilst attempting to magically mix a birthday cake. | (1568 - 1623)<br><br>Famous for blowing up the hamlet of Little Dropping in Hampshire while attempting to magically mix a birthday cake (fw).<br><br>*And also:*<br><br>**Hampshire**<br><br>Hampshire, a county in southern England, is the site of the hamlet of Little Dropping - or at least it was until Archibald Alderton blew it up while trying to mix a birthday cake there (fw). |

157.    In tacit recognition that the Lexicon was taking too much from the Famous Wizard Cards, Mr. Vander Ark testified at trial that he had an oral license to post the Famous Wizard Cards on the Lexicon Website from some person whose name he did not remember who he claims used to work for Electronic Arts. (4/15/08 Tr. (Vander Ark) at 292:12-19). While Mr.

Vander Ark refers to the Famous Wizard Cards in his pre-trial declaration, he did not mention

this alleged license, nor did RDR reference it in any of its pre-trial submissions (Def. Ex. No.

502 at ¶ 14). Mr. Vander Ark admits that he has no documents to corroborate that this oral

license was, in fact, obtained. (4/15/08 Tr. (Vander Ark) at 292:3-9). He also admitted that he

never sought permission to use the cards in a printed book as opposed to on the free fan site.

(4/15/08 Tr. (Vander Ark) at 293:13-15).

### 4. **The Lexicon Contains Extensive Plot Summary**

158. The Lexicon also copies Ms. Rowling's works by its extensive use of plot

summaries detailing what happens in the *Harry Potter* books. (4/14/08 Tr. (Rowling) at 60:20-

61:3; 4/16/08 Tr. (Johnson) at 592:14-22, 611:13-22, 623:4-624:11). These plot summaries

occur both in connection with large entries describing certain events and objects in the novels,

such as "Triwizard Tournament" and "Deathly Hallows," as well as entries about various

characters in the books. (Pl. Ex. No. 1). For example, the Lexicon entries for main characters

such as Harry Potter, Hermione Granger and Ron Weasley span numerous pages and recount key

events from each of the seven *Harry Potter* novels. (4/14/08 Tr. (Rowling) at 61:2-3; 4/16/08

Tr. (Johnson) at 592:17-22; Pl. Ex. No. 11 at ¶¶ 4-10).

159. The character entries detail what happens to that character in a manner

much more extensive than would be necessary for character analysis. The entries dealing with

major characters, as well as many of the minor characters, provide "a summary of events that the

character is engaged in" and, therefore, constitute standard plot summaries. (4/16/08 Tr.

(Johnson) at 611:21-22). Professor Johnson distinguished these plot summaries from character

analysis, as the latter would normally present just the events needed to describe and discuss a

character, and not provide in detail the vast extent of plot summary used in the Lexicon.

52

(4/16/08 Tr. (Johnson) at 610:23-613:14). Professor Johnson further testified that while a character description might allude to events that affect that character, the extent of plot summary used by the Lexicon far exceeds that necessary to do so, noting that "[i]t's entirely possible to do that without giving the complete trajectory of the events that the character goes through." (4/16/08 Tr. (Johnson) at 612:17-613:1, 614:17-19, 615:8-19).

160.    As mentioned above, RDR's own expert Professor Sorensen, when asked who Dumbledore was, described him as, "the master of Hogwarts in Harry's time there and for decades before that. He's one of the main characters. He's sort of very wise, almost a kind of father figure to Harry. He is the leader of the sort of good force in the novel." (4/16/08 Tr. (Sorensen) at 514:15-18). As discussed above, however, the Lexicon entry for "Dumbledore" spans 5 pages and details the story of his childhood, his interactions with Tom Riddle, his relationship with Harry Potter, Severus Snape and Gellert Grindlewald, and even reveals his death at the hands of Snape. (Pl. Ex. No. 1).

161.    Similarly, Professor Johnson was able to describe the entry for "Lord Voldemort," the main villain in the *Harry Potter* series, in two short sentences, saying that Voldemort was "the Dark Lord, Head of the Death Eaters. Harry's nemesis or hoped-to-be nemesis." (4/16/08 Tr. (Johnson) at 624:15-17). Instead of a succinct entry like this, the Lexicon entry goes on for nine pages, detailing what happens to the character, giving away plot "spoilers," and including far more plot than necessary for character analysis.

162.    The "Lord Voldemort" entry begins by providing the pre-story for the character, which is included in the sixth *Harry Potter* book, giving background into the character as a child. (4/14/08 Tr. (Rowling) at 146:10-13). The entry then goes on to detail chronologically all of the events surrounding this character in the *Harry Potter* story from books

one through seven, and also gives an account of this character's death in the last *Harry Potter* book. (4/14/08 Tr. (Rowling) at 62: 12-20; 4/16/08 Tr. (Johnson) at 623:6-624:11).

163. Most striking, however, is the Lexicon entry for "Harry Potter." That entry is 11 pages long and provides the key plot points from all seven *Harry Potter* books. (Pl. Ex. No. 11 (Birchall Decl.) at ¶ 5).

164. The "Harry Potter" entry chronicles each year of the Harry Potter character's life at the fictional Hogwarts School, providing the reader with all of the main events of the story through all seven of Ms. Rowling's novels, leading up to Harry Potter's final battle with Lord Voldemort. (Pl. Ex. No. 11 (Birchall Decl.) at ¶ 5).

165. Thus, the "Harry Potter" entry retells the entire story as it is presented in the seven *Harry Potter* novels, and also reveals the ending to the series. (Pl. Ex. No. 11 (Birchall Decl.) at ¶ 5).

166. Similarly, the entry for "Severus Snape" is six pages long and recounts all of the major and minor plot points surrounding this character, including the fact that he is ultimately killed by Lord Voldemort. (Pl. Ex. No. 11 (Birchall Decl.) at ¶ 5).

167. Other entries similarly retell major plot points and take significantly more than is necessary to provide character sketches or define the terms that Ms. Rowling uses. (4/16/08 Tr. (Johnson) at 621:1-11). For example, the entries for "Sirius Black," "Dobby," "Hermione Granger," "Rubeus Hagrid," "Kreacher," "Bellatrix Lestrange," "Xenophilus Lovegood," "Remus Lupin," "Draco Malfoy," "Lucius Malfoy," "Narcissa Malfoy," "Sibyll Trelawney," "Dolores Umbridge," "Lord Voldemort," and "Ron Weasley" and the other

members of the Weasley family taken together retell virtually every major plot point in the *Harry Potter* series. (Pl. Ex. No. 1).

