## I.      CONCLUSIONS OF LAW

### A.      Parties And Jurisdiction

258.    This action asserts claims arising under the Copyright Act of 1976, as amended, 17 U.S.C. § 101 et seq.

259.    This Court has federal question jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1338(b).

260.    This Court has personal jurisdiction over RDR Books pursuant to C.P.L.R. §§ 302(a)(2) and 302(a)(3) because RDR Books has committed a tortious act both within and without the State of New York through the sale of the Book, which will be available nationally and within the State of New York through traditional and online retailers, causing injury to Plaintiffs within the State of New York, and RDR Books has regularly conducted or solicited business within the State of New York.

261.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1400(a).

### B.      Copyright Infringement

#### 1.      Burden of Proof

262.    Plaintiffs bear the burden of proving each element of their copyright infringement claim by a preponderance of the evidence.

263.    Defendant bears the burden of proving by a preponderance of the evidence its affirmative defenses.

Dockets.Justia.com

## 2. Plaintiffs Can Establish Copyright Infringement

264.    In the Copyright Act, Congress has granted copyright owners various exclusive rights, including the right to "reproduce the copyrighted work" and "to prepare derivative works based on the copyrighted work." 17 U.S.C. § 106.  In general, copyright law protects against production, adaptation, distribution and display of substantially similar copies of the owner's copyrighted work without the owner's permission.  A copyright owner may "institute an action for any infringement" of any the owner's exclusive rights.  17 U.S.C. § 501(b).

265.    To succeed on their claim of copyright infringement, Plaintiffs must prove (i) ownership of a valid, existing copyright and (ii) Defendant's unauthorized copying of their copyrighted material. *See Novelty Textile Mills v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 (2d Cir. 1977) (reversing finding of non-infringement of textile designs and issuing preliminary injunction).

266.    Plaintiffs have presented documentary evidence and testimony proving by a preponderance of the evidence that Defendant's planned Lexicon book constitutes copyright infringement under 17 U.S.C. §§ 101 et seq. of the Copyright Act.

267.    RDR has failed to present any testimony or documentary evidence to rebut Plaintiffs' evidence of copyright infringement.

268.    The applicable case law in this Circuit and others supports a finding of copyright infringement in this case. *See Castle Rock Entm't, Inc v. Carol Publ'g Group, Inc.*, 150 F.3d 132 (2d Cir. 1998) (affirming lower court's finding that trivia book about the *Seinfeld* television series was copyright infringement); *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*,

996 F.2d 1366 (2d Cir. 1993) (affirming the judgment that a book which contained detailed plot summaries of *Twin Peaks* episodes constituted copyright infringement); *Paramount Pictures Corp. v. Carol Publ'g Group*, 11 F. Supp. 2d 329 (S.D.N.Y. 1998) (finding that a book extensively detailing the fictional world of the *Star Trek* series constituted copyright infringement), *aff'd*, 1999 U.S. App. LEXIS 9218 (2d Cir. May 13, 1999); *see also Ty, Inc. v. Publications Int'l, Inc.*, 333 F. Supp. 2d 705, 710-712 (N.D. Ill. 2004) (on remand, concluding that book about Beanie Baby toys was not fair use; book was not transformative where its primary purpose was not to provide criticism or commentary about Beanie Baby toys or serve as a buying guide but instead to be an "upsize Beanie appreciation book"); *Toho Co. Ltd. v. William Morrow and Co., Inc.*, 33 F. Supp. 2d 1206, 1217 (C.D. Ca. 1998) (finding that movie compendium book based on *Godzilla* films was not fair use; although book contained commentary, critique and trivia, the first fair use factor weighed heavily in plaintiff's favor where book contained "extensive detailed plot summaries" that used plaintiff's copyrighted material and were generally twice as long as each commentary).

a.   **Plaintiffs Have Submitted Evidence Showing Ownership of Valid Copyrights.**

269.   The first prong of the test for copyright infringement is met by Ms. Rowling's ownership of United States copyright registrations for the seven *Harry Potter* novels and the two Companion Books. (*See* Findings of Fact ¶¶ 8, 14).

270.   The registrations for the seven *Harry Potter* books and the two Companion Books are *prima facie* evidence of the works' copyrightability, and of the validity of the copyrights. *See* 17 U.S.C. § 410(c); *see also Novelty Textile Mills*, 558 F.2d at 1092 n.1 (copyright registration is "prima facie proof of ownership and validity").

271.    Ms. Rowling also owns a valid copyright in the *"The Daily Prophet"*
newsletter pursuant to the Berne Convention. *Sadhu Singh Hamdad Trust v. Ajit Newspaper*
*Adver., Mktg and Commc'ns, Inc.*, 503 F. Supp. 2d 577, 584-85 (E.D.N.Y. 2007) (the Berne
convention "does not require the owner of a foreign copyright to register in the United States
before seeking redress for infringement of works originating in foreign nations . . . that are
signatories to that convention."); *Bridgeman Art Library, Ltd. v. Corel Corp.*, 25 F. Supp. 2d
421, 425 (S.D.N.Y. 1998) (foreign national "may seek copyright protection under the Copyright
Act although the source of its rights lies abroad."). Ms. Rowling also holds valid registered
copyrights in and to the *"The Daily Prophet"* newsletter. (Reg. Nos. TX 6-836-711, TX 6-836-
704, TX 6-836-722, and TX 6-836-721 (*see* Ex. A attached hereto)). It is appropriate for the
Court to take judicial notice of these registrations, as they are public records whose accuracy can
be readily determined. *See* FED. R. EVID. 201(b)(2); *Island Software & Computer Serv. v.*
*Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) (affirming trial court's taking of judicial
notice of copyright registrations).

272.    Ms. Rowling also owns valid copyrights in and to the Famous Wizard
Cards pursuant to the Berne Convention, given that she wrote the text used in the cards. (4/14/08
Tr. at (Rowling) 76:12-14). *See Sadhu Singh Hamdad Trust*, 503 F. Supp. 2d at 584-85;
*Bridgeman Art Library*, 25 F. Supp. 2d at 425. Warner Bros. also holds valid registered
copyrights in and to the Famous Wizard cards, registrations (Nos. PA 1-391-853 and PA 1-391-
854 (*see* Ex. B attached hereto)), that it jointly owns with Electronic Arts. (4/14/08 Tr. at
(Rowling) 76:15-17). It is appropriate for the Court to take judicial notice of these registrations
as well. FED. R. EVID. 201(b)(2); *Island Software & Computer Serv.*, 413 F.3d at 261.

273.     Ms. Rowling also owns copyrights in the fictional characters, events,

places, and things that she has created and developed. *See Castle Rock*, 150 F.3d at 139

(fictional characters and facts created by *Seinfeld* writers were protectable expression);

*Paramount*, 11 F. Supp. 2d at 333 (characters, devices, alien species and plot lines in *Star Trek*

were copyrighted expression); *see also New Line Cinema Corp. v. Bertlesman Music Group,*

*Inc.*, 693 F. Supp. 1517, 1521 n.5 (S.D.N.Y. 1988) (Freddy Krueger character in *Nightmare on*

*Elm Street* series was protectable); *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 519 F. Supp. 388,

391 (S.D.N.Y. 1981) (Tarzan characters protectable expression; "[i]t cannot be said that such

copyright contemplates protection of only the plot, leaving the characters free for public

exploitation").

### b.     There is Direct Evidence of Copying of Ms. Rowling's Works

274.     Plaintiffs may establish copying, the second part of the test for

infringement, either by direct evidence or by showing that RDR had access to Plaintiffs'

copyrighted work and by demonstrating that the two works were substantially similar. *Castle*

*Rock Entm't v. Carol Publ'g Group*, 955 F. Supp. 260, 264 (S.D.N.Y. 1997) (finding access and

substantial similarity in copied fragments of *Seinfeld* series in trivia book), *aff'd*, 150 F.3d at

137; *Twin Peaks*, 996 F.2d at 1372 (affirming findings of access and substantial similarity in

dialogue quoted from *Twin Peaks* teleplays); *Paramount*, 11 F. Supp. 2d at 332-33 (finding

access and substantial similarity due to direct quotations and plot summary from *Star Trek*

series).

