different, as Ms. Rowling has already entered into the market for companion books based on her own works. (*See* Findings of Fact ¶¶ 13-14).

397.    In another case involving copying of visual works rather than prose or fictional facts, *Bill Graham Archives v. Dorling Kindersley, Ltd.*, the defendant's biography of the Grateful Dead included a timeline featuring thumbnail-sized images of plaintiff's Grateful Dead posters to document the occurrence of the band's concerts. 448 F.3d 605, 609-610 (2d Cir. 2006). The Court found that the copyrighted material was used only minimally, as the images were tiny in size, constituted less than 1/5 of 1% of the total book, and were displayed with the minimal image size and quality necessary to serve the legitimate transformative purpose of using the images for their historical significance rather than their creative value. *Id*. at 611-14. And, unlike the Lexicon, the biography at issue was in a clearly different market than the derivative works the plaintiff would normally create, and therefore there was no market harm due to loss of license fees. *Id*. at 615.

398.    Defendant also relies on several Internet cases, including *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) (finding search engine using reduced-sized versions of plaintiff's images to locate images on the Internet to be fair use) and *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) (finding defendant's reproduction of plaintiff's images for use as thumbnails in defendant's search engine to be a fair use).

399.    Not only are these Ninth Circuit cases not binding on this Court, they are also not applicable to the facts presented here. First, the search engines used low-quality, thumbnail-sized images of the plaintiffs' works, unlike the wholesale taking in the Lexicon. *Kelly*, 508 F.3d at 1155; *Perfect 10*, 336 F.3d at 821. Second, those tiny, low-quality images were necessary to

Dockets.Justia.com

help the user locate the image on the Internet. By contrast, the Lexicon takes far more than necessary of Ms. Rowling's work to accomplish the purpose of locating terms in her books, as would an index. Indeed, as discussed above, the Lexicon does not even function as an index; an index would list *all* of the terms that appear in the books, and would refer the reader to the page numbers on which each term appears, which the Lexicon does not do. (Findings of Fact ¶¶ 202-207). Third, the search engines immediately link the user to the full-size original work, *see Kelly*, 508 F.3d at 1155; *Perfect 10*, 336 F.3d at 821, whereas the Lexicon includes no page citations and, in many cases, omits citations entirely. Fourth, neither plaintiff in *Kelly* and *Perfect 10* was in competition with the search engines, unlike the direct competition between the Lexicon and Ms. Rowling's existing works. Finally, neither plaintiff had evinced any definite intention of licensing their thumbnail images. *See Perfect 10*, 508 F.3d at 1168 (finding no market harm where plaintiff's ability to enter the market for thumbnail images was merely hypothetical); *Kelly*, 336 F.3d at 821-22 (same). Here, by contrast, Ms. Rowling intends to produce her own encyclopedia and has already begun work on such a book. (Findings of Fact ¶¶ 15, 17-18).

400.    RDR also relies on *Eldred v. Ashcroft*, 537 U.S. 186 (2002) (upholding the Copyright Term Extension Act of 1998), and *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir. 2001) (vacating injunction against book based on *Gone With the Wind* where it appeared money damages would be adequate), for the proposition that the fair use defense serves as an important First Amendment safeguard. Neither case has any application to the facts before this Court.

401.    In *Eldred*, the Supreme Court rejected the argument that the Copyright Term Extension Act of 1998 was an impermissible regulation of speech, noting that the fair use

doctrine affords considerable latitude for scholarship and comment. 537 U.S. at 219-20. The Court in that case said nothing, however, about the application of the fair use doctrine to any particular work. Moreover, that the fair use doctrine, in the abstract, offers protection to certain forms of expression such as criticism and commentary is irrelevant to whether a particular work such as the Lexicon, which admittedly contains little of either, is in fact a fair use.

402.     In *Suntrust*, the Court found that the book *The Wind Done Gone* was a parody of *Gone With the Wind* because it was "a specific criticism of and rejoinder to the depiction of slavery and the relationships between blacks and whites" in *Gone With the Wind*. 268 F.3d at 1269-70 (defendant's book was "principally and purposefully a critical statement"). Here, in contrast, even Mr. Vander Ark does not argue that his book's central purpose is to comment on and analyze Ms. Rowling's work. In fact, Defendants' witnesses have admitted that the opposite is true -- the Lexicon is not primarily a work of commentary or analysis. (*See* Findings of Fact ¶¶ 177-180). Thus, *Suntrust* is irrelevant to the facts of this case.