168. Mr. Vander Ark admits that "spoilers" are a term of art meaning plot summaries that, if disclosed, would ruin reading the story for fans. (4/15/08 Tr. (Vander Ark) at 305:14-306:1, 306:16-25). Mr. Vander Ark also admits that someone reading the plot points that he admits are in the Lexicon manuscript would learn the outcome of those stories, such as who lived or who died at the end of a later book. (4/15/08 Tr. (Vander Ark) at 306:19-25).

169. Yet Mr. Vander Ark attempts to justify the inclusion of these plot points and spoilers by suggesting that the Lexicon book would only be read by people who have already read all seven of the *Harry Potter* novels. (4/15/08 Tr. (Vander Ark) at 307:2-4). But there is no reason to think that the readership would be so limited. In fact, RDR's own expert, Professor Sorensen, testified that she believed the Lexicon could be read in conjunction with a "first reading" of one of the *Harry Potter* books. (Def. Ex. No. 503 at ¶ 14).

170. In sum, the Lexicon book contains synopses and abridgements of the plots and story lines of the *Harry Potter* books, retelling the entirety of the *Harry Potter* story from beginning to end and revealing the ultimate outcome of the series. (4/16/08 Tr. (Rowling) at 649:7-23).

## T. The Lexicon Fails To Serve Any Of The Purposes Identified By RDR

171. RDR has struggled to identify the true "purpose" of the Lexicon, initially characterizing the Book as a scholarly work in its pre-trial papers, and then at trial primarily characterizing the Lexicon as a type of memory aid or reference work. (4/14/08 Tr. at (Rowling) at 123:23-124:4; (Rapoport) at 223:18-224:8; 4/15/08 Tr. at (Vander Ark) at 283:13-14, 283:23-284:11; 4/16/08 Tr. (Sorensen) at 504:16-23). However, as the testimony shows, the Lexicon

fails in each of these purposes and, moreover, RDR cannot justify the amount of Ms. Rowling's work used relative to the purported purposes.

1. **The Lexicon Is Not a Work of Scholarship And Contains Virtually No Criticism, Commentary, or Analysis**

172. Plaintiffs' expert, Professor Johnson, closely reviewed Defendant's Lexicon in its entirety, examining all 2,437 entries. (Pl. Ex. No. 17 (Johnson Decl.) ¶ 2). Based on her thorough review, Professor Johnson concluded that the Lexicon "could not reasonably be classified as a work of scholarship or of research as the term is commonly used in the field of scholarly publishing." (Pl. Ex. No. 17 (Johnson Decl.) ¶ 2).

173. Professor Johnson explained that in order to qualify as research or scholarship, "a work must possess some degree of originality or invention." (Pl. Ex. No. 17 (Johnson Decl.) ¶ 4). The Lexicon, however, "lacks any degree of originality or inventiveness," containing only a *de miminus* amount of information that is not the original creation of Ms. Rowling. (Pl. Ex. No. 17 (Johnson Decl.) ¶ 5).

174. The Lexicon provides virtually no independent analysis of the *Harry Potter* books—no mention of the themes, metaphors or literary devices. (Pl. Ex. No. 17 (Johnson Decl.) ¶ 5). Even at the most basic level, the Lexicon does not take advantage of opportunities to analyze or comment on the *Harry Potter* works. (4/16/08 Tr. (Sorensen) at 543:10-17; 4/14/08 Tr. (Rowling) at 67:18-68:1).

175. For example, the Lexicon entry on "Death" merely restates that in a children's story that is referred to in the *Harry Potter* novels, the "character of Death accosted three brothers." (Pl. Ex. No. 1). The Lexicon makes no effort to comment on the theme of death

throughout the *Harry Potter* books, which, as Ms. Rowling testified, is a central theme in the *Harry Potter* series. (4/14/08 Tr. (Rowling) at 69:9-70:3).

176. The Lexicon merely rehashes the people, places and things from Ms. Rowling's universe, placing them in alphabetical order -- rearranging her "intellectual 'furniture'" in a wholly unoriginal manner. (Pl. Ex. No. 17 (Johnson Decl.) ¶ 10). Worse still, the Lexicon lifts material from Ms. Rowling's books word-for-word and yet fails to use quotation marks or provide proper attributions (4/14/08 Tr. (Rowling) at 60:24-61:2) -- a hallmark of true scholarship. (4/16/08 Tr. (Johnson) at 617:16-618:3, 618:20-22).

177. RDR's own expert, Professor Sorensen, admits that the Lexicon book is not a work of scholarship. (4/16/08 Tr. (Sorensen) at 538:14-15).

178. Professor Sorensen also testified that in terms of "critical commentary, interpretive information or interpretive commentary," the Lexicon "does not provide that, most of the entries don't." (4/15/08 Tr. (Sorensen) at 543:10-17).

179. Similarly, according to Mr. Vander Ark, commentary and analysis are not the purpose of the Lexicon (4/15/08 Tr. (Vander Ark) at 283:8-14). He also admits that the Lexicon does not spend much time trying to analyze the *Harry Potter* books. (4/15/08 Tr. (Vander Ark) at 284:17-19).

180. In the course of her analysis, Professor Johnson quantified exactly how little the Lexicon entries provide in terms of analysis, commentary or additional material. She testified that of the Lexicon's 2,437 entries, 2,034 entries simply lift information straight out of the *Harry Potter* books with no commentary or analysis added. (4/16/08 Tr. (Johnson) at 602:19-603:10; (Johnson Supp. Decl.) ¶ 6). Of the remaining 403 entries, many include nothing

more than a single line or phrase of material that does not originate with Ms. Rowling, with the rest of the entry extensively paraphrasing or quoting Ms. Rowling's fictitious facts, plots and storylines. (4/16/08 Tr. (Johnson) at 602:19-603:10; Pl. Ex. No. 28 (Suppl. Johnson Decl.) at ¶¶6-9).

181.    Moreover, the portions of the entries that Professor Johnson credited as having some degree of non-Rowling material contain sporadic and often inaccurate etymologies, facetious comments, statements of the obvious or "continuity" errors (called "flints") in the text that even when taken together are insignificant. (4/16/08 Tr. (Johnson) at 604:1-4, 606:7-18, 607:16-19, 608:18-609:3).

a.    **Etymologies**

182.    As noted above, Profession Johnson describes Ms. Rowling as a nominative genius with respect to her ability to generate nouns, most of which are derived from foreign languages. (4/16/08 Tr. (Johnson) at 598:3-8). Thus, the *Harry Potter* works offer countless opportunities for Mr. Vander Ark to engage with the language and provide his readers with etymological information regarding these invented terms. The Lexicon's etymological references, however, are sporadic and rare, covering only a fraction of the terms in the Book. (4/14/08 Tr. (Rowling) at 67:7-17; 4/15/08 Tr. (Vander Ark) at 296:14-297:7; 4/16/08 Tr. (Sorensen) at 554:24-555:1, (Johnson) 597:7-598:20, 608:18-609:19; Pl. Ex. No. 28 (Johnson Supp. Decl.) at ¶¶ 10-11).