275.     Plaintiffs have demonstrated direct copying. Mr. Vander Ark admits that

the Lexicon is derived from his detailed notes on the *Harry Potter* series. (2/15/08 Tr. (Vander

Ark) 335:9-12; 269:6-270:1; 271:19-272:7).

276.     In addition, the line by line evidence of copying is clear. (*See* Findings of Fact ¶¶ 108-170; Pl. Exs. 47,48 (charts comparing text from the *Harry Potter* books and the Lexicon); Pl. Exs. 43, 44 (charts comparing text from the Companion Books and the Lexicon); Pl. Ex. 45 (chart comparing text from the Famous Wizard Cards and the Lexicon); Pl. Ex. 46 (chart comparing text from the *"The Daily Prophet"* and the Lexicon). *See Paramount*, 11 F. Supp. 2d at 332 (copying inquiry unnecessary where book took quotations from *Star Trek* television series and told its fictional "history"); *Castle Rock*, 955 F. Supp. at 264 (finding that "there can be no real dispute" that trivia book copied material from *Seinfeld* television series where defendants "made 'no secret' of the fact" that their book was based on the series).

### c.     Plaintiffs Can Also Prove Access and Substantial Similarity

277.     In light of the evidence of direct copying, there is no need to assess the alternative test for copying—access and substantial similarity. Nevertheless, Plaintiffs have met this test as well.

278.     First, as stated above, Mr. Vander Ark admits that he had access to Ms. Rowling's creations. (Findings of Fact ¶¶ 101, 103).

279.     As for substantial similarity, it "depends on whether the copying is quantitatively and qualitatively sufficient to support a finding of actionable copying." *Castle Rock*, 150 F.3d at 138. Plaintiffs have demonstrated both quantitative and qualitative copying.

280.     The Second Circuit has found quantitatively sufficient copying in instances involving far less copying than is contained within the Lexicon. For example, in *Castle Rock*, the Second Circuit concluded that a trivia book that copied 643 fragments from an 84-episode television series "crossed the *de minimis* threshold" and constituted actionable

copying. 150 F.3d at 138. Similarly, in *Twin Peaks*, the Second Circuit determined that taking 89 lines of dialogue from a television series for use in a companion book was actionable. 996 F.2d at 1372 (2d Cir. 1993).

281. Here, the Lexicon, in the aggregate, has appropriated over *400 pages* of material directly from the *Harry Potter* books, as well as from the two Companion Books, the Famous Wizard Cards and the *"The Daily Prophet,"* quoting, paraphrasing, summarizing, and abridging all of the fictional facts—the characters, the creatures, the places, and the spells— as well as the storylines and content, word-for-word in many cases. (Findings of Fact ¶¶ 97-99; 109-170). The Lexicon includes 274 entries from *Quidditch*, which is only 64 pages long, and 222 entries from *Fantastic Beasts*, which is only 63 pages long, essentially taking the entirety of those relatively brief works, which unlike the *Harry Potter* novels have no plot and essentially are, like the Lexicon, assemblages of fictional facts created by Ms. Rowling. (Findings of Fact ¶¶ 145-154).

282. In light of the nature and extent of its taking from Ms. Rowling's works, the Lexicon clearly satisfies the quantitative prong. *Twin Peaks*, 996 F.2d at 1372; *Castle Rock*, 150 F.3d at 138.

283. As for the qualitative prong, because the Book takes the heart of the Ms. Rowing's *Harry Potter* universe as well as everything else--the output of her nominative genius, her fictional facts, her plots and unique phrases (Findings of Fact ¶¶ 128-30, 158-70) -- the copying of her protected expression is also qualitatively significant. *See Harper & Row Pub., Inc. v. Nation Enters.*, 471 U.S. 539, 564-65 (1985) (finding that the copying was qualitatively significant where the 300-400 words copied constituted the heart of the work); *Castle Rock*, 150

F.3d at 138 (finding that the qualitative prong was satisfied where the *Seinfeld* trivia book copied copyrightable elements of the original, invented series such as the characters themselves as well as the fictitious facts surrounding those characters).

284.    Because the evidence shows that RDR's extensive copying meets both the quantitative and qualitative prongs of the substantial similarity test, Plaintiffs have demonstrated copyright infringement. *Castle Rock*, 150 F.3d at 139 (establishing "both quantitative and qualitative components of the substantial similarity test [establishes] a *prima facie* case of copyright infringement").

### d.    The Lexicon Is An Unauthorized Derivative Work

285.    As the copyright owner, Ms. Rowling has the right to control derivative works and is entitled to exclude others from creating derivative works based on her works. 17 U.S.C. § 106.

286.    The term "derivative work" refers to "a work based upon one or more preexisting works," including, among other things, an "abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. A work "consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represents an original work of authorship," is also considered a derivative work. *Id*.

287.    The Lexicon is a derivative work because it is "a work based upon one or more preexisting works." *Id*.

288.    Indeed, the Second Circuit has specifically stated that companion guides constitute derivative works where, as is the case here, they "contain a substantial amount of

material from [the underlying work]." *Twin Peaks*, 996 F.2d at 1373 (holding that the lower court was correct in finding that a book, which contained summaries of a television series, constituted a derivative work); *see also Castle Rock*, 150 F.3d at 143 (finding *Seinfeld* trivia book was a derivative work); *Paramount Pictures*, 11 F. Supp. 2d 329, 336 (S.D.N.Y. 1998) (describing defendant's book, which described the characters, places and things within the television series *Star Trek*, as a derivative work).

289.     In addition, the Lexicon entries for characters such as "Harry Potter" and "Lord Voldemort," which contain all of the major plots and storylines from the *Harry Potter* novels (Findings of Fact ¶¶ 158-170), constitute unauthorized abridgments of Ms. Rowling's copyrighted work. *Twin Peaks*, 996 F.2d at 1375 (finding that defendant's work, which simply recounted the plot details of each television episode, constituted an infringing abridgment). The Copyright Act categorizes abridgments as a type of derivative work, which the copyright owner has the exclusive right to prepare. 17 U.S.C. §§ 101, 106. Thus, the Lexicon's numerous entries that simply abridge the *Harry Potter* books weigh in favor of a finding of copyright infringement. *Twin Peaks*, 996 F.2d at 1376.

290.     Defendant argues that the Lexicon is not a derivative work but instead is what it calls a "supplementary work," akin to a preface or epilogue, and as such is somehow immune from liability under the Copyright Act. (Defendant's Opposition to Plaintiffs' Motion for a Preliminary Injunction, dated Feb 8, 2008, p. 6). The Copyright Act, however, makes no mention of such works as exempt from liability for infringement. Nor has RDR cited any case law supporting its argument that such a category of works even exists. This omission is not surprising, as RDR's argument is squarely contradicted by the many cases from this Circuit finding that companion guides such as the Lexicon constitute copyright infringement. *See Castle*

*Rock*, 150 F.3d at 146 (*Seinfeld* trivia book an infringing derivative work); *Twin Peaks*, 996 F.2d at 1383 (book summarizing *Twin Peaks* television series an infringing derivative work); *Paramount*, 11 F. Supp. 2d at 338 (book summarizing *Star Trek* television series an infringing derivative work).

291.    Defendant's reliance on *Ty, Inc. v. Publications Int'l Ltd.* is misplaced. 292 F.3d 512, 515 (7th Cir. 2002). The court there, in evaluating a book regarding plaintiff's Beanie Babies dolls, stated that defendant's photographs of the copyrighted dolls were derivative works and the accompanying "textual portions of a collector's guide" (*e.g.*, release dates, retirement dates, prices) were critical and evaluative rather than a mere recasting of the underlying dolls. *Id.* at 520-21. In contrast, RDR's Lexicon is nothing more than a recasting of Ms. Rowling's original text.

292.    In sum, the Lexicon is an infringing derivative work, and is not immune from liability as a purported supplemental work.

## C.    Defendant's Affirmative Defenses Are Unavailing.

293.    Defendant's Answer, dated March 11, 2008, listed 15 affirmative defenses. In the Joint Pre-Trial Order, dated April 8, 2008, Defendant dropped all but three of its affirmative defenses, including waiver, preserving only the defenses of fair use, copyright misuse and unclean hands. Each of these will be discussed below.