403.     RDR cites *New York Times Co. v. Roxbury Data Interface, Inc.*, 434 F. Supp. 217 (D.N.J. 1977) for the proposition that incorporating copyrighted material into a reference tool can be a fair use. That case, however, dealt with an alphabetized, 22-volume personal name index that included every personal name that appeared in the annual *New York Times* Index produced by the plaintiff, covering the years from 1851 to 1974. *Id.* at 219. The court concluded that the use was fair, in part, because if, for example, a person wanted to find all articles about someone whose career spanned 40 years, absent the defendants' work the person would have to look through 40 volumes of the *Times'* Index. *Id.* at 221. The court also relied on the fact that the underlying work was a collection of facts rather than a creative or imaginative work. *Id.* at 221 ("Since the Times Index is a work more of diligence than of originality or inventiveness,

defendants have greater license to use portions of the Times Index under the fair use doctrine than they would have if a creative work had been involved."). That the defendants had created their own arrangement rather than copying that of plaintiff, and had only copied the names themselves, also weighed in their favor. *Id.* at 223 ("defendants are expending substantial effort and money in culling the millions of personal names from over 100 volumes of the Times Index, alphabetizing those names, and editing the entries into their final form. This independent work is precisely the labor that an original indexer must undertake."). As to the fourth factor, the court concluded that there was no market harm because defendants' index was useless without plaintiffs' index, as it only referred readers to that index and not to the newspaper itself. *Id.*

404.    *Roxbury* is clearly distinguishable from this case, where the book in question, by Mr. Vander Ark's own admission (*see* Findings of Fact ¶ 205), is not an index, the material that is taken is highly creative expression as opposed to just an unprotectable list of names, the amount taken is far in excess of what could be considered reasonable, and the market harm is significant. The *Roxbury* defendants' book stands in sharp contrast to the Lexicon, which, through its wholesale copying of Ms. Rowling's *creative* works, gives its reader virtually every bit of information from the *Harry Potter* fictional world in a way that obviates the need ever to consult any of the original *Harry Potter* books  To be applicable, *Roxbury* would have to involve not only a taking of the names mentioned in the *New York Times* Index, but all of the articles in the indexed newspapers as well. Even more significantly, however, *Roxbury* was decided more than a decade before the Supreme Court's decision in *Feist* eliminated any possible argument that mere alphabetizing is sufficient for copyright protection, *see Feist*, 499 U.S. at 362 (phone directory listing names in alphabetical order was "devoid of even the slightest trace of creativity"), and thus made clear that such a use cannot be transformative.

405.    Defendant also relies on *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18 (1st

Cir. 2000) in arguing that under certain circumstances it may be fair to take the whole of a

copyrighted work. *Nunez* dealt with photographs of a model that were used in a news article

about a controversy over whether the model was an appropriate candidate for Miss Puerto Rico

Universe. *Id.* at 22. The court concluded that the use was fair because, among other things, the

photos were used for a purpose other than the one for which they were originally created

(illustrating a news article as opposed to inclusion in a modeling portfolio), using less than the

entire photos would be useless in telling the story behind the photos and controversy, and there

was no evidence that a market for the photos as illustrations for newspapers existed. *Id.* at 23-25.

Again, the case is easily distinguishable from the situation presented here, where the Defendant's

work is not transformative, the evidence demonstrates that it is possible to use far less of the

underlying copyrighted material and do far more with it, and the Defendant's work would be

sold in direct competition with Ms. Rowling's copyrighted works, including her planned

encyclopedia. (*See* Findings of Fact ¶ 229-230).

406.    Finally, RDR relies on *Wright v. Warner Books, Inc.*, 953 F.2d 731 (2d Cir.

1991), for the proposition that the benefit to the copyright owner of barring a use must be

weighed against the benefit to the public of permitting it. That case, which involved the use of

unpublished letters in a scholarly biography, is also distinguishable on its facts. The court there

found that because "marginal amounts of expressive content were taken" from the author's

letters and "what was taken represented only a small, unfeatured portion of the biography," the

biography did not pose a significant threat to the market for the letters or journals. The contrast

with the Lexicon is clear -- the Lexicon is admittedly not scholarly and it takes all of Ms.

Rowling's copyrighted expression, which accounts for virtually all of the Lexicon's content.

(*See* Findings of Fact at ¶¶ 97-99.) And far from promoting the public interest, if the Lexicon were permitted to be published it would actually harm the public interest, both by dissuading Ms. Rowling from writing more about her *Harry Potter* universe and from eliminating the incentives for all authors to create additional new works.