183.    The Lexicon misses obvious opportunities to provide the reader with additional information. For example, as Ms. Rowling testified, in the "Lupin, Remus" entry, the Lexicon fails to note the fact that "Lupin" (a character in *Harry Potter* who is a werewolf) comes

58

from "lupine" or wolf-like and that "Remus" is derived from the legend of Romulus and Remus -
- two brothers who were raised by wolves. (4/14/08 Tr. (Rowling) at 72:16-22).

184.    Similarly, as Professor Johnson testified, the Lexicon also makes no
attempt to provide an etymology for "Xenophilius Lovegood." (4/16/08 Tr. (Johnson) at 609:9-
23). As Professor Johnson explains, "xeno" means strange or foreign and "philius" means one
who love strange or foreign things" (4/16/08 Tr. (Johnson) at 609:12-19). As the character
Xenophilius Lovegood is the "embodiment of the figure who loves things which are strange or
foreign," "the name goes absolutely to its purpose." (*Id.*)

185.    Moreover, many of the etymologies that the Lexicon actually provides are
incorrect. *See* (4/16/08 Tr. (Johnson) at 597:7-17, 598:21-600:4). For example, "Fenrir" is not
"the gigantic wolf of the God Loki," as is stated in the Lexicon, but a "gigantic wolf, *son* of
Loki." (Pl. Ex. No. 28 (Rowling Supp. Decl.) at ¶ 11). Likewise, "Anapneo" does not mean
simply "breathe," it means "breathe again" as in "recover breath," and thus is a particularly
appropriate form of spell to be used when someone is choking. (Pl. Ex. No. 28 (Rowling Supp.
Decl.) at ¶ 12).

186.    Ms. Rowling also noted that the Lexicon incorrectly states that the term
"Alohomora" is derived from the Hawaiian word "aloha," meaning "good-bye." (4/14/08 Tr.
(Rowling) at 105: 13-17). In fact, the term "Alohomora" is an actual word from the Sidiki
language of West Africa, meaning "favorable to thieves," which as Ms. Rowling testified is "a
very appropriate meaning for a spell that enables you to unlock a locked door by magic."
(4/14/08 Tr. (Rowling) at 105: 17-22). Mr. Vander Ark admits that he simply made his "best
guess" when crafting this and other etymologies. (4/15/08 Tr. (Vander Ark) at 380:8-11).

b.   **Facetious Comments And Statements of The Obvious**

187.    Other entries in the Lexicon simply contain facetious comments (e.g., "Junk Shop": "A shop in Diagon Alley filled with, well junk") or simply restate the obvious (e.g., "Bandon": "presumably the home of the Bandon Banshee"). (4/16/08 Tr. (Johnson) at 604:1-14, 607:16-608:8; Pl. Ex. No. 28 at ¶ 9). Such sophomoric asides do nothing to add value or shed any real light on the novels. (4/16/08 Tr. (Johnson) at 609:4-8).

c.   **Insignificant Adverbs**

188.    As Professor Johnson explained, Mr. Vander Ark would sometimes add adverbs such as "unfortunately," "sadly," or possibly" to Lexicon descriptions otherwise wholly derived from the *Harry Potter* books. This, as Professor Johnson says, is a "very facile way of changing what is really plot summary or paraphrase to something that looks like interpretation." (4/16/08 Tr. (Johnson) at 606:7-18; Pl. Ex. No. 28 at ¶¶ 7-8). It does not add any actual analysis or commentary. *Id*.

d.   **Flints**

189.    Although Professor Sorensen suggests that the Lexicon adds value to the reader by pointing out errors or "flints" in the continuity of the story, Mr. Vander Ark admitted that there are "remarkably few" flints reported in the Lexicon manuscript. (4/15/08 Tr. (Vander Ark) at 297:15-298:4; 4/16/08 Tr. (Sorensen) at 534:9-16, 558:25-559:3; Def. Ex. No. 503 at ¶¶ 23-24).

\*        \*        \*

190.    Especially considering the Lexicon*'s* scant analysis, the Lexicon takes much more than is necessary from Ms. Rowling's original works for the purpose of commentary or criticism. (4/16/08 Tr. (Johnson) at 600:5-601:4; (Rowling) 649:7-21, 651:2-5). As is

discussed infra, there are guides on the market that take far less than the Lexicon does, but use such material as a jumping off point for further commentary, criticism or analysis of the *Harry Potter* works. (4/14/08 Tr. (Rowling) at 83:10-25; 85:9-15; 87:2-12; 88:4-6; Pl. Ex. Nos. 73-75, 192). The Lexicon, on the other hand, takes all of Ms. Rowling's fictional facts and repackages them with little attempt at analysis or commentary and thus the work takes too much to legitimately serve any scholarly purpose. (4/16/08 Tr. (Johnson) at 602:19-603:10, 606:3-18; Pl. Ex. No. 28 (Suppl. Johnson Decl.) at ¶¶6-9).

### 2. The Lexicon Does Not Serve the Purpose of a Reference Guide to the *Harry Potter* Works

#### a. The Lexicon Takes Too Much to Serve as A Legitimate Memory Aid.

191. In her declaration and her testimony, Professor Sorensen stated that the Lexicon served as a useful memory aid to remind first-time readers of a character or a creature as they read through the seven *Harry Potter* books. (4/14/08 Tr. (Sorensen) at 504:24-505:9, 540; Def. Ex. No. 503 (Sorensen Decl.) at ¶¶ 14). If the Lexicon *'s* main purpose was to refresh a reader's memory, however, it would provide no more than a thumbnail sketch of the characters, creatures, places and things from the *Harry Potter* books. (4/14/08 Tr. (Rowling) at 648:12-17).

192. Instead of simply providing a thumbnail sketch, however, the Lexicon retells all of the plots and storylines surrounding a particular character, revealing the ultimate outcome of the series. (4/16/08 Tr. (Johnson) at 624:12-17). The Lexicon also restates in detail all of Ms. Rowling's creative fictional facts, repacking the people, places and things in her books. (4/16/08 Tr. (Johnson) at 602:19-603:10, 606:3-18; Pl. Ex. No. 28 (Suppl. Johnson Decl.) at ¶¶6-9). Thus, the Lexicon provides much more information than is necessary to serve the purpose of a memory aid. (4/16/08 Tr. (Johnson) at 624:12-17, 649:7-11).