### 1.    Defendant's Copyright Infringement Is Not a "Fair Use."

294.    Plaintiffs having established copyright infringement, the issue becomes whether RDR can meet its burden of establishing that publication of the Lexicon is a fair use. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (burden of proving fair use is

90

on the defendant); *College Entrance Exam. Bd. v. Pataki*, 889 F. Supp. 554, 564-65 (N.D.N.Y. 1995) ("Fair use is an affirmative defense and, as such, the burden of proving fair use is always on the party asserting the defense.").

295.    Copyright law, which derives from the Constitution, is intended to promote "the Progress of Science and useful Arts." U.S. CONST. Art. I, § 8, cl. 8. Under the Copyright Act, authors have the exclusive right to control the use of the works that they create, thereby preserving incentives for copyright owners to generate new creative works and enhancing economic efficiency. (Pl. Ex. 19 (Landes Decl.) at ¶¶8-16). *See* 17 U.S.C. § 106.

296.    The fair use doctrine is a statutory exception to the copyright owner's exclusive rights that permits limited unauthorized use of another's work for purposes such as criticism, comment, news, reporting, teaching, scholarship, or research of a copyrighted work. 17 U.S.C. § 107.

297.    In determining whether a use is "fair," courts analyze: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *Id.*; *Campbell*, 510 U.S. at 576-77.

298.    "In essence, . . . the fair use inquiry is whether a reasonable author would consent to the use." *Robinson v. Random House*, 877 F. Supp. 830, 841 (S.D.N.Y. 1995) (granting summary judgment and issuing permanent injunction where no reasonable jury could find that author's use of other author's book was "transformative to any substantial degree" because it "took a significant portion of [someone else's] book verbatim or through very close paraphrase and added only an introductory chapter and three short concluding chapters").

299.    RDR asserts that the first fair use factor (the purpose and character of the use) is paramount, relying on a misrepresentation of the Supreme Court's holding in *Campbell*. In fact, the Supreme Court clearly said that *none* of the four fair use factors should be viewed in isolation -- "[a]ll are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578.

300.    Regardless, in this case an analysis of the four fair use factors shows that *none* of them favor RDR. As this Circuit's well-established case law makes clear, RDR cannot meet its burden of establishing "fair use" under the Copyright Act because repackaging "fictional facts" from another's creative work simply is not a fair use. *Castle Rock*, 150 F.3d at 142-43, 144 (*Seinfeld* trivia book containing numerous fictional facts and references not fair use); *Paramount*, 11 F. Supp. 2d at 335 (book that merely recounted television series' fictional history and characters not fair use); *Twin Peaks*, 996 F.2d at 1375, 1376-77 (companion book retelling fictional "plot details" from *Twin Peaks* was not fair use).

301.    RDR has not identified any cases where fair use has been found on facts similar to those presented in this case.

a.    **First Factor—Purpose and Character of the Use**

302.    To determine the purpose and character of a defendant's use, courts consider (1) whether the infringing work is commercial in nature; and (2) whether it is transformative and therefore "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 578-579 (remanding and noting that a parody may be sufficiently transformative to constitute fair use); *see also Paramount*, 11 F. Supp. 2d at 334-35 (finding that guide to *StarTrek* was not a fair use).

303.    In terms of the first factor's commercial prong, the Lexicon, a $24.95 mass market book intended to be stocked next to the *Harry Potter* books (Findings of Fact ¶ 229), clearly is commercial. *Castle Rock*, 150 F.3d at 141-42 (finding that a *Seinfeld* trivia book was commercial in nature).

304.    As for the transformativeness prong of the first factor, courts evaluate "whether the new work merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 578-79 (remanding with instructions to consider whether parody was sufficiently transformative to constitute fair use).

305.    Judge Leval has explained in a seminal law review article that in order for a use to be considered transformative, "[t]he use must be productive and must employ the quoted matter in a different manner or for a different purpose than the original." Hon. Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990). Judge Leval went on to state that if "the secondary use adds value to the original -- if [the original work's protected expression] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings -- this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Id*.

306.    Judge Leval identified as examples of transformative works those that criticize the quoted work, expose the character of the original author, prove a fact, or works that summarize an idea from the original work in order to defend or rebut that idea. *See* 103 Harv. L. Rev. at 1111.

307.     On the other hand, Judge Leval went on to reason if the defendant's work "merely repackages or republishes the original," it is unlikely to be considered transformative or qualify as a fair use. 103 HARV. L. REV. at 1111.

308.     In *Castle Rock*, the Second Circuit cited Judge Leval's definition of a transformative use, and ultimately held that a trivia book that "repackage[d] *Seinfeld* to entertain *Seinfeld* viewers" was not transformative and did not constitute fair use. 150 F.3d at 142 (finding that any transformative purpose possessed by *Seinfeld* trivia book was "slight to non-existent").

309.     RDR's position regarding the purportedly transformative nature of its book seems to have shifted somewhat during the course of this litigation.  Although Defendant grasps for arguments to justify characterizing the Lexicon is a transformative work, all of its arguments fail.  As the testimony and documentary evidence show, Defendant's Lexicon does not use Ms. Rowling's works as raw material "in the creation of new information, new aesthetics, new insights and understandings," but instead simply copies massive amounts of the seven *Harry Potter* books, the two Companion Books, the "The Daily Prophet" and the Famous Wizard Cards, describing Ms. Rowling's invented terms and original characters using Ms. Rowling's own artful words and phrases and "merely repackag[ing] and republish[ing] the original." *See* Leval, 103 Harv. L. Rev. at 1111; *Castle Rock*, 150 F.3d at 142 (finding *Seinfeld* trivia book not transformative and rejecting defendants' dual characterization of book as (1) adding scholarship or commentary and (2) "critically restructuring" *Seinfeld* into a new format).

310.     Because the evidence shows that the Lexicon is not transformative, the first fair use factor favors Plaintiffs.

### (1)    The Lexicon Does Not Add Any Substantial
###         Commentary Or Analysis

311.    Under this Circuit's case law, the Defendant's extensive use of Ms. Rowling's copyrighted work in a fashion that so minimally alters the original work without adding any significant analysis or commentary is not transformative. *Castle Rock*, 150 F.3d at 143 (trivia book about the *Seinfeld* series not transformative where it did "not contain commentary or analysis about *Seinfeld*"); *Paramount*, 11 F. Supp. 2d at 335 (infrequent instances of "allegedly humorous comments" interspersed throughout section of book that "simply retells the story of Star Trek" did not make that section transformative); *see also Ty*, 333 F. Supp. 2d at 712 (use of plaintiff's photos of its toy products was not transformative where to the extent defendant's use of the photos had "some element of commentary . . ., the commentary [was] nevertheless secondary and [did] not alter [plaintiff's] copyrighted toys with new express[ion], meaning or message.").

312.    As both Professor Sorensen and Mr. Vander Ark admit, the Lexicon does not provide any significant analysis or insight into Ms. Rowling's *Harry Potter* texts. (4/15/08 Tr. (Vander Ark) at 283:8-12, 284:17-19; 4/16/08 Tr. (Sorensen) at 543:3-17). And the value of what little the Lexicon does offer is *de minimus*.

313.    Of the entries that Professor Johnson generously describes as not solely lifting from Ms. Rowling's works, many simply contain a facetious phrase that adds nothing to a reader's understanding of those works. (Findings of Fact ¶ 187). This Court has held that facetious "[a]sides . . . do not sufficiently transform a summary" of a book into a transformative work. *Paramount*, 11 F. Supp. 2d at 335 (finding that "allegedly humorous asides did not "sufficiently transform a summary that the books own cover admits is 'everything a Star Trek

novice needs to know'"). Similarly, the Lexicon contains only sporadic, and often wrong, "etymological" references demonstrating "no real linguistic understanding" while at the same time missing many opportunities to provide etymologies where they would have been helpful to the reader. (Findings of Fact ¶¶182-186).

314.    Although RDR claims that the Book contains "information" and "additional research" beyond Ms. Rowling's texts, Mr. Vander Ark admitted that outside materials are only referenced in the Lexicon a mere handful of times, (4/15/08 Tr. (Vander Ark) at 295:13-296:13), and that the Lexicon was based on Ms. Rowling's work -- her "canon." (*See* Findings of Fact ¶ 105).