407.     In short, none of the cases cited by RDR are analogous, nor do they support its argument that a companion book like the Lexicon -- a book that not only copies plotlines and fictional facts, but uses Ms. Rowling's own prose to describe them -- could constitute a fair use of her works.

### 2.     Defendant Cannot Establish Copyright Misuse

408.     Defendant also asserts an affirmative defense based on Plaintiffs' alleged misuse of their copyrights in the *Harry Potter* Works. Defendant, however, has presented no evidence of copyright misuse. Rather, the undisputed evidence shows that Plaintiffs' efforts to enforce their copyrights constituted nothing other than the normal policing of their rights. (*See* Findings of Fact at ¶¶ 22-25).

409.     Copyright misuse is found "where [the copyright owner] has impermissibly extended the copyright monopoly in a manner which constitutes an unreasonable restraint on trade." *Coleman v. ESPN, Inc.*, 764 F. Supp. 290, 295 (S.D.N.Y. 1991) (rejecting summary judgment motion to dismiss copyright misuse defense).

410.     To establish a defense of copyright misuse, Defendant must prove that Plaintiffs "used [their] legal monopoly to assert economic control over uncopyrighted products." *Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, No. 98 Civ. 641 DLC, 1998 U.S. Dist.

LEXIS 6806, *49 (S.D.N.Y. April 14, 1998) (finding that defendant's copyright misuse defense to be unavailing).

411. Copyright misuse typically arises from tying arrangements, anticompetitive contracts or licensing agreements, or the refusal to license competitors. *See Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 972 (4th Cir. 1990) (holding that Lasercomb misused its copyright by including in its standard licensing agreement clauses that prevented the licensee from participating in the creation of computer-assisted die-making software); *DSC Communications Corp. v. DGI Technologies Inc.*, 81 F.3d 597, 600-01 (5th Cir. 1996) (finding copyright misuse where a copyright holder attempted to leverage its monopoly over a particular expression "in patent-like powers over a general idea").

412. Defendant is barred from asserting copyright misuse as an affirmative defense by the *Noerr-Pennington* doctrine, which shields litigants from claims relating to the filing or prosecution of litigation. *Eastern Railroad Presidents Conference v. Noerr*, 365 U.S. 127, 137-38 (1961) (holding that the Sherman Act did not apply to the mere solicitation of government action); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 670 (1965) (stating that *"Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose); *T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.*, 312 F.3d 90, 93 (2d Cir. 2002) (stating that, "The Noerr-Pennington doctrine generally immunizes from liability a party's commencement of a prior court proceeding.").

413. Courts have extended *Noerr-Pennington* to encompass concerted efforts incident to litigation, such as pre-litigation cease and desist letters. *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1560 (11th Cir. 1992) (holding that concerted threats of litigation are protected

under *Noerr-Pennington*); *see also Primetime 24 Joint Ventures v. Nat'l Broad. Co.*, 219 F.3d 92, 100 (2d Cir. 2000).

414.    The *Noerr-Pennington* doctrine applies to copyright infringement cases and to affirmative defenses. *Primetime 24 Joint Ventures*, 219 F.3d at 100 (applying *Noerr-Pennington* to copyright infringement action); *Estee Lauder, Inc. v. The Fragrance counter, Inc.*, 189 F.R.D. 269, 273 (S.D.N.Y. 1999) (applying the *Noerr-Pennington* doctrine with respect to defendant's affirmative defense).

415.    The only exception for litigation activity under the *Noerr-Pennington* doctrine is for "sham litigation," which requires a proof that: (1) the suit was "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits"; and (2) there was subjective intent to use the litigation to interfere with the business relationships of a competitor. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-62 (1993) (finding that Respondents' copyright action was not a sham litigation because it did not constitute the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief).

416.    There is no evidence that Plaintiffs' policing activities, including the sending of cease and desist letters, and the initiation of this lawsuit, have been anything other than objectively reasonable efforts to enforce their valid copyrights. The cease and desist letters sent by Plaintiffs relied on leading cases in this Circuit supporting a finding that a work such as RDR's constitutes copyright infringement. (*See, e.g.*, Pl. Ex. Nos. 15-A, 82 (citing *Twin Peaks* and *Castle Rock*)). Therefore, the *Noerr-Pennington* doctrine shields Plaintiffs from Defendant's copyright misuse defense.