193. At trial, Professor Sorensen testified that the Lexicon entries could be described as "thumbnail sketch[es]." (4/16/08 Tr. (Sorensen) at 544:20-21; Def. Ex. No. 503 (Sorensen Decl.) at ¶ 32). However, upon cross examination, Professor Sorensen admitted that entries such as "Bertie Bott's Every Flavor Bean" contained much more than was necessary to succinctly describe the term and remind the reader of its meaning. (4/16/08 Tr. (Sorensen) at 544:13-20). Professor Sorensen herself provided an example of how a character (*e.g.*, "Buckbeak") could be succinctly described without taking so much of Ms. Rowling's language. (4/16/08 Tr. (Sorensen) at 545:8-11). As is discussed supra herein, the Lexicon repeatedly contains long, detailed entries when shorter entries would be possible. See Findings of Fact ¶¶ 161-164.

194. Moreover, by providing so much information in such great detail, the Lexicon not only provides the reader with Ms. Rowling's copyrighted expression, including detailed plot descriptions, regarding a character, but also works to "spoil" the story for first-time readers. (4/16/08 Tr. (Rowling) at 649:7-21; 4/16/08 Tr. (Johnson) at 624:12-17, 649:7-11).

195. Also undermining the idea that the Lexicon is meant to serve as a memory aid is the fact that it contains entries for items and elements that appear only once in the *Harry Potter* books or only in the Companion Books, "The Daily Prophet" newsletters and Famous Wizard Cards (and nowhere in the *Harry Potter* books) and for which no memory aid is necessary. (4/14/08 Tr. (Rowling) at 68:23-69:3) A reader who looked up any of these entries would merely receive the same information that they could have obtained from the works themselves. (4/14/08 Tr. (Rowling) at 68:15-69:8; 4/16/08 Tr. (Johnson) at 604:1-14, 604:19-605:3, 605:11-17).

### b. **The Lexicon Lacks Any of the Features of a Proper Reference Guide**

#### (1) **The Lexicon Is Not An Encyclopedia**

196. Mr. Vander Ark claims that the Lexicon is intended to be an encyclopedia. (4/15/08 Tr. (Vander Ark) at 338:15-16).

197. An encyclopedia, however, is based on research and includes extensive etymologies, histories, biographies, essays and analysis, all of which the Lexicon lacks. (4/16/08 Tr. (Johnson) at 587:25-588:19). A true encyclopedia does not simply reorder another individual's work without adding additional research or scholarly analysis. (Id.). Thus, the Lexicon does not function as an encyclopedia as it merely quotes and restates Ms. Rowling's work, adding meager, if any, additional information. (Pl. Ex. No. 17 (Johnson Decl.) ¶ 10).

#### (2) **The Lexicon Is Not A Ready-Reference Book.**

198. The Lexicon does not work as a "ready-reference" book -- a type of book that contains information that is succinctly distilled and often alphabetically arranged. (4/15/08 Tr. (Johnson) at 590:12-23). Rather than providing succinct definitions of terms, the Lexicon provides extensive plot summaries, restatements of fictional facts, and substantial, unattributed quoting and paraphrasing of Ms. Rowling's original works. (4/16/08 Tr. (Johnson) at 591:1-9).

199. As noted above, even Mr. Vander Ark admits that it is possible to define the terms from the *Harry Potter* universe more succinctly than the Lexicon does. (4/15/08 Tr. (Vander Ark) at 281:5). As Mr. Vander Ark has chosen to include entries that far exceed succinct descriptions, the Book does not aid readers as a ready reference book would.

200. In addition, a ready reference guide would normally provide entries on historical contexts, essays, and a much higher level of commentary than the Lexicon, but would

not take in substance or quantity from the primary text to the extent that the Lexicon does. (4/16/08 Tr. (Johnson) at 587:4-12). The Lexicon does not do this and thus it does not operate as a ready-reference.

### (3)    The Lexicon Is Not A True Lexicon

201.    The Lexicon does not serve the purpose of a true lexicon as that term is generally defined. (4/16/08 Tr. (Johnson) at 588:23-589:10). A lexicon is a dictionary or word list that would have information about those words -- such as etymologies or pronunciations -- systematically and uniformly given. (4/16/08 Tr. (Johnson) at 589:4-9). It would succinctly explain information about a word. (4/16/08 Tr. (Johnson) at 589:11-19). It would not simply restate whatever an author said about a term in a book. *Id.* Even Mr. Vander Ark admits that the Lexicon is not a true lexicon and does not assist readers as a true lexicon would. (4/15/08 Tr. (Vander Ark) at 338:25-339:8).

### (4)    The Lexicon Is Not An Index

202.    The Lexicon could also not be used as an index. (4/16/08 Tr. (Johnson) at 591:25-592:1; 4/15/08 Tr. (Vander Ark) at 393:7, 394:14). An index provides an alphabetical listing of all of the elements of a text, including the name of the term and the "exact citational reference for every occurrence of that character" or term. (4/16/08 Tr. (Johnson) at 592:3-9). An index also would provide at most a line of explanation or direct quotation from the underlying text in quotation marks. (4/16/08 Tr. (Johnson) at 593:13-18).

203.    The Lexicon does not provide the reader with a reference to the first time a particular character or term appears within the *Harry Potter* books, nor does it provide an exhaustive list of all of the pages or chapters in which a character or term appears. (4/14/08 Tr. (Rowling) at 147: 8-18). For example, the character Gilderoy Lockhart plays a key role in the

second *Harry Potter* book, but after that he appears only once in the fifth *Harry Potter* novel. (4/14/08 Tr. (Rowling) at 147:6-18). The Lexicon entry for this character, however, only cites to the fifth *Harry Potter* book, failing to inform the reader of this character's first and most significant appearance. (4/14/08 Tr. (Rowling) at 147:6-18; Pl. Ex. No. 1).

204.    Mr. Vander Ark admitted that "The Lexicon book is not intended to be exhaustive." (4/15/08 Tr. (Vander Ark) at 278:13).

205.    Mr. Vander Ark also admitted that an index to the *Harry Potter* novels would not need to reproduce Ms. Rowling's prose and fictional facts, and that the "Lexicon includes more of Ms. Rowling's copyrighted expression than would be necessary to do an index." (4/15/08 Tr. (Vander Ark) at 392:24-393:8).

206.    The Lexicon also cannot function as an index as it does not cite to pages, providing only incomplete citations to some of the chapters from which the material is lifted. (4/16/08 Tr. (Johnson) at 592:23-593:12). Although Mr. Vander Ark tried to excuse this because of the existence of varying editions of the *Harry Potter* books, this reasoning flawed. First, the hardback and paperback editions of the *Harry Potter* books have the same pagination. (4/14/08 Tr. (Johnson) at 595:20-23). Second, as Professor Johnson testified, even where a book has multiple editions, such as an English edition and an American edition, it is common practice for reference guides to include page citations, either by assigning a letter to each edition or by specifying a standard edition and providing a conversion table for other editions. (4/16/08 Tr. (Johnson) at 594:11-16, 594:20-595:3). These conventions are "very, very simple" and are "done all the time to help in exactly these kinds of situations." (4/16/08 Tr. (Johnson) at 594:14-15).