315.    As discussed above (*see* Findings of Fact ¶¶ 174-175), the Lexicon also fails to analyze any of the major themes of the *Harry Potter* books, such as "Death." Instead, it just restates what Ms. Rowling has said about this character and other fictional elements. (4/14/08 Tr. (Rowling) at 69:1770:3).

316.    The lack of any significant new insights into or understanding of the world of *Harry Potter* is particularly striking with respect to the Companion Books, Famous Wizard Cards, and the "The Daily Prophet", works that contain no narrative and merely present fictional facts about Ms. Rowling's *Harry Potter* universe. (Findings of Fact ¶ 142). The Lexicon lifts this material wholesale without adding significant analysis or commentary. (*See* Findings of Fact ¶¶ 121-122, 150-156; Pl. Exs. 43, 44 (charts comparing text from the Companion Books to text from the Lexicon); Pl. Ex. 45 (chart comparing text from the Famous Wizard Cards to text from the Lexicon); Pl. Ex. 46 (chart comparing text from the "The Daily Prophet" to text from the Lexicon.))

317.     There are many other *Harry Potter*-related books on the market containing alphabetized entries that manage to include significantly more commentary and analysis of Ms. Rowling's work than does the Lexicon. (4/14/08 Tr. (Rowling) at 82:18-83:25, 84:23-85:15, 86:9-87:12, 88:7-24; 4/16/08 Tr. (Sorensen) at 551:2-17; Pl. Ex. 45 (*The Magical Worlds of Harry Potter* by David Colbert); Pl. Ex. 74 (*Fact, Fiction, and Folklore in Harry Potter's World* by George Beahm); Pl. Ex. 192 (*The Sorcerer's Companion: A Guide to the Magical World of Harry Potter* by Allen and Elizabeth Conzck); Pl. Ex. 73 (*The Complete Idiot's Guide to the World of Harry Potter* by Tere Stouffer).

318.     The Lexicon's use of Ms. Rowling's copyrighted material far surpasses any possible transformative purpose. *Castle Rock*, 150 F.3d at 143 (while question-and-answer format of trivia book had some creative value, the book's substantial taking of copyrightable expression with only minimal alteration demonstrated lack of transformative purpose); *see also Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) (finding that film biography of Elvis that copied significant portions of copyrighted television clips was not transformative because copying went "beyond merely making a reference for a biography but likely involves the same intrinsic entertainment value that is protected by Plaintiffs' copyrights").

319.     The Lexicon's extensive quotation of Ms. Rowling's material (4/14/08 Tr. (Rowling) at 60:24-61:2) also reveals "a dearth of transformative character or purpose." *Campbell*, 510 U.S. at 587 (remanding and noting that substantial verbatim copying is more likely to result in a nontransformative work).

320.    In essence, the Lexicon is akin to the defendant's book in *Paramount*, which the Court found was not transformative because it "simply retells the story of *Star Trek* in a condensed, albeit a different order" and did not "add anything substantial that is new to the *Star Trek* story." *Paramount*, 11 F. Supp. 2d at 335-37 (finding that although portions of a book on *Star Trek* gave background information regarding the series, the book was not transformative as the middle portion merely summarized the major plots, storylines and characters).

321.    A detailed retelling of a plot that "goes far beyond merely identifying their basic outline for the transformative purposes of comment or criticism," and instead "elaborates in detail far beyond what is required to serve any legitimate purpose" cannot be said to serve a transformative function. *Twin Peaks*, 996 F.2d at 1375-76.

322.    Similarly, in *Religious Technology Center v. Lerma*, the Eastern District of Virginia found that the defendant's use was not transformative where he posted excerpts of Scientology materials online. Civ.A. No. 95-1107-A, 1996 WL 633131, at *5 (E.D. Va. Oct. 4, 1996) (rejecting fair use defense to copyright infringement and awarding injunctive relief and statutory damages). The court there stated that the defendant "claims to be performing academic work of a 'transformative' nature, providing materials which 'add new value to public knowledge and understanding, thereby advancing the goals of copyright as set forth in the Constitution.' That argument does not justify the wholesale copying and republication of copyrighted material. The degree of copying by [defendant], combined with the absence of commentary on most of his Internet postings, is inconsistent with [fair use]." *Id.* (noting that "there is a limit to the extent of reproduction that can be undertaken even by the bona-fide researcher").

323.    Courts in other Circuits have reached the same conclusion as to similar

works.  For example, the Ninth Circuit, when considering to what extent a filmmaker could

incorporate copyrighted video clips, photographs and music into a biography about Elvis Presley

without the copyright owner's permission, found that because the use consisted of "more than

mere reference to these events," and instead "played without much interpretation, if any" and

"rebroadcast for entertainment purposes" significant portions of the copyrighted work, the use

was not transformative. *Elvis Presley*, 349 F.3d at 629.

### (2)    The Lexicon's Lack of Proper Attribution Weighs Against a Finding of Fair Use

324.    The Lexicon extensively copies and paraphrases Ms. Rowling's language

without bothering to use quotation marks. *See* Findings of Fact ¶¶ 116-26.  Such a lack of

attribution weighs against weighs against a finding of transformativeness and ultimately against a

finding of fair use. *See Robinson*, 877 F. Supp. at 841 (finding that analysis of the first factor

strongly disfavored fair use; noting that "paragraph after paragraph simply [was] lifted" without

the use of citations or quotation marks such that "a reader would have absolutely no way of

knowing that thousands upon thousands of words used in the [infringing book] actually were

penned by [the other author]").

325.    In fact, in *Robinson*, failing to attribute quoted material taken from another

author's book placed the defendant "far closer to the scissor-wielding cut-and-paste plagiarist

than to the scholar building on others' past works" and could not constitute fair use.  877 F.

Supp. at 841.  As the court described it in Robinson, such "reprehensible conduct," weighs this

factor in favor of Plaintiffs. *Id*.

### (3) Repackaging A Work For Entertainment Value Is Not Transformative

326. The Lexicon simply takes all of Ms. Rowling's entertaining fictional facts -- the entire *Harry Potter* universe -- and merely "repackages [the original work] to entertain [the original work's] viewers." *Castle Rock*, 150 F.3d at 142 (finding trivia book non-transformative); *see also Elvis Presley*, 349 F.3d at 629 (finding no fair use where producers of Elvis film biography that used plaintiffs' copyrighted film clips were "not advertising a scholarly critique or historical analysis, but instead [sought] to profit at least in part from the inherent entertainment value" of the film clips); *see also Elvis Presley*, 349 F.3d at 628-29 (although defendant did make some transformative use of plaintiffs' film clips in series about Elvis, the first factor weighed against a finding of fair use because many of the clips "seem to be used in excess of this benign purpose, and instead are simply rebroadcast for entertainment purposes that Plaintiffs rightly own") (quoting *Folsom v. Marsh*, 9 F. Cas. 342, 345 (C.C.D. Mass. 1841) (Story, J.).

327. Thus, regardless of the labels that Defendant attaches to the Lexicon, because the Book simply repackages all of Ms. Rowling's fictional facts, places and things, its only possible purpose is for entertainment value, which is not a transformative use.

### (4) A Different Format Is Not Transformative

328. That the Lexicon reformats Ms. Rowling's material does make it transformative. As the court stated in *Paramount*, the fact that "the structure of the book differs from the dramatic linear format of the [underlying] Properties" is not sufficient to render it transformative. *Paramount*, 11 F. Supp. 2d at 332, 335 (book about *Star Trek* phenomenon consisted primarily of material taken from the various *Star Trek* properties and was insufficiently

transformative despite humorous comments interspersed within plot summaries); *see also Castle Rock*, 150 F.3d at 143 (arranging fictional facts from the *Seinfeld* series into hundreds of fun trivia questions was not transformative).

329.    Merely "critically restructuring" elements of an original work into another "system of presentation" does not constitute a transformative purpose. *Castle Rock*, 150 F.3d at 142-43 (arranging fictional facts from the *Seinfeld* series into hundreds of entertaining trivia questions was not transformative); *see also Folsom v. Marsh*, 9 F. Cas. 342, 345 (C.C.D. Mass. 1841) (Story, J.) (finding that defendants two-volume life of George Washington was an infringement where 353 of its 866 pages consisted of text from Washington's letters lifted from the plaintiffs' 11-volume collection of such letters; "a mere selection or different arrangement of parts of the original work" is not a fair use ).