417.     Even if the *Noerr-Pennington* doctrine did not apply, however, Defendant's

copyright misuse defense fails because enforcing a valid copyright, without more, is not

evidence of copyright misuse. *Interscope Records V. Kimmel*, No. 3:07-cv-0108, 2007 U.S.

Dist. LEXIS 43966, *17 n.3 (E.D.N.Y. June 18, 2007) (finding that plaintiffs' efforts to enforce

their copyrights through joint investigations and litigation was not evidence of copyright

misuse).

418.     In *Orth-O-Vision, Inc. v. Home Box Office,* the court found that bringing a

copyright infringement suit based on defendant's unauthorized transmission of the copyright

owner's audiovisual works constituted a good faith effort to enforce copyrights and therefore

could not be said to have contravened antitrust laws. 474 F. Supp. 672 686-87 (S.D.N.Y. 1979);

*Shady Records, Inc. v. Source Enter., Inc.*, No. 03 Civ. 9944 (GEL), 2004 U.S. Dist. LEXIS

26143, *2 (S.D.N.Y. Jan. 3, 2005) (holding that even if the defense of copyright misuse did exist

in the Second Circuit, making efforts to prevent defendant from reproducing registered excerpts

of its copyrighted work was permissible under the Copyright Act and did not constitute copyright

misuse).

419.     "[E]nforcing a valid copyright, without more, is not evidence of copyright

misuse." *Interscope Records*, 2007 U.S. Dist. LEXIS 43966 at *17 n.3; *see also Video Pipeline,*

*Inc. v. Buena Vista Home Entertainment, Inc.*, 192 F. Supp. 2d 321, 346 (D.N.J. 2002) ("In

seeking to enjoin further unauthorized use of [defendant's] clip previews, [plaintiff] has not

caused the video retail market to be impeded by restrictions that substantially undermine its

vitality."); *MGM Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 997 (C.D. Ca. 2006)

(stating that, "[t]he right to exclude is inherent in the grant of a copyright; a copyright is not

improperly expanded simply because the owner has exercised his or her power to exclude.")

420.    Absent any evidence of Plaintiffs' attempt to extend the scope of their copyright protection, Defendant cannot establish the defense of copyright misuse.

### 3.    Defendant's Unclean Hands Defense is Unavailing

421.    Defendant has also asserted that Plaintiffs have unclean hands that bar them from enforcing their copyrights in the *Harry Potter* works.

422.    The defense of unclean hands requires that the plaintiffs "either participated in the acts of infringement or that plaintiffs committed some 'transgression' such as fraud upon the Copyright Office resulting in harm or prejudice to the defendant." *Coleman*, 764 F. Supp. at 296; NIMMER ON COPYRIGHT § 13.09[B].

423.    Unclean hands exist "where the party asking for the invocation of an equitable doctrine has committed some unconscionable act that is directly related to the subject matter in litigation and has injured the party attempting to invoke the doctrine." *PenneCom, B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 1988).  The defense is rarely recognized in copyright actions. *Penguin Books, U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, No. 96 Civ. 4126 (RWS), 2000 WL 1028634 *19 (S.D.N.Y. July 25, 2000) (finding that defendants have failed to show any serious transgression that plaintiffs might have committed and therefore defendants' unclean hands defense was unavailing) (quoting *Broadcast Music*, 746 F. Supp. at 329).

424.    In this case, the record is devoid of any facts that would establish unclean hands. RDR has offered absolutely no evidence that Plaintiffs have participated in the infringement they allege, nor is there any evidence that they have committed any "transgression" that has in any way prejudiced Defendant.

425.    To the contrary, the evidence shows that Ms. Rowling has made use of her copyrights to serve the public good. In addition to entertaining millions of adoring fans, Ms. Rowling has donated all of the proceeds from the sales of her two Companion Books -- more than $30 million dollars to date -- to charity and has used another of her copyrighted works, *The Tales of Beedle the Bard*, similarly to raise money for charity. (4/14/08 Tr. (Rowling) 49:25-50:10; 55:1-5). Moreover, she plans to do the same with the publication of her own encyclopedia. (4/14/08 Tr. (Rowling) 49:25-50:10; 55:1-5).