207.    Overall, the Lexicon fails to serve any of the purposes identified by Defendant because the Book takes too much of Ms. Rowling's original material and uses it in a manner that is, as Ms. Rowling describes, both "sloppy" and "lazy," taking her work wholesale without making any significant contribution in terms of analysis or commentary. (4/14/08 Tr. (Rowling) at 56:1-17).

**U.    Other Companion Guides Indicate That It Is Possible To Create a Companion Guide That Copies Less and Adds More Original Content**

208.    The evidence presented at trial regarding the many examples of companion books available on the market shows that it is possible to create a companion guide to Ms. Rowling's works that (1) does not copy as much of her prose or restate all of her fictional facts, as does the Lexicon, and (2) adds far more commentary, analysis, and other original content than does the Lexicon.

**1.    Companion Guides to Works By Other Authors that Dr. Sorensen Cites Are Different From the Lexicon**

209.    Professor Sorensen admits that it is possible to create a companion guide to Ms. Rowling's works that takes less of her prose and fictional facts and adds more analysis and reference material. (4/16/08 Tr. (Sorensen) at 551:2-17).

210.    Citing numerous companion books on the market based on works other than *Harry Potter*, Professor Sorensen testified that there is a long tradition of companion books, and attempted to classify the Lexicon as part of that tradition. (Def. Ex. No. 503 at ¶¶ 2-13.) But she admitted that none of the books cited in her declaration take as much of the author's work as the Lexicon takes from Ms. Rowling's work. (4/16/08 Tr. (Sorensen) at 562:23-563:3).

211.    Professor Sorensen also admits that there is a value to an author writing a companion guide to his or her own works. (4/16/08 Tr. (Sorensen) at 565:5-7, 13-18).

212.     Professor Johnson testified that no other companion book she was aware of took as much of an author's work as the Lexicon takes from Ms. Rowling. (4/16/08 Tr. (Johnson) at 587:13-17).

213.     Regarding the specific books cited in Professor Sorensen's declaration, Professor Johnson concluded that they are easily distinguished from the Lexicon, not only because they add substantial original commentary and analysis, but also because in some cases they are based on works in the public domain or were even written in conjunction with or with the permission of the copyright owner. (Pl. Ex. No. 28 at ¶5). At trial, both Professors Johnson and Professor Sorensen were shown some of those books and testified regarding how they differed from the Lexicon. (4/16/08 Tr. (Sorensen) at 564:1-12, 571:2-24, 576:2-577:15; 4/16/08 Tr. (Johnson) at 624:23-626:14, 627:15-631:7). Even a casual review of those books indicates that, in addition to taking less of the original authors' prose and fictional facts, they also add far more commentary, analysis, etymological research, or other original insight than does the Lexicon. (*See generally* Def. Ex. Nos. 55, 59, 60, 61, 62, 64).

2.     **Other Companion Guides Based on Ms. Rowling's Works Are Different From the Lexicon**

214.     The testimony and documentary evidence presented at trial also show that other alphabetical *Harry Potter* guides currently available on the market are different from the Lexicon. Those books, unlike the Lexicon, reflect substantial research from outside sources and incorporate new data, taking only so much of Ms. Rowling's work as is needed to analyze the elements of the *Harry Potter* books. (4/14/08 Tr. (Rowling) at 83:17-84:8, 84:23-85:15, 86:19-87:12, 88:15-89:6, 90:13-91:23; 4/16/08 Tr. (Sorensen) at 551:13-17).

215.    For example, the alphabetized guide titled *Fact, Fiction, and Folklore in Harry Potter's World*, by George Beahm (Pl. Ex. No. 74), provides the reader with additional information and analysis than one would obtain by simply reading the *Harry Potter* books, while the Lexicon does not. (4/14/08 Tr. (Rowling) at 85:9-15). For example, the *Fact, Fiction, and Folklore* entry on "Florean Fortescue's Ice Cream Parlor" states briefly where this ice cream parlor appears in the *Harry Potter* story and why it is important, and then goes on to provide new information and research on the history of ice cream, its current popularity, its composition and other facts. (*See* Pl. Ex. No. 74 at pp. 215-216; 4/14/08 Tr. (Rowling) at 85:11-15). The corresponding entry in the Lexicon, by contrast, simply copies Ms. Rowling's fictional facts and adds no commentary or analysis. (*See* Pl. Ex. No. 1; 4/14/08 Tr. (Rowling) at 84:23-85:3).

216.    Dr. Sorensen admitted that the Beahm book contains less of Ms. Rowling's prose, as well as more analysis, than does the Lexicon. (4/16/08 Tr. at 551:13-17 (Sorenson); Pl. Ex. No. 74). Although at trial Mr. Vander Ark suggested that this book had a different focus and purpose from the Lexicon, he cited it in his sworn declaration as a *Harry Potter* encyclopedia that "closely resemble[s his] own Lexicon book." (4/15/08 Tr. (Vander Ark) at 285:8-16; Def. Ex. No. 502 at ¶44(a)(1)).

217.    Another book, *The Complete Idiot's Guide to the World of Harry Potter,* by Tere Stouffer (Pl. Ex. No. 73), also includes far more original content and less copying than does the Lexicon. (4/14/08 Tr. (Rowling) at 83:10-25). For example, the Lexicon*'s* entry on "Paracelsus" merely repeats Ms. Rowling's fictional facts and creative expression, stating, "A 'secretive wizard' about whom little is known (fw). There is a bust of him in a Hogwarts corridor that Peeves has been known to drop on people's heads (OP14)." (Pl. Ex. No. 1). *The Idiot's Guide*, by contrast, provides a "succinct but very informative paragraph about that real person,"

(4/14/08 Tr. (Rowling) at 83:17-25; Pl. Ex. No. 1), namely, that Paracelsus was "a noted fifteenth century physician and alchemist. He was one of the few alchemists who sought the powers of chemicals not for riches or immortality by to improve the abilities of physicians to heal. He contributed much to the medical field, including the idea that wounds can heal on their own, if free from infection." (Pl. Ex. No. 73 at p. 17).

218. *The Magical Worlds of Harry Potter*, by David Colbert (Pl. Ex. No. 75), also highlights the lack of analysis and extensive copying in the Lexicon, as Mr. Colbert's book references outside sources, putting things within the *Harry Potter* novels in their mythological context. (4/14/08 Tr. at 87:2-12 (Rowling); Pl. Ex. No. 75). For example, *The Magical Worlds of Harry Potter* contains a chapter discussing the "Dark Mark" which Voldemort places on his followers and traces its roots to the medieval concepts of the "devil's mark" and "witch's mark." (Pl. Ex. No. 75 at pp. 59-60). In contrast, the Lexicon entry for "Dark Mark" simply refers back to its appearance in Ms. Rowling's work, adding no outside information or analysis. (Pl. Ex. No. 1).