### (5)    A-Z Format Is Not Transformative

330.    The fact that the Lexicon puts Ms. Rowling's material in alphabetical order does not make it transformative given that an alphabetical arrangement is not even copyrightable. *See Feist Publ'ns v. Rural Telephone Svc. Co.*, 499 U.S. 340, 355-56 (1991) (finding that alphabetical arrangement of information in a phone directory did not satisfy the "minimum constitutional standards for copyright protection" because it was "devoid of even the slightest trace of creativity").

331.    Furthermore, that time and effort were spent on alphabetizing the material in the Lexicon is irrelevant.  Is clear under copyright law that "sweat of the brow" is not protectable.  *Id.* (noting that the primary objective of copyright law is not to "reward the labor of authors" but to "promote the Progress of Science and useful Arts").

## (6) Defendant Cannot Point To Any Valid Useful Purpose Of The Lexicon

332. Apparently abandoning its argument that the Lexicon represents the result of significant scholarship and research, Defendant instead argued at trial that the Lexicon is transformative because it is somehow useful. (4/15/08 Tr. (Vander Ark) at 283:23-284:11; 4/16/08 Tr. (Sorensen) at 504:16-23).

333. However, it is difficult to identify what useful purpose the Lexicon serves as it does not serve the function of any standard reference tool such as an encyclopedia, ready reference guide, memory aid, index or true lexicon and it uses far more of Plaintiffs' work than would be necessary for such purposes. (*See* Findings of Fact ¶¶ 196-207).

334. Not is the Lexicon useful in finding things within the *Harry Potter* books as it does not contain page citations and the sporadic chapter references it does contain do not attempt to list all the times a character or thing appears or even the first time something appears. (*See* Findings of Fact ¶¶ 202-206).

335. Moreover, the lack of quotation marks indicating when it quotes from Ms. Rowling's works directly further undermines its usefulness as it is impossible to tell what comes from Ms. Rowling and what comes from Mr. Vander Ark. (*See* Findings of Fact ¶ 116).

336. One possible use for the Lexicon that Mr. Vander Ark identified was as an aid to fans in writing fan fiction based on Ms. Rowling's works. (4/15/08 Tr. (Vander Ark) at 361:25-362:4; 369:19-23). As fan fiction itself is an unauthorized derivative work and would be an infringement of Ms. Rowling's exclusive rights, this cannot justly support a finding of transformativeness even were this in fact true. 17 U.S.C. §§ 101, 106.

337.     Moreover, courts are clear that "usefulness" -- even in situations where usefulness is much more obvious -- is not justification for wholesale copying. *See UMG Recordings, Inc. v. Sony Music Entm't, Inc.*, 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000)(copyright law "is not designed to afford . . . convenience but, rather, to protect the copyright holders' property interests"); *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 924 (2d Cir. 1994) (photocopying articles from journals and allowing employees to read them in a "more usable format" did not make the photocopied work a transformative fair use); *Infinity Broad. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998) (rejecting defense that retransmission of radio broadcasts by telephone provided a "substantial benefit to society") (*citing American Geophysical Union*, 60 F.3d at 924).

*          *          *

338.     Because the Lexicon is commercial in nature, and because it is not transformative, the first fair use factor weighs in favor of Plaintiffs.

### b.     Second Factor—Nature of the Copyrighted Work

339.     The second fair use factor, nature of the copyrighted work, recognizes that "some works are closer to the core of intended copyright protection than others," and considers whether the copyrighted work is expressive or creative and whether the work is published. *Castle Rock*, 150 F.3d at 143-144 (finding that the second factor favored plaintiff given the fictional nature of the copyrighted work).

340.     In creating the *Harry Potter* novels, the Companion Books, the Famous Wizard Cards and the *"The Daily Prophet"*, Ms. Rowling has given rise to a wholly original universe of people, creatures, places and things. (4/16/08 Tr. (Sorensen) at 504:7-15). Such highly

imaginative and creative fictional works are entitled to the strongest protection under copyright law, particularly where the secondary work is "at best minimally transformative." *Castle Rock,* 150 F.3d at 144; *see also Twin Peaks*, 996 F.2d at 1376 (second factor "must favor a creative and fictional work, no matter how successful."); *Paramount*, 11 F. Supp. 2d at 336 (resolving the factor in a single sentence because the determination was "straight forward").

341.    As a result, the second factor favors Plaintiffs. *Campbell*, 510 U.S. at 586 (finding plaintiff's original and creative expression fell within the core of the copyright's protective purposes).

### c.    Third Factor—The Amount and Substantiality of the Portion Used

342.    The third factor, the amount and substantiality of the portion used, asks whether the amount copied exceeds that necessary to further the purpose and character of the new work. *Campbell*, 510 U.S. at 586-87.

343.    Although fair use does allow an individual to draw from the original work of another to some degree, the amount of the taking must be "reasonable in relation to the purpose of the copying." *Texaco*, 60 F.3d at 926; *see also Campbell*, 510 U.S. at 586-87 (stating that the taking must be "proportionate to the purpose of the new work").

344.    Here, as discussed above, the Lexicon constitutes a wholesale taking of every element and character from the series, consisting of over 400 pages of extensive quoting and paraphrasing of Ms. Rowling's original language with virtually no analysis, commentary or reference to any other work. (See Findings of Fact ¶¶ 97-99; 4/15/08 Tr. (Vander Ark) at 254:19-22).

345.    The amount of the copying exceeds that necessary to further any legitimate purpose. *See Harper & Row*, 471 U.S. at 565 (finding that the third factor weighed in favor of the plaintiff where defendant took 300-400 words from the original work).

346.    The Second Circuit has found works that copy far less than the Lexicon in fact take more than is necessary to serve a legitimate purpose. For example, in *Salinger v. Random House*, the Second Circuit overturned Judge Leval's district court decision, finding that defendant's biographical work, in which plaintiff identified only 59 instances of verbatim quoting or close paraphrasing (constituting just 40% of the defendant's 192-page book), to be so quantitatively significant a taking so as to tip the third fair use factor in favor of the plaintiff and result in part in a finding of no fair use. 811 F.2d 90, 99 (2d Cir. 1987). The court stated that the extent of the defendant's use of plaintiff's original language "'exceed[ed] that necessary to disseminate the facts[.]'" *Id.* (quoting *Harper & Row*, 471 U.S. at 564). Here, the Lexicon *'s* use of Ms. Rowling's protected material far exceeds the taking in *Salinger*, and similarly exceeds the amount necessary to describe and identify Ms. Rowling's invented terms.

347.    Similarly, in *Castle Rock*, the Second Circuit concluded that copying 643 fragments from 84-episodes of the television series *Seinfeld* was too excessive to serve the purpose of commentary. 150 F.3d at 144. Instead, the court found that the only possible purpose of taking so much was to use the copyrighted work for its entertainment value. *Id.* Therefore, the third factor weighed in favor of the plaintiff. *Id.*

348.    In addition, in *Twin Peaks*, the Second Circuit determined that taking 89 lines of dialogue from the Twin Peaks television series, "provid[ing] synopses for several episodes" and

"lifting many parts verbatim from the script" was so substantial in relation to the copyrighted work as a whole as to weigh the third factor in favor of the plaintiff. 996 F.2d at 1376-77.

349. Likewise, in *Paramount*, the court rejected the defendant's argument that the large amount of copying was "necessary to accomplish the book's purpose of explaining the appeal of Star Trek to its fans," finding that the book's 168 pages of plot summary and description of all of the fictional facts of the show was not proportionate to the book's remaining 49 pages. 11 F. Supp. 2d at 336. The court reasoned that "allowing such a large portion of the story to be attributed to background for the purposes of commentary would allow the 'fair use' exception to swallow the rule." *Id.* Thus, as the book in effect retold the story of Star Trek, the court found that the third factor favored the plaintiff. *Id.*

350. Courts consider not only the degree of verbatim quoting, but the amount of close paraphrasing as well. For example, in *Toho*, where defendant's "description[s] conjure[d] up vivid images that [could not] be considered necessary for a critical commentary," the court found that defendant had "crossed the line to the point where they [were] exploiting [plaintiff's] copyrighted material without paying the customary price," and thus the third factor weighed in favor of the plaintiff. *Toho*, 33 F. Supp. 2d at 1217 (noting that defendant's book contained "pages and pages of plot summary").