### D.    Plaintiffs Are Entitled To An Injunction Preventing Defendant's Publication Of The Book.

#### 1.    Plaintiffs Are Entitled to a Presumption of Irreparable Injury

426.    A permanent injunction will appropriately issue to prevent or restrain the infringement of a copyright where money damages would not serve as an adequate remedy. 17 U.S.C. § 502; *Lauratex Textile Corp. v. Allton Knitting Mills Inc.*, 519 F. Supp. 730, 732 (S.D.N.Y. 1981) (reasoning that a permanent injunction should issue as monetary damages alone would not prevent the strong probability that the defendant would continue to infringe plaintiff's copyright).

427.    Courts have routinely held that copyright infringement gives rise to a presumption of irreparable injury. *See, e.g., ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 66 (2d Cir. 1996) (a *prima facie* case of copyright infringement supports a presumption of irreparable harm). Because the Plaintiffs have demonstrated a case of copyright infringement, and because Defendant has failed to establish any of its affirmative defenses to copyright infringement, irreparable injury will be presumed.

428.     Recently, in *eBay Inc. v. MercExchange, L.L.C.*, in the context of a patent claim, the Supreme Court applied the traditional four-part test for injunctive relief in determining whether a permanent injunction would issue, including whether the plaintiff had shown that: (1) it would suffer irreparable injury absent relief; (2) the remedies available at law were inadequate to compensate for the injury, (3) considering the balance of the hardships, a remedy in equity was warranted, and (4) the public interest would not be disserved by a permanent injunction. 126 S. Ct. 1837, 1839 (2007).

429.     However, this Circuit has not yet ruled as to whether *eBay* has eliminated the longstanding presumption that a finding of likelihood of success on the merits in a copyright infringement case gives rise to a presumption of irreparable harm.  In fact, several courts have continued to apply a presumption post-*eBay*. *See Warner Bros. Enter. Inc. v. Carsagno*, No. 06 CV 2676(NG)(RLM), 2007 WL 1655666, *6 (E.D.N.Y. June 4, 2007) (finding irreparable harm where plaintiff had demonstrated that without an injunction, its copyrighted work would be subject to continued copyright infringement); *UMG Recordings, Inc. v. Blake*, No. 5:06-CV-00120-BR, 2007 WL 1853956, *3 (E.D.N.C. June 26, 2007) (stating that irreparable injury is presumed when plaintiff succeeds on the merits); *see also* Tomas Gomez-Arostegui, "What History Teaches Us About Copyright Injunctions and the Inadequate-Remedy-At-Law Requirement," Southern Cal. Law Rev. (September 2008) (available at http://ssrn.com/abstract=1101974).  Regardless, even if irreparable injury is not presumed, Plaintiffs have presented substantial evidence that such injury would ensue as a result of the publication of the Lexicon.

## 2. The Evidence Shows That If Defendant's Book is Published, Plaintiffs Will Suffer Irreparable Injury

430.    It is clear from the testimony and other evidence in this case that Plaintiffs will suffer irreparable harm absent an injunction.

431.    First, publication of the Lexicon will cause irreparable injury to Ms. Rowling as a writer. Ms. Rowling has testified that if the Lexicon is published, it would destroy her "will or heart to continue with [writing her own] encyclopedia." (4/14/08 Tr. (Rowling) at 54:9-12). She described writing an encyclopedia as more of a chore than the fun of writing a novel (4/14/08 Tr. (Rowling) at 94:18-20), and testified that if the Lexicon were able to draw freely from her work ("They can do it very easily; they can simply lift my words verbatim wholesale, put it into alphabetical rearrangement and call it a guide." (4/14/08 Tr. (Rowling) at 54:7-9)), inevitably leading to a myriad of others doing the same thing, she would have much less incentive to write her own book. (4/14/08 Tr. (Rowling) at 54:9-12).

432.    Ms. Rowling also testified that she felt pressure to rush her encyclopedia to completion because of statements made by RDR's counsel about how long it might take her to complete it. (4/14/08 Tr. (Rowling) at 95:6-15). Ms. Rowling made it clear that rather than being rushed into producing what she viewed as an inferior book rather than making the best possible encyclopedia she could create, she would rather not write the long-planned encyclopedia at all. (4/14/08 Tr. (Rowling) at 53:17-18, 95:16-22).