219. Similarly, *The Sorcerer's Companion: A Guide to the Magical World of Harry Potter*, by Allan Zola Kronzek and Elizabeth Kronzek (Pl. Ex. No. 192), is another alphabetized guide that copies far less than does the Lexicon while adding substantial original content. Ms. Rowling described this work as a "genuine" reference guide that provides a great deal of additional information. (4/14/08 Tr. (Rowling) at 88:4-6; Pl. Ex. No. 192). For example, *The Sorcerer's Companion* has a long section on "arithmancy" describing its role and importance in the Harry Potter books, giving an etymology for the word, and discussing in detail the real-life subject of numerology. (Pl. Ex. No. 192 at pp. 4-9). In contrast, the Lexicon entry

for "arithmancy" refers solely to Ms. Rowling's work and the fictional facts she wrote which concern "arithmancy". (Pl. Ex. No. 1).

220.    In sum, no other companion book to Ms. Rowling's works takes as much of her prose and fictional facts than does the Lexicon. Instead, these other companion books add more commentary and provide more outside information. And, by the admission of RDR's own literary expert, none of the companion books cited in her declaration take as much of the author's work as the Lexicon takes from Ms. Rowling. (4/16/08 Tr. (Sorensen) at 562:23-563:3).

## V.    The Lexicon's Potential Effect on Plaintiffs

### 1.    The Lexicon Would Likely Be Successful

221.    The evidence shows that RDR and Mr. Vander Ark anticipated that the Lexicon would sell well and be successful.

222.    As noted above (Pl. Ex. No. 14-J), the contract between RDR and Mr. Vander Ark provided for Mr. Vander Ark to be paid a bonus for each week that the Lexicon was on a bestseller list.

223.    Both Mr. Rapoport and Mr. Vander Ark were aware of *Mugglenet.com's What Will Happen in Book 7*, a Harry Potter companion book not authored by Ms. Rowling, that provides a reasonable comparison in predicting the potential success of the Lexicon. (4/15/08 Tr. (Murphy) at 437:13-24; (Vander Ark) at 252:8-253:21). That book sold over 300,000 copies and was on the New York Times Bestseller list. (4/15/08 Tr. (Murphy) at 437:13-24; (Vander Ark) at 253:12-16).

224.    In addition, RDR believed that Mr. Vander Ark's celebrity within the Harry Potter fan community, as well as his ability to advertise the Lexicon on the Lexicon

Website, would be helpful in marketing the Book, as demonstrated by Mr. Rapoport's statements in an email to the purported British publisher of the Lexicon:

> Steve Vander Ark, who created the lexicon is a rock star at academic Harry Potter conferences, not to mention fan events. Rowling herself is a fan. In the Potter name his an Elvis like figure [sic]. I am sure he will continue to attract huge audiences everywhere he goes. This will be great for the book. (Pl. Ex. No. 27 (Blumsack Corrected Supp. Decl.) at ¶ 13, and Ex. 27-H).

225. Mr. Vander Ark, in fact, is well known in the Harry Potter fan community and would be able to promote the Book on his Website, which receives 350,000 visitors per month, as well as through other national media channels. (4/15/08 Tr. (Murphy) at 420:24-421:14, 437:13-24; Pl. Ex. No.22-A). By his own testimony, Mr. Vander Ark estimated that the total number of visits to the Lexicon Website were between 1.5-2 million visits per month. (4/15/08 Tr. (Vander Ark) at 352:16-21).

226. As discussed above, prior to this Court's issuance of a temporary restraining order barring sale of the Book, RDR had already received an initial order for 1,500 copies of the Lexicon from Borders. (Pl. Ex. No. 137). This was 50% more than Defendant's expert Bruce Harris predicted RDR's sales would be to each national chain, and half of what he thought the aggregate sales to all national chains would be. (Def. Ex. No. 529 at ¶ 13). At trial, Mr. Harris revised his assessment after admitting he heard Mr. Rapoport testify that he had already received an order from Borders for 1,500 copies, agreeing that 1,500 copies would be "about right." (4/15/08 Tr. (Harris) at 447:9-17). This constitutes a 50% increase from the estimate of "less than 1000 books per major chain" that he gave in his sworn declaration. (Def. Ex. No. 529 (B. Harris Decl.) at ¶ 13).

227.    In addition, Mr. Rapoport testified that prior to the litigation he had verbal or written agreements regarding the sale of foreign publishing rights in various countries, including Canada, France, the United Kingdom, and Australia. (4/14/08 Tr. (Rapoport) at 187:2-24).

228.    Although Mr. Rapoport testified that he had only planned to print 10,000 copies, he admitted that such a print-run was the largest that RDR had ever ordered, and that it was only an initial print run and that if the Lexicon did well, RDR could simply print more copies. (4/14/08 Tr. (Rapoport) at 238:22-239:20).

## 2.    The Lexicon Would Directly Compete With Ms. Rowling's Encyclopedia

229.    The evidence shows that RDR marketed the book to children's bookstores and book buyers at general stores and would therefore be stocked next to the Harry Potter novels and Ms. Rowling's other Companion Books in bookstores in direct competition with those works. (4/15/08 Tr. (Murphy) at 410:15-411:1; Pl. Ex. No. 31 (Suppl. Murphy Decl.) at ¶ 9).

230.    The Lexicon would also compete directly with, and impair the sales of, Ms. Rowling's planned encyclopedia (4/15/08 Tr. (Murphy) at 413:24-416:6, 417:21-418:9, Pl. Ex. No. 19 (Landes Decl.) ¶¶ 29-30), interfering with her plans to use that book as a means of raising money for charity, as she had done with her two previous Companion Books.

231.    Mr. Rapoport himself recognizes the value of being first to market in a particular category ahead of the competition, as demonstrated by his statement in an email to the Canadian publisher of the Lexicon that one of the reasons it would sell well was that the Lexicon would be the first complete guide to the entire Harry Potter series of novels. (4/15/08 Tr. (Murphy) at 413:24-414:24; Pl. Ex. No. 14-N). Mr. Rapoport also touted to other potential

foreign publishers that the Lexicon would come out ahead of any possible competition. (4/14/08 Tr. (Rapoport) at 212:18-213:12; Pl. Ex. No. 14-K).