351. Here, because of the sheer magnitude of copying contained within the *Lexicon* (*see* Findings of Fact ¶¶ 108-170), the case law supports the conclusion that the Lexicon takes more than is necessary to serve its purpose, however RDR attempts to define it. *Toho*, 33 F. Supp. 2d at 1217 (noting that the amount of copying was far beyond what was necessary to inform the book's commentary).

352. As discussed above, the Lexicon obsessively provides all the fictional facts relating to a person, thing or place in the *Harry Potter* universe when a much more brief description would be possible. (Findings of Fact ¶¶ 128-157). The Lexicon contains extensive plot summaries, abridgements and substantial unattributed quoting and paraphrasing of Ms. Rowling's original works, leaving virtually nothing out. (4/16/08 Tr. (Johnson) at 591:1-9). Consequently, the Lexicon takes much more than would be necessary to serve the purpose of an encyclopedia, index, ready reference, memory guide or lexicon.

353. Moreover, even brief Lexicon entries would take too much of Ms. Rowling's fictional facts and creative expression if they do not also use those facts in the service of commentary or analysis, as the other companion guides to the *Harry Potter* books do. (*See* Findings of Fact ¶¶ 214-20). *See Paramount*, 11 F. Supp. 2d at 336; *Toho*, 33 F. Supp. 2d at 1217.

354. Unlike the Lexicon, other companion guides on *Harry Potter* are able to take less of Ms. Rowling's works, and do nothing more with it in terms of using her material as a jumping-off point for additional commentary and analysis. (4/16/08 Tr. (Sorensen) at 551:13-17; Pl. Exs. 73-75, 192).

355. Because the amount copied far exceeds that which is necessary to further the purpose and character of the Lexicon, this factor weighs in favor of Plaintiffs.

### d. Fourth Factor—Harm to the Market

356. The fourth fair use factor "requires courts to consider not only the extent of the market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a

substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (internal quotation marks and citations omitted).

357.  Consideration of market harm must include "not only the primary market for the copyrighted work, but the current and potential market for derivative works" as well. *Twin Peaks*, 996 F.2d at 1377 (finding that fourth factor favored plaintiff where book about television series "may interfere with the primary market for the copyrighted works and almost certainly interferes with legitimate markets for derivative works"); *see also Campbell*, 510 U.S. at 590 (noting that evidence of harm to the market for derivative works would weigh against a finding of fair use "because the licensing of derivatives is an important economic incentive to the creation of originals"). Derivative works are those "that creators would in general develop or license others to develop." *Campbell*, 510 U.S. at 592.

358.  When "a secondary work is substantially a non-transformative duplication of the original that was made for commercial purposes, there is a presumption or inference of market harm to the original work." *Robinson*, 877 F. Supp. at 843 (author's book was "little more than an updated abridgement" of other author's book).

359.  The non-transformative and commercial nature of the Lexicon, combined with the amount it duplicates from Ms. Rowling's works, entitles Plaintiffs to a presumption of market harm. Even without the benefit of that presumption, however, Defendant has not established that this factor would favor it. On the contrary, the evidence and the law show that publication of the Lexicon would harm Plaintiffs' derivative and primary markets.

**(1)     The Lexicon Would Harm the Market for Ms. Rowling's Planned Encyclopedia**

360.     The undisputed evidence shows that Ms. Rowling already has entered the market for derivative works based on her novels, having created two Companion Books to the *Harry Potter* series—*Quidditch Through the Ages* and *Fantastic Beasts and Where to Find Them*. (*See* Findings of Fact ¶¶ 13-14). It also is undisputed that since as early as 1998, Ms. Rowling has repeatedly stated that she plans to write and publish her own *Harry Potter* A-Z encyclopedia, and indeed already has begun work on this encyclopedia. (*See* Findings of Fact ¶¶ 15, 17-18).

361.     This derivative market for works based on the *Harry Potter* series belongs to Ms. Rowling, as it is one that she clearly "would in general develop or license others to develop" given that she already is developing the market. *Campbell*, 510 U.S. at 592. Moreover, the derivative market space for a work like Ms. Rowling's planned encyclopedia belongs to Ms. Rowling even before she has published the particular derivative work because the print status "is not dispositive -- the statute focuses on the *potential* market for the original work . . . and potential derivative uses of the [original work.]" *Robinson,* 877 F. Supp. at 843; *Twin Peaks*, 996 F.2d at 1377 (holding that a court must consider "the current and potential market for derivative works," and that an author "may rightfully claim a favorable weighting of the fourth fair use factor with respect to a book that reports the plot in such extraordinary detail as to risk impairment of the market for the copyrighted works themselves or derivative works that the author is entitled to license").

362.     Because Ms. Rowling has entered the derivative market and has clearly expressed her intention to publish her own encyclopedia, Defendants have a heavy burden under the fourth fair use factor as "[i]n the cases where [the Second Circuit has] found the fourth factor to favor a

defendant, the defendant's work filled a market niche that the plaintiff simply had no interest in occupying." *Twin Peaks*, 996 F.2d at 1377.

363. It is undisputed that the Lexicon would sit alongside Ms. Rowling's works on the shelves in bookstores. (*See* Findings of Fact ¶ 229). Publication of the Lexicon would harm Ms. Rowling's market by directly competing with her original books and with her own derivative works. *See Castle Rock*, 150 F.3d at 145 ("Because [defendant's infringing trivia book] borrows exclusively from [plaintiff's original work] and not from any other television or entertainment programs, [defendant's book] is likely to fill a market niche that [plaintiff] would in general develop. Moreover . . . [defendant's book] is not critical of the program, nor does it parody the program; if anything, [defendant's book] pays homage to [plaintiff's original work]"); *Twin Peaks*, 996 F.2d at 1377 (holding that a companion book to the *Twin Peaks* program would "almost certainly interfere[ ] with legitimate markets for derivative works," in part because the copyright owner had already licensed two companion books and stated its intention to license more, and that a plaintiff "may rightfully claim a favorable weighting of the fourth fair use factor with respect to a book that reports the plot in such extraordinary detail as to risk impairment of the market for the copyrighted works themselves or derivative works that the author is entitled to license"); *Toho*, 33 F. Supp. 2d at 1217 ("Because [defendant's] book and [plaintiff's licensee's] book are attempting to capitalize on this market, there would be an adverse effect on the potential market for [plaintiff]").

364. Publication of the Lexicon would also allow RDR to usurp the advantage of being first to market with a *Harry Potter* encyclopedia, an advantage that both RDR and Mr. Vander Ark have recognized. (*See* Findings of Fact ¶ 229-235). Allowing publication of the Lexicon would give RDR an undeserved market advantage, while lessening the distinctiveness of Ms.

Rowling's own book. (*See* Findings of Fact ¶¶ 230, 232-235). It also inevitably would dampen the market for Ms. Rowling's own encyclopedia, as many consumers who purchased the Lexicon would find it unnecessary, or would not have the means, to purchase Ms. Rowling's encyclopedia as well. (*See* Findings of Fact ¶¶ 232, 234; Pl. Ex. 30 (Landes Supp. Decl.) at ¶ 8). *See also Telebrands Corp. v. Wilton Indus., Inc.*, 983 F. Supp. 471, 476 (S.D.N.Y. 1997) ("once purchased, the consumer is unlikely to purchase a second can opener"). The poor quality of the Lexicon might also deter consumers from purchasing another similar book. (*See* Findings of Fact ¶¶ 240-241).

365. Allowing publication of the Lexicon also would harm the market for Ms. Rowling's encyclopedia by devaluing Ms. Rowling's exclusive right to create derivative works that borrow freely from her own original words and creations, as the Lexicon engages in the same sort of extensive borrowing that might be expected of a copyright owner, adding virtually no original material, as discussed at length above. *Roy Export Company Establishment etc. v. Columbia Broad. System Inc.,* 503 F. Supp. 1137, 1146 (S.D.N.Y. 1980) ("The value of the right to use the copyrighted work to make a derivative work, which the copyright owner may sell or himself exercise, would certainly seem to be diminished by the ability of another to use the copyrighted work in order to compete at will with the derivative work").