433.    Publication of the Lexicon would also usurp Plaintiffs' right to publish the first complete encyclopedia, robbing Plaintiffs of the first-to-market advantage that Mr. Rapoport himself recognized. *Herbert Rosenthal Jewelry Corp. v. Zale Corp.*, 323 F. Supp. 1234, 1238 (S.D.N.Y. 1971) (irreparable harm where defendant's infringing activity could adversely affect

plaintiff's market position); (4/15/08 Tr. (Vander Ark) at 255:7-14; Pl. Ex. 30 (Landes Supp. Decl.) at ¶23, Pl. Ex. 31 (Murphy Supp. Decl.) at ¶5). Were RDR permitted to proceed, Ms. Rowling—the copyright owner and creator of *Harry Potter*—would be "scooped" from doing a companion guide based on her own original works. (Pl. Ex. 22 (Murphy Decl.) at ¶ 5; Pl. Ex. 25 (Rowling Decl.) at ¶ 9).

434.    If Ms. Rowling does not create such a work, not only would the charitable organizations that would receive the royalties from the sale of her planned encyclopedia be harmed, but so would the reading public who would be unable to enjoy such a book. (4/14/08 Tr. (Rowling) at 55:1-5). Even Professor Sorensen testified that there is significant value in an author producing a guide to their own works. (4/16/08 Tr. (Sorensen) at 565:5-7, 13-18).

435.    If works such as the Lexicon are permitted, the market would be flooded with works that simply arrange popular copyrighted works in alphabetical order in order make a profit. Ms. Rowling identified this as a specific concern, fearing that publication of the Lexicon would result in an "avalanche of dross," exploiting her readers and diminishing the distinctiveness of her own future encyclopedia. (4/14/08 Tr. (Rowling) 101:15-24).

436.    As discussed above, publication of the Book would also divert an unquantifiable number of sales from Ms. Rowling's own planned encyclopedia. (4/15/08 Tr. (Murphy) at 417:21-25; *see Wainwright Sec. Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir. 1977) (finding irreparable injury where publication of extracts of plaintiff's copyrighted materials might materially reduce the demand for plaintiff's services); *Register.com v. Domain Registry of America, Inc.*, No. 02 Civ. 6915 (NRB), 2002 U.S. Dist. LEXIS 24795, *57

(S.D.N.Y. Dec. 27, 2002) (finding irreparable harm where defendant's conduct would cause lost sales); Pl. Ex. 30 (Landes Supp. Decl. at ¶¶ 12-14; Pl. Ex. 22 (Murphy Decl.) at ¶ 3).

437.    As the Lexicon contains all of Ms. Rowling's storylines and plot points, it would also discourage readers from completing the *Harry Potter* series as the various surprises in the books would be "spoiled" (Findings of Fact ¶ 168), thus discouraging sales and readership of the *Harry Potter* novels as well.  (4/15/08 Tr. (Murphy) at 410:15-411:7; 4/14/08 Tr. (Rowling) at 103:9-22).

438.    Similarly, because the Lexicon contains all of the elements of Ms. Rowling's Companion Books, readers would have no reason to purchase either book and thus sales to those books also would suffer.  (4/14/08 Tr. (Rowling) at 101:25-102:12).

439.    Plaintiffs would also be unable to enforce their exclusive rights to license a derivative work of this kind.  *See Tom Doherty Assocs., Inc. v. Saban Entm't.*, 60 F. 3d 27, 38 (2d Cir. 1995) (irreparable harm where the defendant's conduct threatened plaintiff's exclusive license rights).  Under the Copyright Act, it is the copyright holder's right alone to make use of all of his or her original content to prepare a derivative work.  17 U.S.C. § 106.  Thus, to allow publication of a work that usurps that right would give rise to irreparable harm.

440.    Moreover, unauthorized publication of the Lexicon could depress the demand for licenses from Plaintiffs to create *Harry Potter* derivative works, and discourage the creation of such derivative works on the whole, by increasing the transaction costs for such activities.  Pl. Ex. 30 (Landes Supp. Decl.) at ¶¶25-26. Authors of future *Harry Potter* derivative works could be required to obtain licenses from both Ms. Rowling and Mr. Vander Ark, and this increased

transaction cost combined with the ensuing confusion and legal uncertainty would discourage the creation of such derivative works in the first place. *Id.*

441.    The Book's poor quality also causes irreparable harm, damaging the image of the *Harry Potter* works and detracting from the distinctiveness of Ms. Rowling's future encyclopedia. (4/15/08 Tr. (Murphy) at 408:25-409:8; *Firma Melodiya v. ZYX Music*, 882 F. Supp. 1306, 1315 (S.D.N.Y. 1995) ("inferior quality" of defendants' music compact discs and packaging would cause plaintiffs to "suffer irreparable damage to their reputation").