232.    RDR argues that the publication of the Lexicon would not harm sales of Ms. Rowling's encyclopedia because she is so popular that her fans will buy everything she writes. (Def. Ex. No. 502 at ¶ 43). But as Plaintiffs' witnesses testified, there is a difference between die-hard fans and more casual fans. (4/15/08 Tr. (Murphy) at 414:15-415:19, 418:18-419:2; 4/14/08 Tr. (Rowling) at 102:2-12, Pl. Ex. Nos. 30 (Landes Supp. Decl.) at ¶ 13; 31 (Murphy Supp. Decl.) at ¶ 3). While the former group might well buy a book simply because Ms. Rowling wrote it, if they had the means to do so, more casual fans are unlikely to buy more than one encyclopedia. (Pl. Ex. No. 30 (Landes Supp. Decl.) at ¶ 13; 4/15/08 Tr. (Murphy) at 418:21-419:2; 4/14/08 Tr. (Rowling) at 101:25-102:12). Mr. Vander Ark tacitly agrees; he testified that when he refers to "fans," he means only those "who would spend a lot of time reading the books, maybe re-reading them, discussing them, and…creat[ing] fan fiction and artwork and wizard rock songs," rather than the larger universe of Harry Potter readers. (4/15/08 Tr. (Vander Ark) at 336:12-19).

233.    In addition, the evidence shows that although the two Companion Books Ms. Rowling wrote to raise money for charity have sold well, they have sold only a fraction of the copies that her novels have sold. (4/15/08 Tr. (Murphy) at 418:10-419:2; 4/14/08 Tr. (Rowling) at 101:25-102:12). This confirms that the market for such companion guides is different from that for the novels themselves, and that readers of the Harry Potter novels will not simply buy anything that Ms. Rowling writes.

234.    RDR's suggestion that consumers would likely buy both its Lexicon and a later-published encyclopedia by Ms. Rowling (4/15/08 Tr. (Harris) at 442:8-16) is presumptuous.

As Ms. Rowling herself testified, many consumers cannot afford to purchase more than one book of a given kind. (4/14/08 Tr. (Rowling) at 101:25-102:12, Pl. Ex. No. 32 (Rowling Supp. Decl.) at ¶ 8)

235.    Moreover, if the Lexicon were published it would likely encourage others to create and publish similar woks, such that the market would quickly be inundated, further impacting sales of Ms. Rowling's own encyclopedia. (4/15/08 Tr. (Murphy) at 419:20-420:2; Pl. Ex. No. 30 (Landes Supp. Decl.) at ¶ 13; Pl. Ex. No. 31 (Murphy Supp. Decl.) at ¶ 3).

### 3.    The Lexicon Would Harm Ms. Rowling's Existing Companion Books

236.    In addition to impacting sales of Ms. Rowling's planned encyclopedia, the Lexicon would harm sales of Ms. Rowling's existing Companion Books. Consumers who purchased the Lexicon would have no incentive to purchase either of Ms. Rowling's Companion Books as the information contained in these works has been incorporated into the Lexicon almost word-for-word. (4/15/08 Tr. (Murphy) at 419:10-19). Indeed, the Lexicon's taking of these works is so wholesale and complete, there would be no reason for anyone to purchase them. (4/14/08 Tr. (Rowling) at 104:2-11; 4/15/08 Tr. (Murphy) at 419:10-19). The Lexicon draws more than 250 entries from the 56-page book *Quidditch Through the Ages*, and more than 200 entries from the 42-page book *Fantastic Beasts and Where to Find Them*. (Pl. Ex. Nos. 1-3). The Lexicon takes the entire text of the Famous Wizard Cards and borrows heavily from "The Daily Prophet." (4/14/08 Tr. (Rowling) at 77:17-19, 73:19-74:16; Pl. Ex. Nos. 45-46). Mr. Vander Ark himself recognized that reproducing the content of those books -- on the Lexicon Website and in the Lexicon -- "would take away from sales of the [Companion Books]." (Pl. Ex. No. 14-F).

4. **Ms. Rowling's *Harry Potter* Novels Would Be Affected If the Lexicon Were Published**

237.    The Lexicon would have a detrimental effect on sales and readership of Ms. Rowling's *Harry Potter* novels themselves. A reader who has consulted the Lexicon while reading the third Harry Potter book, for example, might find that it is unnecessary or unfulfilling to continue to read the series at all if she or he discovered through the Lexicon the ultimate fate of the characters. 4/15/08 Tr. (Murphy) at 411:3-7, 418:18-419-2). The reader might also choose to skip ahead to the final (seventh) Harry Potter book rather than reading all of the intermediate lengthier books. (4/14/08 Tr. (Rowling) at 102:17-103:3).

238.    In either situation, sales of the novels would be affected (4/14/08 Tr. (Rowling) at 102:17-103:22) and the Lexicon would effectively discourage reading and literacy, undermining Ms. Rowling's intent in that regard. (4/14/08 Tr. (Rowling) at 103:9-22).

5. **The Lexicon Would Harm Plaintiffs' Licensing Efforts**

239.    Publication of the Lexicon would also undermine both Plaintiffs' ability to guarantee exclusivity to licensees and Plaintiffs' existing licensing program, which lays out detailed standards and guidelines for quality control, (4/14/08 Tr. (Rowling) at 104:8-16; Pl. Ex. No. 19 (Landes Decl.) at ¶¶ 8-11, 29-30; Pl. Ex. No. 26 (Williams Decl.) at ¶ 18).

240.    Both Ms. Rowling and Ms. Johnson gave unrebutted testimony that the Lexicon is a work of poor quality that is riddled with errors, virtually devoid of meaningful commentary, and poorly written where it does attempt commentary. (4/14/08 Tr. (Rowling) 44:2-7, 66:25-67:17; 4/16/08 Tr. (Johnson) at 602:15-604:14)

241.     The Lexicon's poor quality is likely to alienate potential readers from purchasing other companion guides, as having purchased one book and been disappointed they are unlikely to purchase another similar book.

242.     Publication of the Lexicon likely would also open the door for other Harry Potter companion guides that similarly do nothing more than reorganize Ms. Rowling's fictional facts without providing anything new, impacting Plaintiffs' long-term licensing and policing strategy and their ability to to protect and preserve the high quality of their book franchise and the strength of their intellectual property rights.  (4/15/08 Tr. (Murphy) at 419:20-420:2; Pl. Ex. No. 12 at ¶¶ 5-6; Pl. Ex. No. 22 at ¶ 6; Pl. Ex. No. 25 at ¶ 4).

### W.     Credibility of Witnesses

243.     On November 9, 2007, this Court entered a temporary restraining order preventing RDR from completing the typesetting of the Lexicon and from advertising, publishing or accepting orders of the Lexicon pending the Court's decision on Plaintiffs' motion for preliminary injunction.  (11/9/07 Order of the Honorable Robert P. Patterson).