366. Defendant's first response to the foregoing arguments -- after conceding that the Lexicon would compete directly on the shelf with Ms. Rowling's own encyclopedia as discussed above -- is that fans will buy Ms. Rowling's encyclopedia regardless of the availability of the Lexicon simply because of Ms. Rowling's popularity (4/15/08 Tr. (Harris) at 442:8-16). Such a conclusory statement does little to meet Defendant's burden of proving that the fourth fair use factor weighs in its favor, and in any case is unavailing.

367.     Regardless of speculation about how many customers would buy Ms. Rowling's encyclopedia after having bought the Lexicon, the simple fact that the Lexicon would "serve[] as a potential substitute" for Ms. Rowling's encyclopedia is enough to defeat Defendant's argument that the fourth fair use factor weighs in its favor. *Paramount*, 11 F. Supp. 2d at 336 (ruling that it made no difference that the infringing book differed from anything then available on the market because a "person now interested in learning about the fictional history of Star Trek now must purchase a product licensed by [plaintiff]. [Defendant's] book serves as a potential substitute"); *see* ¶ 364, *supra*. Plaintiffs also have presented uncontroverted evidence that the market for *Harry Potter* companion books created by Ms. Rowling herself is far smaller than the market for the *Harry Potter* novels (4/15/08 Tr. (Murphy) at 418:10-419:2), and evidence that it is unlikely that casual *Harry Potter* fans, as opposed to diehard *Harry Potter* fans, would feel any need to purchase more than one *Harry Potter* encyclopedia. (Pl. Ex. 30 (Landes Supp. Decl.) at ¶ 13).

368.     Defendant next argues that there would be no market harm because Ms. Rowling would add new material to her encyclopedia that would be unavailable in the Lexicon, making it likely that fans would buy her encyclopedia regardless of the Lexicon's availability. Again, simply because the Lexicon might "differ[] from any work presently licensed" or created by Ms. Rowling, or to be created by Ms. Rowling, does not change the fact that the Lexicon would serve as a "potential substitute" and thus harm the market. *Paramount*, 11 F. Supp. 2d at 336.

369.     Regardless, Defendants can only speculate as to what Ms. Rowling might include in her planned encyclopedia. It is her creative right to publish an encyclopedia derived solely from the works she has already created, or to publish no encyclopedia at all should she make the creative choice that it would detract from her existing work. *Castle Rock*, 150 F.3d at 145-146 (holding that the law must respect the creative and economic choice of an artist as to what

derivative works are placed in the market, as "[i]t would...not serve the ends of the Copyright Act -- *i.e.*, to advance the arts -- if artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original").

370.    Even if Ms. Rowling did choose to incorporate additional material in her planned encyclopedia, Mr. Vander Ark's testimony suggests that it is highly likely such information would simply be incorporated into the next version of the Lexicon book, as Mr. Vander Ark says is his practice with anything that Ms. Rowling says or writes. (4/15/08 Tr. (Vander Ark) at 348:7-15).

371.    As for Defendant's argument that the Lexicon will not sell very well so it should not have a big effect on the market (*see* Findings of Fact ¶ 228), RDR ignores the legal test under the fourth factor that requires the Court to evaluate "whether unrestricted and widespread conduct of the sort engaged in" by RDR "would result in a substantially adverse impact on the potential market" for the original and derivative works. *Campbell*, 510 U.S. at 590.  Plaintiffs have presented uncontroverted evidence that the market likely would be flooded with copycat works if RDR were allowed to publish the Lexicon, likely further diminishing sales of Ms. Rowling's own encyclopedia. (*See* Findings of Fact ¶ 242).  As Ms. Rowling testified, even the most avid fans might well be put off by the "avalanche of dross" that would likely result if this Book were allowed to be published. (4/14/08 Tr. (Rowling) at 101:11-24).

372.    RDR's publishing expert, Mr. Bruce Harris, also overlooks the fact that Mr. Vander Ark, although an unknown to Mr. Harris, is in fact a celebrity within the *Harry Potter* fan community and able to market and advertise the Lexicon book on his Website in addition to

generating publicity for the Book via his appearances on various national media programs. (4/15/08 Tr. (Murphy) at 437:13-24; Pl. Ex. 22A; Pl. Ex. 30 (Landes Supp. Decl. at ¶¶ 15-18).

373.    Mr. Harris also ignores the fact that a *Harry Potter* fan Website similar to Mr. Vander Ark's published a book titled *Mugglenet.com's What Will Happen in Book 7* that sold over 330,000 copies and was listed on the *New York Times* bestseller list for several weeks, providing further evidence that the Lexicon has the potential to harm the market for Ms. Rowling's work. (4/15/08 Tr. (Murphy) at 437:13-24). RDR has been keenly aware of this fact, however, planning a first printing of 10,000 copies of the Lexicon -- the most copies RDR has sold of any book it has published in the last ten years -- and admitting that the print run could increase if the Lexicon sold well. (4/14/08 Tr. (Rapoport) at 238:22-239:20).

### (2)    The Lexicon Would Harm the Market for Ms. Rowling's Existing Companion Guides and Related Works

374.    In addition to the harm to the market for Ms. Rowling's encyclopedia, publication of the Lexicon could be devastating to the sales of Ms. Rowling's existing Companion Books and Famous Wizard Cards. The "fair use doctrine distinguishes between a true scholar and a chiseler who infringes a work for personal profit." *Robinson*, 877 F. Supp. at 843. In the case of these existing works, the Lexicon represents the work of no more than a chiseler; plaintiffs have presented unrebutted evidence and testimony showing that the Lexicon's taking is so wholesale and complete with respect to these works, there would be no reason for anyone to purchase them. (4/14/08 Tr. (Rowling) at 104:2-11; 4/15/08 Tr. (Murphy) at 419:10-19). As Ms. Rowling testified, these works have been "plundered." (4/14/08 Tr. (Rowling) at 62:25-63:3).

375. Mr. Harris failed to address at all the issue of market impact with respect to the two Companion Books and the Famous Wizard Cards. (*See* Def. Ex. 529). Even Mr. Vander Ark admits that the fact that the Lexicon incorporates extensive material from Ms. Rowling's existing companion books likely would affect sales of those books. (Pl. Ex. 14-F).

### (3)    The Lexicon Would Harm the Market for Ms. Rowling's *Harry Potter* Novels

376. Although the Lexicon is by no means as entertaining as the *Harry Potter* novels, it nonetheless contains substantially all of its storylines and plot elements. (4/16/08 Tr. (Rowling) at 648:13-649:23; (Johnson) at 624:4-17). This fact alone is sufficient to find harm to the primary market, especially with regard to a series of creative works. *See Twin Peaks*, 996 F.2d at 1377 (reasoning that the infringing book in that case could interfere with the primary market for the television show because "[i]t is possible that a person who had missed an episode of "Twin Peaks" would find reading the Book an adequate substitute, and would not need to rent the videotape of that episode in order to enjoy the next one.")

377. Having read the Lexicon and learned the ultimate fate of the characters, a child who had read up to the third *Harry Potter* book, for example, might find it unnecessary or unfulfilling to continue to read the series at all, or might choose to skip ahead to the final (seventh) *Harry Potter* book. (4/15/08 Tr. (Vander Ark) at 306:22-25; 4/15/08 Tr. (Murphy) at 410:15-411:7, 418:18-419-2; 4/14/08 Tr. (Rowling) at 103:8-22). Either way, sales of the novels would be affected. (4/14/08 Tr. (Rowling) at 102:17-103:22). The Lexicon would also discourage reading, undermining Ms. Rowling's intent. (4/14/08 Tr. (Rowling) at 103:9-22).

### (4)    The Lexicon Would Harm Plaintiffs' Licensing Program

378.    Evidence of harm to Plaintiffs' licensing opportunities "weigh[s] against a finding of fair use, because the licensing of derivatives is an important economic incentive to the creation of originals." *Campbell*, 510 U.S. at 593.