442.    Ms. Rowling has testified that publication of the Lexicon would not only exploit "17 years of Ms. Rowling's work," but it also would open Ms. Rowling up to the potential risk that when and if she does come out with her own encyclopedia, Mr. Vander Ark would sue her, claiming that her "paraphrase ran a little too close to his paraphrasing." (4/14/08 Tr. (Rowling) 96:10-11, 14-23). This is a real risk as Mr. Vander Ark, through RDR, has demonstrated a belief that he has rights to derivative works that he has produced based on Ms. Rowling's works. For example, Mr. Vander Ark has already represented to Warner Bros. that he owns the copyrights in a timeline based on the *Harry Potter* series. (4/14/08 Tr. (Rowling) at 97:4-7, 100:12-22). At trial, Mr. Vander Ark even admitted that he continues to pursue his claim that he holds the rights in a timeline based on fictional events within Ms. Rowling's novels. (4/15/08 Tr. (Vander Ark) at 324:23-329:6). Also, Mr. Vander Ark's Lexicon Website includes notices such as, "This is my original work. Do not copy." (4/14/08 Tr. (Rowling) at 100:18-101:7). In addition, Mr. Vander Ark has sent letters to third parties enforcing his supposed copyrights in the Lexicon Website material (4/15/08 Tr. (Vander Ark) at 312:6-313:13).

443.    Because the harm that would flow from RDR's continuing infringement, including lost sales, the loss of Ms. Rowling's right to exclusive control over derivative works and the injury to the quality of her works, cannot be compensated by money damages alone, a permanent injunction should issue. *See Lauratex Textile Corp. v. Allton Knitting Mills Inc.*, 519 F. Supp. 730, 732 (S.D.N.Y. 1981) (finding that money damages would not suffice where there was a strong probability that the defendant would continue to infringe plaintiff's copyright).

### 3.    Plaintiffs Have Shown That The Balance of Hardships Favors Them.

444.    Neither Mr. Rapoport's declaration nor his trial testimony identified *any* hardship whatsoever that would RDR would suffer if a permanent injunction was issued.

445.    The only possible harm to RDR is the loss of the chance to sell an infringing book.

446.    But the law is clear that this is not the type of hardship the law protects. *See My-T Fine Corp. v. Samuels*, 69 F.2d 76, 78 (2d Cir. 1934) (Hand, J.) ("advantages built upon a deliberately plagiarized makeup do not seem to us to give the borrower any standing to complain that his vested interests will be disturbed"); *see also Concrete Mach. Co. v. Classic Lawn Ornaments*, 843 F.2d 600, 612 (1st Cir. 1988) (internal quotations and citations omitted) ("[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration . . . . Such considerations apply even to a business which is exclusively based on an infringing activity and which would be virtually destroyed by a preliminary injunction."); *Apple Computer Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983), *cert. dismissed*, 464 U.S. 1033 (1984) (internal citations omitted) (if defendant's reliance on

infringing activity for survival barred issuance of injunction, "a knowing infringer would be permitted to construct its business around its infringement, a result we cannot condone.").

447. Thus, the balance of the hardships weighs in favor of Plaintiffs.

### 4. **Issuing a Permanent Injunction Would Best Serve the Public Interest.**

448. Issuing an injunction would benefit the public as it would preserve the rights guaranteed to authors under the Copyright Act. *Propet USA, Inc. v. Shugart*, No. C06-0186-MAT, 2007 U.S. Dist. LEXIS 94979, *7 (W.D. Wash. Dec. 13, 2007) (stating that the "public interest is served by upholding copyright protections").

449. Copyright law encourages individuals to create new and original works by providing them with the necessary rights to protect the fruits of their labor. U.S. Const., art. I, § 8, cl. 8 (stating that the purpose of copyright law is to promote "the Progress of Science and useful Arts"). It also allows creators to reap the benefits of having the exclusive right to prepare derivative works based on their original works. Issuing an injunction in this case would work to uphold these rights. § 107; *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, No. 04 CV 977, 2007 U.S. Dist. LEXIS 88763 (M.D.N.C. Nov. 30, 2007) (stating that there is substantial public interest in preserving a copyright holder's exclusive rights).

450. Courts have recognized that, "[s]ince Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work." *Apple Computer,*, 714 F.2d at 1255 (quoting *Klitzner Indus., Inc. v. H.R. James & Co.*, 535 F. Supp. 1249, 1259-60 (E.D. Pa. 1982)). This concept lies at the heart of this

case. In order to carry out the goals of the Copyright Act, Plaintiffs respectfully request that the Court permanently enjoin RDR from publishing the Lexicon.