244.     On March 5, 2008, this Court ordered that the hearing on Plaintiffs' motion for preliminary injunction be consolidated with trial on the merits.  (3/5/08 Order of the Honorable Robert P. Patterson).

245.     A consolidated preliminary injunction hearing/trial on the merits was held in this matter on April 14-16, 2007.  In the course of the trial, the Court was able to hear testimony and observe the demeanor of the various witnesses.

246.     This Court finds that the testimony of Plaintiffs' lead witnesses, Ms. Rowling and Professor Johnson, was credible.

247.     For the following reasons, this Court finds that the testimony of Defendant's lead witnesses, Mr. Rapoport, Mr. Vander Ark and Professor Sorensen, was not credible.

1.     **Defendant's Witnesses Lack Credibility**

a.     **Roger Rapoport Was Not Credible Given His Deliberate Misrepresentations and Inconsistent Testimony**

248.     Mr. Rapoport has engaged in a pattern of false statements and evasions, both prior to the filing of this suit and during his testimony at trial. He falsely told Plaintiffs in an e-mail that a family emergency had "interrupted all of [his] work" such that he could not respond substantively to Plaintiffs' numerous cease and desist letters (4/14/08 Tr. (Rapoport) at 192:18-193:1), yet an hour after sending that message Mr. Rapoport sent another e-mail to a Brazilian publisher continuing to market the Lexicon, without mention of the family tragedy. (Pl. Ex. No. 120; 4/14/08 Tr. (Rapoport) at 193:8-25). The next day, October 4, 2007, Mr. Rapoport made a sale of the rights to the Lexicon in Italy. (Pl. Ex. No. 120). And on October 11, 2007, he sent a detailed cease and desist letter to Warner Bros. regarding the purported use of a timeline that appeared on Mr. Vander Ark's website. (4/14/08 Tr. (Rapoport) at 200: 17-22).

249.     The evidence shows that at the same time Mr. Rapoport was stalling Plaintiffs and asking for more time to respond to their letters regarding the Lexicon, he was continuing to market the Lexicon to foreign publishers while seeking to keep it away from any such publishers who also published the *Harry Potter* books. (4/14/08 Tr. (Rapoport) at 184:7-21, 185:15-23, 192:21-196:2)

250.     In response to inquiries from foreign publishers who were concerned about possible copyright issues in connection with the Lexicon, Mr. Rapoport falsely stated that

it would be an "unlikely event" for Ms. Rowling to raise any copyright questions about the Lexicon, even though he had already received two cease and desist letters and an e-mail from Ms. Rowling's literary agent, none of which he disclosed to the foreign publishers. (4/14/08 Tr. (Rapoport) at 198: 2-19; Pl. Ex. No. 121).

251.    Mr. Rapoport also falsely represented to foreign publishers that Ms. Rowling had said "again and again that the people behind [the Lexicon book] are her absolute favorites when it comes to a Harry Potter reference book," despite the fact that the sole basis for that statement was a quote from Ms. Rowling in 2004 about the Lexicon Website that had nothing to do with any book or person. (Pl. Ex. No. 89; 4/14/08 Tr. (Rapoport) at 172:14-173:7).

252.    Mr. Rapoport similarly falsely told a British publisher that he had received advances of more than 10,000 pounds from other European publishers. (Pl. Ex. No. 123; 4/14/08 Tr. (Rapoport) at 229:5-22). At trial, however, Mr. Rapoport testified that the largest advance he had received was for $5,000 from a Canadian publisher. (4/14/08 Tr. (Rapoport) at 228:14-20).

253.    Mr. Rapoport marketed the Lexicon as having been written by "20 academic scholars and reference experts" and by a "team of professors and reference librarians," when in fact, as he admitted, there were only four primary authors of the book. (4/14/08 Tr. (Rapoport) at 218: 10-17; Pl. Ex. No. 114). He also could not name any of the other purported "academic scholars and reference experts" who supposedly worked on the book. (4/14/08 Tr. (Rapoport) at 220:10-21). No evidence was presented at trial suggesting any "professors" had worked on the Lexicon; certainly Mr. Vander Ark is not a professor.

b.     **Steven Vander Ark's Trial Testimony and Declaration Were Not Credible**

254.     At trial, Mr. Vander Ark initially denied that he has refused to allow RDR to publish additional books he is planning to write because he believes that RDR lied to him and misled him. (4/15/08 Tr. (Vander Ark) at 331:2-11). When confronted with an e-mail containing a statement to that effect, Mr. Vander Ark then acknowledged that he wrote and believed those words, contradicting his earlier trial testimony. (4/15/08 Tr. (Vander Ark) at 332: 10-15, 332:22-23).

255.     At trial, Mr. Vander Ark admitted that he had used electronic copies of Ms. Rowling's books in order to write the Lexicon book. (4/15/08 Tr. (Vander Ark) at 259:16-20). He also conceded that he was aware that Ms. Rowling had never released any electronic copies of her books. (4/15/08 Tr. (Vander Ark) at 259:21-23). Nevertheless, Mr. Vander Ark testified that he did not believe scanning Ms. Rowling's books into electronic format in order to write a book was illegal. (4/15/08 Tr. (Vander Ark) at 263:4-8). In an internet posting in 2003, however, Mr. Vander Ark advised others that it would be illegal to make electronic copies of the Harry Potter books. (4/15/08 Tr. (Vander Ark) at Ex. 194; 266:8-17).

c.     **Prof. Sorensen's Trial Testimony and Declaration Were Not Credible**

256.     By her own admission, Prof. Sorensen's Declaration relied on books she never read, in at least one instance relying on the title alone in deciding whether to include a book on a list of supposedly "helpful" companion guides. (4/16/08 Tr. (Sorensen) at 566:3-4, 566:25-567:4, 568:21-23, 570:12-22; Def. Ex. No. 503 (Sorensen Decl.) at ¶¶ 9, 12).

257.     Professor Sorensen also pointed to a book entitled Shakespeare Illustrated as an example of a book with extensive plot summaries, testifying unequivocally that the book

did not contain any original sources or discussion of the real life histories underlying Shakespeare's plays and described the book as one containing just "plot summaries" of Shakespeare's plays. (4/16/08 Tr. (Sorensen) at 569:7-569:24). But the full title of the book -- *Shakespeare Illustrated: or the Novels and Histories on which the Plays of Shakespeare are Founded*, makes clear that the very purpose of this book to describe and discuss the novels and histories on which Shakespeare based his plays. (*See* Pl. Ex. No. 55). Even a casual reading of *Shakespeare Illustrated* shows that Professor Sorensen's testimony was incorrect and that the book specifically discusses the works of Shakespeare in terms of the real-life myths, legends or histories that inspired them.