379.    Allowing publication of the Lexicon would undermine this economic incentive by robbing Plaintiffs of licensing opportunities related to the fictional world of *Harry Potter*. *See Paramount*, 11 F.Supp.2d at 336; Pl. Ex. 30 (Landes Supp. Decl.) at ¶¶ 25-26.

380.    Additionally, publication of the Lexicon would undermine both Plaintiffs' ability to guarantee exclusivity to licensees and Plaintiffs' existing licensing program, which lays out detailed standards and guidelines for quality control, and which would be subverted by allowing the Lexicon to be published outside the licensing scheme. (4/14/08 Tr. (Rowling) at 104:8-16; Pl. Ex. 19 (Landes Decl.) at ¶¶ 8-11, 29-30, 38; Pl. Ex. 26 (Williams Decl.) at ¶ 18). Both Ms. Rowling and Ms. Johnson gave unrebutted testimony that the Lexicon is a work of poor quality because it is riddled with errors, virtually devoid of meaningful commentary, and poorly written where it does attempt commentary. (Pl. Ex. 28 (Johnson Supp. Decl.) at ¶¶11-12; 4/16/08 Tr. (Johnson) at 597:7-17, 598:21-600:4; 4/14/08 Tr. (Rowling) at 105:13-22).

381.    Thus, as Ms. Rowling testified, allowing publication of the Lexicon could flood the market with an "avalanche of dross," making her work less distinctive and less appealing even to her fans. (4/14/08 Tr. (Rowling) at 101:11-24).

\*    \*    \*

382. In light of the significant market harm that the Lexicon likely would cause to Plaintiffs by directly competing with Ms. Rowling's planned encyclopedia derivative work, severely dampening the market for her existing derivative works, undercutting sales of her novels, eroding Plaintiffs' licensing program, and ultimately striking at the very heart of the Copyright Act's endeavor to create incentives for new artistic expression, the fourth fair use factor also weighs in favor of Plaintiffs.

###### e. Defendant Has Acted With Willfulness And In Bad Faith

383. In addition to the four statutory factors, in evaluating whether a defendant's use of a copyrighted work is fair, courts will also consider whether a defendant has run afoul of principles of equity, "presuppos[ing] good faith and fair dealing." *Roy*, 503 F. Supp. at 1146-47 (finding defendant's bad faith weighed against a finding of fair use).

384. The facts demonstrating RDR's bad-faith conduct are also evidence of its willful infringement, a factor in assessing statutory damages as well as equitable considerations such as injunctive relief. *NFL v. Primetime 24 Joint Venture*, 131 F. Supp. 2d 458, 480 (S.D.N.Y. 2001) (finding willfulness and awarding maximum statutory damages). Willful infringement is established with a showing of actual or constructive knowledge, and does not require a showing of malicious intent. *Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co., Inc.*, 807 F.2d 1110, 1115 (2d Cir. 1986), *aff'd*, 862 F.2d 304 (1988) (affirming lower court's finding of willfulness; "[A] court need not find that an infringer acted maliciously to find willful infringement . . . a defendant's actual or constructive knowledge proves willfulness.").

385. Here, the undisputed evidence shows that RDR and Mr. Vander Ark conducted their entire enterprise with knowledge that it would violate Plaintiffs' rights. Mr. Vander Ark

was well aware that publishing the Lexicon without Ms. Rowling's permission would violate her rights, and discussed his concerns about publishing the Lexicon with RDR. (*See* Findings of Fact ¶¶ 40-44, 51-52). RDR was aware of potential copyright infringement claims, and agreed to an unusual clause indemnifying Mr. Vander Ark from any such claims brought by Ms. Rowling. (*See* Findings of Fact ¶ 54).

386.     Significantly, RDR asserts no advice of counsel defense to rebut a finding of willful infringement. (*See* Findings of Fact ¶ 53).

387.     Because RDR is in the publishing industry, and therefore more sophisticated with respect to copyright matters, RDR's willful conduct is even more egregious. *See Castle Rock*, 955 F. Supp. at 267 (finding willfulness in part because defendant book publisher was "sophisticated" with respect to copyright matters); *Fallaci v. New Gazette Literary Corp.*, 568 F. Supp. 1172, 1173 (S.D.N.Y. 1983) (finding willful infringement where defendant newspaper publisher "was or should have been aware" that its conduct constituted copyright infringement).

388.     Further demonstrating its willful conduct and bad faith, RDR's own documents demonstrate that it sought to prevent Plaintiffs from discovering its conduct by marketing the Lexicon to foreign publishers who did not publish the *Harry Potter* books. (Findings of Fact ¶ 73. RDR and Mr. Vander Ark also knowingly used unauthorized electronic copies of Ms. Rowling's works, obtained by scanning each of those works, in preparing the Lexicon manuscript. (Findings of Fact ¶¶ 101-102).

389.     When Plaintiffs asked that RDR cease all such activities until they could review it for possible infringement, RDR continued its clandestine marketing efforts, refused to respond substantively to Plaintiffs' requests, and wrote an aggressive cease and desist letter to Warner

Bros. (*See* Findings of Fact ¶¶ 68-81, 85-93). A defendant's continued infringing activity after receiving a plaintiff's request to cease and desist from such conduct is clear evidence of willful infringement. *NFL*, 131 F. Supp. 2d at 480 (finding willfulness and awarding maximum statutory damages in part because defendant continued to infringe after receiving plaintiff's cease and desist letters); *Castle Rock*, 955 F. Supp. at 267 (finding willfulness based in part on continued publication of *Seinfeld* trivia book after receiving a cease and desist letter).

390. Further evidence of RDR's willful disregard for Plaintiffs' copyright rights is shown by RDR's refusal to provide a copy of the Lexicon manuscript for Plaintiffs to review. *See Scafa-Tornabene Art Publ. Co. v. Pride Prods. Corp.*, No. 03 Civ. 8273 (DLC)(MHD), 2007 U.S. Dist. LEXIS 66501 (S.D.N.Y., June 4, 2007) (a "failure to participate in discovery . . . warrants a higher award of statutory damages.").

391. In addition, willfulness and bad faith are shown by the double standard that RDR and Mr. Vander Ark have manifested with respect to what they believe to be Mr. Vander Ark's rights to derivative works based on Ms. Rowling's *Harry Potter* books. Mr. Vander Ark aggressively enforces his own perceived copyright rights, going so far as to join with RDR to send a cease and desist letter to Warner Bros. regarding a *Harry Potter* timeline while freely plundering Ms. Rowling's works. (*See* Findings of Fact ¶¶ 82-84).

392. Finally, willfulness and bad faith are also shown by knowing use of unauthorized and infringing electronic copies of Ms. Rowling's works, obtained by improperly scanning each of those works, in preparing the Lexicon manuscript. (*See* Findings of Fact ¶¶ 101-102.)

393.    The evidence as to RDR's conduct thus establishes bad faith, weighing against a finding of fair use, as well as willfulness, necessitating increased statutory damages as well as injunctive relief.

*      *      *

394.    Because all four of the statutory fair use factors favor Plaintiffs, and because RDR's own bad faith weighs against a finding of fair use, Defendant cannot meet its burden of establishing its affirmative defense based on the fair use exception to copyright protection.

### f.    Defendant's Case Citations Are Inapposite

395.    None of the cases that Defendant cites in support of its argument that the Lexicon is a fair use are applicable to the facts presented in this case.

396.    For example, *Blanch v. Koons* involved a visual work, not a book copying prose, plotlines and fictional facts.  467 F.3d 244 (2d Cir. 2006).  The defendant, acclaimed visual artist Jeff Koons, used plaintiff's fashion photography to create a new work of fine art that the court found to be "substantially transformative," given that Koons changed numerous visual elements of the image, including its color, background, medium, size, and details.  *Id.* at 253-54.  It also had a clearly transformative purpose, making a satirical "commentary on the social and aesthetic consequences of mass media," and was not simply attempting to repackage the plaintiff's work for its entertainment value.  *Id.* at 252-53.  Koons also copied only that portion of the work that was necessary to serve his satirical purposes (*id.* at 258), unlike the Lexicon which takes all of Ms. Rowling's creative elements.  (*See* Findings of Fact ¶¶ 97-99).  And the court reasoned that because the plaintiff had never licensed any of her photographs for use in graphic or visual art and had no plans to do so, there was no market harm.  *Id.*  In this case, the situation is quite