451.    Ms. Rowling herself has testified that the Lexicon has disincentized her from working on her own encyclopedia (4/14/08 Tr. (Rowling) at 94:24-95:5). The purpose of the copyright law, however, is to encourage authors, especially talented authors like Ms. Rowling, who is so loved by so many readers, to create new works. There is a clear public interest in encouraging Ms. Rowling to write more about *Harry Potter*.

452.    Publication of the Lexicon, however, also has broader implications than the effect on Ms. Rowling's creative output. There is a very real possibility that it would send a message to other authors that they cannot expect their works to be protected, effectively disincentivizing them to create new works in direct contravention of the central purpose of the Copyright Act to promote "the Progress of Science and useful Arts." U.S. Const., art. I, § 8, cl. 8. As Ms. Rowling herself stated, "when [she] had been literally choosing between food and a typewriter ribbon, [ ] had [ she] been told [she] did not own these words, these words were not [hers], they could be taken, lifted by anyone and resold under a different author's name . . . [she] would have found that quite devastating." (4/14/08 Tr. (Rowling) at 93:20-94:10). Thus, issuance of an injunction would benefit all creators who want to know that their works would be protected and could not be so easily usurped by third parties.

453.    Enjoining publication of the Lexicon would also incentivize authors like Mr. Vander Ark  who base their works on the works of others to do more than simply rehash the original author's material. This would encourage them to add something new or create their own expression, in further keeping with the policy underlying the Copyright Act.

\*     \*     \*

454.    In light of the foregoing, this Court finds that injunctive relief is proper and hereby issues a permanent injunction in the form of Order attached hereto as Exhibit C.

**E.     Plaintiffs Are Entitled to Statutory Damages**

455.    Plaintiffs seek statutory damages based on Defendant's infringement of the seven *Harry Potter* novels, two Companion Books, the *"The Daily Prophet"* and the Famous Wizard Cards.

456.    This Court has the discretion to award statutory damages as it wishes in order deter this type of infringing conduct, in the amount of $750 to $30,000 per work if non-willful or up to $150,000 per work if the infringement is found to be willful. 17 U.S.C. § 504. In awarding statutory damages, the Court has broad discretion to set the amount of the award within the statutory limits. *Fitzgerald*, 807 F.2d at 1116-17.

457.    In calculating an award of statutory damages, courts are free to consider all available evidence and are not bound by a rigid formula. *See id.*; *NFL*, 131 F. Supp. 2d at 472-82. Courts are not bound, for example, to limit the award in light of the evidence regarding actual damages. *Stevens v. Aeonian Press, Inc.*, No. 00 Civ. 6330(JSM), 2002 WL 31387224 *3 (S.D.N.Y. Oct. 23, 2002) ("statutory damages awards frequently greatly exceed the actual damages shown"); *Wilen v. Alternative Media Net, Inc.*, No. 03CIV2524(RMB)(JCF), 2005 WL 167589, at *5 (S.D.N.Y. Jan. 26, 2005) (ignoring absence of evidence regarding parties' profits and losses and awarding heightened damages solely based on defendant's willfulness and the need for deterrence).

140

458.     RDR's willful infringement is a "key factor" of central importance in setting the appropriate statutory damages award. *NFL*, 131 F. Supp. 2d at 472-82 (finding infringement was not "innocent" and awarding heightened statutory damages).  The amount of statutory damages awarded should also be sufficient to deter RDR from such cavalier conduct in the future, and also to dissuade Mr. Vander Ark from continuing to infringe Plaintiffs' or anyone else's works. *See Van Der Zee v. Greenidge*, No. 03 Civ. 8659, 2006 WL 44020, at *2 (S.D.N.Y. Jan. 6, 2006) ("As the defendants are in the book publishing business and in a position to repeat the unauthorized reproduction of copyrighted material, there is deterrent value in assessing damages against defendants."); *Stevens*, 2002 WL 31387224 at *3 (considering the deterrent effect on third parties as well as on the defendant).

Dated: New York, New York
     May 9, 2008

By: _____
     Dale M. Cendali (DC-2676)
     Claudia Ray (CR-4132)
     Melanie Bradley (MB-0823)
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
Tel.: 212-326-2000
Fax: 212-326-2061

Counsel for Plaintiffs
Warner Bros. Entertainment, Inc.
 and J.K. Rowling